**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

KARST ENVIRONMENTAL EDUCATION          )
AND PROTECTION, INC.,                   )
WARREN COUNTY CITIZENS FOR              )
MANAGED GROWTH, GAYLA CISSELL,          )
JIM DUFFER and ROGER BRUCKER            )
                                         )
Plaintiffs                              )
                                         )   CIVIL ACTION NO.
v.                                       )
                                         )
U.S. ENVIRONMENTAL PROTECTION           )
   AGENCY,                               )
U.S. HOUSING AND URBAN DEVELOPMENT,)
and                                      )
TENNESSEE VALLEY AUTHORITY               )
                                         )
Defendants.                             )

\* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Karst Environmental Education and Protection, Inc. ("KarstEEP"), Warren County Citizens for Managed Growth, Gayla Cissell, Jim Duffer and Roger Brucker, state as follows:

### INTRODUCTION

1.    The Kentucky Trimodal Transpark ("Transpark"), as proposed, is a 4,000-6,000-acre integrated road, air and rail industrial park in north Warren County, Kentucky, approximately six miles south of Mammoth Cave National Park. Because the Transpark development is a major federal action significantly affecting the quality of the human

1

environment, and threatens to destroy unique historical, cultural and environmental resources, Plaintiffs bring this action for declaratory and injunctive relief to require Defendants to comply with their duties under the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA").

## JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 5 U.S.C. § 704, 29 U.S.C. § 1331(a), 28 U.S.C. § 2201-2202, and 28 U.S.C. § 1361. Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## PARTIES

3.    Plaintiff Karst Environmental Education and Protection, Inc. ("KarstEEP") is a non-profit Kentucky corporation whose mission is to educate and advocate towards the goal of protecting, conserving, and defending karst, karst systems, and karst landscapes. KarstEEP's Board of Directors includes individuals who have been involved in opposition to the Transpark since 1999 due to its proximity to Mammoth Cave National Park and its inappropriate siting on the vast cave, sinkhole and karst terrain of north Warren County, Kentucky.[1] KarstEEP has

---

[1]Mammoth Cave, the world's largest known cave system, is the heart of the south central Kentucky karst, an integrated set of subterranean drainage basins covering more than 400 square miles. On the surface is a biologically diverse set of ecosystems inextricably linked with the ecosystems underground. This

spent organizational resources opposing the Transpark complex. Defendants' actions have injured, and are continuing to injure, KarstEEP's aesthetic, ecological and recreational interests.

4.    Plaintiff Warren County Citizens for Managed Growth, Inc. ("WCCMG") is a non-profit Kentucky corporation registered as Citizens for Managed Growth, Inc. and doing business as WCCMG.    WCCMG's purpose is to support development that follows established principles and practices generally referred to as "smart growth" and to oppose development that meets the criteria of "sprawl." Members of WCCMG have an interest in protecting the environment, preserving prime farmland and farmland of statewide importance, preserving historical and cultural resources and communities, and protecting natural resources such as Mammoth Cave National Park. WCCMG has spent organizational resources opposing the Transpark complex. Defendants' actions have injured, and are continuing to injure, WCCMG's aesthetic, recreational, cultural and historical interests.

5.    Plaintiff Gayla Cissell is a resident of Warren County, Kentucky and a member of the Board of Directors of

---

physiographic province, with Mammoth Cave National Park at its core, was declared by the United Nations as an International Biosphere Reserve and World Heritage Site in 1990. The Park is home to more than 70 federally threatened, endangered or state listed species.

WCCMG. She lives on the edge of the Transpark development and passes the complex each day driving to and from work. Defendants' actions have injured, and are continuing to injure, Ms. Cissell's aesthetic, cultural and historic interests in preserving her rural community.

6.    Plaintiff Jim Duffer is a resident of Warren County, Kentucky and serves as chairman of the Board of Directors of WCCMG. Defendants' actions have injured and continue to injure Mr. Duffer's aesthetic, cultural and historic interests in preserving his rural community.

