UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION      )
AND PROTECTION, INC., et al.,      )
                                   )
Plaintiffs,                        )
                                   )
v.                                 )     CIVIL ACTION NO.
                                   )
U.S. ENVIRONMENTAL PROTECTION      )
AGENCY, et al.,                    )
                                   )
Defendants.                        )

\* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
### FOR PRELIMINARY INJUNCTION

The Kentucky Trimodal Transpark ("Transpark") is a 4,000-6,000-acre integrated road, airport and rail industrial complex in north Warren County, Kentucky, near the City of Bowling Green.

Defendant federal agencies – the U.S. Environmental Protection Agency ("EPA"), U.S. Department of Housing and Urban Development ("HUD") and the Tennessee Valley Authority ("TVA")-- are major funders of the Transpark. As such, the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA") impose upon Defendants a variety of statutory obligations. Unfortunately, Defendants have chosen to ignore, and in some instances actively conspired to evade, these requirements. As a result, the Transpark development is

already significantly affecting the quality of the human environment, has destroyed historic resources, and is threatening to destroy more unique natural, cultural and historic resources.    Plaintiffs therefore seek a preliminary injunction halting further irreparable damage to unique natural, cultural and historic resources.

**STATEMENT OF FACTS**

**Adverse Impacts to Historic Properties**

The Transpark developer is the Intermodal Transportation Authority ("ITA"), an agent of Warren County and the City of Bowling Green, Kentucky.   ITA has already acquired approximately 800 acres for the Transpark, and construction (including demolition of existing structures) has begun on at least 300 acres, including the TVA-supported Bowling Green Metalforming, LLC, as well as an interior road, water and sewer infrastructure, and a training facility.

In the period from January 10, 2004 to March 16, 2004, the ITA or its agents commenced and completed the demolition of certain potentially eligible historic buildings within the boundaries of the Transpark complex and proximate to the Loving/Sunnyside communities, unincorporated Reconstruction Era African-American communities which contain structures and a graveyard

eligible for listing in the National Register of Historic Places.   Each of these properties demolished contained structures (e.g., homes and outbuildings) more than 50 years old that were set in rural landscapes that are likely to possess historical significance in an agricultural context. Cissell Declaration, para. 2. The following is a partial list of residences, outbuildings and cultural landscapes that have been demolished or destroyed to date:

>    (1) 206 Hayes Martin Road--listed as
>    Site 14 in FHWA's Section 106 Study
>    Process for the new I-65 Transpark
>    interchange initiated in June 2004. At
>    that time, comments were submitted by
>    Consulting Parties noting that this
>    structure, dated 1860-1875, had already
>    been demolished in the site work for
>    Bowling Green Metalforming.
>
>    (2) 809 Glasgow Road.
>
>    (3) 1075 Glasgow Road--listed as Site
>    12 in FWHA's Section 106 Study Process
>    for the new I-65 Transpark interchange
>    initiated in June 2004.  At that time,
>    comments were submitted by Consulting
>    Parties that noted that this structure,
>    dated 1925-1949, had already been
>    demolished in the site work for Bowling
>    Green Metalforming.
>
>    (4) Five barns have also been
>    demolished on these properties.
>
>    Pl.Ex. 1; Pl. Ex. 2; Pl. Ex. 3.

This "anticipatory demolition" was only the beginning. Sometime between January 1, 2005 and February 28, 2005, a

3

construction crew at the Transpark working on a retention basin that is part of the HUD-funded training center punched an opening into an archaeological site, consisting of a 2,000 foot long cave and the bones of two Native Americans dating from 5000-3500 B.C.E., as well as several ancient drawings on hardened mud and limestone.  Pl. Ex. 4. The ITA's public announcement of the intrusion ironically required the rescheduling of its "groundbreaking" ceremony for the training center.  The groundbreaking was held a few days later and the construction was moved away from the cave, which the ITA claims it has sealed. Pl. Ex. 5.

