## DECLARATION OF DR. MIKE MAY

1. Pursuant to 28 U.S.C. 1746 and under penalty of perjury, Dr. Mike May states as follows:

2. I have provided sworn testimony in regard to the adverse impacts of the Transpark on groundwater previously in the context of prior rezoning applications, and I have complained numerous times from 2000-2003 that the environmental impacts to groundwater and surface water in this karst area had not been fully investigated. I am a registered professional geologist by exam (ASBOG) in the Commonwealth of Kentucky, an associate professor of Geology at Western Kentucky University, and have experience with two major petroleum companies and two environmental consulting companies. I have provided technical support for expert witness testimony for several consultants and law firms in the Commonwealth and surrounding areas in karst terrain. I continue to be an active member of the Karst Education & Environmental Protection, Inc. (KarstEEP), a cadre of various experts in several states working to educate and protect delicate karst resources. I was also a member of the City of Bowling Green, Storm Water Advisory Committee (SWAC) from 2002-2003 and helped to get Bowling

1

Green's permit submitted to USEPA as a Phase II Storm Water Rule compliant community.

3. My testimony before the Warren County Planning Commission on several occasions from the period of 2002 to 2003 was focused on my concern over the concerted effort on the part of the proponents to purposely segment the development of proposed Kentucky Trimodal Transpark. I firmly believe that proponents of the Transpark have not addressed issues in particular those of an environmental nature as outlined in the National Environmental Policy Act (NEPA).

4. In my professional opinion, there has already been a negative impact on the Graham Springs karst groundwater basin which drains under the industrial complex already constructed for Bowling Green Metalforming, LLC. Most of this damage would be in the form of mobilization of fine-grained materials of clay and silt size into the subsurface karst conduits. Mobilization of fines is known to have negative impacts on fauna in both karst and surface waters. During construction at the site, I witnessed that silt fences had done little to protect the watershed, as numerous sinkholes and solution-enlarged fractures were illegally plugged with multiple loads of trucked in rip-rap limestone blocks and then back filled with mostly clayey

2

soil on the site. Many fine-grained materials obviously went into the subsurface.

5. It is my opinion that surface modification of the karst drainage network has already resulted in changes to the subsurface flow network. This was particularly evident during construction of the Metalforming site where I have seen aerial photos of holes opening up due to regolith (soil arch) collapse into karst systems that obviously had undergone a changed flow capacity due to surface modification. In my opinion, there will be future negative impacts to the karst basin. For example, where storm water retention ponds have been constructed, numerous sinks have been plugged and these will likely open up in the future and could decrease water quality and even flood dry cave passages that harbor rich archaeological remains as well as ecological resources including many threatened and endangered species. Before there is modification of additional hundreds of acres in the Graham's Springs Basin karst watershed, the watershed should be investigated adequately. Likewise, there should be a complete analysis of the four pathways of potential concern – air, groundwater, surface water (to which karst waters discharge such as the Barren River), and soil/rock. This has not been completed heretofore in detail relative to what should be

3

conducted for a project of this proposed size of 4,000 plus acres.

5. In fact, there have been no geologic characterizations of the site by academically trained geologists or full-fledged site characterization or analysis of alternative sites that one would expect under NEPA. It is my professional opinion that testimony by experts for the proponents has not addressed the NEPA process in any shape or form, considering especially, the cumulative environmental effects of this project.

6. There have also been wetlands that have been graded and filled in without getting U.S. Army Corp of Engineers permits. Wetland areas in karst, not unlike other areas, are known to have filtering capacities for polluted water. These areas have also been disregarded by the developers.

_____
Dr. Mike May

Commonwealth of Kentucky
State at Large

Subscribed, sworn to, and acknowledged before me by Dr. Mike May, this _12_ day of June, 2005.

_____
NOTARY PUBLIC

My Commission Expires: _7-13-08_

4