No. 1:05-CV-01190-RMU

---

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC.,
WARREN COUNTY CITIZENS FOR MANAGED GROWTH,
GAYLA CISSELL, JIM DUFFER and ROGER BRUCKER

Plaintiffs

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, U.S. HOUSING AND
URBAN DEVELOPMENT, and TENNESSEE VALLEY AUTHORITY

Defendants

---

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND SUGGESTION
OF LACK OF JURISDICTION**

---

June 27, 2005

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Maureen H. Dunn
General Counsel

Harriet A. Cooper
Assistant General Counsel

Frank H. Lancaster

Maria V. Gillen
Telephone 865-632-7741

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

**Page**

STATEMENT ................................................................................................................ 1

    I.   Introduction ..................................................................................................... 1

    II.   Facts ................................................................................................................ 3

ARGUMENT ............................................................................................................... 4

    I.   Plaintiffs' Alleged Injuries Cannot Be Redressed by Enjoining TVA. ........... 4

    II.   Plaintiffs Have Not Established That They Are Entitled to a
Preliminary Injunction. ................................................................................... 9

        A.  Plaintiffs have not shown a substantial likelihood of success on the
merits. ....................................................................................................... 9

           1. NEPA ................................................................................................ 10

           2. NHPA ................................................................................................ 14

        B.    Plaintiffs have not shown that they would suffer irreparable harm
without Injunctive Relief. ...................................................................... 16

        C.  Plaintiffs have not shown that a preliminary injunction would not
substantially harm other interested parties. ........................................... 19

        D.  The issuance of an injunction would not be in the Public Interest. ......... 19

CONCLUSION ........................................................................................................... 21

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMIBA

KARST ENVIRONMENTAL )
EDUCATION AND PROTECTION, INC., )
WARREN COUNTY CITIZENS FOR )
MANAGED GROWTH, GAYLA )
CISSELL, JIM DUFFER and ROGER )    No. 1:05-CV-01190-RMU
BRUCKER )
 )
Plaintiffs )
 )
v. )
 )
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, U.S. HOUSING AND URBAN )
DEVELOPMENT, and TENNESSEE )
VALLEY AUTHORITY )
 )
Defendants )

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND SUGGESTION
OF LACK OF JURISDICTION**

**STATEMENT**

**I. Introduction**

This is an action seeking to halt development of the Kentucky Trimodal

Transpark (Transpark), an integrated industrial complex in north Warren County,

Kentucky.  The complaint alleges that the Tennessee Valley Authority (TVA) and two

other federal agencies, the United States Environmental Protection Agency and the

United States Department of Housing and Urban Development, violated sections 106 and

110(k) of the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470f, 470h-2(k)

(2000), and section 102(2)(C) of the National Environmental Policy Act (NEPA), 42

U.S.C. § 4332(C) (2000), in connection with their activities at the Transpark.  Plaintiffs,

two not-for-profit organizations and three individuals, have moved for a preliminary

1

injunction.  Specifically, Plaintiffs ask this Court to order TVA to comply with procedural requirements of the NHPA and NEPA *before* disbursing federal funds to the Inter-Modal Transportation Authority (ITA), the developer of the Transpark, and to order TVA to enforce ITA's compliance with the NHPA and NEPA by withholding future grants of federal funds.

With regard to TVA, there is simply no federal action for this Court to enjoin. TVA has no relationship with the ITA, has never awarded federal funds to the ITA, has entered into no agreement to provide any funds to the ITA, and has no plans to provide funding to the ITA and its agents for Transpark activities.  TVA did award a modest economic development grant to a *tenant* of the Transpark, Bowling Green Metalforming LLC (Metalforming) on August 12, 2004, for the purchase of equipment.  In September 2004, TVA disbursed all the funds that it agreed to pay to Metalforming.  TVA has made no further payments to Metalforming.  Metalforming has made no further application to TVA for funding. TVA is under no obligation to provide any further funding to Metalforming and has no plans to do so.

