UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC., WARREN COUNTY CITIZENS FOR MANAGED GROWTH, GAYLA CISSELL, JIM DUFFER, and ROGER BRUCKER, | ) ) ) ) ) ) ) | |
| Plaintiffs | ) ) | Civil Action No. 1:05-CV-01190-RMU |
| v. | ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, U.S. HOUSING AND URBAN DEVELOPMENT, and TENNESSEE VALLEY AUTHORITY, | ) ) ) ) ) | |
| Defendants | ) | |

## DECLARATION OF BILL L. ZOTTO

1.      My name is Bill L. Zotto, I am competent to testify, and I have personal knowledge of the matters contained in this declaration.

2.      I am employed by the Tennessee Valley Authority (TVA) as a Project Control Specialist, and I have been so employed since March, 2001. In that capacity, I participated as the Project Manager for TVA's Economic Development Grant to Bowling Green Metalforming LLC.

3.      In March, 2004, Bowling Green Metalforming LLC submitted a Request for Valley Advantage Agreement in the amount of $500,000 for the purchase of equipment.

4.      I reviewed the scope of the proposed project.

5.    The project funds were requested for the purchase of equipment that would not be central to plant operation, which means that the primary operation of the facility could be performed without the operation of the equipment.

6.    On this basis, I determined that the non-essential new equipment qualified for a categorical exclusion under Section 5.2.28 of TVA's National Environmental Policy Act regulations.  A true and correct copy of the Categorical Exclusion Checklist that I completed is attached to this Declaration as Exhibit A.

7.    Categorical exclusions are groups of actions that, under normal circumstances, do not have significant effects, either individually or cumulatively, on the environment and for which neither an Environmental Assessment (EA) nor an Environmental Impact Statement is required.  One of these categorical exclusions found at Section 5.2.28 of TVA's NEPA procedures covers categories of actions, the impacts of which have been evaluated in a Generic Environmental Assessment prepared pursuant to Section 5.3.5 of TVA's NEPA Procedures.  In June 2001, TVA prepared a Generic EA that assessed the impact of the repetitive category of "New or Replacement Equipment That Would Not Be Central to Plant Operation." A true and correct copy of TVA's NEPA procedures is attached to this Declaration as Exhibit B.

8.    On this basis, I determined that the non-central new equipment did not have the potential to affect historic structures in compliance with requirements under Section 106 of the NHPA which require federal agencies to take into account the effect of the undertaking on historic properties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
is true and correct.

Executed in Nashville, Tennessee, on June __23__, 2005.

_____
Bill L. Zotto

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM OF
POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF BILL L. ZOTTO**

# Exhibit A

# Categorical Exclusion Checklist for Proposed TVA Actions

| Categorical Exclusion Number Claimed | Organization ID Number<br>CATS # 7785 | Tracking Number *(NEPA Administration Use Only)*<br>7444 |
|---|---|---|
| Form Preparer<br>Bill L. Zotto | Project Initiator/Manager<br>David H Parham | Business Unit<br>Economic Development |

| Project Title<br>Megna Metalforming | Hydrologic Unit Code |
|---|---|

| Description of Proposed Action *(Include Anticipated Dates of Implementation)*    ☒ Continued on Page 3 *(if more than one line)*<br>For Proposed Action See Attachments and References |
|---|

| Initiating TVA Facility or Office | TVA Business Units Involved in Project |
|---|---|

| Location *(City, County, State)*<br>For Project Location see Attachments and References |
|---|

Parts 1 through 4 verify that there are no extraordinary circumstances associated with this action:

## Part 1. Project Characteristics

| Is there evidence that the proposed action--- | No | Yes | Information Source |
|---|---|---|---|
| 1. Is major in scope? | X | | Zotto B. L. 07/16/2004 |
| 2. Is part of a larger project proposal involving other TVA actions or other federal agencies? | X | | Zotto B. L. 07/16/2004 |
| *3. Involves non-routine mitigation to avoid adverse impacts? | X | | Zotto B. L. 07/16/2004 |
| 4. Is opposed by another federal, state, or local government agency? | X | | Zotto B. L. 07/16/2004 |
| *5. Has environmental effects which are controversial? | X | | Zotto B. L. 07/16/2004 |
| *6. Is one of many actions that will affect the same resources? | X | | Zotto B. L. 07/16/2004 |
| 7. Involves more than minor amount of land? | X | | Zotto B. L. 07/16/2004 |

* If "yes" is marked for any of the above boxes, consult with NEPA Administration on the suitability of this project for a categorical exclusion.

## Part 2. Natural and Cultural Features Affected

| Would the proposed action--- | No | Yes | Per-mit | Commit-ment | Information Source for Insignificence |
|---|---|---|---|---|---|
| 1. Potentially affect endangered, threatened, or special status species? | X | | No | No | Zotto B. L. 07/16/2004 |
| 2. Potentially affect historic structures, historic sites, Native American religious or cultural properties, or archaeological sites? | X | | No | No | Zotto B. L. 07/16/2004 |
| 3. Potentially take prime or unique farmland out of production? | X | | No | No | Zotto B. L. 07/16/2004 |
| 4. Potentially affect Wild and Scenic Rivers or their tributaries? | X | | No | No | Zotto B. L. 07/16/2004 |
| 5. Potentially affect a stream on the Nationwide Rivers Inventory? | X | | No | No | Zotto B. L. 07/16/2004 |
| 6. Potentially affect wetlands, water flow, or stream channels? | X | | No | No | Zotto B. L. 07/16/2004 |
| 7. Potentially affect the 100-year floodplain? | X | | No | No | For comments see attachments |
| 8. Potentially affect ecologically critical areas, federal, state, or local park lands, national or state forests, wilderness areas, scenic areas, wildlife management areas, recreational areas, greenways, or trails? | X | | No | No | Zotto B. L. 07/16/2004 |
| 9. Contribute to the spread of exotic or invasive species? | X | | No | No | Zotto B. L. 07/16/2004 |
| 10. Potentially affect migratory bird populations? | X | | No | No | Zotto B. L. 07/16/2004 |
| 11. Involve water withdrawal of a magnitude that may affect aquatic life or involve interbasin transfer of water? | X | | No | No | Zotto B. L. 07/16/2004 |
| 12. Potentially affect surface water? | X | | No | No | Zotto B. L. 07/16/2004 |
| 13. Potentially affect drinking water supply? | X | | No | No | Zotto B. L. 07/16/2004 |
| 14. Potentially affect groundwater? | X | | No | No | Zotto B. L. 07/16/2004 |
| 15. Potentially affect unique or important terrestrial habitat? | X | | No | No | Zotto B. L. 07/16/2004 |
| 16. Potentially affect unique or important aquatic habitat? | X | | No | No | Zotto B. L. 07/16/2004 |

