UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION )
AND PROTECTION, INC., et al.,           )
                                        )
        Plaintiffs,                     )
                                        )
        v.                              )     No. 1:05-cv-01190-RMU
                                        )
UNITED STATES ENVIRONMENTAL             )
PROTECTION AGENCY, UNITED STATES        )
DEPARTMENT OF HOUSING AND URBAN         )
DEVELOPMENT, and TENNESSEE VALLEY       )
AUTHORITY,                              )
                                        )
        Defendants.                     )
                                        )

DECLARATION OF JAMES N. HIZER

I, James N. Hizer, make the following declaration based on personal knowledge, information, and belief:

1.      I am the President of the Inter-Modal Transportation Authority ("ITA"). The ITA is located in the City of Bowling Green, Kentucky (the "City"), which is the fifth largest city in Kentucky and is located in Warren County, Kentucky (the "County").

2.      In 1998 the Kentucky General Assembly appropriated $6,000,000 from the Commonwealth's general fund for the purpose of evaluating and developing an industrial park. The County formed the ITA, a non-stock, non-profit corporation, to act as the County's agency and instrumentality in acquiring and financing the project. The facility envisioned by the County is known as the Kentucky Tri-Modal Transpark (the "Transpark").

1

3.  Michael Buchanon, Warren County Judge-Executive, the chief executive officer of the County, appointed a number of business leaders, community leaders and educators to the Board of Directors of ITA. In order to evaluate whether the Transpark was economically feasible and, if so, in what manner the project should be developed, ITA retained the services of Wilbur Smith Associates (WSA), an internationally recognized consulting and engineering firm possessing special expertise in engineering, planning and economics.

4.  WSA collected data through empirical studies of Warren County and its economy and studied data available from governmental sources and the Bowling Green – Warren County Chamber of Commerce. An Executive Summary of WSA's Benefit-Cost and Economic Impact Analysis found, among other things, that the Transpark should be constructed in stages.

5.  Based on the WSA feasibility study, ITA retained the regional accounting firm of Baird, Kurtz and Dobson ("BKD") to assist in developing a Business Plan. The Business Plan was developed after reviewing WSA's feasibility study and through close consultation between ITA's Board of Directors, WSA, BKD and various community leaders. The resulting Business Plan provided for the development of the Transpark in separate phases or stages. Phase I of the development includes the purchase and development of approximately 1,200 acres of land and the development of that land as a business or industrial park. The development of the Transpark in stages or phases has been the plan of development since a staged approach was recommended by WSA. No development of any part of the Transpark beyond Phase I has been undertaken or will be undertaken until Phase I is completed and a determination is made, after completion of Phase I, whether development beyond Phase I should be undertaken.

2

6.   Phase I of the Transpark does not include the construction of an airport. Although initial plans for development of the Transpark included development of a new airport, as the project is currently envisioned, any new airport will be developed by the Bowling Green – Warren County Airport Board (the "Airport Board"), an agency of the City and the County unrelated to the ITA. The Federal Aviation Administration ("FAA") funded a risk analysis study and a cost-benefit analysis to study the feasibility of closing the existing Bowling Green-Warren County Airport and replacing it with a new airport. This feasibility study is being completed by the Bowling Green-Warren County Airport Board under the guidance of its manager, Rob Barnett. The ITA is not participating in the feasibility study that was funded, at least in part, by the FAA. Any new airport would be located outside the land comprising Phase I of the Transpark, since Phase I of the Transpark consists solely of a business and industrial park. The ITA has not acquired any land to use for the construction of an airport. An airport is not part of any future plans by the ITA. If a new airport is constructed near the Transpark, it will be constructed under the auspices of the Airport Board, not the ITA. Whether an environmental impact statement will be required is a matter that will be addressed by the Airport Board and the Federal Aviation Administration ("FAA") if and when the Airport Board determines that a new airport should be constructed.

7.   On April 5, 2001 the County and ITA filed a Petition with the appropriate Kentucky authority, the State Local Debt Officer, seeking approval of a financing plan to provide permanent and interim financing for Phase I of the Transpark through the issuance of industrial revenue bonds (the "bond issue"). The Petition made no mention of an airport or the potential development of later Phases of the Transpark.

