UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION )
AND PROTECTION, INC. et al. )
)
)
Plaintiffs, )
)
)
U.S. ENVIRONMENTAL PROTECTION )
AGENCY et al. )
)
Defendants, )  No. 1:05-cv-01190-RMU
)
)
INTER-MODAL TRANSPORTATION )
AUTHORITY, INC; FISCAL COURT OF )
WARREN COUNTY, KENTUCKY; and )
BOARD OF COMMISSIONERS OF CITY )
OF BOWLING GREEN, KENTUCKY )
)
Intervenors. )

## INTERVENORS INTER-MODAL TRANSPORTATION AUTHORITY, INC., THE FISCAL COURT OF WARREN COUNTY, KENTUCKY, AND THE CITY OF BOWLING GREEN, KENTUCKY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

The Inter-Modal Transportation Authority, Inc. ("ITA"), the fiscal Court of Warren County, Kentucky (the "County"), and the Board of Commissioners of the City of Bowling Green, Kentucky (the "City") (collectively the "Intervenors") seek dismissal of the Complaint and denial of Plaintiffs' Motion for Preliminary Injunction. The Intervenors are the owners and developers of an industrial park being developed in the City of Bowling Green, Kentucky known as the Kentucky Tri-Modal Transpark, or simply the Transpark. The ITA is an agent of the County and is the owner of the land where the Transpark is being developed; the City and the County have guaranteed a bond issue to finance the acquisition of the land and the construction

of the infrastructure necessary to develop the land into a business and industrial park. In the making since 1998, the Transpark is a vital part of the economic future of the City and surrounding region.

The Plaintiffs in this action contend that the U.S. Environmental Protection Agency ("EPA"), the U.S. Department of Housing and Urban Development ("HUD"), and the Tennessee Valley Authority ("TVA") (collectively the "federal defendants") each have violated various provisions of the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA"). To remedy these purported violations of federal law, the Plaintiffs seek declaratory and injunctive relief, including a preliminary injunction that would have the effect of halting any further development activities associated with the Transpark. Thus, while EPA, HUD, and TVA have been named as defendants, this action is, in reality, a collateral attack on the Transpark project and the Intervenors' interests. By seeking orders that would stop, or delay, the Transpark project, Plaintiffs seek relief that would directly and substantially affect the interests of the Intervenors.

However, there have been no federal actions by EPA, HUD, or TVA, or action by the Intervenors, that trigger federal jurisdiction in this case. Accordingly, Plaintiffs' Complaint should be dismissed for lack of jurisdiction, since there has been no "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704 ("APA"), the jurisdictional statute upon which this case hinges. The Complaint also fails to state a claim upon which relief can be granted. Consequently, the Complaint should be dismissed and Plaintiffs' Motion for Preliminary Injunction should be denied.

"Walker Decl."), ¶ 4. The first phase of the development does not include the construction of an airport, Hizer Decl., ¶ 6. The Bowling Green – Warren County Airport Board is considering replacement of the existing airport with a new regional airport, but has made no decision as to whether a new airport will be built or where it would be located. Declaration of Robert Barnett (the "Barnett Decl."), ¶ 2.

The efforts to develop the Transpark are supported by neighboring counties and municipalities, who have pledged to bear approximately 35% of the financial burden of the project in the event it fails to become self-supporting as projected. Buchanon Decl., ¶ 4. Pursuant to an agreement between the City and the County, the remaining 65% of the financial burden of the project, in the event it is not self-supporting, will be borne equally by the City and the County. Buchanon Decl., note 1.

## ARGUMENT

**I.     The Complaint Should be Dismissed for Lack of Subject Matter Jurisdiction**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. It is well-established that a party seeking federal court jurisdiction bears the burden of demonstrating that jurisdiction exists. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189 (1936); *Commodity Futures Trading Com'n v. Nahas,* 738 F.2d 487 (D.C. Cir. 1984). It is presumed that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *United States Dep't of Energy v. Ohio,* 503 U. S. 607, 614 (1992); *Renne v. Geary,* 501 U.S. 312, 315 (1991). Federal courts are courts of limited jurisdiction and may only decide cases after the party asserting jurisdiction demonstrates that the dispute falls within the court's constitutional and statutory jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994).

