UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC. et al.<br><br>Plaintiffs,<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY et al.<br><br>Defendants,<br><br>INTER-MODAL TRANSPORTATION AUTHORITY, INC; FISCAL COURT OF WARREN COUNTY, KENTUCKY; and BOARD OF COMMISSIONERS OF CITY OF BOWLING GREEN, KENTUCKY<br><br>Intervenors. | No. 1:05-CV-01190-RMU |

**DECLARATION OF MICHAEL O. BUCHANON**

I, Michael O Buchanon, make the following declaration based on personal knowledge, information and belief:

1. I am the duly elected Judge-Executive of Warren County, Kentucky (the "County"), the Chief Executive Officer of the County. I was first elected by the people of Warren County in 1993, and I have served as Judge-Executive since that time. Warren County is a political subdivision of the Commonwealth of Kentucky.

2. The City of Bowling Green (the "City") is the county seat of Warren County, the largest incorporated city within the County, and with roughly 50,000 residents, contains slightly over half of the population of the entire County.

3. In 1998 the County received six million dollars as a grant to be used in planning, designing and developing what is now the Kentucky Tri-Modal Transpark (the "Transpark") from a legislative appropriation of the Kentucky General Assembly in their 1998 legislative session. The County formed the Inter-Modal Transportation Authority, Inc. (the "ITA") to act as its agent and instrumentality in planning and acquiring the Transpark. Warren County later borrowed additional bridge funding to begin land acquisition, and later authorized the ITA to issue $25 million in bonds to finance additional land acquisition totaling approx 900 acres and install infrastructure (roads, sewers, water lines, etc.) in the Transpark. No funds from any agency of the United States Government have been used in the acquisition or development of these 900 acres, which comprise Phase I of the Transpark, and the ITA is not dependent on such funds to complete development of the Transpark.. There is no present intention to request or utilize funding from any agency of the United States Government in connection with the future development of the Transpark.

4. The County has entered into agreements with neighboring counties and cities for financing and marketing purposes. These neighboring communities are smaller in population than the County, and many do not have the financial capacity to employee their own economic development staff. Twenty-five Board members were appointed to the ITA Board of Directors by the County, consisting of regional business people, educators, individuals from the economic development community and elected Judge Executives and Mayors from all of the counties and cities who have agreed to support the Transpark. The importance of the Transpark to the entire south central Kentucky region is evidenced by the fact that these neighboring counties and cities have, collectively, agreed to reimburse the County for approximately 35% of any funds required

to pay the bonds issued by the ITA in the event the ITA is unable to generate sufficient income from the sale of land to pay the bonds.

5.  At the outset of the project, professional consultants were hired to study the feasibility of the project and to conduct cost/benefit studies, environmental studies, and site selection studies. These studies considered several large areas, mostly within the County, but some areas crossing over into adjoining counties were also investigated. Each of these large study areas were examined and analyzed thoroughly, from every aspect, before selecting the site that the Transpark now occupies.

6.  If the plaintiffs are successful in obtaining the injunction they seek, the result will be devastating to the continued development of the Transpark and will result in irreparable harm to the City, to the County, to the nearly 100,000 residents of Warren County, and to the more than 130,000 residents of the cities and counties which have entered into agreements to support the Transpark, for the following reasons.

7.  The $25,000,000 in bonds issued by the ITA is amortized over 30 years. The revenues to repay the bonds are to be derived from industrial land sales, payroll deductions from those employed in the Transpark as part of a development district, and incremental ad valorem taxes. Thus, the revenues necessary to repay the bonds depends on the ITA being able to successfully market its land to businesses and industries that will locate business and industrial facilities in the Transpark.

8.  The mere filing of this lawsuit has adversely affected the efforts to recruit occupants for the Transpark and an injunction would have a devastating effect on future efforts to recruit businesses and industries to locate in the Transpark. One prospective purchaser who was preparing to apply for a building permit and begin construction this month informed me

within the past few days that it is now aggressively seeking alternative sites for the location of the facility that was to be located in the Transpark because of the uncertainties as to the future of the Transpark caused by this lawsuit. Other businesses and industries that are near to committing to locate in the Transpark will undoubtedly resume negotiations with other states, or cancel their projects altogether, if an injunction is granted.

9. Worse than losing potential purchasers and the jobs and economic benefits they will bring to the region, our community and the Transpark stand to lose credibility in the international marketplace altogether if the ITA is forced to delay development of the Transpark. A preliminary injunction could very well deal a death blow to the Transpark, not just delay development.

10. Any delay in the development of the Transpark will cause irreparable harm to our collective community, permanently damage the financial strength of the County and the City, and would undoubtedly cause neighboring counties and cities, who have agreed to provide financial support for the Transpark in the event it is needed, to withdraw from the regional partnership relationship that many have worked so hard to build.

