UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION )
AND PROTECTION, INC. et al. )
)
    Plaintiffs, )
)
)
U.S. ENVIRONMENTAL PROTECTION )
AGENCY et al. )
)
    Defendants, )               No. 1:05-CV-01190-RMU
_____ )
)
INTER-MODAL TRANSPORTATION )
AUTHORITY, INC; FISCAL COURT OF )
WARREN COUNTY, KENTUCKY; and )
BOARD OF COMMISSIONERS OF CITY )
OF BOWLING GREEN, KENTUCKY )
)
    Intervenors. )
_____ )

**DECLARATION OF JAMES N. HIZER ON BEHALF OF INTERVENORS**

I, James N. Hizer, make the following declaration based on personal knowledge, information,

and belief:

1.    I am the President of the Inter-Modal Transportation Authority ("ITA"). The ITA is

located in the City of Bowling Green, Kentucky (the "City"), which is the fifth largest city in

Kentucky and is located in Warren County, Kentucky (the "County").

2.    In 1998 the Kentucky General Assembly appropriated $6,000,000 from the

Commonwealth's general fund for the purpose of evaluating and developing an industrial park. The

County formed the ITA, a non-stock, non-profit corporation, to act as the County's agency and

1

instrumentality in acquiring and financing the project. The facility envisioned by the County is known as the Kentucky Tri-Modal Transpark (the "Transpark").

3.      Michael Buchanon, Warren County Judge-Executive, the chief executive officer of the County, appointed a number of business leaders, community leaders and educators to the Board of Directors of ITA. In order to evaluate whether the Transpark was economically feasible and, if so, in what manner the project should be developed, ITA retained the services of Wilbur Smith Associates (WSA), an internationally recognized consulting and engineering firm possessing special expertise in engineering, planning and economics.

4.      WSA collected data through empirical studies of Warren County and its economy and studied data available from governmental sources and the Bowling Green – Warren County Chamber of Commerce. An Executive Summary of WSA's Benefit-Cost and Economic Impact Analysis found, among other things, that the Transpark should be constructed in stages.

5.      Based on the WSA feasibility study, ITA retained the regional accounting firm of Baird, Kurtz and Dobson ("BKD") to assist in developing a Business Plan. The Business Plan was developed after reviewing WSA's feasibility study and through close consultation between ITA's Board of Directors, WSA, BKD and various community leaders. The resulting Business Plan provided for the development of the Transpark in separate phases or stages. Phase I of the development includes the purchase and development of approximately 1,200 acres of land and the development of that land as a business or industrial park. The development of the Transpark in stages or phases has been the plan of development since a staged approach was recommended by WSA. No development of any part of the Transpark, beyond Phase I, has been undertaken or will be

2

undertaken until Phase I is completed and a determination is made, after completion of Phase I, whether development beyond Phase I should be undertaken.

6.     Phase I of the Transpark does not include the construction of an airport. Although initial plans for development of the Transpark included development of a new airport, as the project is currently envisioned, any new airport will be developed by the Bowling Green – Warren County Airport Board (the "Airport Board"), an agency of the City and the County unrelated to the ITA. The Federal Aviation Administration ("FAA") funded a risk analysis study and a cost-benefit analysis to study the feasibility of closing the existing Bowling Green-Warren County Airport and replacing it with a new airport. This feasibility study is being completed by the Bowling Green-Warren County Airport Board under the guidance of its manager, Robert Barnett. The ITA is not participating in the feasibility study that was funded, at least in part, by the FAA. Any new airport would be located outside the land comprising Phase I of the Transpark, since Phase I of the Transpark consists solely of a business and industrial park. The ITA has not acquired any land to use for the construction of an airport. An airport is not part of any future plans by the ITA. If a new airport is constructed near the Transpark, it will be constructed under the auspices of the Airport Board, not the ITA. Whether an environmental impact statement will be required is a matter that will be addressed by the Airport Board and the Federal Aviation Administration ("FAA") if and when the Airport Board determines that a new airport should be constructed.

7.     On April 5, 2001 the County and ITA filed a Petition with the appropriate Kentucky authority, the State Local Debt Officer, seeking approval of a financing plan to provide permanent and interim financing for Phase I of the Transpark through the issuance of industrial revenue bonds

(the "bond issue"). The Petition made no mention of an airport or the potential development of later Phases of the Transpark.

