**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

KARST ENVIRONMENTAL EDUCATION        )
AND PROTECTION, INC.,                )
WARREN COUNTY CITIZENS FOR           )
MANAGED GROWTH, GAYLA CISSELL,       )
JIM DUFFER and ROGER BRUCKER         )
                                     )
Plaintiffs                           )
                                     )  No. 1:05-cv-01190-RMU
v.                                   )
                                     )
U.S. ENVIRONMENTAL PROTECTION        )
AGENCY,                              )
U.S. HOUSING AND URBAN DEVELOPMENT,)
and                                  )
TENNESSEE VALLEY AUTHORITY           )
                                     )
Defendants.                          )

\* \* \* \* \* \* \* \* \* \*

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, Karst Environmental Education and Protection, Inc. ("KarstEEP"), Warren County Citizens for Managed Growth, Gayla Cissell, Jim Duffer and Roger Brucker, state as follows:

<u>**INTRODUCTION**</u>

1.   The Kentucky Trimodal Transpark ("Transpark"), as proposed, is a 4,000-6,000-acre integrated road, air and rail industrial park in north Warren County, Kentucky, approximately six miles south of Mammoth Cave National Park. Because the Transpark development is a major federal action significantly affecting the quality of the human

1

environment, and threatens to destroy unique historical, cultural and environmental resources, Plaintiffs bring this action for declaratory and injunctive relief to require Defendants to comply with their duties under the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA").

## JURISDICTION AND VENUE

2.    This Court has jurisdiction pursuant to 5 U.S.C. § 704, 29 U.S.C. § 1331(a), 28 U.S.C. § 2201-2202, and 28 U.S.C. § 1361. Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## PARTIES

3.    Plaintiff Karst Environmental Education and Protection, Inc. ("KarstEEP") is a non-profit Kentucky corporation whose mission is to educate and advocate towards the goal of protecting, conserving, and defending karst, karst systems, and karst landscapes. KarstEEP's Board of Directors includes individuals who have been involved in opposition to the Transpark since 1999 due to its proximity to Mammoth Cave National Park and its inappropriate siting on the vast cave, sinkhole and karst terrain of north Warren County, Kentucky.[1] KarstEEP has

---

[1]Mammoth Cave, the world's largest known cave system, is the heart of the south central Kentucky karst, an integrated set of subterranean drainage basins covering more than 400 square miles. On the surface is a biologically diverse set of ecosystems inextricably linked with the ecosystems underground. This

spent organizational resources opposing the Transpark complex. Defendants' actions have injured, and are continuing to injure, KarstEEP's aesthetic, ecological and recreational interests.

4. Plaintiff Warren County Citizens for Managed Growth, Inc. ("WCCMG") is a non-profit Kentucky corporation registered as Citizens for Managed Growth, Inc. and doing business as WCCMG. WCCMG's purpose is to support development that follows established principles and practices generally referred to as "smart growth" and to oppose development that meets the criteria of "sprawl." Members of WCCMG have an interest in protecting the environment, preserving prime farmland and farmland of statewide importance, preserving historical and cultural resources and communities, and protecting natural resources such as Mammoth Cave National Park. WCCMG has spent organizational resources opposing the Transpark complex. Defendants' actions have injured, and are continuing to injure, WCCMG's aesthetic, recreational, cultural and historical interests.

5. Plaintiff Gayla Cissell is a resident of Warren County, Kentucky and a member of the Board of Directors of

---

physiographic province, with Mammoth Cave National Park at its core, was declared by the United Nations as an International Biosphere Reserve and World Heritage Site in 1990. The Park is home to more than 70 federally threatened, endangered or state listed species.

WCCMG. She lives on the edge of the Transpark development and passes the complex each day driving to and from work. Defendants' actions have injured, and are continuing to injure, Ms. Cissell's aesthetic, cultural and historic interests in preserving her rural community.

6.  Plaintiff Jim Duffer is a resident of Warren County, Kentucky and serves as chairman of the Board of Directors of WCCMG. Defendants' actions have injured and continue to injure Mr. Duffer's aesthetic, cultural and historic interests in preserving his rural community.