7.    Plaintiff Roger Brucker has worked as an adjunct professor at Western Kentucky University in Bowling Green for many years, teaching summer courses in speleology at Mammoth Cave National Park, and has authored several well-known books on Mammoth Cave and other caves in the south central area of Kentucky. He is a founding director of the Cave Research Foundation and a member of the Board of Directors of KarstEEP. Defendants' actions have injured, and continue to injure, Mr. Brucker's aesthetic, ecological and recreational interests in protecting karst and karst ecosystems.

8.    Defendant U.S. Environmental Protection Agency ("EPA") is an agency of the United States Government and is responsible    for    ensuring    compliance    with    federal

4

environmental laws, including NEPA, in conjunction with federally funded projects. EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark. EPA has initiated no NEPA process with respect to these infrastructure projects.

9. Defendant U.S. Department of Housing and Urban Development ("HUD") is an agency of the United States Government and is responsible for ensuring compliance with the applicable federal laws cited above in conjunction with federally funded development projects. HUD's spending authorization bill for federal fiscal year 2005 appropriated a total of $1.75 million for a training center that is already under construction at the Transpark. The Training Center is the location where both a cave and prehistoric Native American remains were recently uncovered during site preparation. No NEPA process has been initiated under HUD's auspices.

10. Defendant Tennessee Valley Authority ("TVA") is an agency of the United States Government and is responsible for ensuring compliance with the applicable federal laws cited above, in conjunction with federally funded projects. TVA has acknowledged that public funds have been allocated by TVA to Bowling Green Metalforming,

5

LLC, a manufacturing plant under construction at the Transpark, but the agency has refused to disclose any details about this funding. TVA has exempted its involvement in the Transpark project from NEPA and NHPA review.

## STATEMENT OF FACTS

11.   The Kentucky TriModal Transpark ("Transpark"), as proposed, is an $80 million 4,000-6,000-acre integrated road, air, and rail complex in north Warren County, KY, approximately six miles south of Mammoth Cave National Park.  The local governments of the City of Bowling Green, Kentucky and Warren County, Kentucky, have supported the Transpark.   The Warren County Fiscal Court established South Central Kentucky Regional Development Authority ("SCKRDA"), a non-profit industrial development authority to finance the acquisition of property for and the development of the Transpark project. The SCKRDA's Board of Directors includes both the Warren County Judge Executive and the Mayor of Bowling Green.

12.   The Warren County Fiscal Court established the Inter-Modal Transportation Authority ("ITA") as a non-profit, non-stock Kentucky corporation to act as the agency and instrumentality of the county in acquiring, developing and financing public improvements and public projects,

6

specifically the Transpark complex. ITA has committed public funds for land acquisition and demolition of the existing rural and residential development at the site, including cultural and historic resources, to make such land available for private and public industrial and commercial activities. The ITA Board of Directors includes the Mayor of Bowling Green.

13. The ITA's January, 2001 *Business and Finance Plan* for the Transpark states that the project will be financed by, among other sources, federal and state grants. The *Official Statement* by ITA's bond counsel for a January, 2005 issuance of $6.64 million in bonds by ITA provides that debt payments would be made, in part, by government grants.

14. The Transpark has already benefited from, and is based on, pervasive federal action in the form of financial assistance from EPA, HUD and TVA as well as the Federal Aviation Administration and Federal Highway Administration.

15. Although the Federal Highway Administration ("FHWA") is not a defendant in this action, FHWA's spending authorization bills for fiscal years 2003 through 2005 appropriated a total of $8.7 million for road infrastructure for the Transpark complex. Of this total, $5.25 million was allocated to a new interstate interchange

at I-65 for the Transpark, and $1.7 million was awarded for the Transpark interior road, although ITA and the Kentucky Transportation Cabinet ("KYTC") subsequently "rejected" the money and the road has been built. $2 million has been awarded for expansion of US 68/80 through the Transpark. FHWA began a NEPA and NHPA study process in 2003 for the Transpark's interior road, but halted that process when the ITA and KYTC rejected the federal money. FHWA improperly segmented the I-65 interstate interchange project and began a NHPA study process in 2004 which is still pending. However, this pending study focuses only on the I-65 interchange rather than on the comprehensive, integrated Transpark project, including the expansion of US 68/80.