Due to the filling of substantial sinkholes on the Transpark site that has already occurred during the ongoing construction, it is very likely that other irreplaceable archaeological sites have been harmed or destroyed. Declaration of Dr. Mike May, para. 5.  The Smithsonian Institution, National Museum of Natural History, warned ITA by letter in 2001 of its concern regarding the impact of the proposed Transpark on the "rich and unique cultural heritage of the region" and that "the cave and karst sinkhole landscape of the region has yielded. . . a remarkably well-preserved record of ancient human societies." Pl. Ex. 6.

4

The Oakland-Freeport Historic District was listed by the National Park Service in the National Register of Historic Places on August 2, 2004. Pl. Ex. 7. This rural historic district, on the periphery of the Transpark, shares the same access roads, US 68/80 and US 31W. As a result of the industrial development at the Transpark site, the Oakland-Freeport Historic District is already adversely impacted by the increased traffic volume, the operation of heavy equipment, and other environmentally hazardous conditions created by demolition and construction activities. Other communities adjacent to the Transpark, subject to direct, indirect and cumulative adverse effects, are eligible for listing and have initiated the eligibility process. Pl. Ex. 8. Clearly, the ongoing demolition and industrial development will adversely impact these historic districts but, as discussed below, this fact is going unnoticed due to the Defendant agencies' failure to require compliance with the Section 106 process of the NHPA.

Additional demolition is imminent. On May 12, 2005, the ITA published a Request for Proposal to demolish and dispose of more structures at the Transpark site in the local newspaper. Pl. Ex. 9. The federal agencies involved with the Transpark development have done nothing to prevent

further destruction prior to Section 106 review. See discussion of Section 106 review, below.

**Significant Environmental Impacts**

In addition to these historic resource impacts, the Transpark has significant environmental impacts as well. To begin with, the majority of the Transpark site consists of federally designated "prime farmland" under the Federal Farmland Policy Protection Act which has already been or will be lost if the unregulated development is allowed to continue.

More to the point, the filling of sinkholes and construction of stormwater drainage facilities has impacted the numerous subterranean watercourses that flow through the Transpark. May Decl. para. 4 and 5.

Furthermore, the ITA's consultants identified wetlands that are protected under section 404 of the Clean Water Act that have now been filled by the Bowling Green Metalforming construction. Id. However, in response to a Freedom of Information Act request, the U.S. Army Corps of Engineers reported no records responsive to Section 404 nationwide or individual permits for Bowling Green Metalforming or the Transpark. Pl. Ex. 10 and May Decl. para.6.

Finally, ITA's consultant discovered the presence of at least four federally threatened and endangered species

6

at the site. Pl. Ex. 11. Following this 2001 report, there has been no discussion by any of the Defendant agencies concerning the presence of the Kentucky Cave shrimp, the Indiana bat, the gray bat and Eggert's sunflower at the Transpark site, or the impacts that the Transpark development will have on them.

**Federal Agency Involvement in Transpark**

The ITA's January, 2001 *Business and Finance Plan* for the Transpark states that the project will be financed by, among other sources, federal and state grants. Pl. Ex. 12. The *Official Statement* by ITA's bond counsel for a January 2005 issuance of $6.64 million in bonds by ITA provides that debt payments would be made, in part, by federal government grants.[1] Pl. Ex. 13.

The Transpark has already benefited from, and is based on, pervasive federal action in the form of financial assistance from EPA, HUD and TVA as well as the Federal Highway Administration and Federal Aviation Administration. EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark. Pl. Ex. 14. Upon information and belief, this appropriation has not yet

---

[1] ITA's President has acknowledged that federal funds have gone into the infrastructure "surrounding" the Transpark and added that an Environmental Impact Statement would "significantly delay any additional construction." *Bowling Green Daily News*, "Cave Found on Transpark Land," February 10, 2005. Pl. Ex. 5.

been awarded, although it has been applied for and the application is believed to be currently pending. The water/sewer infrastructure now built was paid for by local government bonds intended to be repaid by the federal grant.