Moreover, as Plaintiffs themselves admit (Pls.' Br. at 8), TVA has performed the required review under NEPA and the NHPA and determined that the Metalforming project that TVA funded qualified for a categorical exclusion under TVA's NEPA procedures.  Plaintiffs' motion to preliminarily enjoin TVA should be denied because there is no relief for the Court to provide to Plaintiffs, and Plaintiffs cannot demonstrate a likelihood of success on the merits.  Further, if Plaintiffs fail to establish their standing to assert a claim against TVA, the Court should dismiss TVA as a defendant for want of jurisdiction.

## II.  Facts

TVA is authorized by sections 22 and 23 of the Tennessee Valley Authority Act to foster the proper physical, economic, and social well-being of the TVA region. 16 U.S.C. §§ 831u, 831v (2000).  As part of this statutory mission, TVA provides business loans and grants to encourage economic development in the Tennessee Valley. In March 2004, Metalforming submitted a Request for Valley Advantage Agreement in the amount of $500,000 to TVA's Economic Development Division.  Barker Declaration ¶ 3.  The project funds were requested for the purchase of equipment that would not be central to plant operation.  Zotto Declaration ¶ 5.  Pursuant to TVA's NEPA procedures, TVA conducted an environmental review, and determined that the noncentral new equipment qualified for a categorical exclusion.  Zotto Declaration ¶¶ 6-7.  Under regulations implementing NEPA, categorical exclusions are defined as groups of actions that, under normal circumstances, do not have significant effects, either individually or cumulatively, on the environment and for which neither an Environmental Assessment (EA) nor an Environmental Impact Statement (EIS) is required.  *See* 40 C.F.R. § 1508.4; TVA NEPA Procedures § 5.2 (attached as Exhibit B to the Zotto Declaration).  TVA also conducted a review under section 106 of the NHPA and determined that the proposed TVA funding, which was for ancillary equipment to be installed in a building already being constructed, did not have the potential to affect historic structures.  Graham Declaration ¶ 5.

Upon completion of the required environmental reviews, TVA awarded the grant to Metalforming and paid the entirety of that grant in September 2004.  Barker Declaration ¶ 6.  Metalforming has provided TVA with documentation confirming that it used the TVA funds to purchase electrical equipment.  Barker Declaration ¶ 7.  Since

TVA's September 2004 payment, TVA has made no further payments to Metalforming, and Metalforming has made no further application to TVA for the payment of any money. Barker Declaration ¶ 8. TVA has no plans to provide further funding to Metalforming. Barker Declaration ¶ 9.

TVA has provided no funds to the ITA, and has entered into no agreement to provide any funds to the ITA. Barker Declaration ¶ 10. TVA has no plans to provide funding to the ITA or its agent for Transpark activities. Barker Declaration ¶ 11. Construction of the Metalforming facility at the Transpark is complete. Morgan Declaration ¶ 4.

## ARGUMENT

### I.    Plaintiffs' Alleged Injuries Cannot Be Redressed by Enjoining TVA.

Plaintiffs cannot obtain the relief they seek from TVA because TVA has never been involved with the ITA, has no power over construction activities at the Transpark, and is involved in no federal action at Metalforming.

It is clear from Plaintiffs' pleadings and papers that they seek to halt construction of the Transpark. See Compl. ¶¶ 17, 20, 21, 27, 31, 32; Pls.' Mot. for Preliminary Injunction (requesting the Court to order Defendants to prevent "further anticipatory demolition of eligible historic resources and irreparable injury to natural and cultural resources," and "continuing excavation, demolition and construction and . . . other irrevocable commitment of resources for the development of the Transpark"). Plaintiffs define the "project" that they seek to arrest as the entire Transpark project. See, e.g., Compl. ¶¶ 1, 3, 4, 15, 16, 17, 26, 27, 38 (characterizing the "project" at issue in this lawsuit as "the Transpark development," "the Transpark complex," and "the entire Transpark project"). Accordingly, the focus of Plaintiffs' requested relief is the entity

that controls Transpark development, the ITA.   See Req. for Relief ¶ 2-5; Pls.' Mot. for

Preliminary Injunction at 1 ("Plaintiffs seek a preliminary injunction . . . enjoining

Defendants . . . from providing funding to the Intermodal Transportation Authority.").