### Part 3. Potential Pollutant Generation

| Would the proposed action potentially (including accidental or unplanned)--- | No | Yes | Per-mit | Commit-ment | Information Source for Insignificence |
|---|---|---|---|---|---|
| 1.  Release air pollutants? | X | | No | No | Zotto B. L. 07/16/2004 |
| 2.  Generate water pollutants? | X | | No | No | Zotto B. L. 07/16/2004 |
| 3.  Generate wastewater streams? | X | | No | No | Zotto B. L. 07/16/2004 |
| 4.  Cause soil erosion? | X | | No | No | Zotto B. L. 07/16/2004 |
| 5.  Discharge dredged or fill materials? | X | | No | No | Zotto B. L. 07/16/2004 |
| 6.  Generate large amounts of solid waste or waste not ordinarily generated? | X | | No | No | Zotto B. L. 07/16/2004 |
| 7.  Generate or release hazardous waste (RCRA)? | X | | No | No | Zotto B. L. 07/16/2004 |
| 8.  Generate or release universal or special waste, or used oil? | X | | No | No | Zotto B. L. 07/16/2004 |
| 9.  Generate or release toxic substances (CERCLA, TSCA)? | X | | No | No | Zotto B. L. 07/16/2004 |
| 10. Involve materials such as PCBs, solvents, asbestos, sandblasting material, mercury, lead, or paints? | X | | No | No | Zotto B. L. 07/16/2004 |
| 11. Involve disturbance of pre-existing contamination? | X | | No | No | Zotto B. L. 07/16/2004 |
| 12. Generate noise levels with off-site impacts? | X | | No | No | Zotto B. L. 07/16/2004 |
| 13. Generate odor with off-site impacts? | X | | No | No | Zotto B. L. 07/16/2004 |
| 14. Produce light which causes disturbance? | X | | No | No | Zotto B. L. 07/16/2004 |
| 15. Release of radioactive materials? | X | | No | No | Zotto B. L. 07/16/2004 |
| 16. Involve underground or above-ground storage tanks or bulk storage? | X | | No | No | Zotto B. L. 07/16/2004 |
| 17. Involve materials that require special handling? | X | | No | No | Zotto B. L. 07/16/2004 |

### Part 4. Social and Economic Effects

| Would the proposed action--- | No | Yes | Commit-ment | Information Source for Insignificence |
|---|---|---|---|---|
| 1.  Potentially cause public health effects? | X | | No | Zotto B. L. 07/16/2004 |
| 2.  Increase the potential for accidents affecting the public? | X | | No | Zotto B. L. 07/16/2004 |
| 3.  Cause the displacement or relocation of businesses, residences, cemeteries, or farms? | X | | No | Zotto B. L. 07/16/2004 |
| 4.  Contrast with existing land use, or potentially affect resources described as unique or significant in a federal, state, or local plan? | X | | No | Zotto B. L. 07/16/2004 |
| 5.  Disproportionately affect minority or low-income populations? | X | | No | Zotto B. L. 07/16/2004 |
| 6.  Involve genetically engineered organisms or materials? | X | | No | Zotto B. L. 07/16/2004 |
| 7.  Produce visual contrast or visual discord? | X | | No | Zotto B. L. 07/16/2004 |
| 8.  Potentially interfere with recreational or educational uses? | X | | No | Zotto B. L. 07/16/2004 |
| 9.  Potentially interfere with river or other navigation? | X | | No | Zotto B. L. 07/16/2004 |
| 10. Potentially generate highway or railroad traffic problems? | X | | No | Zotto B. L. 07/16/2004 |

### Part 5. Other Environmental Compliance/Reporting Issues

| Would the proposed action--- | No | Yes | Commit-ment | Information Source for Insignificence |
|---|---|---|---|---|
| 1.  Release or otherwise use substances on the Toxic Release Inventory list? | X | | No | Zotto B. L. 07/16/2004 |
| 2.  Involve a structure taller than 200 feet above ground level? | X | | No | Zotto B. L. 07/16/2004 |
| 3.  Involve site-specific chemical traffic control? | X | | No | Zotto B. L. 07/16/2004 |
| 4.  Require a site-specific emergency notification process? | X | | No | Zotto B. L. 07/16/2004 |
| 5.  Cause a modification to equipment with an environmental permit? | X | | No | Zotto B. L. 07/16/2004 |
| 6.  Potentially impact operation of the river system or require special water elevations or flow conditions?? | X | | No | Zotto B. L. 07/16/2004 |

| Description of Proposed Action *(Include Anticipated Dates of Implementation)* | ☐ Continued from Page 1 |
|---|---|

*Parts 1 through 4: If "yes" is checked, describe in the discussion section following this form why the effect is insignificant. Attach any conditions or commitments which will ensure insignificant impacts. Use of non-routine commitments to avoid significance is an indication that consultation with NEPA Administration is needed.*

*An ☐ EA or ☐ EIS will be prepared.*

*Based upon my review of environmental impacts, the discussions attached, and/or consultations with NEPA Administration, I have determined that the above action does not have a significant impact on the quality of the human environment and that no extraordinary circumstances exist. Therefore, this proposal qualifies for a categorical exclusion under Section 5.2._____ of TVA NEPA Procedures.*

| Project Initiator/Manager<br>David H Parham | | Date |
|---|---|---|
| TVA Organization<br>UNKN | E-mail<br>dhparham@tva.gov | Telephone |

**Site Environmental Compliance Reviewer**                    **Final Review/Closure**

_____                    _____
*Signature*                                                        *Signature*

**Other Review Signatures** *(as required by your organization)*

Bill L. Zotto                          07/16/2004
_____                    _____
*Signature*                                                        *Signature*

_____                    _____
*Signature*                                                        *Signature*

_____                    _____
*Signature*                                                        *Signature*

**Attachments/References**

Description of Proposed Action

The Tennessee Valley Authority (TVA) proposes to grant $500,000 in Valley Advantage (VA) funds to Bowling Green Metal Forming, LLC for the installation of the power supply equipment to the new manufacturing facility. The total investment for the project is estimated at $170,000,000. The total federal involvement would be about 0.3%. This is not considered a major federal action. The project is estimated to generate 600 new jobs with an average pay of $13.22/hour and add 25 megawatts of electric power load demand.