8. The SLDO approved the bond issue consisting of three elements: (1) Bond Anticipation Notes to be issued for interim financing of Phase I of the Transpark; (2) First Mortgage Revenue Bonds in the amount of $25 million in one or more series maturing in 30 years, representing permanent financing for Phase I of the Transpark; and (3) a Lease to be entered into between ITA and Warren County obligating the County to make such payments to ITA as are necessary to pay the Bond Anticipation Notes and the Bonds. The State Local Debt Officer's approval of the bond issue was ultimately affirmed by the Kentucky state courts on appeal.

9. To date, the ITA has utilized a portion of the bond issue to acquire approximately 800 acres of land and to commence the installation of the infrastructure of Phase I of the project, such as roads, water lines, sewer lines, etc. All of the land comprising Phase I of the Transpark is located in the corporate limits of the City of Bowling Green and adjacent to I-65, the CSX Railroad, U.S. 68/80 and U.S. 31W.

10. On June 10, 2004 the contractor chosen to begin construction of the infrastructure of the Transpark was authorized to begin construction and construction began shortly thereafter on Phase I of the Transpark. Phase I of the Transpark was planned, designed, financed and has been constructed without any federal funding and will utilize no federal funding in the future.

11. Numerical paragraph 8 of the complaint filed in the above-styled case states, "EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark." This statement is incorrect. The $3.75 million referred to represents two separate grants, neither of which were actually made to the ITA and neither of which relate to the Transpark. The $3.75 million referenced in numerical paragraph 8 of the

4

complaint consists of (1) a $2 million grant made to the Warren County Water District to extend larger water and sewer lines to north Warren County and (2) a $1.75 million dollar grant to the city of Bowling Green to assist in the "South Central Kentucky Water Infrastructure Project," which is being administered by the Warren County Water District.

While it is true that the $2 million grant was initially requested by the ITA, after the funds were appropriated, the ITA realized that the funds had been requested by mistake because (1) the water and sewer lines were to be constructed on property not owned by the ITA and (2) the water and sewer lines were to be constructed and owned by the Warren County Water District. After the funds were appropriated, but before they were received by the ITA, the ITA notified the office of Kentucky's senior Senator, Senator Mitch McConnell, that the funds had been mistakenly applied for. Senator McConnell's staff contacted the grantor, the Environmental Protection Agency ("EPA"), which changed the grantee from the ITA to the Warren County Water District before the funds were dispersed. Thus, the ITA never received the funds and did not spend them.

Neither of these two grants will finance construction of water and sewer lines in the Transpark. The water and sewer lines located in the Transpark have been constructed using exclusively the proceeds of the bond issue referenced above. The ITA awarded Brock Excavating a contract in the spring of 2004 to do all the grade work for the internal roads of the Transpark connecting U.S. 68/80 and U.S. 31-W. Included in this contract was the installation of 20 inch water and sewer lines inside the Transpark, which constitutes all of the water and sewer lines to be located inside Phase I of the Transpark. To date Brock Excavating has been paid approximately $6 million

5

JUN.24.2005 1:24PM NO.276 P.9/10

entirely out of revenue bonds issued by Warren County and/or funds received from the Commonwealth of Kentucky.

12. Numerical paragraph 9 of the complaint refers to $1.75 million appropriated by the Department of Housing and Urban Development ("HUD") for a training center under construction at the Transpark. The statements contained in numerical paragraph 9 of the complaint are incorrect for the following reasons: The amount of the appropriation was $1.50 million, not $1.75 million. These funds were appropriated for the purchase of equipment only, not for construction of the training center or the purchase of items that will become fixtures in the training center. The funds were appropriated to the City of Bowling Green, not the ITA. The funds to begin construction of the training center initially came from local sources involving no federal funds; interim financing from local sources was necessary because the Commonwealth of Kentucky was in a budget crisis at the time and had not enacted a budget. The Commonwealth of Kentucky has since enacted a budget and is in the process of taking over construction of the training center. The training center is not being constructed by the ITA. When completed, the training center will be part of the Kentucky Community and Technical College System ("KCTCS"), a state-wide system of vocational and training centers unrelated to the ITA.