In order to invoke the Court's subject matter jurisdiction, the Plaintiffs must show that the federal defendants in this case took final agency action relative to the Transpark, 5 U.S.C. § 704, or demonstrate that Transpark is a "federal undertaking." They can do neither. The Plaintiffs try to "federalize" the Transpark through a series of erroneous allegations regarding appropriations of federal funds. In contrast, Judge Michael O. Buchanon, Judge-Executive (Chief Executive Officer) of the County, summarizes the absence of any federal funding or involvement in the development of the Transpark as follows:

> No funds from any agency of the United States Government have been used in the acquisition or development of these 900 acres, which comprise Phase I of the Transpark, and the ITA is not dependent on such funds to complete development of the Transpark. There is no present intention to request or utilize funding from any agency of the United States Government in connection with the future development of the Transpark. Buchanon Decl., ¶ 3.

The various other declarations filed in support of Intervenors' Motion to Dismiss demonstrate that each of the Plaintiffs' allegations of federal involvement in the Transpark are illusory. Neither NEPA nor the NHPA contains a grant of federal jurisdiction, and the APA only allows review of "final agency actions" pursuant to 5 U.S.C. § 704. As recently articulated by the Supreme Court, the APA grants jurisdiction to review "some 'particular agency action' that causes...harm" such as the outcome from an "agency rule, order, license, sanction, or relief." *Norton v. Southern Utah Wilderness Alliance,* 124 S.Ct. 2373, 278-80 (2004). Such discrete federal actions do not exist in this case. The mere appropriation of funds is not a final agency action; the APA expressly excludes Congressional actions. 5 U.S.C. §§ 701(b)(1), 551(1) Nevertheless, as will be demonstrated, appropriations, and little more, are what Plaintiffs allege as grounds for jurisdiction. Therefore, the Complaint should be dismissed for lack of jurisdiction.

5

### A. No Federal Funds Have Been Used for the Construction of the Infrastructure of the Transpark.

Plaintiff falsely alleges that the Transpark is "a 4,000-6,000 acre integrated road, air and rail industrial park" in an effort to erroneously link projects that have been undertaken by various state and local agencies. Pls.' Compl., ¶ 1. The initial plans for the Transpark were more ambitious than the development currently under construction and currently envisioned. The development of a new regional airport is no longer part of the Transpark. The question of whether a new airport should be developed in the area is no longer to be addressed by the ITA, because the Bowling Green – Warren County Airport Board, an agency of the City and the County separate and apart from the ITA, is solely responsible for determining whether a new airport will be developed and where it will be located. Barnett Decl. ¶¶ 2-3; Buchanon Decl., ¶ 13, Hizer Decl., ¶ 6.

In addition to the fact that an airport is not part of the Transpark, the declarations before the Court establish that the Transpark presently consists solely of the development of a 900 acre business and industrial park, Hizer Decl., ¶¶ 5, 9; Buchanon Decl., ¶ 14, not a 4,000 to 6,000 acre facility as alleged by Plaintiff. Pls.' Compl., ¶ 1.

The Complaint also erroneously states that "EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark." Pls.' Compl ¶ 8. However, the funds that Plaintiffs refer to in that portion of the Complaint were not appropriated for the ITA, and were not received or spent by the ITA. Hizer Decl., ¶ 11. All infrastructure of the Transpark, including water and sewer lines, has been constructed exclusively with the proceeds of the ITA's $25 million industrial revenue bond issue and funds provided by the Commonwealth of Kentucky. Id. The June 27, 2005 Declaration of Dorothy Rayfield ("Rayfield Decl.") filed in support of the EPA's and HUD's Motion to Dismiss

6

confirms the statements set forth in the Hizer Declaration. The $3.75 million referred to in the Complaint consisted of two grants: (1) a grant to the Warren County Water District, not the ITA, to extend larger water and sewer lines to northern Warren County and (2) a grant to the City of Bowling Green to assist the South Central Kentucky Water Infrastructure Project. Hizer Decl., ¶ 11.

The $1.7 million grant was requested by the ITA by mistake. Hizer Declaration, ¶ 11. Before the funds were dispersed, the ITA realized that the funds had been mistakenly applied for by the ITA because the water and sewer lines were to be constructed on land located outside the Transpark by the Warren County Water District and were to be owned by the Warren County Water District. Id. The funds have not been released to the Warren County Water District by EPA and, obviously, have not been spent by anyone, including the ITA.