11. Through a lease agreement between the ITA and the County, the County has guaranteed the repayment of the $25 million in bonds issued by the ITA in the case of any shortfall in revenue from anticipated sources.[1] Should the injunction the plaintiffs seek be granted, the County would be required to reallocate money from its general fund to repay the bonds. Such a reallocation of funds would force the County to curtail normal funding for social programs within the County that benefit many underprivileged or underserved individuals.

---

[1] As stated above, neighboring cities and counties have collectively agreed to pay the County approximately 35% of any shortfalls. In addition, the City has agreed to reimburse the County for ½ of the remaining 65% of any such shortfalls, resulting in remaining liability on the part of the County in the amount of approximately 32 ½ % of any shortfalls

Funding for agencies that benefit local citizens may have to be eliminated. Initiatives that have been put in place for storm water planning, recycling, solid waste removal, illegal dump cleanups, and parks and recreation facilities and programs could be seriously curtailed if the plaintiffs are successful in obtaining the preliminary injunction they request.

12.     Construction of the infrastructure of the Transpark is nearly complete, with paved streets, storm water sewers, earthmoving, and excavation nearly finished. The remaining work, which includes the installation of state-of-the-art storm water filtration and treatment systems, as well as seeding and planting trees and vegetation, are among the more important elements of the infrastructure necessary for environmental protection and erosion control. Any delays in completing these elements of the infrastructure would damage the very environmental interests the plaintiffs allege they desire to protect.

13.     The initial plans for the Transpark were ambitious, including the development of a new regional airport to serve, not only the Transpark, but the entire region, and including the development of additional land for business and industrial use. As the project has developed, its scope has diminished. For example, as is established by other declarations to be filed in this action, the Transpark project no longer includes an airport.

14.     The 900 acres of land currently under development as Phase I of the Transpark has independent utility whether or not any additional development is undertaken. Full development of the 900 acres of land which currently comprises the Transpark will generate many economic benefits for the citizens of South Central Kentucky whether or not any further development of the Transpark occurs. Phase I of the Transpark, which is the only portion currently under development, does not depend for its success on any other development of additional land. The complete development of the currently owned acreage will yield revenues

sufficient to repay the bonds that have been sold to date. However, delays as the result of this lawsuit could jeopardize the entire project.

15. The Plaintiffs and others opposed to development of the Transpark have made numerous unsuccessful efforts in the past to delay development of the Transpark. The State Local Debt Officer's initial approval of the $25 million bond issue to finance Phase I of the Transpark was appealed to the Kentucky Department of Local Government based on environmental concerns; the State Local Debt Officer's decision was affirmed by the Kentucky Department of Local Government. The Kentucky Department of Local Government's decision was appealed to the Franklin Circuit Court, a court of general jurisdiction, which again affirmed the approval of the bond issue. The Franklin Circuit Court's decision was appealed to the Kentucky Court of Appeals, Kentucky's intermediate appellate court, which again affirmed the approval of the bonds. No further appeal was taken and the decision of the Kentucky Court of Appeals became final.

16. In addition to opposing the funding for Phase I of the Transpark, the plaintiffs and others have unsuccessfully opposed efforts to re-zone the land within the Transpark based on environmental and historical concerns. Four separate judicial appeals have been filed which seek to reverse the rezoning of 747 acres of the Transpark from Agriculture to Light or Heavy Industry. The following is a summary of the present status of each of these four rezoning appeals:

    a. The first rezoning appeal involving 153 acres was commenced by the City of Oakland, Kentucky and two of its residents. The Kentucky Court of Appeals rendered a unanimous decision, which affirmed the Warren Circuit Court's decision sustaining the rezoning. The Court of Appeals has also entered an order

on 22 December 2004 denying a petition for rehearing. This judicial appeal is now pending upon a motion for discretionary review filed with the Kentucky Supreme Court on 21 January 2005.

b. The second rezoning appeal involved 236 acres. The Warren Circuit Court entered an order affirming the rezoning on 7 July 2004 and overruled a motion to vacate, alter or amend on 1 October 2004. On 28 October 2004, an appeal was taken to the Kentucky Court of Appeals where the matter is now pending and where the first issue is whether the Court will accept a late filing of the appellants' brief.

c. The third rezoning appeal involved 330 acres. The application for a zone change was granted by the zoning authority and the zone change was affirmed by the Warren Circuit Court on all counts by its final judgment entered on 7 January 2005. On 7 February 2005, an appeal was taken to the Kentucky Court of Appeals. The case is in the process of being briefed.

d. The fourth rezoning involving 28 acres resulted in the grant of ITA's request for a zone change and that action has been appealed to the Warren Circuit Court. A scheduling order has been entered which requires the parties to file briefs setting forth their position.

Each of these past court actions that the plaintiffs have pursued against the Transpark, although without merit, have resulted in extraordinary costs to the Transpark and to the County. They have cost a great deal of money and set our marketing efforts back immeasurably. In view of the fact that the Transpark is in the final stage of construction, and the ITA is in the final

stages of closing arrangements with prospective occupants of the Transpark, the effect of a preliminary injunction on the Transpark will be devastating and irreparable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of June 2005.

Michael O. Buchanon