8.    The SLDO approved the bond issue consisting of three elements: (1) Bond Anticipation Notes to be issued for interim financing of Phase I of the Transpark; (2) First Mortgage Revenue Bonds in the amount of $25 million in one or more series maturing in 30 years, representing permanent financing for Phase I of the Transpark; and (3) a Lease to be entered into between ITA and Warren County obligating the County to make such payments to ITA as are necessary to pay the Bond Anticipation Notes and the Bonds. The State Local Debt Officer's approval of the bond issue was ultimately affirmed by the Kentucky state courts on appeal.

9.    To date, the ITA has utilized a portion of the bond issue to acquire approximately 900 acres of land and to commence the installation of the infrastructure of Phase I of the project, such as roads, water lines, sewer lines, etc. All of the land comprising Phase I of the Transpark is located in the corporate limits of the City of Bowling Green and adjacent to I-65, the CSX Railroad, U.S. 68/80 and U.S. 31W.

10.    On June 10, 2004 the contractor chosen to begin construction of the infrastructure of the Transpark was authorized to begin construction and construction began shortly thereafter on Phase I of the Transpark. Phase I of the Transpark was planned, designed, financed, and has been constructed, without any federal funding and will utilize no federal funding in the future.

11.    Numerical paragraph 8 of the complaint filed in the above-styled case states, "EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark." This statement is incorrect. The $3.75 million referred to represents two separate grants, neither of which were actually made to the ITA and neither

4

of which relate to the Transpark. The $3.75 million referenced in numerical paragraph 8 of the complaint consists of (1) a $2 million grant made to the Warren County Water District to extend larger water and sewer lines to north Warren County and (2) a $1.75 million dollar grant to the city of Bowling Green to assist in the "South Central Kentucky Water Infrastructure Project," which is being administered by the Warren County Water District.

While it is true that the $2 million grant was initially requested by the ITA, after the funds were appropriated, the ITA realized that the funds had been requested by mistake because (1) the water and sewer lines were to be constructed on property not owned by the ITA and (2) the water and sewer lines were to be constructed and owned by the Warren County Water District. After the funds were appropriated, but before they were received by the ITA, the ITA notified the office of Kentucky's senior Senator, Senator Mitch McConnell, that the funds had been mistakenly applied for. Senator McConnell's office contacted the grantor, the Environmental Protection Agency ("EPA"), which changed the grantee from the ITA to the Warren County Water District before the funds were dispersed. Thus, the ITA never received the funds and did not spend them.

Neither of these two grants will finance construction of water and sewer lines in the Transpark. The water and sewer lines located in the Transpark have been constructed using exclusively the proceeds of the bond issue referenced above. The ITA awarded Brock Excavating a contract in the spring of 2004 to do all the grade work for the internal roads of the Transpark connecting U.S. 68/80 and U.S. 31-W. Included in this contract was the installation of 20 inch water and sewer lines inside the Transpark, which constitutes all of the water and sewer lines to be located inside Phase I of the Transpark. To date Brock Excavating has been paid approximately $6 million

5

entirely out of revenue bonds issued by Warren County and/or funds received from the Commonwealth of Kentucky.

12.    Numerical paragraph 9 of the complaint refers to $1.75 million appropriated by the Department of Housing and Urban Development ("HUD") for a training center under construction at the Transpark. The statements contained in numerical paragraph 9 of the complaint are incorrect for the following reasons: The amount of the appropriation was $1.50 million, not $1.75 million. These funds were appropriated for the purchase of equipment only, not for construction of the training center or the purchase of items that will become fixtures in the training center. The funds were appropriated to the City of Bowling Green, not the ITA. The funds to begin construction of the training center initially came from local sources involving no federal funds; interim financing from local sources was necessary because the Commonwealth of Kentucky was in a budget crisis at the time and had not enacted a budget. The Commonwealth of Kentucky has since enacted a budget and is in the process of taking over construction of the training center. The training center is not being constructed by the ITA. When completed, the training center will be part of the Kentucky Community and Technical College System ("KCTCS"), a state-wide system of vocational and training centers unrelated to the ITA.

13.    The $1.5 million grant from HUD was originally requested by Jack Thomas, the former President of the Bowling Green Technical College, which is a member of the KCTCS and is unrelated to the ITA. The ITA, KCTCS, and the Bowling Green Technical College are all separate entities. The training center is a state project which is part of the KCTCS, although it will be available to assist in training employees of companies located in the Transpark. Neither the training center nor KCTCS is affiliated with the ITA. Based on my information, knowledge and belief, none

6

of the grant funds referenced in numerical paragraph 9 of the complaint have been spent or requested.