7.  Plaintiff Roger Brucker has worked as an adjunct professor at Western Kentucky University in Bowling Green for many years, teaching summer courses in speleology at Mammoth Cave National Park, and has authored several well-known books on Mammoth Cave and other caves in the south central area of Kentucky. He is a founding director of the Cave Research Foundation and a member of the Board of Directors of KarstEEP. Defendants' actions have injured, and continue to injure, Mr. Brucker's aesthetic, ecological and recreational interests in protecting karst and karst ecosystems.

8.  Defendant U.S. Environmental Protection Agency ("EPA") is an agency of the United States Government and is responsible for ensuring compliance with federal

environmental laws, including NEPA, in conjunction with federally funded projects. EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark. EPA has initiated no NEPA process with respect to these infrastructure projects.

9. Defendant U.S. Department of Housing and Urban Development ("HUD") is an agency of the United States Government and is responsible for ensuring compliance with the applicable federal laws cited above in conjunction with federally funded development projects. HUD's spending authorization bill for federal fiscal year 2005 appropriated a total of $1.75 million for a training center that is already under construction at the Transpark. The Training Center is the location where both a cave and prehistoric Native American remains were recently uncovered during site preparation. No NEPA process has been initiated under HUD's auspices.

10. Defendant Tennessee Valley Authority ("TVA") is an agency of the United States Government and is responsible for ensuring compliance with the applicable federal laws cited above, in conjunction with federally funded projects. TVA has acknowledged that public funds have been allocated by TVA to Bowling Green Metalforming,

LLC, a manufacturing plant under construction at the Transpark, but the agency has refused to disclose any details about this funding. TVA has exempted its involvement in the Transpark project from NEPA and NHPA review.

## STATEMENT OF FACTS

11. The Kentucky TriModal Transpark ("Transpark"), as proposed, is an $80 million 4,000-6,000-acre integrated road, air, and rail complex in north Warren County, KY, approximately six miles south of Mammoth Cave National Park. The local governments of the City of Bowling Green, Kentucky and Warren County, Kentucky, have supported the Transpark. The Warren County Fiscal Court established South Central Kentucky Regional Development Authority ("SCKRDA"), a non-profit industrial development authority to finance the acquisition of property for and the development of the Transpark project. The SCKRDA's Board of Directors includes both the Warren County Judge Executive and the Mayor of Bowling Green.

12. The Warren County Fiscal Court established the Inter-Modal Transportation Authority ("ITA") as a non-profit, non-stock Kentucky corporation to act as the agency and instrumentality of the county in acquiring, developing and financing public improvements and public projects,

specifically the Transpark complex. ITA has committed public funds for land acquisition and demolition of the existing rural and residential development at the site, including cultural and historic resources, to make such land available for private and public industrial and commercial activities. The ITA Board of Directors includes the Mayor of Bowling Green.

13. The ITA was incorporated on October 23, 1998, with the "power to apply for and receive grants from all governmental bodies and agencies including, without limitation, the Federal Aviation Administration." One of the first actions taken by the ITA Board of Directors was the hiring of a consultant with FAA funds, as per the minutes of the March 22, 1999 meeting.

14. The minutes of the September 22, 1999 Board of Directors meeting record that the ITA President and Board Chair met with Kentucky Transportation Cabinet officials, and that "The land acquisition process will involve adherence to the U.S. Department of Transportation guidelines." These minutes also report on a meeting with TVA Vice President of Economic Development, Katie Rawls, and other TVA representatives, and "TVA has a strong interest in our project."

15.   ITA's March 16, 2000 Benefit–Cost Analysis included a financial analysis based upon each of the three aspects: 1) an airport, 2) an industrial park and 3) a new I-65 interchange.   The new interstate interchange was estimated at $25 million, the new airport at $43– $110 million, the sale of the existing airport (funded by FAA) at $13 million.

16.   ITA Board of Directors meeting on March 21, 2000 described the Transpark as an industrial park that would be "Multi modal" with an airport, rail system and access to the interstate highway system. According to the minutes, the Transpark was, "Excellent opportunity for FAA funding."