16.   The Federal Aviation Administration ("FAA"), also not a defendant in this action, has been involved in the Transpark project for several years. The FAA funded a risk analysis study in 2001 and a cost-benefit analysis in 2004 to study the feasibility of closing the existing local general aviation airport and replacing it with a new regional commercial service airport at the Transpark complex. The footprint of a proposed North-South runway is included in FHWA's study maps of the Transpark.

8

17. Construction on at least 300 acres of the
Transpark has begun (including demolition of structures
described below), including the TVA-supported Bowling Green
Metalforming, LLC facility, an automobile parts
manufacturing facility, as well as an interior road, water
and sewer infrastructure, and a training facility. On
information and belief, a portion of the funding for such
construction was federal funding from one or more of the
Defendants. However, funding for a substantial portion of
the demolition and construction that has occurred has come
from local government loans or bonds or other local
government obligations for which the local government
entities intend to seek reimbursement from the Defendants
or other federal agencies, after the work has been
completed and after there has been an irreplaceable
commitment of resources, but without the protections and
processes required by NEPA and NHPA. Moreover, Defendants
are (or should be) aware of this scheme to obtain federal
approvals and funding while avoiding compliance with these
statutes.

18. As this project has proceeded, the Defendant
federal agencies have not only failed to designate a lead
agency for purposes of compliance with NEPA, but also have
failed to prevent the Transpark's developer, ITA, from

initiating site development and demolition activities in contravention of federal law. Plaintiffs, members of the public, environmental organizations, elected officials from the city of Oakland and the National Trust for Historic Preservation have all expressed these concerns to the federal agencies, to no avail.

19.  The Oakland-Freeport Historic District was listed by the National Park Service on the National Register of Historic Places ("National Register") on August 2, 2004, achieving a goal of the 1999 *Oakland Rural Village Focal Point Plan*, which had been formally adopted as part of the *Bowling Green-Warren County Comprehensive Land Use Plan*. Other communities adjacent to the Transpark are eligible for listing and have initiated the application process.

20.  In the period from January 10, 2004 and March 16, 2004, ITA or its agents commenced and completed the demolition of certain potentially eligible historic buildings within the boundaries of the Transpark and proximate to the Loving/Sunnyside communities, Reconstruction Era African-American communities which contain structures and a graveyard eligible for listing on the National Register.  The Defendants have violated Section 106 of the NHPA by willfully disregarding the destruction of potentially eligible historic properties and

allowing the ITA to commence demolition prior to seeking necessary federal approvals for the project, in order to preclude and avoid the requirements of Section 106. Based upon information and belief, the following is a partial list of residences, outbuildings and cultural landscapes that have been demolished or destroyed to date:

> (1) 206 Hayes Martin Road--listed as Site 14 in FHWA's Section 106 Study Process for the new I-65 Transpark interchange initiated in June 2004. At that time, comments were submitted by the Consulting Parties noting that this structure, dated 1860-1875, had already been demolished in the site work for Bowling Green Metalforming.

> (2) 809 Glasgow Road.

> (3) 1075 Glasgow Road--listed as Site 12 in FHWA's Section 106 Study Process for the new I-65 Transpark interchange initiated in June 2004. Comments were submitted by the Consulting Parties that noted that this structure, dated 1925-1949, had already been demolished in the site work for Bowling Green Metalforming.

> (4) Five barns have also been demolished on these properties.

21. On information and belief, in the period from January 1, 2005 through February 28, 2005, ITA or its agents, in the course of constructing roads or water/sewer infrastructure and the HUD supported training center, punched an opening into an archaeological site in a

sinkhole, consisting of a 2,000 foot long cave and the bones of two Native Americans dating from 5000-3500 B.C.E., as well as several ancient drawings on hardened mud and limestone. Due to the filling of substantial sinkholes on the Transpark site that has already occurred during the ongoing construction, it is possible that irreplaceable archaeological sites have been harmed or destroyed. The Smithsonian Institution, National Museum of Natural History, warned ITA by letter in 2001 of its concern regarding the impact of the proposed Transpark on the "rich and unique cultural heritage of the region" and that "the cave and karst sinkhole landscape of the region has yielded. . . a remarkably well-preserved record of ancient human societies." This warning was borne out by the 2005 intrusion into a cave and the discovery of prehistoric human remains.