HUD's spending authorization bill for federal fiscal year 2005 appropriated a total of $1.75 million for a training center that is already under construction at the Transpark. Pl. Ex. 15.

TVA has acknowledged that public funds have been allocated by TVA to Bowling Green Metalforming, LLC, a manufacturing plant under construction at the Transpark, but TVA has refused to disclose any details about this funding. Pl. Ex. 16. TVA has exempted its involvement in the Transpark project from NEPA and NHPA review. Pl. Ex. 17. Inexplicably, TVA completed a perfunctory checklist in which, *inter alia*, it concluded that there were no other federal agencies involved, that the project did not involve a larger pattern of development, and that the project was not publicly controversial and posed no environmental or historic property impacts. *Id.*

Although the Federal Highway Administration ("FHWA") is not a defendant in this action, FHWA's spending authorization bills for fiscal years 2003 through 2005

8

appropriated almost $9 million for road infrastructure for the Transpark project. Of this total, $1.7 million was awarded for the Transpark "interior road." FHWA began an NHPA study process in 2003 for the Transpark's interior road, to comply with NHPA and NEPA requirements. See Pl. Ex. 18. Clearly, this agency recognized that the "interior road" within the Transpark was part of a larger development and triggered an agency obligation to comply with these laws. This compliance was halted when the ITA and Kentucky Transportation Cabinet ("KYTC") rejected the federal funds. The admitted purpose for "rejecting" federal money was to avoid having to comply with NEPA and NHPA "at the earliest possible time." Pl. Ex. 19. The interior road was subsequently constructed with a KYTC "grant." See Pl. Ex. 1, photos 7, 8 and 9. As ITA President Jim Hizer explained to a local news reporter:

> Federal funds have gone into infrastructure surrounding the transpark but we have been careful not to use those funds. Therefore we are not required to follow all those guidelines.

Pl. Ex. 5, page 4.

Congress has also appropriated $2 million for FHWA's expansion of the US 68/80 entrance into and through the Transpark, which construction is complete. Pl. Ex. 20. FHWA

9

compliance with NEPA and NHPA for this construction is unknown. There have been no public notices regarding federally required studies accompanying this expenditure of federal funds.

Congress also appropriated $5.25 million for a new interstate interchange at I-65 and a connector road for the Transpark. The proposed federally funded "Connector Road" element is, in fact, the first local segment of a new $6 billion interstate highway proposal through Kentucky (I-66). Pl. Ex. 21. Once again, this federal agency, FHWA, through its agent KYTC, began a NEPA and NHPA study process for only the proposed I-65 interchange and connector road in 2004. On December 15, 2004, KYTC released to the Consulting Parties involved in the NHPA Section 106 process for the segment a description of the "Area of Potential Effect" to listed and eligible historic and archaeological properties. Pl. Ex. 22. KYTC's and FHWA's Area of Potential Effect excluded the acreage of the Transpark which is currently under construction and where demolition or relocation of eligible historic properties have been undertaken.

In summary, one federal agency has twice recognized the obligation to comply with NEPA and NHPA for smaller segments of the overall project, but no agency has actually

conducted any study where the buildings are being demolished, cultural landscapes destroyed, wetlands filled, and buildings and roads and infrastructure are being constructed, and prehistoric Native American burial sites are being opened up.

The Federal Aviation Administration ("FAA"), also not a defendant in this action, has been involved in the Transpark project for several years; a 10,000 foot runway remains part of the Transpark plan – hence the name "Inter-Modal."  The FAA funded ITA to conduct a risk analysis study in 2001 and a cost-benefit analysis in 2004 to study the feasibility of closing the existing local general aviation airport and replacing it with a new regional commercial service airport at the Transpark. Pl. Ex. 23.