Enjoining TVA will not redress Plaintiffs' alleged injury because TVA has no

authority, statutory or contractual, over ITA.  The Supreme Court's recent decision in

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) is controlling.  In

that case, the Federal Motor Carrier Safety Administration (FMCSA) promulgated

regulations establishing a new operating application form for Mexican motor carriers and

establishing a safety-inspection regime for all Mexican motor carriers that received

operating authority.  *Id*. at 756.  Public Citizen argued that FMCSA's Environmental

Assessment of its new regulations violated NEPA by not taking into account the effect of

increased cross-border operations of Mexican motor carriers that would result from the

lifting of a presidential moratorium on the entry of Mexican motor carriers.  *Id*. at 767.

The Supreme Court rejected this argument, under which "an agency's action is

considered a cause of an environmental effect even when the agency has no authority to

prevent the effect," *id*., because such a level of causation would fulfill neither of the

informational purposes behind NEPA's EIS requirements, *id*. at 768 (concluding that

because the FMSCA "simply lack[ed] the power to act on whatever information might be

contained in the EIS [that considered the increased cross-border operations]," it had no

responsibility to consider that factor in its NEPA analysis).  The Court held that *"where*

*an agency has no ability to prevent a certain effect due to its limited statutory authority*

*over those actions, the agency cannot be considered the legally relevant cause of the*

*action." Id.* at 770 (emphasis added); *see also Metro. Edison Co. v. People Against*

*Nuclear Energy*, 460 U.S. 766, 774 (1983) ("Our understanding of the congressional concerns that led to the enactment of NEPA suggests that the terms 'environmental effect' and 'environmental impact' in § 102 be read to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue."). Courts have interpreted NEPA and the NHPA similarly and have applied the same reasoning in addressing claims under each statute. *See, e.g., Sugarloaf Citizens Ass'n v. F.E.R.C.*, 959 F.2d 508, 515 (4th Cir. 1992); *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1484 (10th Cir. 1990); *Ringsred v. City of Duluth*, 828 F.2d 1305, 1309 (8th Cir. 1987).

Under the foregoing principles, TVA cannot be held legally responsible for the alleged environmental effects caused by the Transpark development because TVA had and has no authority to prevent those alleged effects; TVA has no statutory or contractual authority to regulate ITA's actions.

Nor would an injunction serve any purpose with regard to TVA's small grant to Metalforming, a tenant of the Transpark. TVA granted funds for the purchase of equipment. TVA disbursed those funds in September 2004. Barker Declaration ¶ 6. TVA has no further plans to provide funding to Metalforming. Barker Declaration ¶ 9. Metalforming has completed construction on its facility. Morgan Declaration ¶ 4. Indeed, a Bowling Green newspaper reported that Plaintiffs' attorney, W. Henry Graddy, IV, admitted that "the basic structures for Bowling Green Metalforming are essentially complete, and so would probably not be affected by [Plaintiffs'] request [for an injunction]." Jim Gaines, *Suit Filed to Stall Transpark*, Bowling Green Daily News (June 16, 2005), *available at*:

http://www.bgdailynews.com/articles/stories/public/200506/16/4uu5_top-news.html.

Hence, TVA's action is complete and Metalforming is not undertaking the demolition or

construction activities that Plaintiffs seek to stop.

A claim made under NEPA or the NHPA does not present a live controversy

when the proposed action has been completed and no effective relief is available.  *See,*

*e.g.*, *One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 893 (8th Cir. 2004)

(completion of construction process mooted plaintiffs' NEPA claim for declaratory and

injunctive relief); *Benavides v. Hous. Auth. of the City of San Antonio*, 238 F.3d 667,

669-70 (5th Cir. 2001) (completed demolition and completed agency NHPA review

mooted plaintiffs' claim for prospective injunctive relief under the NHPA); *Bayou*

*Liberty Ass'n, Inc. v. United States Army Corps of Eng'rs*, 217 F.3d 393, 398 (5th Cir.