CEC General Comment Listing

1.  Project Description and Scope.
    By: Bill L. Zotto 07/16/2004
    Files: Project Description and Scope.doc 07/16/2004 22,528 Bytes

CEC General Comment Listing

2.  Location map.
    By: Bill L. Zotto  07/16/2004
    Files:  Location Maps.pdf  07/16/2004  66,269 Bytes
3.  Aerial map.
    By: Bill L. Zotto  07/16/2004
    Files:  Aerial map.pdf  07/16/2004  432,903 Bytes
4.  Topo map.
    By: Bill L. Zotto  07/16/2004
    Files:  Topo map.pdf  07/16/2004  178,328 Bytes


CEC Comment Listing


Part 2 Comments


7.  See attached FIRM.
    By: Bill L. Zotto  07/16/2004
    Files:  Flood map.pdf  07/16/2004  49,065 Bytes

# Bowling Green Metal Forming, LLC Valley Advantage Grant
# Project Description and Scope
# Cats ID # 7785

The Tennessee Valley Authority (TVA) proposes to grant $500,000 in Valley Advantage (VA) funds to Bowling Green Metal Forming, LLC for the installation of the power supply equipment to the new manufacturing facility. The total investment for the project is estimated at $170,000,000. The total federal involvement would be about 0.3%. This is not considered a major federal action.

The facility's new address will be 111 Cosma Drive, Bowling Green, Warren County, Kentucky 42101 (see the attached map).

The company is building a new 900,000 square foot facility for manufacturing truck frames from coil steel using a stamp press process. The coil steel will be delivered to the plant by semi-sized trucks and rail service. The company anticipates manufacturing 800,000 frames per year. The truck frames will be shipped out by semi-sized trucks and rail service.

The company would not produce any air pollutants, waste water, or industrial waste. Any scraps and rejects would be sold for scrap metal. The manufacturing process will use electricity and compressed air in its operation. Any water used for cleaning the equipment will be recirculated in a closed system.

The project is estimated to generate 600 new jobs with an average pay of $13.22/hour and add 25 megawatts of electric power load demand.

The facility site does not lie in a 100 year floodplain (see the attached map).

This project involves financial assistance for the purchase of equipment not central to plant operations with little or no impact to natural or cultural resources. This is the type of activity described in section 3.2.1 of the Final Generic Environmental Assessment of Selected Economic Development Activities. Accordingly, an Environmental Assessment is not required.

**Bowling Green Metalforming**
**111 Cosma Drive**
**Bowling Green, Warren County, KY**



**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF BILL L. ZOTTO**

# Exhibit B

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

## PROCEDURES FOR COMPLIANCE WITH THE
## NATIONAL ENVIRONMENTAL POLICY ACT

Table of Contents

| Title | | | Page |
|---|---|---|---|
| 1.0 | Purpose | | 2 |
| 2.0 | Policy | | 2 |
| 3.0 | Abbreviations | | 2 |
| 4.0 | Definitions | | 2 |
| 5.0 | Procedures | | 3 |
| | 5.1 | Action Formulation and NEPA Determination | 3 |
| | 5.2 | Categorical Exclusions | 3 |
| | 5.3 | Environmental Assessments | 5 |
| | 5.4 | Environmental Impact Statements | 7 |
| | 5.5 | Mitigation Commitment Identification, Auditing, and Reporting | 11 |
| | 5.6 | Emergency Action | 11 |
| | 5.7 | Floodplains and Wetlands | 12 |
| | 5.8 | Miscellaneous Procedures | 14 |

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

**1.0    Purpose**

These procedures provide guidance for compliance by the Tennessee Valley Authority (TVA) with the National Environmental Policy Act (NEPA), 42 U.S.C. 4321, et seq. (1976) and other applicable guidelines, regulations, and Executive orders implementing NEPA. It is intended to incorporate concepts and implement policies in the regulations promulgated by the Council on Environmental Quality at 40 CFR, parts 1500-1508 (1981).

**2.0    Policy**

TVA, to the fullest extent possible, incorporates environmental considerations into its decision making processes. In carrying out this policy, these procedures ensure that actions are viewed in a manner to encourage productive and enjoyable harmony between man and the environment. Commencing at the earliest possible point and continuing through implementation, appropriate and careful consideration of the environmental aspects of proposed actions is built into the decision making process in order that adverse environmental effects may be avoided or minimized, consistent with the requirements of NEPA.

**3.0    Abbreviations**

3.1 CEQ - Council on Environmental Quality
3.2 EA - Environmental Assessment
3.3 EIS - Environmental Impact Statement-D-Draft; F-Final
3.4 NEPA - National Environmental Policy Act
3.5 TVA - Tennessee Valley Authority

**4.0    Definitions**

The following definitions shall apply throughout these procedures. All other applicable terms shall be given the same meaning as set forth in CEQ's currently effective regulations (see 40 CFR regulations, part 1508) unless otherwise inconsistent with the context in which they appear.

4.1    "Floodplain" refers to the lowland and relatively flat areas adjoining flowing inland waters and reservoirs or to those areas inundated by the unusual or rapid accumulation or runoff of surface waters from any source. Floodplain generally refers to the base floodplain, i.e., that area subject to a 1 percent or greater chance of flooding in any given year. A flood having a 1 percent chance of occurring in any given year is usually referred to as a 100-year flood.