13. The $1.5 million grant from HUD was originally requested by Jack Thomas, the former President of the Bowling Green Technical College, which is a member of the KCTCS and is unrelated to the ITA. The ITA, KCTCS, and the Bowling Green Technical College are all separate entities. The training center is a state project which is part of the KCTCS, although it will be available to assist in training employees of companies located in the Transpark. Neither the training

6

center nor KCTCS is affiliated with the ITA. Based on my information, knowledge and belief, none of the grant funds referenced in numerical paragraph 9 of the complaint have been spent or requested.

14. Numerical paragraph 10 of the complaint refers to money being allocated by the Tennessee Valley Authority ("TVA") to Bowling Green Metalforming, LLC ("BGMF"). BGMF is a for profit company which was the first company to purchase land and build a facility in the Transpark. BGMF announced in December, 2003 its intention to locate in Bowling Green, Kentucky and in February 2004 BGMF's purchase of land from the ITA was completed. After BGMF purchased its land from the ITA in February 2004, all decisions regarding the use of the land BGMF purchased from the ITA have been made by BGMF, not the ITA. The TVA funds were not requested by the ITA and have not been received by the ITA. ITA was not involved in any request for funds made by BGMF to TVA and had no knowledge of any such request. ITA has not received any funds from TVA and has not spent any funds provided by TVA.

15. Numerical paragraph 15 of the complaint states $8.7 million has been allocated by the Federal Highway Administration ("FHWA") for road infrastructure for the Transpark. This statement is incorrect. The complaint mentions a $2 million grant and a $5.25 million grant, but the $2 million is included in the $5.25 million grant. The $5.25 million was appropriated in fiscal year 2004 for improvements to U.S. 31-W and U.S. 68/80. The recipient of the funds was the Kentucky Transportation Cabinet, not the ITA. None of these funds were appropriated to, received by, or spent by the ITA. Although the expansion of U.S. 68/80 has recently been completed by the

7

Kentucky Transportation Cabinet, none of the $5.25 million grant was used for construction of the expansion of U.S. 68/80.

16. The allegation that the FHWA funds are to be used to add an exit and connector road for I-65 is misleading. The FHWA appropriated $1.7 million, which was divided into two grants, a $500,000 grant to the Kentucky Transportation Cabinet for a feasibility study of a new exit off I-65 and a $1.2 million grant for the construction of internal roads in the Transpark. The ITA declined the $1.2 million appropriation and these funds were never requested or received. The internal roads in the Transpark are being constructed and funded entirely by the proceeds of the bond issue discussed above and funds appropriated by the Commonwealth of Kentucky.

17. The Kentucky Transportation Cabinet is currently studying the possibility of constructing a connector road as mentioned in numerical paragraph 15 of the complaint, along with two other options. The Kentucky Transportation Cabinet has made no decision as to which of the three options will be chosen. Any construction of such a connector will be undertaken by the Kentucky Transportation Cabinet, not the ITA. The I-65 connector is not part of the Transpark plan, but is part of the City of Bowling Green 20 year road plan. The proponents of the I-65 connector hope it will eventually become part of a new interstate highway which will cross Kentucky from east to west, I-66. The I-65 connector mentioned in the complaint is not part of the Transpark and the ITA has not been notified as to which of the three options noted above will be chosen.

18. On May 12, 2005, ITA advertised for requests for proposals from qualified firms to demolish and dispose of a residential structure and all associated farm buildings at 839 Mizpah

8

Road, Bowling Green, KY. The properties at 839 Mizpah Road, Bowling Green, KY are within the acreage acquired for the Transpark. ITA intends demolition of these as part of construction of Phase I of the Transpark.

19.   ITA's decision on whether to undertake the aforementioned demolition at 839 Mizpah Road, Bowling Green, KY is not contingent upon ITA receiving funding from either HUD or the Environmental Protection Agency ("EPA") or any other federal source.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th day of June 2005.

James N. Hizer, President, Inter-Modal
Transportation Authority, Inc.