An additional $2 million was appropriated to fund a possible grant from the EPA to the City of Bowling Green; the ITA is not a recipient of the funds. Rayfield Declaration, ¶ 12. Moreover, the City has not made application for the funds and the funds have not been awarded, received, or spent. Rayfield Decl., ¶ 12.

C.  **The Appropriation of Funds for a Training Center through the U.S. Department of Housing and Urban Development Does Not Establish Federal Involvement in, or Jurisdiction over, the Transpark.**

The Complaint also alleges that "HUD's spending authorization bill for fiscal year 2005 appropriated a total of $1.75 million for a training center that is already under construction at the Transpark." Pls.' Compl. ¶ 9. The allegation is incomplete and misleading. It is true that the U.S. Department of Housing and Urban Development ("HUD") has appropriated funds for a training center and that the training center is located at the Transpark. However, HUD's prospective financial support for the training center does not establish, or equate to, federal funding of the Transpark.

7

The June 27, 2005 Declaration of Francis P. McNally filed in support of the Motion to Dismiss filed by HUD and the U.S. Environmental Protection Agency ("EPA") states that $1.5 million in funds were appropriated, not for the ITA, but for the City of Bowling Green. McNally Decl., ¶ 8. Even so, the funds cannot be dispersed until an application is made and approved by the City and no application for the funds has been made. Id. at ¶¶ 9-10. Since no funds have been awarded, HUD has no authority to dictate the activities of the possible recipient. Id. at ¶ 11. Moreover, the HUD funds were appropriated for the purchase of equipment, not construction of the training center. Id. Construction of the training center is funded by the Commonwealth of Kentucky, not the ITA; the training center will be part of the Kentucky Community and Technical College System, a state-wide system of vocational and training centers operated by the Commonwealth and unrelated to the ITA. Hizer Decl., ¶ 12.

D.  **TVA's Grant to Bowling Green Metalforming LLC Does Not Establish Federal Jurisdiction Over the Transpark.**

The Complaint makes further attempts to establish federal involvement in the Transpark through its assertions concerning Bowling Green Metalforming LLC. Pls. Compl., ¶ 10. Plaintiffs fail to inform the Court that Bowling Green Metalforming LLC is a privately owned company whose only connection with the Transpark is that it purchased land in the Transpark from the ITA and is in the process of constructing facilities on the land it purchased. Hizer Decl., ¶ 14. The ITA has had no role in the construction of Bowling Green Metalforming LLC's facility. Id. The ITA did not request the funds that Bowling Green Metalforming LLC received from the TVA. The grant by TVA to Bowling Green Metalforming LLC was for the purchase of equipment, as established by the Declarations filed in support of TVA's opposition to the Plaintiffs' motion for a preliminary injunction.

E.  **The U.S. Federal Highway Administration's Grants to the Kentucky Transportation Cabinet Do Not Establish Federal Jurisdiction or Involvement in Transpark.**

The Complaint makes erroneous allegations concerning the nature of grants awarded by the U.S. Federal Highway Administration ("FHWA") in an effort to establish that the Transpark is federally funded or is a "federal undertaking," by stating that "FHWA's spending authorization bills for fiscal years 2003 through 2005 appropriated a total of $8.7 million for road infrastructure for the Transpark complex." Pls.'Compl., ¶ 10. The FHWA grants in question relate to three separate construction projects: (1) the improvement of U.S. 31-W and U.S. 68/80, (2) the construction of a new interchange off I-65, and (3) the construction of internal roads in the Transpark. Hizer Decl., ¶¶ 15-17.

The FHWA funds appropriated for the improvement of U.S. 31-W and U.S. 68/80 were not appropriated for ITA, but were appropriated for the Kentucky Transportation Cabinet. Hizer Decl., ¶¶ 15-17. None of the funds were received or spent by the ITA and no part of this particular project was located inside the Transpark. Id.

The construction of a new connector or exchange off I-65 is not a project that is directly related to the Transpark. Rather, it is part of the 20-year plan for the City of Bowling Green, through which I-65 passes, and is hoped to be part of a new interstate highway, I-66, which will pass through Kentucky in an east to west direction. Id. The Kentucky Transportation Cabinet, not the ITA, received a $500,000 grant from the FHWA to study the project, but none of these funds were received or spent by the ITA. Id. The Kentucky Transportation Cabinet is currently in the process of studying the project, and is considering three different proposals, none of which has been adopted. Id.