14.    Numerical paragraph 10 of the complaint refers to money being allocated by the Tennessee Valley Authority ("TVA") to Bowling Green Metalforming, LLC ("BGMF"). BGMF is a for profit company which was the first company to purchase land and build a facility in the Transpark. BGMF announced in December, 2003 its intention to locate in Bowling Green, Kentucky and in February 2004 BGMF's purchase of land from the ITA was completed. After BGMF purchased its land from the ITA in February 2004, all decisions regarding the use of the land BGMF purchased from the ITA have been made by BGMF, not the ITA. The TVA funds were not requested by the ITA and have not been received by the ITA. ITA was not involved in any request for funds made by BGMF to TVA and had no knowledge of any such request. ITA has not received any funds from TVA and has not spent any funds provided by TVA.

15.    Numerical paragraph 15 of the complaint states $8.7 million has been allocated by the Federal Highway Administration ("FHWA") for road infrastructure for the Transpark. This statement is incorrect. The complaint mentions a $2 million grant and a $5.25 million grant, but the $2 million is included in the $5.25 million grant. The $5.25 million was appropriated in fiscal year 2004 for improvements to U.S. 31-W and U.S. 68/80. The recipient of the funds was the Kentucky Transportation Cabinet, not the ITA. None of these funds were appropriated to, received by, or spent by the ITA. Although the expansion of U.S. 68/80 has recently been completed by the Kentucky Transportation Cabinet, none of the $5.25 million grant was used for construction of the expansion of U.S. 68/80.

16.     The allegation that the FHWA funds are to be used to add an exit and connector road for I-65 is misleading.  The FHWA appropriated $1.7 million, which was divided into two grants, a $500,000 grant to the Kentucky Transportation Cabinet for a feasibility study of a new exit off I-65 and a $1.2 million grant for the construction of internal roads in the Transpark.  The ITA declined the $1.2 million appropriation and these funds were never requested or received.  The internal roads in the Transpark are being constructed and funded entirely by the proceeds of the bond issue discussed above and funds appropriated by the Commonwealth of Kentucky.

17.     The Kentucky Transportation Cabinet is currently studying the possibility of constructing a connector road as mentioned in numerical paragraph 15 of the complaint, along with two other options.  The Kentucky Transportation Cabinet has made no decision as to which of the three options will be chosen.  Any construction of such a connector will be undertaken by the Kentucky Transportation Cabinet, not the ITA.  The I-65 connector is not part of the Transpark plan, but is part of the City of Bowling Green 20 year road plan.  The proponents of the I-65 connector hope it will eventually become part of I-66, a new interstate highway which will cross Kentucky from east to west.  The I-65 connector mentioned in the complaint is not part of the Transpark and the ITA has not been notified as to which of the three options noted above will be chosen.

18.     On May 12, 2005, ITA advertised for requests for proposals from qualified firms to demolish and dispose of a residential structure and all associated farm buildings at 839 Mizpah Road, Bowling Green, KY.  The properties at 839 Mizpah Road, Bowling Green, KY are within the acreage acquired for the Transpark.  ITA intends demolition of these as part of construction of Phase I of the Transpark.

8

ITA's decision on whether to undertake the aforementioned demolition at 839 Mizpah Road, Bowling Green, KY is not contingent upon ITA receiving funding from either HUD or the Environmental Protection Agency ("EPA") or any other federal source.

19.    At present, the ITA is in final discussions with three separate corporate entities that have expressed an interest in locating facilities in the Kentucky Transpark. These entities represent a combined investment of approximately $180 million. These entities estimate they will employ over 1,100 persons. In addition, BGMF, which has already established a manufacturing facility in the Kentucky Transpark, holds a real estate option on an adjoining 68 acre parcel for the purposes of future expansion.

20.    The board of directors for one of the interested corporate entities had already voted to locate a $7 million, 44,000 square foot facility in the Kentucky Transpark at the time that the motion for preliminary injunction was filed in this case. After learning of this legal action through the news media, this same board of directors has asked their management to postpone applying for a building permit and to seek out alternative sites. In my recent conversations with this client, management asked me if I could guarantee that their site in the Kentucky Transpark will be available when they are ready to proceed with their project. I responded that I could make no such guarantee as long as there was a threat of a preliminary injunction. Since I could not provide them with reasonable assurance, they informed me that they will proceed with their search for an alternative site.

21.    An injunction will likely cause these entities, and any other prospective purchasers of land in the Kentucky Transpark, to abandon their plans to locate business and industrial facilities in the Transpark, thereby resulting in irreparable damage to the finances, marketing efforts and current

9

good reputation of the Kentucky Transpark, the ITA, and to the economy of the Bowling Green/Warren County area.

22.    Currently, there are over 6,500 unemployed people living in the Bowling Green area. An injunction will cause employers to locate outside of the Bowling Green area, thus denying these unemployed individuals the opportunity to seek employment at these firms.