17.   ITA Board of Directors meeting minutes include a plan to comply with laws that apply to federally funded projects, such as the Uniform Relocation Act (August 9, 2000 minutes, March 18, 2001 minutes, April 25, 2001 minutes); reports on funding options, including federal grants from USDA Rural Development Fund and "TVA grants and loan" (September 13, 2000 minutes), sale of the existing airport (funded by FAA) and FAA airport enhancement funds (November 8, 2000 minutes).

18.   ITA President Cherry was quoted in the *Bowling Green Daily News* on December 3, 2000, as follows: "Other pieces of the puzzle will be to develop infrastructure–such

as water, sewer and road improvements–for the park. [Federal] Community Development block grants, Rural Development Association funds and other funding sources will be explored for those projects." Related costs would include $40.6 million for an Interstate 65 interchange and extension of Bowling Green's outer loop, $4 million for engineering costs, $12 million for other infrastructure and $2 million to improve water flow."

19. The ITA's January, 2001 *Business and Finance Plan* for the Transpark states that the project will be financed by, among other sources, federal and state grants. The plan included the ITA expectation of federal and state grants of $18.35 million, and $17.39 million from the sale of the existing Bowling Green Airport, revenue that cannot be received until Bowling Green builds a new airport, unless Bowling Green is willing to have no airport. The *Official Statement* by ITA's bond counsel for a January, 2005 issuance of $6.64 million in bonds by ITA provides that debt payments would be made, in part, by government grants.

20. On July 20, 2001, ITA President Daniel Cherry testified before the Commonwealth of Kentucky, County Debt Commission in a proceeding titled, *In Re: County of Warren, Inter–Modal Transportation Authority, Inc. First*

*Mortgage Revenue Bonds and Notes.* He testified that the ITA anticipated receiving federal funding and the corresponding "additional environmental work that we will do as federal funding and federal sponsorship materializes..." He testified that ITA guidance "is that we want to stay in compliance with all the federal guidelines and regulations every step of the way, whether it's the Federal Highway Administration, the Federal Aviation Administration, whatever it might be..." He testified about his optimism that FAA would agree to the plan to sell the old airport and fund the new airport, and the FAA had already agreed to fund a risk analysis study. Mr. Cherry then described the three aspects of the *Tri-Modal Transpark – rail, highway, and airport,* at Transcript, page 54*:*

> Q: But the rail has not been developed yet?
>
> A: That's correct.
>
> Q: Interstate 66 has not been—there's not been a corridor chosen and funded by the federal government for I66, has there.
>
> A: No, it has not
>
> Q: Airport hasn't been approved by the FAA, has it?
>
> A: It has not.

*Q:   Would the lack of any of those three
things affect the viability of the project?*

*A:   Yes.*
*[Emphasis added]*

21.   On July 25, 2001 the ITA entered into an
agreement with the Bowling Green Warren County Airport
Board, wherein the Airport Board granted ITA full
authority, including administration of federal assistance
grants with respect to the acquisition, development and
operation of the Kentucky TriModal Transpark and
"application for federal assistance...and all decision
making with respect to federal grant monies and receipt and
disbursement of federal grant monies."

22.   In June 2003, ITA released an ITA Forecast of
Financial Statements for 6/30/03–6/30/12.   "Over the
forecast period, the Organization expects to receive grants
totaling $6,700,000 from the federal government to purchase
and develop land for the business park and pay for other
related costs associated with the development and
construction of the KTT."

23. On November 6, 2001, then Kentucky Transportation
Secretary James Codell sent a letter to Oakland City
Commissioner Gayla Cissell (plaintiff) stating, "As soon as
federal funds are committed to the Transpark project the

Secretary of the U.S. Department of Transportation will
determine whether the Federal Aviation Administration or
the Federal Highway Administration will be the 'lead'
agency..."

24.  On January 1, 2005, the ITA issued First Mortgage
Revenue Bonds, Series 2005, for $6.64 Million, as per the
Preliminary Official Statement.  The bond proceeds (last of
an overall $25 million issue) are to pay for infrastructure
(including sewer and water quality infrastructure) at the
KTT, "a (sic) Inter-modal transportation access
distribution center which will contain a regional
industrial airpark with transportation access by air, rail
and highway."  With regard to funding sources, "...the
(ITA) or the County has received and have or will spend
approximately (sic) an additional $24 million of federal
and state grant funds towards the (KTT) (p1)."
"Government grants" are listed specifically as sources of
payment for the bond proceeds.