## COUNT I

22. Plaintiffs repeat and reallege the foregoing allegations.

23. Section 106 of the NHPA, 16 U.S.C. § 470f, prohibits federal agencies from engaging in any federal undertaking (or federally assisted or licensed undertaking) unless the agency first  (1) takes into account the effects

of the undertaking on historic (including archaeological) properties, including both properties listed on the National Register and those deemed eligible for listing; and (2) affords the Advisory Council on Historic Preservation ("Advisory Council") a reasonable opportunity to comment on the undertaking. National Register properties, listed or eligible, can include above-ground districts such as a collection of related buildings on acreage (a farmstead with outbuildings and associated land as a cultural landscape), sites, buildings, structures and objects, as well as archaeological sites.

24.    The Advisory Council is an independent federal agency responsible for the implementation and enforcement of the NHPA. 16 U.S.C. §470s. The Advisory Council has promulgated regulations implementing the requirements of the NHPA at 36 C.F.R. Part 800.

25.    36 C.F.R. Sec. 800.2 defines "undertaking" as follows:

> [A]ny project, activity, or program that can result in changes in the character or use of historic properties, if any such historic properties are located in the area of potential effects. The project, activity, or program must be under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency. Undertakings include new and continuing projects,

13

> activities, or programs and any of
> their elements not previously
> considered under Section 106.

26. The Transpark project is a federal undertaking within the meaning of Section 106, because it is a project or activity that is unavoidably under the direct or indirect jurisdiction of at least one federal agency and licensed or assisted by at least one federal agency. The relationship between the Transpark elements and road projects are long-standing, integral and closely coordinated, both in terms of the planning process and the project's purpose and need. "*Inter-modal*" and "*Trans-park*" mean integration of different methods of transportation, specifically road, rail and air, all of which are transportation elements of this development proposal. The Transpark site is bounded on the south by I-65 (a new interstate interchange is proposed to serve the Transpark), on the north by US 31 (a connector road from the new I-65 interchange to US 31 is proposed), and is bisected by US 68/80 (the portion of this road at the intersection of US 31 has recently been widened and serves as the entrance to the Transpark). One of the proposed corridors for I-66 (the Kentucky portion of the coast-to-coast Transamerica Highway) bisects the Transpark site in Warren County.

14

27.    EPA, HUD and TVA jurisdiction over the project requires compliance with Section 106 of the NHPA prior to agency funding or approval of any aspect of the project. By failing to identify and take into account the effects of the Transpark on historic properties, by failing to afford the Advisory Council and the Kentucky State Historic Preservation Officer ("SHPO") an opportunity to comment on the effects of the Transpark on historic properties, and by failing to seek and consult with Consulting Parties and the public under 36 C.F.R. Part 800 on what properties might be listed or eligible for the National Register, what alternatives to the action would be available, and what the effects of the Transpark project might be prior to demolition activities, Defendants have violated Section 106 and its implementing regulations.

28.    Defendants' violations of the NHPA constitute agency action that is unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

### COUNT II

29.    "Anticipatory demolition" means the demolition or destruction of historic or archaeological properties in anticipation of review under Section 106 of the NHPA, in order to avoid and preclude the possibility of taking into

15

account the effects of the project on those historic properties and affording the Advisory Council, the Kentucky SHPO, Consulting Parties, and the public an opportunity to comment, as required by Section 106.