**ARGUMENT**

**I.   DEFENDANTS SHOULD BE ENJOINED FROM FURTHER VIOLATIONS OF THE NATIONAL HISTORIC PRESERVATION ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT**

A party is entitled to an injunction upon establishing: (1) absent relief, the movant will suffer irreparable harm; (2) issuance of an injunction will not substantially harm other parties; (3) there is a strong showing of likelihood to prevail on the merits; and (4) the public interest favors relief. See Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921 (D.C.

11

Cir. 1958). The burden on the party seeking the injunction is to show "either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977). Each of these factors favors the issuance of injunctive relief in this case.

**A. Plaintiffs Will Suffer Irreparable Injury Unless Defendants are Enjoined From Providing Federal Assistance to the Transpark.**

The Supreme Court held in Amoco Production Company v. Village of Gambell, Alaska, et al., 480 U.S. 531, 544-45, 107 S.Ct. 1396, 1404 (March 24, 1987) that "[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action." This is clearly the situation in the instant case, because Defendants failed to adequately evaluate the environmental impacts of the Transpark development. Following the holding of Village of Gambell, the First Circuit in Sierra Club v. Marsh, 872 F.2d 497 (1st Cir. 1989), stated:

> To repeat, the harm at stake in a NEPA violation *is* a harm to the *environment,* not merely to a legalistic "procedure". . . But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation.

12

> The difficulty of stopping a bureaucratic steam roller, once started,...still seems to us a perfectly proper factor for a district court to take into account when assessing that risk, on a motion for a preliminary injunction.
>
> 872 F.2d 496 at 504.

See also Realty Income Trust v. Eckerd, 564 F. 2d 447, 456 (D.C. Cir. 1977), "Ordinarily when an action is undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance."

Injunctive relief is clearly necessary in the instant case to prevent the Defendants from funding or entertaining requests for funding further building demolition, destruction of cultural landscapes, or construction of water/sewer/road infrastructure prior to compliance with NEPA and NHPA.

The NEPA rules of the Council on Environmental Quality ("CEQ") obligate federal agencies to commence their NEPA process "at the earliest possible time," and include an affirmative duty to initiate planning and consultation for actions that are planned by private applicants or other non-Federal entities *before Federal involvement* (emphasis added). 40 C.F.R. Sec. 1501.2(d). Additionally, the CEQ rules require federal agencies to take appropriate action

13

to ensure that the goals and objectives of NEPA are achieved when it becomes aware that a private or other non-Federal entity is undertaking action that would have an adverse environmental impact or limit the choice of reasonable alternatives, such as construction and demolition that precludes alternative site evaluation. 40 C.F.R. Sec. 1506.1.

The same presumption of irreparable injury applies to violations of the NHPA. As many courts have recognized, "demolition is generally irreparable." WATCH v. Harris, 603 F.2d 310, 312 n.2 (2d Cir. 1979); see also National Trust for Historic Preservation v. Blanck, 938 F. Supp. 908, 910 n.2 (D.D.C. 1996), aff'd per curiam, 203 F.3d 53 (D.C. Cir. 1999); Save the Courthouse Committee v. Lynn, 408 F. Supp. 1323, 1342 (S.D.N.Y. 1975); Boston Waterfront Residents Association v. Romney, 343 F. Supp. 89, 91 (D. Mass. 1972) ("The act of demolition is irrevocable. Consideration of alternative plans ... is permanently foreclosed once the structures have been razed.").

**B.  Plaintiffs Are Likely to Prevail on the Merits**

The NHPA sets forth the policy of the federal government to provide leadership in the preservation of America's historic resources and to "administer federally owned, administered, or controlled . . . historic resources in a spirit of stewardship for the inspiration and benefit of present and future generations." 16 U.S.C. § 470-1(3). At issue here are Defendants' violations of two separate NHPA obligations.

### 1. Defendants Violated Section 106 of NHPA

Section 106 of the NHPA prohibits federal agencies from engaging in any federal undertaking unless the agency first (1) takes into account the effects of the undertaking on historic properties; and (2) affords the Advisory Council on Historic Preservation ("Advisory Council") a reasonable opportunity to comment on the undertaking "prior to" the issuance of a license or the approval of federal assistance. *Id.* § 470f.