2000) (completion of construction project mooted NEPA claim); *Knaust v. City of*

*Kingston*, 157 F.3d 86, 88 (2d Cir. 1998) ("[Defendant's] construction was finished in

July 1997, the final disbursement of the federal funds was made in September of that

year, and there are no pending applications for additional federal financing.  Because this

[NEPA] appeal thus seeks to enjoin the future occurrence of events that are already in the

past, we lack appellate jurisdiction."); *Neighborhood Transp. Network, Inc. v. Pena*, 42

F.3d 1169, 1172 (8th Cir. 1994) (holding that an order enjoining defendants from further

construction on a project for alleged violation of NEPA would serve no purpose and

afford plaintiffs no relief where construction was complete).

In sum, issuing the injunction Plaintiffs request would not redress their alleged

injuries because TVA has no authority over the actions of ITA and because TVA is not

engaged in any federal action at Metalforming.  Plaintiffs' motion should therefore be

denied.**1**  Moreover, as discussed below, Plaintiffs have not demonstrated that they are

entitled to a preliminary injunction.

---

**1**  For the same reasons, Plaintiffs cannot demonstrate the existence of an Article III case
or controversy, and thus have not properly invoked the Court's subject matter
jurisdiction.  Plaintiffs have failed to allege or submit proof of sufficient facts to
demonstrate either that their alleged injuries have been caused by TVA's actions or how
those injuries could be redressed by the entry of a preliminary injunction against TVA,
and thus do not have standing to maintain this suit.  *See Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560-61 (1992) (holding that to have standing plaintiff must have suffered
an "injury in fact" that is fairly traceable to the challenged action of the defendant and
that it is likely, rather than merely speculative that the injury will be redressed by a
favorable decision); *accord Common Cause v. Dep't of Energy*, 702 F.2d 245, 250 (D.C.
Cir. 1983).  "The 'vitality' of the redressability requirement has been 'repeatedly
reaffirmed.'  The requirement serves to limit the judicial role to measures that will
produce tangible, meaningful results in the real world." *Common Cause*, 702 F.2d at 254.
As explained above, Plaintiffs cannot establish any live controversy between TVA and
the Plaintiffs.

Where a plaintiff lacks standing to maintain its suit or otherwise cannot establish
subject matter jurisdiction, the suit should be dismissed.  *See Coalition for Underground
Expansion v. Mineta*, 333 F.3d 193, 196 (D.C. Cir. 2003); Fed. R. Civ. P. 12(h)(3)
("Whenever it appears by suggestion of the parties or otherwise that the court lacks
jurisdiction of the subject matter, the court shall dismiss the action.").

### II.    Plaintiffs Have Not Established That They Are Entitled to a Preliminary Injunction.

A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion. *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997); *Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail, the moving party must demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without injunctive relief, (3) that an injunction would not substantially harm other interested parties, and (4) that issuance of the injunction is in the public interest.  *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir.1998)*; CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir.1995); *see also* Fed. R. Civ. P. 65(a). Plaintiffs have not met their burden here.

### A.  Plaintiffs have not shown a substantial likelihood of success on the merits.

Plaintiffs allege that TVA violated the statutory requirements of NEPA and the NHPA.  They are simply wrong.  TVA conducted its NEPA review in conformity with its own procedures and regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500.1-1508.28 (2004).  TVA also conducted its NHPA review in accordance with federal regulations promulgated by the Advisory Council on Historic Preservation that implements section 106 of the Act.  36 C.F.R. pt. 800.  The courts grant substantial deference to an agency's determinations under NEPA and the NHPA, including its decision about the level of environmental review needed.  Such determinations are to be upheld by the courts unless they are shown to be arbitrary or capricious.  As the Supreme Court stated in *Kleppe v. Sierra Club*:

> Neither the statute [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.
>
> . . . .
>
> Resolving these [environmental] issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.  Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.

427 U.S. 390, 410 n.21, 412 (1976) (internal citations omitted); *accord Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989); *see also Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 582 (9th Cir. 1998) (arbitrary and capricious standard applies to agency determinations under NHPA); *Crutchfield v. U.S. Army Corps of Eng'rs*, 154 F. Supp. 2d 878, 892 (E.D. Va. 2001) (same).  Plaintiffs cannot demonstrate that TVA's NEPA and NHPA review was arbitrary and capricious and therefore are not likely to succeed on the merits.