4.2    "Natural and beneficial floodplain and wetland values" refer to such attributes as the capability of floodplains and wetlands to provide natural moderation of floodwaters, water quality maintenance, fish and wildlife habitat, plant habitat, open space, natural beauty, scientific and education study areas, and recreation.

4.3    "Practicable" refers to the capability of an action being done within existing constraints. The test of what is practicable depends on the situation involved and should include an evaluation of all pertinent factors, such as environmental impact, economic costs, technological achievability, and public benefit.

4.4    "Wetlands" are those areas inundated by surface or ground water with a frequency sufficient to support, and under normal circumstances do or would support, a prevalence of vegetation or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands generally include swamps, marshes, bogs, and similar areas such as sloughs, potholes, wet meadows, mud flats, and

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

natural ponds. Wetlands do not include temporary human-made ponds, sloughs, etc., resulting from construction activities.

4.5    "Important farmland" includes prime farmland, unique farmland, and farm land of Statewide importance as defined in 7 CFR, part 657 (1981).

## 5.0    Procedures

### 5.1    Action Formulation and NEPA Determination

Each office within TVA is responsible for integrating environmental considerations into its planning and decision making process at the earliest possible time to ensure that potential environmental effects are appropriately considered to avoid potential delays and to minimize potential conflicts. Environmental analyses are to be included in or circulated with and reviewed at the same time as other planning documents. This responsibility is to be carried out in accordance with the environmental review procedures contained herein.

The General Manager and Board of Directors are the major decision points within the agency for TVA's principal programs that are likely to have a significant effect on the quality of the human environment. Alternatives considered by the General Manager and Board of Directors shall be encompassed by the range of alternatives discussed in relevant environmental documents, and the General Manager and Board of Directors shall consider the alternatives described in relevant EISs.

At the earliest possible time, the office proposing to initiate an action will initially determine the level of environmental review required for a specific action. The level of review will be in one of the following categories:

|  | Procedure |
|---|---|
| Categorical Exclusions | 5.2 |
| Environmental Assessments | 5.3 |
| Environmental Impact Statements | 5.4 |

### 5.2    Categorical Exclusions

Categories of actions listed in this section are those which do not normally have, either individually or cumulatively, a significant impact on the quality of the human environment and require neither the preparation of an EA nor an EIS. The office proposing to initiate an action shall determine, in consultation with the Environmental Quality Staff as appropriate, whether or not the proposed action is categorically excluded. An action which would normally qualify as a categorical exclusion shall not be so classified if: (1) the proposed action could have a potentially significant impact on a threatened or endangered species, wetland or floodplain, cultural or historical resource, important farmland, or other environmentally significant resource; or (2) substantial controversy over the significance of the environmental impacts associated with the proposed action has developed or is likely to develop. Categorical exclusion actions are:

1. Routine operation, maintenance, and minor upgrading of existing TVA facilities.

2. Technical and planning assistance to State and local organizations.

3. Personnel action.

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

4. Procurement activities.

5. Accounting, auditing, financial reports, and disbursement of funds.

6. Contracts or agreements for the sale, purchase, or interchange of electricity.

7. Activities related to the promotion and maintenance of employee health.

8. Activities of TVA's Equal Employment Opportunity staff.

9. Administrative actions consisting solely of paperwork.

10. Communication, transportation, computer service, and other office services.

11. Property protection, law enforcement, and other legal activities.

12. Emergency preparedness.

13. Preliminary planning, studies, or reviews consisting of only paperwork.

14. Exploration for uranium, including hydrologic investigations.

15. Preliminary onsite engineering and environmental studies for future power generating plants and other energy-related facilities.

16. Establishment of environmental quality monitoring programs and field monitoring stations.

17. Transmission line relocation, tap-ins, or modifications or substation alterations due to conflicts such as new highway projects and projects requiring acquisition of minor amounts of additional substation property or transmission line right-of-way easements.

18. Construction and operation of communication facilities (i.e., powerline carrier, insulated overhead ground wire, VHF radio, and microwave).

19. Backslope agreements involving properties on which TVA holds an interest between operators and other adjacent mining companies.

20. Purchase, exchange, lease or sale, or lease purchase of stepdown facilities, transmission lines, and transmission line rights of way by distributors or customers directly served by TVA.

21. Minor research, development, and joint demonstration projects.

22. Construction of visitor reception centers.

23. Development of minor TVA public use areas and stream access points.
24. Minor non-TVA activities on TVA property authorized under contract or license, permit and covenant agreements, including utility crossings, encroachments, agricultural uses, rental of structures, and sale of miscellaneous structures and materials from TVA land.

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

25. Purchase, sale, abandonment or exchange of minor tracts of land, mineral rights, or landrights.

26. Approvals under Section 26a of the TVA Act of minor structures, boat docks, and shoreline facilities.

27. Any action which does not have a primary impact on the physical environment.

28. Actions which were the subject of an EA which concluded that the category of such actions should be treated as a categorical exclusion.

**5.3    Environmental Assessments**

5.3.1    Purpose and Scope

An EA will be prepared for any appropriate action not qualifying as a categorical exclusion to determine whether an EIS is necessary or a Finding of No Significant Impact should be reached. An EA is not necessary if it has been determined that an EIS will be prepared.

5.3.2    Public Participation in EA Preparation

The Environmental Quality Staff or the initiating office, in consultation with the Environmental Quality Staff, Citizen Action Office, and other interested offices, may request public involvement in the preparation of the EA or a revision or supplement thereof. The type of and format for public involvement would be selected as appropriate to best facilitate timely and meaningful public input to the EA process.

5.3.3    EA Preparation

The initiating office is responsible for the preparation of the EA. As soon as practical after the decision to prepare an EA is made, the initiating office in consultation with the Environmental Quality Staff shall determine the need for a coordination meeting to define (1) reasonable alternatives, (2) permit requirements, (3) coordination with other agencies, (4) environmental issues, and (5) a schedule for EA preparation.