The FHWA funds referenced in the Complaint consisted, in part, of a $1.7 million grant for the construction of internal roads within Transpark. Although these funds were allocated by

9

the FHWA, they were never received by or spent by the ITA. Id. The ITA declined the funds and has constructed all internal roads inside the Transpark with funds derived from the ITA's $25 million industrial revenue bond issue and funds received from the Kentucky Transportation Cabinet. Id. Thus, no federal funds have been used to construct roads inside the Transpark.

**F.    The U.S. Federal Aviation Administration is not Providing Financing for the Transpark.**

The construction of a new airport is no longer part of the Transpark. Hizer Decl., ¶ 6. Responsibility for determining whether a new airport will be constructed, when it will be constructed, and where it will be constructed is now in the hands of the Bowling Green – Warren County Airport Board, an agency of the City and the County separate from the ITA. Id.; Barnett, ¶¶ 2 and 3.

The ITA has never received nor spent any federal funds for the development of Phase I of the Transpark. June 29, 2005 Declaration of Dan Cherry ("Cherry Decl."), former president of the ITA. Phase I is the only portion of the project currently under construction and the only portion that will be constructed pending completion of Phase I and a re-evaluation of the advisability of increasing the size of the business and industrial park thereafter. Hizer Declaration, ¶ 5.

**II. THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

If a Complaint fails to challenge a "final agency action" under the APA, it also may be dismissed for failure to state a claim upon which relief can be granted. Therefore dismissal is proper pursuant to both Rule 12(b)(6) and 12(b)(1). In *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003) the DC Circuit held that "[i]f there was no final agency action here, there is no doubt that appellant would lack a

cause of action under the APA. Dismissal is therefore appropriate pursuant to 12(b)(6)"); *CropLife America v. Environmental Protection Agency,* 329 F.3d 876, 882 (D.C. Cir. 2003) ("In *Reliable,* we determined that the District Court lacked jurisdiction to review the Consumer Product Safety Commission's ("CPSC") process absent final agency action"). Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326 (1989) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41 (1957)). "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke,* 490 U.S. at 327 (quoting *Hishon,* 467 U.S. at 73).

Plaintiffs allege that both NEPA and the NHPA have been violated. However, there is no basis in law for either claim, as even a cursory examination of those two statutes demonstrates.

### A. Plaintiff Has Failed to State A Claim Under NEPA Because There Has Been No Major Federal Action Taken

NEPA, 42 U.S.C. § 4332 et seq., was enacted for the purpose of protecting the human environment by requiring federal agencies to consider carefully the environmental consequences of their actions. Without federal action, NEPA's procedural requirements are not invoked. Under Section 4332(2)(C) of NEPA, federal agencies are required to conduct an environmental analysis and prepare an Environmental Impact Statement ("EIS") for **major federal actions** significantly affecting the quality of the human environment."

The purpose and intent of NEPA is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented. 42 U.S.C. § 4321; 40 C.F.R. § 1501.10; *Marsh v. Oregon Natural*

11

*Resources Council,* 490 U.S. 360, 371 (1989). Regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500-1508, provide guidance in the application of NEPA. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989). NEPA's mandate to federal agencies, is "essentially procedural ... It is to insure a fully informed and well-considered decision ...." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 (1978). In this case, **there is nothing for the federal agencies to consider or decide.** While NEPA mandates the procedures by which federal agencies must consider the environmental impacts of their actions, it does not dictate the substantive results. *Robertson,* 490 U.S. at 350 (1989); *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227-28 (1980) (citing *Vermont Yankee Nuclear Power Corp,* 435 U.S at 558).

As should be clear from the previous discussion, there is no major federal action currently pending regarding the Transpark. The existence of federal appropriations alone does not trigger NEPA requirements, as this court recently pointed out in *Citizens Alert Regarding the Environment v. EPA*, 259 F. Supp.2d 9 (D.D.C. 2003) *aff'd* 2004 WL 1336644 (D.C.Cir. 2004). In *Citizens Alert,* Plaintiff attempted to stop a township's sewer project because an EPA appropriation Act had earmarked money for the project. Plaintiff insisted a NEPA review was necessary. The court held that although the project might receive federal funds in the future, it was unnecessary to enjoin the project pending a NEPA analysis. The court concluded that EPA's actions were not major federal actions under NEPA. *Citizens Alert* at 20.