23.    The impact of losing an occupant of the Kentucky Transpark goes far beyond the loss of jobs, since the loss of jobs results in a loss of revenue to the City and the County from property taxes, along with the loss of occupational taxes to the City. In addition, an injunction would shift the burden of paying the ITA bonds from the income generated by the Kentucky Transpark to the taxpayers in the City and the County.

24.    An injunction would also likely force the ITA to cease operations, since the ongoing operations of the ITA are to be funded through the land sales in the Kentucky Transpark.

25.    In addition, an injunction would cause irreparable harm to the standing and reputation of the ITA, the Kentucky Transpark, and the community of Bowling Green/Warren County in the eyes of corporate site location consultants and business entities from all over the world. It would not be soon forgotten by our target audience that the local community aggressively marketed the Kentucky Transpark to the world, only to find that the Kentucky Transpark is not available for occupancy as a result of an injunction. For years to come, prospective investors would view the Kentucky Transpark suspiciously and many would likely decide not to invest in the Kentucky Transpark as a result.

26.    The overall loss of economic impact from the wages that would have been earned by employees of Transpark occupants could also be substantial. Studies have shown that for every

10

dollar of wages paid to an employee, $2 - $3 in total economic activity is generated. The impact on retail and service businesses from the loss of this economic activity would constitute irreparable damage.

27.    Local human service agencies, such as the United Way, and local arts organizations, such as the Bowling Green Chamber Orchestra, would also suffer irreparable damage from an injunction since the employers who abandon efforts to locate in the Kentucky Transpark would not support these local agencies which rely on local businesses and industries for a substantial portion of their funding. The human service agencies in the area would also likely suffer additional irreparable harm as a result of being compelled to provide financial support to the unemployed, who otherwise might have become employed by firms locating in the Kentucky Transpark. This, in turn, would result in a reduced standard of living and quality of life for residents of the Bowling Green area, since organizations such as these are vital to making our community a better place in which to live.

28.    An injunction would likely halt construction on the South Central Kentucky Technical Training Center in the Kentucky Transpark. This 31,000 square foot training center will serve residents from throughout the South Central Kentucky area. An injunction would irreparably harm these residents by denying them the opportunity to gain advanced technical skills and by denying them the employment opportunities that might have been available to them had they attended the Technical Training Center.

29.    Contrary to the allegations in the complaint that the ITA has engaged in anticipatory demolition of structures that are potentially designable as historic, the ITA has obtained determinations that there are no historic structures located in the area presently comprising the Kentucky Transpark. Attached hereto as Exhibit 1 is a true and correct copy of a letter dated June 2,

11

2004 from David L. Morgan, Kentucky's State Historic Preservation Officer, to Jim Vance, former President of the ITA, stating that there are "no prehistoric or early historic sites in the project area." This letter was received by the ITA before construction of Phase I of the Kentucky Transpark was commenced and before any buildings were razed. Exhibit 1 is a true and correct copy of the original, which is part of the business records maintained by the ITA in the ordinary course of its business.

30.     In view of the allegations contained in the complaint filed in this case, the ITA obtained a review of all structures located in the Transpark by Robin Zeigler, the Historic Preservation Planner for the Bowling Green – Warren County Historic Preservation Board.  Ms. Zeigler has filed a declaration stating that none of the structures she examined are eligible for inclusion in the National Register of Historic Places.

31.     Construction on the Kentucky Transpark's state-of-the-art storm water management and filtration system is not yet complete.  If an injunction is granted, it is likely that groundwater under the Kentucky Transpark, and in the vicinity of the Transpark, will be fouled by unfiltered storm water runoff, causing irreparable damage to the environment.

32.     Construction on the Kentucky Transpark's street lighting system is not yet complete. If an injunction is granted, these systems will not be installed.  Personal injury automobile accidents could result, causing irreparable harm to pedestrians and the automobile occupants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of June 2005.

James N. Hizer, President, Inter-Modal
Transportation Authority, Inc.





BY: --------------------

**COMMERCE CABINET**

**KENTUCKY HERITAGE COUNCIL**
THE STATE HISTORIC PRESERVATION OFFICE
300 WASHINGTON STREET
FRANKFORT, KENTUCKY 40601
(502) 564-7005  (502) 564-5820 FAX
www.kentucky.gov

ERNIE FLETCHER
GOVERNOR

W. JAMES HOST
SECRETARY

DAVID L. MORGAN
EXECUTIVE DIRECTOR AND
STATE HISTORIC PRESERVATION OFFICER

June 2, 2004

Mr. Jim Vance
Inter-Modal Transportation Authority
2325 Airway Court, Suit C
Bowling Green, Kentucky 42103

Dear Mr. Vance:

The State Historic Preservation Office has received for review and approval an archaeological survey report entitled "A Phase I Archaeological Survey for the Industrial Park Access Road, Warren County, Kentucky" by Tanya M. Peres and Casey R. Barrier.