25.  The Transpark has already benefited from, and is
based on, pervasive federal action in the form of financial
assistance from EPA, HUD and TVA as well as the Federal
Aviation Administration and Federal Highway Administration.

26.  The March 31, 2003 ITA Statement of Financial
Position shows a federal grant receivable in the amount of

$1.2 million.  This is the FHWA grant for the interior road for which a NEPA process was started and then the KYTC and ITA rejected the money, in order to avoid or NEPA and NHPA compliance.  This receivable was backed out of ITA's subsequent Financial Statements.

27.  Local news, WBKO TV in Bowling Green announced on Sept. 8, 2003 that Senator McConnell Secures Federal Funds for Transpark water and sewer infrastructure and roads.

28. On February 3, 2004,    the *Russellville News-Democrat & Leader*, announced, "*McConnell secures funds for Kentucky Transpark*,"   "Senator Mitch McConnell announced that he has secured $7.25 million in funding for the Kentucky Trimodal Transpark....$5.25 million for access roads to the (KTT)...including the I-65 interchange and U.S. 68; and $2 million for water and sewer improvements...."

29.  As anticipated by ITA, (see paragraph 12B), the TVA has made a $500,000 grant to Bowling Green Metal Forming, the first and only industry to locate in the Transpark.

30.  Although the Federal Highway Administration ("FHWA") is not a defendant in this action, FHWA's spending authorization bills for fiscal years 2003 through 2005 appropriated a total of $8.7 million for road

infrastructure for the Transpark complex. Of this total, $5.25 million was allocated to a new interstate interchange at I-65 for the Transpark, and $1.7 million was awarded for the Transpark interior road, although ITA and the Kentucky Transportation Cabinet ("KYTC") subsequently "rejected" the money and the road has been built. $2 million has been awarded for expansion of US 68/80 through the Transpark. FHWA began a NEPA and NHPA study process in 2003 for the Transpark's interior road, but halted that process when the ITA and KYTC rejected the federal money. FHWA improperly segmented the I-65 interstate interchange project and began a NHPA study process in 2004 which is still pending. However, this pending study focuses only on the I-65 interchange rather than on the comprehensive, integrated Transpark project, including the expansion of US 68/80.

31. As described above, the Federal Aviation Administration ("FAA"), also not a defendant in this action, has been involved in the Transpark project from its conception, where it was identified by name on page 2 of the October 23, 1998 ITA Articles of Incorporation and where FAA funds were used to hire a consultant for the ITA in early 1999. The FAA funded a risk analysis study in 2001 and a cost-benefit analysis in 2004 to study the

feasibility of closing the existing local general aviation airport and replacing it with a new regional commercial service airport at the Transpark complex. The footprint of a proposed North-South runway is included in FHWA's study maps of the Transpark. The FAA has awarded over $2.8 million to the existing Bowling Green airport, and must approve the sale of the existing airport and operation of the new airport. The sale of the existing airport was and is today central to the financing of the Transpark project. The sale is anticipated to generate about $17 million needed to pay off the revenue bonds that the Intervening Defendants have issued to finance what they want to claim as the non-federal portion of this project.

32. Construction on at least 300 acres of the Transpark has begun (including demolition of structures described below), including the TVA-supported Bowling Green Metalforming, LLC facility, an automobile parts manufacturing facility, as well as an interior road, water and sewer infrastructure, and a training facility. On information and belief, a portion of the funding for such construction was federal funding from one or more of the Defendants. However, funding for a substantial portion of the demolition and construction that has occurred has come from local government loans or bonds or other local

government obligations for which the local government
entities intend to seek reimbursement from the Defendants
or other federal agencies, after the work has been
completed and after there has been an irreplaceable
commitment of resources, but without the protections and
processes required by NEPA and NHPA. Moreover, Defendants
are (or should be) aware of this scheme to obtain federal
approvals and funding while avoiding compliance with these
statutes.