30. The Advisory Council has adopted a policy on "anticipatory demolition" under Section 106. That policy provides in part as follows:

> I.    Anticipatory demolition is inconsistent with the intent and spirit of the National Historic Preservation Act, and should be discouraged by all Federal agencies.
>
> II.   Federal agencies should ensure that anticipatory demolition does not occur in connection with projects they undertake, and do everything feasible to discourage it with respect to projects in which Federal assistance or permits may be directly or indirectly involved.
>
> III.  Within the scope of their legal authority, agencies should decline to provide assistance or permits to applicants who demolish historic properties during the application process, or shortly before it is initiated. Where demolition occurs substantially before the application process is initiated, the Federal agency receiving the application should renew the matter carefully to determine whether

the demolition constituted a deliberate effort to frustrate Section 106 review; if so, the agency should decline to provide assistance or permits.

31. Defendants have violated Section 106 by failing to exercise their authority to prevent or delay the destruction of historic properties prior to compliance with Section 106.

32. The demolition that has already occurred at the Transpark also violates Section 110(k) of the NHPA, which prohibits federal assistance to projects that involve anticipatory demolition. Section 110(k) specifically bans federal funding to applicants who either intentionally harm historic properties in order to avoid Section 106 review or allow a third party to harm historic properties when the applicant has the "legal power to prevent" the demolition. 16 U.S.C. § 470h-2(k); 36 C.F.R. Sec. 800.9(c)(1).

33. The statutory violations described above constitute agency action that is unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

## COUNT III

34.  Plaintiffs repeat and reallege the foregoing allegations.

35.  The funding, permitting and construction of the Transpark project is a "major federal action significantly affecting the quality of the human environment," within the meaning of Section 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(C), and the Council on Environmental Quality ("CEQ") regulations implementing NEPA, 40 C.F.R. Part 1500 et seq.

36.  Because the Transpark is a "major federal action significantly affecting the quality of the human environment," NEPA requires Defendants to prepare and circulate for public and interagency comment an Environmental Impact Statement, a detailed statement on the proposed project, identifying and discussing in detail the following:

> (i)   the environmental impact of the proposed action,
>
> (ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv)  the relationship between local and short-term uses of man's

18

> environment and the maintenance
> and enhancement of long-term
> productivity, and
>
> (v)    any irreversible and
>        irretrievable commitments of
>        resources which could be
>        involved in the proposed action
>        should it be implemented.
>
> 42 U.S.C. § 4332 (C).

37.   Defendants are also required by NEPA to "study, develop, and describe appropriate alternatives" to the proposal because the project involves "unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).

38.   Defendants have violated NEPA by failing to prepare an Environmental Impact Statement for the entire Transpark project.

39.   Defendants' violations of NEPA described above constitute agency action that is unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

**WHEREFORE**, Plaintiffs respectfully request this Court to grant the following relief:

1. Declare that Defendants have violated Sections 106 and 110(k) of NHPA, and Section 102 of NEPA.

2. Order Defendants to comply with Sections 106 and 110(k) of NHPA before issuing any permit or approval related to the Transpark project.

3. Order Defendants to comply with Sections 106 and 110(k) of NHPA before awarding, granting, reimbursing, or paying in any way any funds to any entity engaged in any aspect of the Transpark project.

4. Order Defendants to ensure that any entity that has already received any funds, or promises or a guarantee of funds, from Defendants related to the Transpark project refrain from any action that may adversely affect listed or eligible cultural and historic resources unless and until this Court has determined that the Defendants have fully complied with the requirements of the NHPA.

5. Order Defendants to complete an Environmental Impact Statement on the Transpark project before any further consideration of any application for federal permits, approvals or funding.

6. Award Plaintiffs their attorneys' fees, costs, and disbursements.

7.    Award such other and further relief as the Court may deem appropriate.

Respectfully submitted,


W. Henry Graddy, IV
KBA Bar No. 26350
W. H. GRADDY & ASSOCIATES
103 Railroad Street
P.O. Box 4307
Midway, KY 40347
859-846-4905
e-mail: hgraddy@aol.com

AND

David Bookbinder
D.C. Bar No. 455525
Sierra Club
408 C Street, NE
Washington D.C.  20002
202-548-4598
e-mail:
david.bookbinder@sierraclub.org


By: *David Bookbinder*
    David Bookbinder

Dated: 15 June 2005