The Advisory Council is an independent federal agency responsible for implementing and enforcing the NHPA. 16 U.S.C. § 470s. The Advisory Council's regulations, which are binding on all federal agencies, establish a consultation process that agencies must complete before approving any undertaking.

15

First, the federal agency, in consultation with the State Historic Preservation Officer ("SHPO")[2] must make a "reasonable and good faith effort" to identify all historic properties that may be affected by the undertaking and must assess the effects of the project on those properties. *Id.* Secs. 800.4, 800.5. If the effects of the project will be adverse, the agency must then seek ways to avoid, minimize, or mitigate those adverse effects, in consultation with the SHPO, the Advisory Council, Consulting Parties and the public. *Id.* Sec. 800.6. The Section 106 review process is concluded by the execution of a "Memorandum of Agreement" ("MOA"), *Id.* Sec. 800.5(c), which operates to "govern the undertaking and all of its parts," in particular mitigation for adverse effects. 16 U.S.C. § 470h-2(1).[3]

Second, the demolition of buildings within the Transpark is an undertaking that clearly has an adverse effect on historic properties, requiring consultation under Section 106. <u>See</u> *Id.* Secs. 800.5(a)(2)(i) and (ii) (Adverse effects on historic properties include "[p]hysical destruction of or damage to all or part of the property" and "[a]lteration of a property...") <u>Don't Tear it Down,</u>

---

[2] The SHPO is the state official responsible for assisting federal agencies in carrying out their historic preservation responsibilities under16 U.S. C. § 470 (b); 36 C.F.R. Sec. 800.2 (c) (1).
[3] Alternatively (and rarely) the Section 106 consultation process is "terminated," and the Section 106 review is concluded by the Advisory Council's issuance of formal comments and the formal response thereto by the head of the federal agency. *Id.,* 36 C.F.R. Sec. 800.7.

Inc. v. General Services Administration, 401 F. Supp. 1194
(D.D. C. 1975).    Accordingly, the Section 106 regulations
require TVA, HUD and EPA to seek ways to resolve adverse
effects, in consultation with the Kentucky SHPO, the
Advisory Council, Consulting Parties, and the public. 36
C.F.R. Secs. 800.4, 800.5.

Notwithstanding this clear adverse effect, the
Defendants failed to require the ITA, the "responsible
party," to comply with the consultation process set forth
in the Section 106 regulations prior to the demolition of
the above referenced properties and have taken no steps to
require such compliance prior to the pending demolition of
other eligible properties.

There can be no question that compliance with NEPA and
NHPA is required "at the earliest possible time." Clearly,
FHWA recognized that the "interior road" within the
Transpark was part of a larger development and triggered an
agency obligation to comply with these laws. This
compliance was halted only when the ITA and Kentucky
Transportation Cabinet ("KYTC") rejected the federal funds.
The admitted purpose for "rejecting" federal money was to
avoid having to comply with NEPA and NHPA "at the earliest
possible time." Again, when Congress appropriated $5.25
milliion for a new I-65 interstate interchange and a

17

connector road for the Transpark, FHWA recognized the need to begin a NEPA/NHPA study process. Thus, one federal agency (FHWA) has twice recognized the obligation to comply with NEPA and NHPA for smaller segments of the overall project, but no agency has actually conducted any study where buildings are being demolished, cultural landscapes irrevocably altered, wetlands filled, prehistoric Native American burial sites uncovered, and infrastructure constructed.

Specifically, the Defendants failed to require the ITA, the responsible party, to assess the effects of the project on historic properties in accordance with the regulatory criteria, and to consult with the Kentucky SHPO, the Advisory Council, Consulting Parties and the public to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties, as required by 36 C.F.R. Secs. 800.5, 800.6(a).    Instead, the Defendants did nothing to advise the ITA that it would jeopardize its potential for federal funding when the ITA unilaterally decided to demolish potentially eligible historic properties without consulting with the Kentucky SHPO, the Advisory Council, Consulting Parties and the public.