## 1.  NEPA

NEPA requires federal agencies to include in every proposal for "major Federal actions significantly affecting the quality of the human environment, a detailed statement . . . on . . . the environmental impact of the proposed action . . . ."  42 U.S.C. § 4332(2)(C).  TVA is guided in its NEPA compliance by its own procedures implementing NEPA and by binding regulations promulgated by the CEQ.  In accordance with Executive Order No. 11,991 and CEQ's regulations, 40 C.F.R. § 1507.3, TVA in 1980 adopted amendments to its existing NEPA procedures to supplement CEQ's then new regulations.  Those amendments, which resulted in a substantial reformatting of TVA's procedures, were issued in the Federal Register for public review and comment on July 6, 1979.  44 Fed. Reg. 39,679-86.  Following this public comment process and with

CEQ's approval, TVA adopted the revised procedures on August 15, 1980. 45 Fed. Reg. 54,511-15. TVA subsequently amended its procedures again following public review and comment, 47 Fed. Reg. 54,586-93, and with CEQ's approval, 48 Fed. Reg. 19,264. A copy of TVA's current NEPA procedures has been filed as Exhibit B to the Zotto Declaration.

CEQ's regulations specify the process that federal agencies are to employ in determining the appropriate level of environmental review for a particular proposal. Essentially, CEQ has required agencies to adopt criteria for and to identify three classes of environmental reviews for proposed agency actions, 40 C.F.R. § 1501.4(a), (b), including those for which an agency must prepare an EA, those which normally require an EIS, and those which are categorically excluded. CEQ required each agency to describe the kinds of actions which normally would require either an EIS or would be categorically excluded. *Id.*

Under section 102(2)(C) of NEPA and CEQ's regulations, EISs are required for major federal actions that have potentially significant environmental impacts. *See* 40 C.F.R. §§ 1502.1, 1508.18 (2004). EISs are the most detailed and comprehensive level of review under the NEPA regulations. *See* 40 C.F.R. §§ 1508.11, 1502.10-1502.18 (2004).

The next level of review is the EA. EAs are to be "concise public documents" that "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9 (2004). EAs are required for those actions that are not EIS-level actions and are not otherwise covered by a categorical exclusion. *Id.* § 1501.4(a), (b).

Categorical exclusions are important tools in CEQ's effort to ensure that agencies comply with NEPA in a manner that does not divert agency resources from matters of real environmental concern, *id.* § 1500.4(p) (2004), or unnecessarily delay federal activities, *id.* § 1500.5(k) (2004).  CEQ defines categorical exclusions as:

> [A] category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency.

*Id.* § 1508.4.  Each agency was required by CEQ to identify those actions that normally should be categorically excluded.  40 C.F.R. § 1501.4(a) (2004).  CEQ's guidance discourages agencies from preparing extensive paperwork to document an activity that has been categorically excluded.  *See* 48 Fed. Reg. 34,263, 34,265 (July 28, 1983). Based on years of experience in both assessing and implementing different kinds of actions, TVA proposed and promulgated with CEQ's approval 28 categorical exclusions. TVA NEPA Procedures § 5.2; 40 C.F.R. §§ 1507.3(a), b(2)(ii).  One of these categorical exclusions, found at section 5.2.28,[2] covers categories of actions, the impacts of which have been evaluated in a Generic Environmental Assessment prepared pursuant to section 5.3.5[3] of TVA's NEPA Procedures.  Such treatment under a Generic EA is intended to improve the review process because it affords the opportunity to assess the cumulative

---

[2]   Section 5.2.28 provides: "Actions which were the subject of an EA which concluded that the category of such actions should be treated as a categorical exclusion."

[3]   Section 5.3.5 provides:

> For any category of actions not described in section 5.2 (Categorical Exclusions), the initiating office may prepare a generic EA.  The generic EA will be prepared, reviewed, and approved as would any other EA. Upon completion of review, the Environmental Quality Staff and the Office of the General Counsel, will consider preparing a revision or supplement to the EA based on the significance of the new information.

impacts of activities that fall within a generic category.  Further, preparing a Generic EA reduces the need for case-by-case environmental reviews for minor actions that reoccur frequently, minimizing paperwork and delays consistent with the guidance in CEQ's regulations in 40 C.F.R. §§ 1500.4 and 1500.5 (2004).  In June 2001, TVA prepared a Generic EA that assessed, *inter alia*, the impact of the repetitive category of "New or Replacement Equipment That Would Not Be Central to Plant Operation."