The EA will include the identification and, as appropriate, discussion of questions and concerns raised during the public input period, if any. The EA will describe the proposed action and will include brief discussions of the need for the proposed action, reasonable alternatives, the environmental impacts of the proposed action and alternatives, measures (if any) to minimize or mitigate such impacts, and a listing of the agencies and persons consulted. A list of required permits and environmental commitments will be circulated with the EA.

The EA will briefly provide sufficient data and analysis for determining whether to prepare an EIS or a Finding of No Significant Impact. The EA will be reviewed by the Environmental Quality Staff and other interested offices. After completion of the review, the Environmental Quality Staff will, in consultation with the Office of the General Counsel, make one of the following determinations: (1) the action does not require the preparation of an EIS, (2) the action will require the preparation of an EIS, or (3) the EA is incomplete or the decision will be deferred until a later stage in the planning process. Measures (if any) to minimize or mitigate impacts committed to in the EA will be implemented as described in section 5.5 (Mitigation Commitment Identification, Auditing, and Reporting).

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

5.3.4    Finding of No Significant Impact

If it is concluded, based on an EA, that a proposed action does not require the preparation of an EIS, the Environmental Quality Staff, in consultation with the Office of the General Counsel and the initiating office, will prepare a Finding of No Significant Impact.

Appropriate notice of Finding of No Significant Impact shall be made available to the public by the Environmental Quality Staff.

In the following circumstances, the Environmental Quality Staff, in consultation with the Office of the General Counsel and the initiating office, will make a Finding of No Significant Impact available for public review and comment (including, if appropriate, State and regional A-95 clearinghouses or other designated State/local coordination points) for a period of time (normally 30 days) before a final determination is made as whether or not to prepare an EIS and before the proposed action may begin:

1.    The proposed action is, or is closely similar to, an action listed in section 5.4.1

2.    TVA has previously announced that the proposed action would be the subject of an EIS.

3.    The nature of the proposed action is one without precedent.

5.3.5    Generic EAs

For any category of actions not described in section 5.2 (Categorical Exclusions), the initiating office may prepare a generic EA. The generic EA will be prepared, reviewed, and approved as would any other EA. Upon completion of review, the Environmental Quality Staff, in consultation with the Office of the General Counsel, will determine whether or not the category of actions may normally be treated as if listed in section 5.2 as a categorical exclusion.

5.3.6    Revisions and Supplements

If new information concerning action modifications, alternatives, or probable environmental effects becomes available, the initiating office, in consultation with the Environmental Quality Staff and the Office of the General Counsel, will consider preparing a revision or supplement to the EA based on the significance of the new information.

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

5.4        **Environmental Impact Statements**

5.4.1    Purpose and Scope

The following actions normally will require an environmental impact statement:

1. Large water resource development and water control projects.

2. Major power generating facilities.

3. Uranium mining and milling complexes.

4. Any major action, the environmental impact of which is expected to be highly controversial.

5. Any other major action which will have a significant effect on the quality of the human environment.

An EIS should include a description and an analysis of the proposed action; alternatives to the proposed action, including the no-action alternative; probable environmental impacts associated with the proposed action and measures (if any) to minimize impacts; and a list of the major preparers of the EIS. The scope and detail of the EIS should be reasonably related to the scope and the probable environmental impacts of the proposed action and alternative actions (see 40 CFR, parts 1502.10-1502.18).

5.4.2    Lead and Cooperating Agency Determinations

As soon as possible after the decision is made to prepare an EIS, the Environmental Quality Staff, in consultation with the initiating office and the Office of the General Counsel, shall consider requesting other Federal, State, or local agencies to participate in the preparation of the EIS as lead, joint lead (see 40 CFR 1501.5), or cooperating agencies (see 40 CFR 1501.6). If TVA is requested to participate in the preparation of another Federal agency's EIS, the General Manager will determine if TVA will become a cooperating agency.

5.4.3    Scoping Process

As soon as possible after the decision to prepare an EIS is made, the initiating office will organize a scoping committee to tentatively identify action alternatives, probable environmental issues and environmental permits, and a schedule for EIS preparation. The scoping committee will consist of representatives of the Environmental Quality Staff, the initiating office, the Office of the General Counsel, Citizen Action Office, and other interested or affected offices.

The scoping process may include interagency scoping sessions to coordinate an action with and obtain inputs from other interested agencies, and public scoping sessions to obtain input from interested members of the general public. The scoping committee will determine the need, nature, and format for the various scoping sessions. Session type and format will be selected to facilitate timely and meaningful public input into the EIS process.

As soon as practicable in the scoping process, the initiating office will prepare and the Environmental Quality Staff, in consultation with the Office of the General Counsel, will review and make available a Notice of Intent to Prepare an EIS. This notice will briefly describe the

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

action, reasonable alternatives thereto, and potential environmental impacts associated with the action. In addition, those issues which tentatively have been determined to be insignificant and which will not be discussed in detail in the EIS may be identified. The scoping process will be described and, if a scoping meeting will be held, the notice should state where and when the meeting is to occur. The notice will identify the person in TVA who can supply additional information about the action and to whom comments should be sent. There will normally be a public input period of 30 days from the date of publication of the Notice of Intent in the *Federal Register* to allow other interested agencies and the public an opportunity to review the action alternatives and probable environmental issues identified by the scoping committee. On the basis of input received, the Environmental Quality Staff, in consultation with the scoping committee, may determine what, if any, additions or modifications in the scoping process or schedule are required and establish the scope of the EIS.

At the close of the scoping process, the Environmental Quality Staff, in consultation with the scoping committee, will identify in writing the following EIS components:

1. Key action alternatives.

2. Significant environmental issues to be addressed in detail.

3. Probable nonsignificant environmental issues that should be mentioned but not addressed in detail.

4. Lead and cooperating agency assignments, if any.

5. Related environmental documents.

6. Other environmental review and consultation requirements.

7. Delegation of DEIS work assignments to interested offices.

5.4.4    DEIS Preparation

Based on information obtained and decisions made during the scoping process, the initiating office, in consultation with the Environmental Quality Staff and other interested offices, will prepare the preliminary DEIS using an appropriate format (see 40 CFR 1502.10). In addition, a list of required permits and an environmental commitment list will be prepared and circulated with the DEIS. The preliminary DEIS will be circulated by the initiating office to the Environmental Quality Staff, the Office of the General Counsel, and other interested offices for review and comment. All reviewing offices will, as soon as practical and normally within 30 days, supply comments on the preliminary DEIS to the initiating office, the Environmental Quality Staff, and the Office of the General Counsel. These comments will include lists of agencies, A-95 contacts or other State/local coordination points, and groups and individuals (both proponents and opponents, if any, of the proposed action) who should receive a copy of the DEIS. After the preliminary DEIS is revised, the initiating office will transmit it to other interested offices for their final approval. The Environmental Quality Staff will, in consultation with the Office of the General Counsel, review the document and transmit it and the commitment list to the General Manager for approval.