### B. Plaintiffs Fail To State a Claim under NHPA Because There is No Federal Undertaking

Congress also directed federal agencies to consider the impact of federal undertakings on historic resources of national significance, 16 U.S.C. § 470f, and to assume responsibility for the

12

preservation of historic resources that they own or control, 16 U.S.C. § 470h-2. Section 106 of the NHPA, establishes responsibilities of a federal agency over a proposed federal or federally assisted "undertaking":

> The head of any federal agency having direct or indirect jurisdiction over a proposed federal or federally assisted undertaking in any State and the head of any federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such federal agency shall afford the Advisory Council on Historic Preservation established under Title 11 of this Act a reasonable opportunity to comment with regard to such undertaking. 16 U.S.C. § 470f:

Just as in the case of NEPA, the requirements set forth in section 106 of the NHPA are essentially procedural in nature. *National Min. Assn v. Fowler,* 324 F.3d 752, 755 (D.C. Cir. 2003); *United States v.162.20 Acres of Land,* 639 F.2d 299, 302 (5th Cir. 1981) *cert. denied,* 454 U.S. 828 (1981). The Act "neither ... forbid[s] the destruction of historic sites, nor ... command[s] their preservation."). Section 106 requires agency decision-makers to consider specified information concerning the effects of a federal undertaking on National Register-eligible resources prior to the agency's issuance of a final decision. Furthermore, as articulated by the DC Circuit in *Sheridan Kalorama Historical Ass'n v. Christopher,* 49 F.3d 750, 754-55 (D.C. Cir. 1995), the only activities that invoke federal obligations under the NHPA are (1) conducting an undertaking involving federal funding and (2) issuance of a federal license.

Since the TransPark activities do not involve federal funding, ownership, or control, there is simply no federal "undertaking" that triggers NHPA review. Since the Plaintiffs have utterly failed to state a claim upon which relief can be granted, the Complaint should be dismissed.

### III. Plaintiffs' Motion for Preliminary Injunction Should be Denied

The courts recognize that a preliminary injunction is extraordinary relief which should only be granted when the moving party, by a clear showing, carries the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparably injury if the Court does not issue a preliminary injunction; (3) that the preliminary injunction will not substantially injure another party; and (4) the preliminary injunction would be in the public interest. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441-43 (1974); *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). *Sorono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317-1318 (D.C. Cir. 1998). The third prong of the preliminary injunction test is critical in this case, and reflects the fact that the Court must balance the relative hardships of different parties in determining whether to issue a preliminary injunction. *National Wildlife Fed'n v. Burford*, 835 F.2d 305, 318-19 (D.C. Cir. 1987). To prevail, the plaintiff bears the burden of proving each of the prerequisites by clear and convincing evidence. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441 (1974); *Cobell v. Norton*, 397 F.3rd 251, 258 (D.C.Cir. 2004). The Plaintiff are unable to satisfy any of the prongs of the test in this case.

### A. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

As both the Intervenors and federal Defendants have explained, the Court is unlikely to reach the merits of Plaintiffs' claims, because Plaintiffs have not met their burden of establishing jurisdiction. If the Court were to consider the merits, even a cursory review of Plaintiffs' Complaint shows that Plaintiffs' claims are unlikely to succeed. See generally Argument II, *supra*.

Plaintiffs' allegation that Defendants EPA and HUD violated sections 106 and 110(k) of the NHPA also fails. Pls.' Compl. ¶23-33. 106 and 110(k) of the NHPA. Pls.' Compl. ¶¶ 23-33 and Prayer for Relief. Plaintiffs' complaint fails to identify any federal action (because there has been none) approving the expenditure of federal funds or issuing any federal license in violation of this provision. In fact, as detailed above, the ITA, the developer of the Transpark, has not received or used any federal funding in connection with the Transpark. Similarly, NHPA section 110(k) relates, in relevant part, to federal funding decisions in connection with applicants who have intentionally and significantly adversely affected historic properties with the intent to avoid the requirements of section 106. Notwithstanding Plaintiffs' allegation that the Transpark project developers are engaging in activities that amount to anticipatory demolition of historic properties, their complaint fails to identify any federal funding decision on the part of either Defendant in violation of section 110(k). Section 110(k) is focused on the grant award decision and does not provide Defendants any pre-award authority to condition or halt project activities.