The survey found no prehistoric or early historic sites in the project area. I concur with the authors' findings. In accordance with 36CFR Part 800.4 (d) of the Advisory Council's revised regulations our finding is that there are No Historic Properties Present within the undertaking's area of potential impact. Therefore, we have no further comments and the Agency Official's responsibility to consult with the Kentucky State Historic Preservation Officer under the Section 106 review process is fulfilled.

Should you have any questions, feel free to contact Charles Hockensmith of my staff at (502) 564-7005.

Sincerely,

David L. Morgan, Director
Kentucky Heritage Council and
State Historic Preservation Officer

cc: Dr. Tanya M. Peres
Dr. George Crothers

**Exhibit 1**

An Equal Opportunity Employer M/F/D

# A PHASE I ARCHAEOLOGICAL SURVEY FOR THE INDUSTRIAL PARK ACCESS ROAD, WARREN COUNTY, KENTUCKY (UK-PAR PROJECT NO. 04-01)



**UK** University of Kentucky
**Program for Archaeological Research**
**Department of Anthropology**

**Technical Report No. 515**

**April 2004**





UNIVERSITY OF KENTUCKY

BY: --------------------

*Tanya M. Peres, PhD, RPA*
**Assistant Director**
**Adjunct Assistant Professor**

April 28, 2004

Mr. Jim Vance
Inter-Modal Transportation Authority
2325 Airway Court
Suite C
Bowling Green, Kentucky 42103



RE: *A Phase I Archaeological Survey for the Industrial Park Access Road,
Warren County, Kentucky (UK-PAR Project No. 04-01)*

Dear Mr. Vance,

Enclosed please find three (3) copies of the above-mentioned report completed by the University
of Kentucky's Program for Archaeological Research for your review.

During the Phase I survey, no new archaeological sites were identified, however one isolated
find was identified during pedestrian reconnaissance. This location did not receive an
archaeological site number after consultation with the OSA, and is considered not eligible for
nomination to the NRHP under Criterion A-D. Thus, no further archaeological work is
recommended for the project area. Please feel free to contact me if you have any questions about
this project.

Sincerely,

Tanya M. Peres, PhD, RPA
Assistant Director, Program for Archaeological Research
Adjunct Assistant Professor, Department of Anthropology

Enclosures

1020 A Export Street, Lexington, Kentucky 40506-9854  ♦  859-257-1944 ♦ 859-323-1968 FAX
tmpere2@uky.edu ♦ www.uky.edu/AS/anthropology/par

# A PHASE I ARCHAEOLOGICAL SURVEY FOR THE INDUSTRIAL PARK ACCESS ROAD, WARREN COUNTY, KENTUCKY (UK-PAR PROJECT NO. 04-01)



**UK** University of Kentucky
Program for Archaeological Research
Department of Anthropology

**Technical Report No. 515**

**April 2004**

# TABLE OF CONTENTS

**Page**

Abstract/Management Summary ........................................................................................................... ii

List of Figures ............................................................................................................................... iv

List of Tables ................................................................................................................................ iv

CHAPTER 1: Introduction .............................................................................................................. 1

CHAPTER 2: Background Research and Survey Predictions ......................................................... 7

CHAPTER 3: Project Methodology and Results ........................................................................... 13

CHAPTER 4: Summary and Recommendations ........................................................................... 17

References Cited ........................................................................................................................... 19

Appendix A: Artifact Inventory .................................................................................................... 21

# CHAPTER 1:
# Introduction

At the request of the Inter-Modal Transportation Authority (IMTA), staff of the University of Kentucky's Program for Archaeological Research (UK-PAR) conducted a Phase I archaeological survey for the proposed Industrial Park Access Road Project in Warren County, Kentucky (Figure 1.1). The purpose of this Phase I survey was to identify any archaeological resources within the project area and assess their potential eligibility for nomination to the National Register of Historic Places (NRHP). The survey was conducted in compliance with the provisions of the National Historic Preservation Act of 1966 (as amended), the National Environmental Policy Act of 1969, Procedures of the Advisory Council on Historic Preservation, Executive Order 11593 (Protection and Enhancement of the Cultural Environment), and the Kentucky Heritage Council's *Specifications for Conducting Fieldwork and Preparing Cultural Resource Assessment Reports* (revised June 2001). Fieldwork consisted of pedestrian reconnaissance, systematic shovel testing, and auger testing.