33. As this project has proceeded, the Defendant
federal agencies have not only failed to designate a lead
agency for purposes of compliance with NEPA, but also have
failed to prevent the Transpark's developer, ITA, from
initiating site development and demolition activities in
contravention of federal law. Plaintiffs, members of the
public, environmental organizations, elected officials from
the city of Oakland and the National Trust for Historic
Preservation have all expressed these concerns to the
federal agencies, to no avail.

34. The Oakland-Freeport Historic District was listed
by the National Park Service on the National Register of
Historic Places ("National Register") on August 2, 2004,
achieving a goal of the 1999 *Oakland Rural Village Focal
Point Plan*, which had been formally adopted as part of the

16

*Bowling Green-Warren County Comprehensive Land Use Plan*. Other communities adjacent to the Transpark are eligible for listing and have initiated the application process.

35. In the period from January 10, 2004 and March 16, 2004, ITA or its agents commenced and completed the demolition of certain potentially eligible historic buildings within the boundaries of the Transpark and proximate to the Loving/Sunnyside communities, Reconstruction Era African-American communities which contain structures and a graveyard eligible for listing on the National Register. The Defendants have violated Section 106 of the NHPA by willfully disregarding the destruction of potentially eligible historic properties and allowing the ITA to commence demolition prior to seeking necessary federal approvals for the project, in order to preclude and avoid the requirements of Section 106. Based upon information and belief, the following is a partial list of residences, outbuildings and cultural landscapes that have been demolished or destroyed to date:

> (1) 206 Hayes Martin Road--listed as Site 14 in FHWA's Section 106 Study Process for the new I-65 Transpark interchange initiated in June 2004. At that time, comments were submitted by the Consulting Parties noting that this structure, dated 1860-1875, had already been demolished in the site work for Bowling Green Metalforming.

        (2) 809 Glasgow Road.

        (3) 1075 Glasgow Road--listed as Site
12 in FHWA's Section 106 Study Process
for the new I-65 Transpark interchange
initiated in June 2004. Comments were
submitted by the Consulting Parties
that noted that this structure, dated
1925-1949, had already been demolished
in the site work for Bowling Green
Metalforming.

        (4) Five barns have also been demolished
on these properties.

    36. On information and belief, in the period from
January 1, 2005 through February 28, 2005, ITA or its
agents, in the course of constructing roads or water/sewer
infrastructure and the HUD supported training center,
punched an opening into an archaeological site in a
sinkhole, consisting of a 2,000 foot long cave and the
bones of two Native Americans dating from 5000-3500 B.C.E.,
as well as several ancient drawings on hardened mud and
limestone. Due to the filling of substantial sinkholes on
the Transpark site that has already occurred during the
ongoing construction, it is possible that irreplaceable
archaeological sites have been harmed or destroyed. The
Smithsonian Institution, National Museum of Natural
History, warned ITA by letter in 2001 of its concern
regarding the impact of the proposed Transpark on the "rich
and unique cultural heritage of the region" and that "the

cave and karst sinkhole landscape of the region has yielded. . . a remarkably well-preserved record of ancient human societies." This warning was borne out by the 2005 intrusion into a cave and the discovery of prehistoric human remains.   But for the federal funding described above, no part of the Transpark activities which are the subject of this complaint would have been undertaken.   The actions taking place at the Transpark that are the subject of this Complaint are thus final agency action for purposes of the APA.

## COUNT I

37.  Plaintiffs repeat and reallege the foregoing allegations.

38.  Section 106 of the NHPA, 16 U.S.C. § 470f, prohibits federal agencies from engaging in any federal undertaking (or federally assisted or licensed undertaking) unless the agency first  (1) takes into account the effects of the undertaking on historic (including archaeological) properties, including both properties listed on the National Register and those deemed eligible for listing; and (2) affords the Advisory Council on Historic Preservation ("Advisory Council") a reasonable opportunity to comment on the undertaking.   National Register

properties, listed or eligible, can include above-ground districts such as a collection of related buildings on acreage (a farmstead with outbuildings and associated land as a cultural landscape), sites, buildings, structures and objects, as well as archaeological sites.

39. The Advisory Council is an independent federal agency responsible for the implementation and enforcement of the NHPA. 16 U.S.C. §470s. The Advisory Council has promulgated regulations implementing the requirements of the NHPA at 36 C.F.R. Part 800.