18

Agencies may not attempt to substitute their own "unilateral determinations" for the consultations mandated by Section 106. "Without consultation" an agency has "no reasonable basis" for making determinations about identifying adverse effects on historic properties and appropriate mitigation measures. Attakai v. United States, 746 F. Supp. 1395, 1407 (D. Ariz. 1990); Committee to Save Cleveland's Huletts v. U.S. Army Corps of Engineers, 163 F. Supp.2d at 790 (agency's informal consultation with SHPO is no substitute for the process mandated by the Section 106 regulations, which "contemplate a far more formal procedure").

On May 12, 2005, the ITA advertised for bids to conduct more demolition of existing buildings, without any evidence that any Defendant intends to perform its NHPA duties, making this application to this Court all the more urgent.

## 2. Defendants Violated Section 110 of NHPA

Section 110(a) of the NHPA requires each Federal agency to "assume responsibility" for preserving historic properties it owns or controls. *Id.* § 470h-2(a)(1). In addition, Section 110(a) requires each federal agency to establish a preservation program that shall ensure "(E) that the agency's procedures for compliance with Section

19

106(i) are consistent with regulations issued by the [Advisory] Council." *Id.* § 470h-2(a)(2)(E)(i).

By allowing the "anticipatory demolition" of the historic resources described above last year, and by taking no action to stop the next round of demolition as announced by ITA in the May 12, 2005 advertised request for proposals, Defendants are each violating the NHPA, causing irreparable injury to the plaintiffs.

### 3.  **Defendants Violated NEPA**

Each of the Defendants has published regulations for complying with NEPA.

EPA regulations for implementing NEPA are located at 40 C.F.R. Part 6. Sec. 6.100, Purpose and Policy, commits the agency to integrate NEPA requirements as early as possible in the agency planning process. "The environmental review process shall be the focal point to assure NEPA considerations are taken into account." EPA has failed to follow its own regulations.

HUD regulations for complying with environmental review requirements under NEPA are at 24 C.F.R. Part 58, and include the identification of the "responsible entity" for environmental responsibilities as the recipient of HUD financial support. 24 C.F.R. Sec. 58.2. These regulations

require the "responsible entity" to comply with NEPA. 24 C.F.R. Sec 58.10.

TVA procedures for complying with NEPA are published in a guidance document entitled "Procedures for Compliance with the National Environmental Policy Act," published at 47 *Federal Register* 54586-54593 (December 3, 1982) and finalized at 48 *Federal Register* 19264 (April, 1983). These procedures incorporate the CEQ NEPA regulations at 40 C.F.R. Part 1500 et seq.   According to Sec. 5.1 of the Procedures,   TVA   is   "responsible   for   integrating environmental considerations . . .at the earliest possible time to insure that potential environmental effects are appropriately considered . . ." The agency has failed to follow its own guidelines.

The   Defendants   have   violated   NEPA   by   failing   to designate   a   lead   agency   and   cooperating   agencies   for preparation of an Environmental Impact Statement for the entire Transpark project.

The Defendants each have the legal power to prevent the non-federal project partners from taking actions that foreclose   an   objective   review   of   alternatives   by   the responsible   federal   agencies   prior   to   the   irreversible commitment of resources, and prior to the destruction of natural, cultural and historic resources, where the project

21

is fundamentally dependent upon federal funding, the local government funding with bonds is secured in part by the promise to pay with federal funds, and the Defendants have notice that those demolition activities by ITA were in anticipation that ITA would qualify for federal funds, and would apply for and would receive federal funds.