In its review of the proposed grant to Metalforming, TVA determined that the grant was to be used for the installation of power supply equipment in a plant already under construction and that the grant would represent 0.3% of the total estimated capital investment in Metalforming.  Accordingly, TVA determined that the categorical exclusion for "New or Replacement Equipment That Would Not Be Central to Plant Operation" applied to the grant.

Although Plaintiffs complain about TVA's NEPA review here, the courts give particular deference to an agency's decision interpreting its own regulations, *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355-56 (1989); *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988), and specifically to decisions such as those interpreting an agency's own categorical exclusion regulations, *see, e.g., Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.,* 297 F.3d 1012, 1023 (10th Cir. 2002); *Nat'l Trust for Historic Pres. v. Dole*, 828 F.2d 776, 782 (D.C. Cir. 1987) (per curiam); *West Houston Air. Comm. v. F.A.A.*, 784 F.2d 702, 705 (5th Cir. 1986); *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1020 (4th Cir. 1985).  As the court explained in *Citizens' Committee*:

> Once an agency establishes categorical exclusions, its decision to classify
> a proposed action as falling within a particular categorical exclusion will

> be set aside only if a court determines that the decision was arbitrary and
> capricious.  When reviewing an agency's interpretation and application of
> its categorical exclusions under the arbitrary and capricious standard,
> courts are deferential.

297 F.3d at 1023 (internal citations omitted).

Plaintiffs have shown no likelihood of success on the merits of their NEPA claim

since nothing in their moving papers suggests that TVA's NEPA review was arbitrary

and capricious.  To the contrary, in classifying the Metalforming grant as subject to a

categorical exclusion, TVA plainly adhered to its own approved NEPA procedures.

## 2. NHPA

Section 106 of the NHPA requires federal agencies "having direct or indirect

jurisdiction over a proposed . . . federally assisted undertaking in any State" to "take into

account the effect of the undertaking on any district, site, building, structure, or object

that is included in or eligible for inclusion in the National Register . . . prior to the

approval of the expenditure."  16 U.S.C. § 470f (2000).  The regulations promulgated

under this section provide:

> If the undertaking is a type of activity that does not have the potential to
> cause effects on historic properties, assuming such historic properties were
> present, the agency official has no further obligations under section 106 or
> this part.

36 C.F.R. § 800.3(a)(1) (2004).

Section 110(k) of the NHPA provides:

> Each Federal agency shall ensure that the agency will not grant . . .
> assistance to an applicant who, with *intent to avoid the requirements of
> section 470f* of this title, has *intentionally significantly adversely* affected
> a historic property to which the grant would relate. . . .

16 U.S.C. § 470h-2(k) (2000) (emphasis added).

Plaintiffs have shown no likelihood of success on the merits of their NHPA claims because nothing in their moving papers suggests that TVA's NHPA review was arbitrary and capricious. Before approving Metalforming's request, TVA undertook the assessment required by section 106 and determined that the undertaking – the provision of equipment that was not central to Metalforming's operations – did not have the potential to affect an historic property. Zotto Declaration ¶ 8. This assessment was reached upon consideration that the equipment was to be installed in a building already under construction and that the $500,000 grant amounted to 0.3% of the total capital investment in the Metalforming site, which was estimated to be $170 million. Graham Declaration ¶ 5. In accordance with the regulations implementing NHPA, TVA concluded that "no further obligations" were required of it. *See* 36 C.F.R. § 800.3(a)(1) (2004).