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

5.4.5    DEIS Transmittal and Review

Upon notification of approval from the General Manager, TVA will transmit the DEIS and appropriate notices to the Environmental Protection Agency (EPA) and other interested Federal, State, and local agencies (including State and regional A-95 clearinghouses or other State/local coordination points). The Citizen Action Office will coordinate overall DEIS distribution and will maintain a master list of those to whom the DEIS is sent. The length of the DEIS public comment period, normally no less than 45 days from publication of the notice of availability in the *Federal Register*, will be determined by the scoping committee. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including CEQ.

At any time in the DEIS process, the initiating office, in consultation with the Environmental Quality Staff, the Citizen Action Office, and other interested offices, may provide for additional public involvement to supplement EIS preparation. The type of and format for public involvement will be selected as appropriate to best facilitate timely and meaningful public input into the EIS process.

5.4.6    FEIS Preparation

At the close of the DEIS public review period, the Environmental Quality Staff will, in consultation with the initiating office and other interested offices, determine what is needed for the preparation of an FEIS. If the requisite changes in the DEIS are limited to making minor factual corrections and explaining why the comments received do not warrant further response, an errata sheet containing only DEIS comments, responses, and factual corrections in the DEIS may be prepared by the initiating office. If other more extensive modifications are required, the initiating office will, in consultation with the Environmental Quality Staff and other interested offices, prepare a preliminary FEIS utilizing an appropriate format (see 40 CFR 1502.10).

The errata sheet or preliminary FEIS will be prepared and circulated by the initiating office to the Environmental Quality Staff, Office of the General Counsel, and other interested offices for review and comment. All reviewing offices will supply written comments concerning the errata sheet or preliminary FEIS to the initiating office with copies to the Environmental Quality Staff and Office of the General Counsel.

The initiating office, with the assistance of the Environmental Quality Staff, will review all comments received and modify, as appropriate, the errata sheet or the preliminary FEIS. After the errata sheet or preliminary FEIS is revised, the initiating office will transmit it to other interested offices for their final approval. The Environmental Quality Staff will, in consultation with the Office of the General Counsel, review the document and transmit it to the General Manager for approval along with a list of environmental commitments made in the EIS.

Measures (if any) to minimize or mitigate impacts committed to in the FEIS will be identified and implemented as described in section 5.5 (Mitigation Commitment Identification, Auditing, and Reporting).

5.4.7    FEIS Transmittal

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

Upon notification of approval from the General Manager, TVA will transmit the FEIS and appropriate notices to EPA and other Federal, State, and local agencies (including State and regional A-95 clearinghouses or other State/local coordination points) to whom copies of the DEIS were sent. The FEIS will also be sent to every person and organization to whom copies of the DEIS were sent or from whom comments were received.

5.4.8    Commencement of Action

Except in emergency circumstances, an action for which an EIS has been approved will not commence until 30 days after notice of availability of the final statement has been published in the *Federal Register* or 90 days after a notice of availability of the DEIS has been published in the *Federal Register*, whichever is later.

5.4.9    Record of Decision

After release of the FEIS, a Record of Decision shall be prepared for the General Manager by the Environmental Quality Staff, in consultation with the Office of the General Counsel and the initiating office. The record will normally include the following: (1) what the decision was; (2) what alternatives were considered; (3) which alternative(s) was considered to be environmentally preferable; (4) the alternatives' associated environmental considerations (which may include a discussion of measures to be taken to mitigate or minimize adverse environmental impacts (see 40 CFR 1505.2); and (5) what monitoring, reporting, and administrative arrangements have been made (see 40 CFR 1505.2). Records of decision will be made available to the public.

5.4.10    Revisions and Supplements

If significant new information concerning action modifications, alternatives, or probable environmental effects becomes available, TVA will make such information available to the public. The initiating office shall consider preparing a revision or a supplement to the EIS. The Environmental Quality Staff will, in consultation with the initiating office, Office of the General Counsel, Citizen Action Office, and other interested offices, determine the method of making such information available to the public.

5.4.11    EIS Adoption

TVA may adopt as its final EIS another EIS or any portion thereof whether or not TVA participated in its preparation. The Environmental Quality Staff and the Office of the General Counsel, in consultation with the initiating office, will determine if the EIS proposed for adoption adequately assesses the TVA action and is still generally available to the public.

If it is determined that the EIS proposed for adoption or the relevant portion thereof is adequate and still available, TVA will circulate its written finding of this determination and advise that copies of the EIS will be sent to any person or agency requesting it. If the EIS is not available, TVA will then circulate, along with its written finding, the adopted EIS (or relevant portion) or a summary thereof (see 40 CFR 1502.12; 40 CFR 1502.19 (d)).

If the EIS is generally available and TVA determines that significant supplementary information is needed, TVA will prepare and circulate a supplement to the EIS and advise that copies of the adopted EIS will be sent to any person or agency requesting it. If the EIS is not generally available, TVA will circulate its supplement along with either the adopted EIS or a summary

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

thereof (see 40 CFR 1502.12; 40 CFR 1502.19 (d)). The above findings or documents shall be approved and circulated in accordance with section 5.4.5 or 5.4.7, as appropriate.

5.5     **Mitigation Commitment Identification, Auditing and Reporting**

All significant measures planned to minimize or mitigate expected environmental impacts shall be identified in the EA or EIS (or, as appropriate, in a memorandum documenting the Environmental Quality Staff's determination or concurrence that a proposed action is a categorical exclusion) and compiled in a commitment list. The commitment list will include, to the extent practicable, the estimated cost of each commitment. The commitment list is prepared for both the draft and final EA or EIS and should be developed in cooperation with the Environmental Quality Staff and all interested offices.