Plaintiffs also allege Defendants EPA and HUD violated NEPA by failing to prepare an EIS. Pls.' Compl. ¶ 38. As Plaintiffs have failed to identify any final agency actions taken by Defendants EPA and HUD, their NEPA claim necessarily fails as well.

### B. Plaintiffs Cannot Prove Irreparable Injury Will Occur.

Plaintiffs also fail to show that they would be irreparably injured if their motion for preliminary injunction was denied. Contrary to Plaintiffs' analysis, in *Amoco Prod. Co. v. Village of Gambell,* the Supreme Court explicitly rejected a presumption of irreparable injury. 480 U.S. 531, 545 (1987). The *Amoco Prod. Co.* Court *reversed* a lower court ruling that

"[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action." *Id.* at 544-45.

Plaintiffs assert that a preliminary injunction is necessary "to prevent the Defendants from funding or entertaining requests for further building demolition, destruction of cultural landscapes, or construction of water/sewer/road infrastructure prior to compliance with NEPA and NHPA." Pls.' Mot. at 13. In making this allegation, Plaintiffs have completely failed to offer any evidence that demonstrates that Defendants EPA and HUD will not follow the established agency procedures to reach a sound final agency decision, including compliance with all applicable laws, regarding any grant applications that may be submitted. Plaintiffs' suggestion that Defendants will violate NEPA and the NHPA in making their decisions, if and when the grantees apply for the appropriated funds is mere speculation. Plaintiffs failure to demonstrate irreparable harm is independent grounds, by itself, for the Court to deny Plaintiffs' motion. *Smith, Bucklin & Assoc. v. Sonntag,* 83 F.3d 476, 477 (D.C. Cir. 1996); *CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).

### C. An Injunction Would Unnecessarily and Irreparably Harm Intervenors' Rights and Is Decidedly Not in the Public Interest

If the Court had jurisdiction to enjoin the Transpark project -- and the Intervenors and federal defendants argue it does not -- the public interest would still not be served by an injunction. An injunction would disrupt the economic development that the local decision-makers in Bowling Green, Kentucky and Warren County, Kentucky have determined is in the best interest of their community. Accordingly, the public interest favors denial of Plaintiffs' motion.

Specifically, should the Plaintiffs ultimately obtain an injunction, the future viability of the Transpark project could be called into question. Such an outcome would have serious impacts on the further development of the Transpark and ITA's ability to attract additional industries to the park. Thus, should the plaintiffs prevail in the instant action, particularly with regard to the preliminary injunction they seek, the Intervenors will suffer immediate, concrete injuries. Such injuries will include:

- ITA will be unable to generate funds from the sale or lease of the property it has acquired and will be unable to pay Warren County the amounts necessary to meet the payments on the bond issue. Buchanon Decl., ¶ 7

- Warren County, as a guarantor of the bond issue, will be required to pay approximately 32.5% of the bond issue from its general funds if the ITA is unable to generate funds through the sale of property the ITA has purchased. Pearson Decl., ¶ 3-4.

- The City of Bowling Green, as a guarantor of the bond issue, will be required to pay approximately 32.5% of the bond issue from its general funds if the ITA is unable to generate funds through the sale of property the ITA has purchased. Buchanon Decl., ¶ 11, note 1.

- Warren County's bond rating, which affects its ability to issue bonds and the rates it is required to pay on money borrowed through bond issues, will be adversely affected. Terrell Ross Decl., ¶ 6.

- Both the City and the County would lose tax revenues that would flow from development of the Transpark by virtue of the location of industries in the Transpark, which would substantially increase the tax base and generate hundreds

17

of jobs for local residents. Walker Decl., ¶ 4; Buchanon Decl., ¶ 7; Hizer Decl., ¶ 23.

- Even a temporary delay in construction at the Transpark will result in irreparable damage because contractors will go on to other jobs and the ITA will have to pay for the costs of re-starting the project. Costs of construction will increase and the accumulated expertise of current contractors and consultants regarding this particular project will be lost. Glenn Ross Decl., ¶ 4.