*Figure 1.1. Project area location (Warren County, Kentucky).*

All artifacts collected during the survey were washed, sorted, and catalogued at UK-PAR in Lexington. All artifacts, field notes, photographs, and other project-related materials will be curated at the William S. Webb Museum of Anthropology, Lexington, Kentucky.

The project was carried out under the supervision of UK-PAR assistant director Dr. Tanya M. Peres, assisted by field technicians Casey Barrier, Steve Culler, Dona Daugherty, and Ann Wilkinson. Work was completed January 5-7, 2004, and took approximately 70 person-hours to complete. Mr. Barrier and Dr. Peres were responsible for preparing the final report. Laboratory processing and artifact analysis was conducted by Myrisa Byrd. Cartographer Donna Gilbreath prepared the final maps and figures for the report.

The Phase I survey resulted in the recovery of one isolated find, a single non-diagnostic prehistoric lithic flake. After consultation with the Office of State Archaeology, this location did not receive an archaeological site number, and is considered not eligible for nomination to the NRHP under Criterion A-D. Thus, no further work is recommended.

## Project Area Description

The project area is located in Warren County, Kentucky, and runs north from KY 68-80 and connects with US 31-W (Figure 1.2). The project area is located on the U.S.G.S. 7.5' Bristow, Kentucky, topographic quadrangle (see Figure 1.2). The project right of way (ROW) is 4,700 ft. long

and approximately 100 ft. wide, an area of approximately 470,000 ft.$^2$ (43,664.43 m$^2$, 10.80 acres) (Figures 1.3-1.8). The project area crosses karstic terrain filled with small sinkholes, one of which occurs within the project right of way (Figure 1.9). Much of the area is used as agricultural land for cultivation or pasture. The project area is at an elevation of approximately 500-600 ft. above mean sea level (amsl).

Potential disturbance within the proposed project area includes the use of the land for agricultural activities. A portion of the project area was covered with cornfields, another with alfalfa, and a third in pasture grass. Surface visibility was 0% over the majority of the site resulting in subsurface testing of the entire project area at 20 m intervals.



*Figure 1.3. View of the project area, facing north.*

3



*Figure 1.6. View of the project area, facing southwest.*



*Figure 1.7. View of the project area, facing west.*

5

# CHAPTER 2:
# Archaeological Background and Survey Predictions

Prior to conducting fieldwork, a search of several databases was made in order to determine the extent of previous research both in and around the project area. The complete collection of archaeological reports for Warren County at the Office of State Archaeology (OSA), the State Historic Preservation Plan (Pollack 1990), and portions of the collections of microfiche, reports, and curated collections at the University of Kentucky were all examined in order to locate references to previous archaeological work in the project area. Historic maps from the map collection housed at the University of Kentucky's map library were also consulted. These maps include: *Map of Warren County* (Beers 1877), *Map of Warren County, Kentucky* (McAdoo 1891), *Sketch Map Showing Oil and Gas Development in Warren County, Kentucky* (Jillson 1919), *Brownsville, Kentucky 15' topographic quadrangle map* (U.S.G.S. 1923), and the *Oil and Gas Map of Warren County, Kentucky* (Eyl 1928).

## Previously Identified Archaeological Sites within a 2-Km Radius of the Project Area

Prior to conducting fieldwork in Warren County, a search of several databases was made in order to determine the extent of previous research both in and around the project area. The complete collection of archaeological reports for Warren County at the Office of State Archaeology (OSA), the State Historic Preservation Plan (Pollack 1990), and portions of the collections of microfiches, reports, and curated collections at the University of Kentucky were all examined in order to locate references to previous work in and around the project area. There are no previously identified archaeological sites within a 2-km radius of the survey area. There have, however, been a total of two archaeological reconnaissance surveys completed within a 2-km radius of the project area, and these are described below.

In March 1987, the Kentucky Transportation Cabinet conducted an archaeological reconnaissance for two proposed alignments of a US 68 railroad overpass (Deiss 1987). No archaeological sites were discovered during this survey.

In March 1991, Janzen Inc. conducted an archaeological reconnaissance survey of two proposed borrow sites for a US 68 railroad bridge (Janzen 1991). No archaeological sites were discovered during this survey.

## Survey Predictions

A combination of data from previous investigations in the vicinity of the project area and environmental characteristics from the project area allowed for broad predictions concerning site types and locations that might be encountered in the project area.