40. 36 C.F.R. Sec. 800.2 defines "undertaking" as follows:

> [A]ny project, activity, or program that can result in changes in the character or use of historic properties, if any such historic properties are located in the area of potential effects. The project, activity, or program must be under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency. Undertakings include new and continuing projects, activities, or programs and any of their elements not previously considered under Section 106.

41. The Transpark project is a federal undertaking within the meaning of Section 106, because it is a project or activity that is unavoidably under the direct or indirect jurisdiction of at least one federal agency and

licensed or assisted by at least one federal agency. The
relationship between the Transpark elements and road
projects are long-standing, integral and closely
coordinated, both in terms of the planning process and the
project's purpose and need. "*Inter-modal*" and "*Trans-park*"
mean integration of different methods of transportation,
specifically road, rail and air, all of which are
transportation elements of this development proposal. The
Transpark site is bounded on the south by I-65 (a new
interstate interchange is proposed to serve the Transpark),
on the north by US 31 (a connector road from the new I-65
interchange to US 31 is proposed), and is bisected by US
68/80 (the portion of this road at the intersection of US
31 has recently been widened and serves as the entrance to
the Transpark). One of the proposed corridors for I-66 (the
Kentucky portion of the coast-to-coast Transamerica
Highway) bisects the Transpark site in Warren County.

42. EPA, HUD and TVA jurisdiction over the project
requires compliance with Section 106 of the NHPA prior to
agency funding or approval of any aspect of the project. By
failing to identify and take into account the effects of
the Transpark on historic properties, by failing to afford
the Advisory Council and the Kentucky State Historic
Preservation Officer ("SHPO") an opportunity to comment on

the effects of the Transpark on historic properties, and by failing to seek and consult with Consulting Parties and the public under 36 C.F.R. Part 800 on what properties might be listed or eligible for the National Register, what alternatives to the action would be available, and what the effects of the Transpark project might be prior to demolition activities, Defendants have violated Section 106 and its implementing regulations.

43. Defendants' violations of the NHPA constitute agency action that is unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2) ("APA"). But for the federal funding described above, no part of the Transpark activities which are the subject of this complaint would have been undertaken. The actions taking place at the Transpark that are the subject of this Complaint are thus final agency action for purposes of the APA.

## COUNT II

44. "Anticipatory demolition" means the demolition or destruction of historic or archaeological properties in anticipation of review under Section 106 of the NHPA, in order to avoid and preclude the possibility of taking into account the effects of the project on those historic

properties and affording the Advisory Council, the Kentucky SHPO, Consulting Parties, and the public an opportunity to comment, as required by Section 106.

45. The Advisory Council has adopted a policy on "anticipatory demolition" under Section 106. That policy provides in part as follows:

> I.      Anticipatory demolition is inconsistent with the intent and spirit of the National Historic Preservation Act, and should be discouraged by all Federal agencies.
>
> II.     Federal agencies should ensure that anticipatory demolition does not occur in connection with projects they undertake, and do everything feasible to discourage it with respect to projects in which Federal assistance or permits may be directly or indirectly involved.
>
> III.    Within the scope of their legal authority, agencies should decline to provide assistance or permits to applicants who demolish historic properties during the application process, or shortly before it is initiated. Where demolition occurs substantially before the application process is initiated, the Federal agency receiving the application should renew the matter carefully to determine whether the demolition constituted a deliberate effort to frustrate

> Section 106 review; if so, the
> agency should decline to
> provide assistance or permits.

46.  Defendants have violated Section 106 by failing to exercise their authority to prevent or delay the destruction of historic properties prior to compliance with Section 106.

47.  The demolition that has already occurred at the Transpark also violates Section 110(k) of the NHPA, which prohibits federal assistance to projects that involve anticipatory demolition.  Section 110(k) specifically bans federal funding to applicants who either intentionally harm historic properties in order to avoid Section 106 review or allow a third party to harm historic properties when the applicant has the "legal power to prevent" the demolition. 16 U.S.C. § 470h-2(k); 36 C.F.R. Sec. 800.9(c)(1).

48.  The statutory violations described above constitute agency action that is unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).  But for the federal funding described above, no part of the Transpark activities which are the subject of this complaint would have been undertaken.  The actions taking place at the Transpark that are the subject of this

Complaint are thus final agency action for purposes of the APA.