The Defendants were and are under a legal obligation to warn ITA that demolition and construction, and other irreversible commitment of resources prior to NEPA compliance, could disqualify ITA from federal funding. The Defendants were and are under a legal obligation to warn the ITA that such premature action could require a federal agency that awarded funding prematurely to then take action to recover such funds. Each federal agency, including each Defendant, must instruct ITA to stop all demolition and construction activities if ITA intends to receive and retain federal funds; if ITA elects not to stop demolition and construction, it must withdraw all applications for federal assistance and it must return to the federal agencies all funds received prematurely as must Bowling Green Metalforming, LLC, and any other entity that has already received federal assistance for the Transpark.

In Citizens Alert Regarding the Environment v. United
States Department of Justice, 1995 WL 748246 (D.D.C. 1995)
("CARE I"), this Court considered a request for injunctive
relief that is strikingly parallel to the Transpark.    The
Lackawanna County Chamber of Commerce and its economic
development agent wanted to develop a new industrial park.
Because the site was forested, there was no utility service
and no adequate road access to the site; substantial
infrastructure needs would have to be constructed.    In
1995, when this matter came before the Court, construction
of the water line, the access road and the storm water
management system had begun.    Construction of the sewer
line was imminent.

Citizens Alert Regarding the Environment ("CARE")
sought a preliminary injunction to compel the Bureau of
Prisons ("BOP") and the Department of Commerce ("DOC") to
comply with their NEPA obligations.    Previously, on April
8, 1994, the DOC had issued a six page environmental
assessment ("EA") and a Finding of No Significant Impact
("FONSI"), but had determined that a full EIS was not
needed for the business park as a whole – despite the fact
that a full EIS was required for the prison.    The BOP had
not begun work on that EIS.    In October 1994, BOP released

23

a draft environmental impact statement for the prison project alone.

This Court found that "It is clear that from the beginning there was close cooperation and collaboration between the BOP and the Chamber with respect to the business park and the prison project." In considering each of the elements that must be established to warrant a preliminary injunction, this Court ordered:

> Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with Defendants who receive actual notice of this Order, not to engage in construction, removal of vegetation, construction of utilities, roads, or other infrastructure, or other alteration of natural conditions in connection with the Federal Bureau of Prison's proposed minimum security prison camp on Moosic Mountain, or in connection with the proposed Moosic Mountain Business Park, or to assist in, provide funding for, or allow others subject to their control to engage in such construction ...pending further orders of this Court...

CARE I, *supra*, page 12.

The lack of coordination between federal agencies in the Transpark case closely resembles the circumstances in CARE I. The close coordination between the ITA and the individual federal agencies from whom ITA has sought support resembles the relationship in CARE I. The

24

commencement of demolition and construction in this case, prior to full compliance with NEPA by preparing a project-wide EIS, parallels that same failure in CARE I.   This Court should apply the preliminary injunction criteria and issue a similar order as was issued in CARE I.

As Circuit Judge Skelly Wright explained the purpose and requirements of NEPA in Foundation on Economic Trends v. Heckler, 756 F. 2d 143, 146-147 (D.C. Cir.1985):

> On January 1, 1970 the National Environmental Policy Act became law. Recognizing "the profound impact of man's activity on the interrelation of all components of the natural environment," 42 U.S.C. §4331(a), Congress sought to fulfill the responsibilities of each generation as trustee of the environment for succeeding generations". *Id.*, §4331(b)(1) . . . Two fundamental principles underlie NEPA's requirements: federal agencies have the responsibility to consider the environmental effects of major actions significantly affecting the environment, and the public has the right to review that consideration. Baltimore Gas & Electric Co. v. Natural Resources Defense Council, 462 U.S. 87, 103 S. Ct. 2246 (1983). NEPA's dual mission is thus to generate federal attention to environmental concerns and to reveal that federal consideration for public scrutiny.