Finally, with regard to Plaintiffs' claim based on section 110(k), Plaintiffs' unsupported allegation that TVA sanctioned "anticipatory demolition" (Compl. ¶ 32) has no basis in fact and is refuted by TVA's declaration that it had no reason to believe that Metalforming had "intentionally significantly adversely affected a historic property" so as to avoid the section 106 review process. Graham Declaration ¶ 4. Indeed, with respect to any historic property "to which the grant would relate," TVA's action – providing a grant to assist in the purchase of electrical equipment to be installed in a building that was already under construction – did not have the potential to impact historic properties.

While none of the four factors usually has controlling weight, "a preliminary injunction issued where there is simply no likelihood of success on the merits must be

15

reversed." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997);

*accord Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 49 (7th Cir. 1980)

("[T]he likelihood of success on the merits often serves as a threshold requirement for

entitlement to preliminary relief."). Plaintiffs' inability to demonstrate a likelihood of

success on their NEPA and NHPA claims against TVA weighs heavily against their

request for a preliminary injunction.

### B. Plaintiffs have not shown that they would suffer irreparable harm without Injunctive Relief.

Plaintiffs' argument that they will suffer irreparable harm if this Court does not

issue a preliminary injunction is premised on two erroneous assertions. The first error is

factual. Plaintiffs assert that "Defendants failed to adequately evaluate the environmental

impacts of the Transpark development." Pls.' Br. at 12. As demonstrated above, TVA

has no authority over the "Transpark development," and accordingly TVA was not

required to assess the environmental effects of that development. Moreover, as

demonstrated above, TVA did evaluate properly the environmental impacts of *its*

undertaking – the provision of funds for the purchase of nonessential equipment at

Metalforming.

The second error is legal. Plaintiffs assert that the Supreme Court held in *Amoco*

*Prod. Co. v. Village of Gambell,* 480 U.S. 531 (1987), that "[i]rreparable damage is

presumed when an agency fails to evaluate thoroughly the environmental impact of a

proposed action." Pls.' Br. at 12. Actually, the Supreme Court *held exactly the opposite*.

The quotation cited by Plaintiffs was an excerpt from the Court of Appeals decision

vacated by the Supreme Court. The quotation in context reads:

The Court of Appeals did not dispute that the Secretary could meaningfully comply with ANILCA § 810 in conjunction with his review of production and development plans. Instead, the court stated that "[i]rreparable damage is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action." This presumption is contrary to traditional equitable principles and has no basis in ANILCA. Moreover, the environment can be fully protected without this presumption. Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. Here, however, injury to subsistence resources from exploration was not at all probable. And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration to be conducted during the summer of 1985 which they would have lost without chance of recovery had exploration been enjoined.

*Amoco Production Co.*, 480 U.S. at 544-545 (internal citation omitted). Thus, the

Supreme Court determined that **no presumption of irreparable injury exists in such**

**cases**, but instead "a court must balance the competing claims of injury and must

consider the effect on each party of the granting or withholding of the requested relief."

480 U.S. at 542.**4**

Plaintiffs contend in their brief that they have suffered a procedural injury under

NEPA and the NHPA. Procedural violations however do not, by themselves, establish

---

**4**  Plaintiffs' other cases on this point are not to the contrary. In *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989), the court reiterated its earlier conclusion that no presumption of irreparable injury exists when a NEPA violation is alleged, but noted that "Congress, in enacting NEPA, explicitly took note of one way in which governments can harm the environment (through inadequately informed decision-making); and we said that courts should take account of this harm and its potentially 'irreparable' nature." *Id.* at 503-04.  The other case cited by Plaintiffs, *Realty Income Trust v. Eckerd*, 564 F.2d 447 (D.C. Cir. 1977) was decided before *Amoco*, and despite stating that "[o]rdinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted," *id.* at 456, the court ultimately held that injunctive relief was not warranted in the case because the decision to grant injunctive relief rests in the sound discretion of the court and "[w]here the countervailing equities are exceptional, . . . the action may be allowed to proceed," *id.* at 457.

irreparable injury. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992); *Town of Huntington v. Marsh*, 884 F.2d 648, 653 (2d Cir. 1989) "([The] threat of irreparable injury must be proved, not assumed, and may not be postulated *eo ipso* on the basis of procedural violations of NEPA.").  In any event, as we demonstrated above, Plaintiffs have not shown that TVA has violated the procedural requirements of either NEPA or the NHPA.