Each such commitment in the commitment list will be tentatively assigned by the initiating office to the appropriate responsible office and such assignments shall be transmitted to the Environmental Quality Staff and affected offices at the time the draft EA or EIS is sent out for review. The initiating office should consult with the assigned offices to resolve assignment conflicts, identify supporting offices, and determine commitment schedules. Prior to finalization of the commitment list, the initiating office shall obtain Environmental Quality Staff concurrence that commitments can be monitored for compliance. At the time of finalizing the EA or EIS, the initiating office shall submit to the Environmental Quality Staff a finalized commitment list.

The initiating office shall report, periodically and upon request to the Environmental Quality Staff, the status of a commitment. The Environmental Quality Staff will ensure that commitments are met and will, as it deems appropriate, audit commitment progress. Circumstances may arise which warrant modifying or deleting previously made commitments. When such circumstances occur, the office desiring the change shall submit to the Environmental Quality Staff and the initiating office a request which shall include the basis for changing or deleting the commitment and an evaluation of the environmental significance of the requested change. The decision to modify or delete the commitment will be made by the Environmental Quality Staff in consultation with the Office of the General Counsel and the initiating office.

5.6     **Emergency Action**

Because of unforeseen situations or emergencies, or through inadvertence, or for other reasons, some of the steps outlined in these procedures may be consolidated, modified, or omitted. The Environmental Quality Staff and the Office of the General Counsel shall be promptly notified and asked to approve any such consolidation, modification, or omission, and may do so if such change would conform to legal requirements and substantially comply with the intent of these procedures. The Environmental Quality Staff, in consultation with the Office of the General Counsel, will consult with CEQ when appropriate before such changes are approved.

5.7     **Floodplains and Wetlands**

5.7.1    Purpose and Scope

Consistent with Executive Order Nos. 11988 (Floodplain Management) and 11990 (Protection of Wetlands), and TVA Code under IX FLOODPLAIN MANAGEMENT AND PROTECTION OF WETLANDS, the review of a proposed action undertaken in accordance with sections 5.2, 5.3, or 5.4 of these procedures that potentially may affect floodplains or wetlands shall include a floodplain or wetlands evaluation as required by this section. A wetland evaluation is not

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

required for (1) the issuance of permits, licenses, or allocations to private parties for activities involving wetlands on non-Federal lands; (2) projects or programs under construction or in operation as of May 24, 1977; (3) projects for which all funds were appropriated through June 1977; or (4) projects for which a draft or final EIS was filed before October 1, 1977. Moreover, no reevaluation of floodplain or wetland impacts is required for projects, programs, and policies approved by TVA before July 23, 1979.

5.7.2    Evaluation Process

5.7.2.1   Area of Impact

If a proposed action will potentially occur in or affect wetlands or floodplains, the initiating office, as soon as practicable in the planning process, will request the Office of Natural Resources to determine whether the proposed action will occur in or affect a wetland or floodplain and the level of impact, if any, on the wetland or floodplain. If the Office of Natural Resources determines that the proposed action (1) is outside the floodplain or wetland, (2) has no identifiable impacts on a floodplain or wetland, and (3) does not directly or indirectly support floodplain development or wetland alteration, further floodplain or wetland evaluation shall be unnecessary.

5.7.2.2   Actions That Will Affect Floodplains or Wetlands

When a proposed action can otherwise be categorically excluded under section 5.2, no additional floodplain or wetland evaluation is required if (1) the initiating office determines that there is no practicable alternative that will avoid affecting floodplains or wetlands and that all practical measures to minimize impacts to floodplains or wetlands are incorporated and (2) the Office of Natural Resources determines that impacts on the floodplain or wetland would be minor.

If the action requires an EA or an EIS, the ensuing evaluation shall consider (1) the effect of the proposed action on natural and beneficial floodplain and wetland values and (2) alternatives that would eliminate or minimize such effects. The initiating office shall determine if there is no practicable alternative to siting in a floodplain or constructing in a wetland. If the Environmental Quality Staff in consultation with the Office of the General Counsel concurs, this determination shall be final. If a determination of no practicable alternative is made, all practical measures to minimize impacts on the floodplain or wetland shall be implemented.

If at any time prior to commencement of the action it is determined that there is a practicable alternative that will avoid affecting floodplains or wetlands, the proposed action shall not proceed.

5.7.2.3   Public Notice

Public notice of actions affecting floodplains or wetlands is not required if the action is categorically excluded under section 5.2. If an EA or EIS is prepared and a determination of no practicable alternative is made in accordance with section 5.7.2.2, the initiating office shall notify the public of a proposed action's potential impact on the floodplain or wetland.

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

Public notice of actions affecting floodplains or wetlands may be combined with any notice published by TVA or another Federal agency if such a notice generally meets the minimum requirements set forth in this section. Issuance of a draft or final EA or EIS for public review and comment will satisfy this notice requirement.

Public notices shall at a minimum (1) briefly describe the proposed action and the potential impact on the floodplain or wetland; (2) briefly identify alternative actions considered and explain why a determination of no practicable alternative has been proposed; (3) briefly discuss measures that would be taken to minimize or mitigate floodplain or wetland impacts; (4) state when appropriate whether the action conforms to applicable State or local floodplain protection standards; (5) specify a reasonable period of time within which the public can comment on the proposal; and (6) identify the TVA official who can provide additional information on the proposed action and to whom comments should be sent.

Such notices shall be issued in a manner designed to bring the proposed action to the attention of those members of the public likely to be interested in or affected by the action's potential impact on the floodplain or wetland. The initiating office, in consultation with the Environmental Quality Staff and the Citizen Action Office, shall determine the manner in which the notice will be made available to the public. Typical ways of providing public notice include direct mailing, posting in appropriate places in the vicinity of the proposed action, publication in the *Federal Register,* or publication in newspapers of general circulation in the area of the proposed action. If a floodplain public notice is required, a copy of such notice shall be included in information sent to State and regional clearinghouses for those actions subject to Office of Management and Budget Circular A-95 or other State/local coordination points.