- The standing of the City, the County, and the ITA in international business circles will be affected, irreparably damaging efforts to recruit businesses to locate in the Transpark. Hizer Decl., ¶¶ 19-21; Walker Decl., ¶ 4; Buchanon Decl., 8; Ticknor Decl., ¶¶ 2-3.

The irreparable damage that will result from the plaintiffs' success in this action goes beyond the adverse economic impacts on the City and the County. The residents of Bowling Green and Warren County will be irreparably damaged in the following ways:

- There are 6,500 unemployed residents in the Bowling Green area who will be denied access to the thousands of jobs that will be created by continued development of the Transpark. Walker Decl., 4; Hizer Decl., ¶ 22.

- Local businesses will suffer through the loss of the synergistic effect that translates each dollar paid in wages to $2 to $3 in economic activity. Local retailers and service businesses will suffer from the loss of this increased economic activity. Hizer Decl., ¶ 26.

- Businesses that locate in the area support culturally enhancing organizations, such as the Bowling Green Chamber Orchestra, which will lose that support. Hizer Decl., ¶ 27.

18

- Financial support for organizations that serve the underprivileged and underserved members of the community, such as the United Way, will be adversely affected because they will receive less corporate support; the City and the County will be unable to provide their past level of support if they are required to pay the ITA bonds. Hizer Decl., ¶ 27.

- Funds required to pay the ITA bond issue will be diverted from such initiatives as storm water planning, recycling, solid waste disposal, illegal dump cleanups, and parks and recreation facilities. Buchanon Decl., ¶ 11.

- Delays in construction at the Transpark will result in the very environmental damage the plaintiffs purportedly seek to avoid because the installation of a state-of-the-art storm water treatment system is yet to be accomplished, as is the mulching, seeding, landscaping and re-vegetation of the land disturbed by construction, which would prevent erosion. The result is a risk of damage to the ground water. Ross Decl., ¶ 3.

The injuries that Intervenors and the community would suffer are concrete and imminent should a preliminary injunction be issued. Finally, balancing the injuries in this case weighs in favor of the Intervenors, federal Defendants, and the public interest. When injunctive relief would harm the public interest, the Court may withhold the relief, even if doing so would burden or cause irreparable injury to the movant. *Weinberger v. Romero Barcelo,* 456 U.S. 305, 312-13(1982); *Yakus v. United States,* 321 U.S. 414, 440 (1944).

## CONCLUSION

For the reasons stated above, the Court should grant the Intervenors' Motion to Dismiss the Complaint with prejudice and deny the Motion for Preliminary Injunction.

Respectfully submitted,

ATTORNEYS FOR INTERVENORS

Charles E. English
Whayne C. Priest, Jr.
ENGLISH, LUCAS, PRIEST & OWSLEY, LLP
1101 College Street; P.O. Box 770
Bowling Green, KY 42102-0770
Telephone: (270) 781-6500
Facsimile: (270) 782-7782
E-mail:  charles@elpolaw.com
E-mail:  whayne@elpolaw.com

and

LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1875 Connecticut Avenue, NW
Washington, DC  20009
Telephone:  (202) 986-8000
Facsimile:  (202) 986-8102

_____/s/ George Ellard_____
GEORGE ELLARD
D.C. Bar No. 386084
D. RANDALL BENN
ROBERT M. ANDERSEN

20

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the attached INTERVENORS' MOTION TO DISMISS and INTERVENORS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THE MOTION TO DISMISS AND IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION, were this 1st day of July 2005, served by first class U.S. Mail, postage prepaid, on the following:

Frank Lancaster
Maria Gillen
Office of General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive, East Tower
Knoxville, TN 37902
E-mail: mvgillen@tva.gov
Attorneys for Defendant Tennessee Valley Authority

Sara Culley
U.S. Department of Justice
601 D Street, NW
Washington, DC 20004
E-mail: sara.culley@usdj.gov
Attorneys for defendants U.S. Environmental Protection Agency and U.S. Housing and Urban Development

W. Henry Graddy, IV
W. H. Graddy & Associates
103 Railroad Street
Post Office Box 4307
Midway, KY 40347
E-mail: hgraddy@aol.com
Attorneys for plaintiffs

David Bookbinder
Sierra Club
408 C Street, NE
Washington, DC 20002
E-mail: david.bookbinder@sierraclub.org
Attorneys for plaintiffs

/s/ George Ellard
GEORGE ELLARD
Attorney for Intervenors

21