The project area is included in the Pennyroyal section of the Green River Management Area (Carter et al. 1990). Previous fieldwork in the region has identified the highest concentration of prehistoric sites on floodplains, most of which are of open habitation sites without mounds. Historic maps consulted include those housed at the University of Kentucky's map library. Four of the five maps show historic structures in the vicinity of the project area (Figure 2.1-2.4). No historic

7



*Figure 2.2. Historic 1891 map of the project area and environs (Kentucky Geological Survey map of Warren County, 1891).*

9



*Figure 2.4. Historic 1928 map of the project area and environs (Kentucky Geological Survey Oil and Gas map of Warren County, Kentucky 1928).*

11

# CHAPTER 3:
# Project Methodology
# and Results

## Introduction

The purpose of the survey was to identify any archaeological resources within the project area and assess their **potential** eligibility for nomination to the National Register of Historic Places (NRHP). Natural and cultural indicators of archaeological resources include landform features, structural remains, anomalous soil coloration, particular species or patterns of vegetation, and concentrations of historic or prehistoric artifacts. This section includes a description of field survey methodologies.

Background research performed prior to initiating the survey included a literature search conducted to identify previously recorded sites in the survey area. Historic maps from the map collection housed at the University of Kentucky's map library were also consulted. These maps include: 1877 *Beers Map of Warren County*, 1891 *Geological Survey of Kentucky Map of Warren County*, 1919 *Oil and Gas Development Map in Warren County*, 1923 *Brownsville, Kentucky Geologic Map*, and the 1928 *Oil and Gas Map of Warren County, Kentucky*. Records and maps of the Office of State Archaeology, as well as the State Historic Preservation Plan (Pollack 1990), were utilized in a search for existing sites in the project area.

## Field Methods

Field survey methods employed subsurface shovel testing, pedestrian reconnaissance, and auger testing as appropriate to specific field conditions. Shovel testing was conducted at 20 m intervals along two transects throughout the entire project area. Shovel tests measured approximately 30 cm in diameter and were excavated to, and approximately 10 cm into, the natural subsoil. All soils excavated from the shovel tests were screened through 1/4-in. mesh hardware cloth to ensure complete recovery of all artifacts. Auger tests were placed within the single sinkhole present within the project ROW. The placement of auger tests was based on discussions between UK-PAR archaeologists and Dr. George Crothers, director of the Office of State Archaeology. These augers were used to investigate potential buried deposits in the sinkhole context. The auger tests were done with an eight centimeter bucket auger and excavated to a depth of one meter or more unless terminated due to water or bedrock.

## Results

A total of 168 shovel tests were excavated within the project ROW (Figure 3.1). The representative soil profile from the project area (ST60) consists of a 27 cm thick stratum of strong brown (7.5YR4/6) clay loam plowzone (Stratum I) overlaying a yellowish red (5YR5/8) clay subsoil (Stratum II) (Figure 3.2).

During the Phase I archaeological survey, no new archaeological sites were identified; however, one isolated find was identified from Shovel Test (ST7) (Table 3.1). The isolated find consists of one noncortical interior flake made from Ste. Genevieve chert. Interior flakes are removed from the interior of a core or biface during an intermediary stage of lithic reduction and therefore exhibit less cortex (less than 75%) on the dorsal surface. A total of six additional shovel tests were excavated in the vicinity of ST7, however no additional cultural

13



I - Strong brown (7.5YR4/6) clay loam (plowzone)

II - Yellowish red (5YR5/8) clay subsoil (subsoil)

*Figure 3.2. Profile of Shovel Test 60.*



I - Brown (7.5YR4/4) clay loam (plowzone)

II - Yellowish red (5YR4/6) clay (subsoil)

*Figure 3.3. Profile of Shovel Test 7, Isolated Find #1.*

| Table 3.1.  *Artifact recovered during Phase I Survey, Warren County, Kentucky.* | | | |
|---|---|---|---|
| **Provenience** | **Artifact Type** | **Raw Material** | **Qty.** |
| ST 07 | Interior flake, noncortical | Ste. Genevieve | 1 |
| **ST 07 Total** | | | **1** |

materials were recovered. The soil profile from ST7 consists of 20 cm of brown (7.5YR4/4) clay loam plowzone overlaying a yellowish red (5YR4/6) clay subsoil (Figure 3.3). After consultation with the Office of State Archaeology, this location did not receive an archaeological site number, and is considered not eligible for nomination to the NRHP under Criteria A-D. Thus, no further archaeological work is recommended for the project area.