## COUNT III

49. Plaintiffs repeat and reallege the foregoing allegations.

50. The funding, permitting and construction of the Transpark project is a "major federal action significantly affecting the quality of the human environment," within the meaning of Section 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(C), and the Council on Environmental Quality ("CEQ") regulations implementing NEPA, 40 C.F.R. Part 1500 et seq. But for the federal funding available from and/or provided by EPA, FAA, FHWA, HUD, TVA, and other sources, no part of the Transpark activities which are the subject of this complaint would have been undertaken. The actions taking place at the Transpark that are the subject of this Complaint are thus final agency action for purposes of the APA.

51. Because the Transpark is a "major federal action significantly affecting the quality of the human environment," NEPA requires Defendants to prepare and circulate for public and interagency comment an Environmental Impact Statement, a detailed statement on the

proposed project, identifying and discussing in detail the following:

> (i)    the environmental impact of the proposed action,
>
> (ii)   any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii)  alternatives to the proposed action,
>
> (iv)   the relationship between local and short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v)    any irreversible and irretrievable commitments of resources which could be involved in the proposed action should it be implemented.

42 U.S.C. § 4332 (C).

52. Defendants are also required by NEPA to "study, develop, and describe appropriate alternatives" to the proposal because the project involves "unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).

53. Defendants have violated NEPA by failing to prepare an Environmental Impact Statement for the entire Transpark project.

54.   Defendants' violations of NEPA described above constitute agency action that is unlawful, unreasonable, arbitrary and capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

**WHEREFORE**, Plaintiffs respectfully request this Court to grant the following relief:

1.   Declare that the Defendants and the Intervening Defendants have violated Sections 106 and 110(k) of NHPA, and Section 102 of NEPA.

2.   Issue a preliminary injunction and a permanent injunction halting all demolition and construction of the Transpark until NEPA and NHPA have been fully complied with.

3. Order Defendants to comply with Sections 106 and 110(k) of NHPA before issuing any permit or approval related to the Transpark project.

4. Order Defendants to comply with Sections 106 and 110(k) of NHPA before awarding, granting, reimbursing, or paying in any way any funds to any entity engaged in any aspect of the Transpark project.

5. Order Defendants to ensure that any entity, including the Intervening Defendants, that has already

received any funds, or promises or a guarantee of funds, from Defendants related to the Transpark project to refrain from any action that may adversely affect listed or eligible cultural and historic resources unless and until this Court has determined that the Defendants have fully complied with the requirements of the NHPA.

6. Order Defendants to complete an Environmental Impact Statement on the Transpark project before any further consideration of any application for federal permits, approvals or funding.

7. Award Plaintiffs their attorneys' fees, costs, and disbursements.

8. Award such other and further relief as the Court may deem appropriate.

Respectfully submitted,

W. Henry Graddy, IV
KBA Bar No. 26350
W. H. GRADDY & ASSOCIATES
103 Railroad Street
P.O. Box 4307
Midway, KY 40347
859-846-4905
e-mail: hgraddy@aol.com

AND

David Bookbinder
D.C. Bar No. 455525
Sierra Club
408 C Street, NE
Washington D.C.  20002
202-548-4598

```
                                    e-mail:
                                    david.bookbinder@sierraclub.org


                                    By:_s/ David Bookbinder_
                                         David Bookbinder
```

### CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2005, I electronically filed the foregoing document with the Clerk of the Court using the DM/EMF system which will send notification of such filing by operation of the Court's electronic filing system to the following:

```
Sara Culley
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington DC 20044-0663

Counsel for Defendants HUD and EPA
```

Maria V. Gillen
Tennessee Valley Authority
Office of the General Counsel
400 West Summitt Hill Drive
Knoxville, TN 37902-1401

Counsel for Defendant TVA

```
Randall Benn
Robert Anderson
Paul Freeman
George Ellard
LeBOEUF, LAMB, GREENE & MacRAE
1875 Connecticut Ave, NW
Washington DC 20009
Counsel for Intervenors
```

```
                                    s/David Bookbinder_
                                    DAVID BOOKBINDER
```