Since its inception, the Transpark is a development proposal that has been marketed to the public and the

business and financial community as an integrated, multimodal complex that required federal assistance. In fact, it *has* received federal assistance, in the form of a TVA grant and Congressional earmarks for road, water, sewer, and other infrastructure. The Defendants have been "missing in action" despite NEPA's clear mandate to begin planning at the earliest possible time (40 C.F.R. Sec. 1501.2), to plan for actions of private applicants even before federal involvement *(Id.)*, and to designate a lead agency for NEPA compliance when more than one federal agency is involved in the same action or a proposal that is functionally interdependent or geographically proximate (40 C.F.R. Sec. 1501.5(a)).

**II. NO IDENTIFIABLE HARM OUTWEIGHS THE IRREPARABLE INJURY TO PLAINTIFFS THAT WOULD RESULT IF FURTHER DEMOLITION AND CONSTRUCTION IS NOT ENJOINED OR THE STRONG PUBLIC INTEREST FAVORING INJUNCTIVE RELIEF**

> "The environmental harm which NEPA seeks to prevent is the additional risk posed to the environment by uninformed decision making . . . and a resultant agency commitment to its uninformed decision."

Marsh, *supra*, 714 F.Supp. at 586. No applicant for federal funding can have a legitimate interest or right to the continued violation of the requirements of NEPA.

Even if an injunction would result in financial costs to the ITA, irreparable damage to the historic buildings

and to the karst landscape in and cave system underlying the sinkhole plain easily outweighs this monetary cost. See Save the Courthouse Committee v. Lynn, 408 F. Supp. 1323, 1343 (S.D.N.Y. 1975). While an injunction may delay demolition, "delay is better than hasty and irreversible action." Society for the Protection of New Hampshire Forests v. Brinegar, 381 F. Supp. 282, 289 (D. N.H. 1974), Steubing v. Brinegar, 511 F.2d 489, 497 (2d Cir. 1975). Compliance with the NHPA, like similar environmental laws, "invariably results in delay and concomitant cost increases, and Congress has implicitly decided that these costs must be discounted."

Indeed, the Defendants and the ITA were fully aware of the concerns over the failure to comply with Section 106 and NEPA requirements as a result of the Plaintiffs' prior correspondence back to 2001. Under these circumstances, any monetary costs to the ITA associated with an injunction are attributable to the ITA's own actions.

Moreover, the public interest strongly favors an injunction. It is the declared national policy of this country that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of

27

orientation to the American People."    16  U.S.C.  §
470(b)(2). As the NHPA emphasizes:

> *the preservation of [our Nation's] irreplaceable
> heritage is in the public interest* so that its vital
> legacy   of   cultural,   educational,   esthetic,
> inspirational, economic, and energy benefits will be
> maintained and enriched for future generations of
> Americans.

*Id.* § 470(b)(4) (emphasis added).

Taken as a whole and even viewed in the light most
favorable to the Defendants, the record irrefutably
demonstrates that the Defendants have disregarded and
violated their respective congressionally mandated
responsibilities under the NHPA and NEPA. This Court should
enjoin the Defendants from providing funding to the ITA
conditioned upon the ITA and its agents ceasing any further
demolition of eligible buildings, destruction of cultural
landscapes, filling of wetlands, construction of
water/sewer/road infrastructure and intrusion into
prehistoric Native American burial sites until the federal
agencies subject to NEPA and NHPA have fully complied with
same, so that the important mandates of the NHPA and NEPA
will not be subverted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion for a preliminary injunction be granted.

                    Respectfully submitted,

                    W. Henry Graddy, IV
                    KBA Bar No. 26350
                    W. H. GRADDY & ASSOCIATES
                    103 Railroad Street
                    P.O. Box 4307
                    Midway, KY 40347
                    859-846-4905
                    e-mail: hgraddy@aol.com

                    AND

                    David Bookbinder
                    D.C. Bar No. 455525
                    Sierra Club
                    408 C Street, NE
                    Washington D.C.  20002
                    202-548-4598
                    e-mail:
                    david.bookbinder@sierraclub.org

                    By: _David Bookbinder_
                        David Bookbinder

Dated: 15 June 2005