Moreover, Plaintiffs have delayed seeking an injunction for an unduly lengthy period.  Plaintiffs have been aware of TVA's involvement with Metalforming since at least December 2004, when TVA responded to Plaintiffs' FOIA request on the subject. *See* Pls.' Mot. for Prelim. Injunc. Ex. 16.  If Plaintiffs truly had been suffering irreparable harm from TVA's alleged violations of NEPA and the NHPA, they would have brought suit earlier.  "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005); *accord Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."); *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir. 1985) (per curiam) ("Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes . . . to the issue of irreparable harm. . . ."); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.,* 762 F.2d 1374, 1377 (9th Cir. 1985) (A long delay in requesting a preliminary injunction "implies a lack of urgency and irreparable harm").

**C.  Plaintiffs have not shown that a preliminary injunction would
not substantially harm other interested parties.**

As discussed in Part I above, an injunction against TVA would not give the

Plaintiffs the relief they seek; it would be a useless act.  The analysis of harm caused by

such an injunction has little meaning in such a context.  Moreover it is clear that

Plaintiffs' argument that a "delay [in] demolition . . . 'is better than hasty and irreversible

action,'" Pls.' Br. at 27, does not support enjoining TVA because TVA has no control

over ITA's actions, and has no authority to suspend ITA's activities.  Thus, Plaintiffs

have failed to show any harm to their interests from TVA's activities.

**D.  The issuance of an injunction would not be
in the Public Interest.**

TVA agrees with Plaintiffs that it is the declared national policy that "the

historical and cultural foundations of the Nation should be preserved as a living part of

our community life and development in order to give a sense of orientation to the

American People."  16 U.S.C. § 470(b)(2) (2000); Pls.' Br. at 27-28.

TVA's statutory mission is to steward "the proper use, conservation, and

development of the natural resources of the Tennessee River drainage basin," 16 U.S.C. §

831u (2000), and to foster "the economic and social well-being of the people living in

said river basin," *id*. § 831v.  TVA's grant of Valley Advantage funds to Metalforming

for the purchase of equipment furthered both those missions.  The Metalforming plant has

brought over 700 jobs to Bowling Green, Kentucky, and TVA's environmental review of

the project demonstrated that it would be carried out so as to "proper[ly] use, conserv[e],

and develop[] . . . the natural resources" of the Tennessee Valley.

In sum, while the public interest has been served by TVA's actions, no purpose

would be served by issuing an injunction against TVA in this case.

## CONCLUSION

For the foregoing reasons, TVA respectfully requests the Court to deny Plaintiffs'

Motion for a Preliminary Injunction.

Respectfully submitted,

June 27, 2005

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Maureen H. Dunn
General Counsel
D.C. Bar No. 212266

Harriet A. Cooper
Assistant General Counsel

Frank H. Lancaster

s/Maria V. Gillen
Maria V. Gillen
Telephone 865-632-7741

Attorneys for Tennessee Valley Authority

003739124

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2005, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing by operation of the Court's electronic filing system to the following:

David G. Bookbinder, Esq.

I further certify that on June 27, 2005, I served a copy of the foregoing document by first-

class mail, postage prepaid, on the following:

> Stephen Johnson, Administrator
> Environmental Protection Agency
> Ariel Rios Federal Building
> 1200 Pennsylvania Avenue, NW
> Washington, D.C. 20460
>
> Housing & Urban Development
> Alphonso Jackson, Director
> Weaver Federal Building, Rm. 10000
> 451 7th Street, SW
> Washington, D.C. 20410
>
> The Honorable Alberto Gonzales
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, D.C. 20530-0001
>
> The Honorable Kenneth Wainstein
> United States Attorney's Office
> 555 4th Street, NW
> Washington, D.C. 20530

> s/Maria V. Gillen
> Maria V. Gillen
> New Jersey Bar No.: 025642001
> Tennessee Valley Authority
> Office of the General Counsel
> 400 West Summit Hill Drive
> Knoxville, Tennessee 37902-1401
> Telephone:  865-632-7741
> Facsimile: 865-632-6718
> E-mail: mvgillen@tva.gov