TVA shall consider all relevant comments received in response to a notice and shall reevaluate the action as appropriate to take such comments into consideration. The Environmental Quality Staff, in consultation with the initiating office, shall determine if response is necessary and the initiating office, in coordination with other interested offices, shall prepare comment responses. The Environmental Quality Staff, in consultation with the Office of the General Counsel, shall approve all comment responses before release.

A proposed action may not be implemented before publication of any required public notice and appropriate consideration of any relevant comments received in a timely manner.

5.7.2.4   Disposition of Real Property

When TVA property in a floodplain or wetland is proposed for lease, easement, license, right of way, or disposal to non-Federal public or private parties and the action will not result in disturbance of the floodplain or wetland, floodplain or wetland evaluation is not required. The conveyance document, however, shall specify:

1.      Applicable restricted uses under Federal, State or local floodplain and wetland regulations.

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

      2.     Other appropriate restrictions to minimize destruction, loss, or degradation of floodplains and wetlands and to preserve and enhance their natural and beneficial values, except when prohibited by law or unenforceable by TVA or, otherwise, the property shall be withheld from conveyance or use.

If the disposition of TVA property rights in a floodplain or wetland potentially will result in disturbance to the floodplain or wetland, the proposed action shall be reviewed in accordance with sections 5.7.2.1 - 5.7.2.3.

**5.8    Miscellaneous Procedures**

5.8.1    Proposals for Legislation

Proposals for congressional legislation significantly affecting the quality of the human environment will require the preparation of an EIS (see 40 CFR 1506.8).

5.8.2    Private Applicants

In those cases when private applicants or other non-Federal entities propose to undertake an action that will require TVA's approval or involvement and fall within the scope of these procedures, the contacted office will as soon as possible notify the Environmental Quality Staff. Each office will maintain information to advise potential applicants of studies or other data that may be required in connection with applications and will take reasonable steps to publicize accessibility of such information. The office charged with initiating action, upon the applicant's request, will in consultation with the Environmental Quality Staff when practicable advise the applicant of the information or studies (including the preparation of environmental documents, if necessary) that will be required in order to fulfill its responsibilities hereunder. The applicant must provide TVA sufficient information to allow an accurate determination of the environmental impacts of the proposed action. TVA may require that this information be submitted in the form of a written environmental report. If TVA is required to make investigations or otherwise incur additional expenses, the applicant may be charged for TVA's service. The Environmental Quality Staff, in consultation with the Office of the General Counsel, will also determine the need to consult early with appropriate Federal, State, and local agencies (including State and regional A-95 clearinghouses or their State/local coordination points); Indian tribes; and other interested persons regarding TVA's involvement in or approval of the applicant's proposed action and, where appropriate, should commence such consultation at the earliest practicable time.

5.8.3    Non-TVA EISs

The Environmental Quality Staff, in consultation with other interested offices, will coordinate the review of EISs provided to TVA for review by other Federal agencies. The Environmental Quality Staff, in consultation with the Office of the General Counsel, will prepare comments on such EISs and transmit any TVA comments to the initiating agency (see 40 CFR 1503.2 - 1503.3).

5.8.4    Supplemental Instruction

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

The Environmental Quality Staff, in consultation with interested offices and with concurrence of the Office of the General Counsel, may issue supplemental or explanatory instructions to these procedures.

5.8.5    Modifications of These Procedures

The assignments to offices in these procedures can be modified by agreement of the offices involved or by instructions from the General Manager.

5.8.6    Tiering

An initiating office may consider tiering the environmental review of a proposed action. Tiering involves coverage of general matters in broader environmental documents, and subsequent narrower analyses need only incorporate by reference the broader analyses (see 40 CFR 1508.28).

5.8.7    Combining Documents

Any environmental document may be combined with any other document to reduce duplication and paperwork.

5.8.8    Applicability to Ongoing Actions

These procedures shall not apply to those actions which have been approved under applicable procedures prior to the effective date of these procedures or for which an EA or a DEIS has already been prepared. No environmental documents need be redone by reason of the adoption of these revised procedures.

5.8.9    Consolidation of Reviews

Review of proposed actions under these procedures may be consolidated with other reviews where such consolidation would reduce duplication or increase efficiency.

5.8.10    Documents

The Environmental Quality Staff shall keep on file all final and approved environmental documents.

5.8.11    Substantial Compliance

Minor deviations from these procedures will be permitted, but in all respects substantial compliance must be achieved. Flexibility is the key to implementing these procedures and reviewing proposed actions.

5.8.12    Reducing Paperwork and Delay

These procedures are to be interpreted and applied with the aim of reducing paperwork and the delay associated with both assessment and implementation of a proposed action. In this regard,

TENNESSEE VALLEY AUTHORITY
INSTRUCTION
IX ENVIRONMENTAL REVIEW

data and analyses shall be commensurate with the importance of associated impacts. Less important material should be summarized, consolidated, or referenced.

5.8.13    Office Responsible for NEPA Compliance Efforts

The Director of Environmental Quality is designated as that person responsible for overall NEPA compliance.

5.8.14    Status Reports

Information or status reports on EISs and other related NEPA compliance activities and documents may be obtained by writing to the Director of Environmental Quality, Tennessee Valley Authority, Knoxville, Tennessee 37902.

5.8.15    Public Participation

TVA's policy is to encourage public participation in all of its decision making. This policy is implemented through various mechanisms. TVA has open meetings of the Board of Directors. These Board meetings are widely publicized and include a question and answer session between the public and Board of Directors. TVA has established a Citizen Action Office whose responsibility is to maximize to the extent practicable the interchange of ideas between TVA and the public in the full range of TVA activities. In addition, TVA has set up a "Citizen Action Line" which allows members of the public to call in on toll-free lines to ask questions and make suggestions or comments to TVA. In line with TVA's broad policies, TVA intends to encourage and actively seek public participation in its NEPA review process. The type of and format for public participation will be selected as appropriate to best facilitate timely and meaningful public input into the review process.