Three auger tests were excavated within the sinkhole present in the project area. A representative soil profile (Auger Test 2) consists of a 49 cm thick layer of brown (7.5YR4/4) clay loam plowzone (Stratum I) (Figure 3.4). Stratum II ranges from 50-85 cm and is composed of a dark brown (7.5YR3/4) clay. Stratum III ranges from 86-90 cm and is composed of a dark reddish brown (5YR3/4) clay mottled with a reddish brown (5YR4/4) clay. Stratum IV ranges from 91-140 cm and consists of reddish brown (5YR4/4) clay mottled with dark reddish brown (5YR3/4) clay. Bedrock was encountered at 140 cm below the surface. The three auger tests did not yield any additional cultural materials.

15

# CHAPTER 4:
# Summary and
# Recommendations

At the request of the Inter-Modal Transportation Authority (IMTA), staff of the University of Kentucky's Program for Archaeological Research (UK-PAR) conducted a Phase I archaeological survey for the proposed Industrial Park Access Road Project in Warren County, KY. The purpose of this Phase I survey was to identify any archaeological resources within the project area and assess their potential eligibility for nomination to the National Register of Historic Places (NRHP). The project area is located in Warren County, Kentucky, and runs north from KY 68-80 and connects with US 31-W. The project ROW is 4,700 ft. long and 100 ft. wide, an area of approximately 470,000 ft.$^2$ (43,664.43 m$^2$, 10.80 acres).

UK-PAR archaeologists performed pedestrian reconnaissance, systematic shovel testing, and limited auger testing within the project area to identify any cultural materials. A total of 168 shovel tests and three auger tests were excavated within the project area. During the UK-PAR field investigations, one isolated find, a non-diagnostic prehistoric lithic flake, was recovered. A total of six additional shovel tests were excavated in the vicinity of the isolated find, but no further cultural materials were recovered. Consultation with the Office of State Archaeology (OSA) resulted in the isolated find not receiving an archaeological site number.

During the Phase I survey, no new archaeological sites were identified, however one isolated find was identified during systematic shovel testing. This location did not receive an archaeological site number after consultation with the OSA, and is considered not eligible for nomination to the NRHP under Criteria A-D. Thus, no further archaeological work is recommended for the project area.

# REFERENCES CITED

Beers, D.G.
     1877        *Map of Warren County, Kentucky*, Philadelphia, Pennsylvania.

Carter, John T., Jimmy A. Railey, and David Pollack
     1990        Chapter 2: Overview of Prehistoric Archaeological Research in Kentucky. In *The Archaeology of Kentucky: Past Accomplishments and Future Directions Vol. I*, edited by David Pollack, pp. 25-71. State Historic Preservation Comprehensive Plan Report No. 1. Kentucky Heritage Council, Frankfort.

Deiss Ronald W.
     1987        *An Archaeological Reconnaissance and Testing of the Proposed US 68 Railroad Overpass Alignment ROWs at Sunnyside, Warren County, Kentucky*. Kentucky Transportation Cabinet. Report on file, Office of State Archaeology, University of Kentucky, Lexington.

Eyl, W.C.
     1928        *Oil and Gas Map of Warren County, Kentucky*. Kentucky Geological Survey, Frankfort.

Janzen, Donald E.
     1991        *An Archaeological Survey of Two Borrow Sites for the CSX Railroad Bridge Project, Warren County, Kentucky*. Janzen, Inc. Submitted to Larry Glass Construction CO. Report on file, Office of State Archaeology, University of Kentucky, Lexington.

Jillson, Willard R.
     1919        *Sketch Map Showing Oil and Gas Development in Warren County, Kentucky*. Department of Geology and Forestry, Frankfort, Kentucky.

McAdoo, J.F.
     1891        *Map of Warren County*. Geological Survey of Kentucky, Frankfort.

Pollack, D.
     1990        *The Archaeology of Kentucky: Past Accomplishments and Future Directions*. State Historic Preservation Comprehensive Plan Report No. 1, Kentucky Heritage Council, Frankfort.

United States Geological Survey
     1923        Brownsville, Kentucky 15' topographic quadrangle map.

# APPENDIX A:
# ARTIFACT INVENTORY

1/13/2004

Project 04-01 Prehistoric Artifact Inventory

Page 1

| Provenience | Group | Class | Subclass I | Subclass II | Raw Material | Size Code | Comments | Quantity | Weight |
|---|---|---|---|---|---|---|---|---|---|
| 1F-01 | | | | | | | | | |
| S1-07 | Flaked Stone | Debitage | Interior Flake | Noncortical | Ste Genevieve | .50-1.0" | | 1 | 0.54 |

Provenience Total:  1

Site Total:  1

**Project 04-01 Prehistoric Artifact Total:  1**

23