UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC. et al. | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY et al. | ) ) ) ) | |
| Defendants, | ) ) | No. 1:05-CV-01190-RMU |
| | ) | Judge Ricardo M. Urbina |
| INTER-MODAL TRANSPORTATION AUTHORITY, INC; FISCAL COURT OF WARREN COUNTY, KENTUCKY; and BOARD OF COMMISSIONERS OF CITY OF BOWLING GREEN, KENTUCKY | ) ) ) ) ) ) ) | |
| Intervener Defendants | ) ) | |

**SECOND DECLARATION OF JAMES N. HIZER**

I, James N. Hizer, make the following declaration based on personal knowledge, information, and belief:

1.  I am the President of the Inter-Modal Transportation Authority ("ITA"). The ITA is located in the City of Bowling Green, Kentucky (the "City"), which is the fourth largest city in Kentucky and is located in Warren County, Kentucky (the "County").

2.  All documents referred to herein are part of the business records maintained in the ordinary course of business by the ITA under my supervision.

1

3. In 1998 the Kentucky General Assembly appropriated $6,000,000 from the Commonwealth's general fund for the purpose of evaluating and developing an industrial park. The County formed the ITA, a non-stock, non-profit corporation, to act as the County's agency and instrumentality in acquiring, developing and financing the project. The facility envisioned by the County is known as the Kentucky Tri-Modal Transpark (the "Transpark").

4. Michael Buchanon, Warren County Judge-Executive, the chief executive officer of the County, appointed a number of business leaders, community leaders and educators to the Board of Directors of ITA. In order to evaluate whether the Transpark was economically feasible and, if so, in what manner the project should be developed, ITA retained the services of Wilbur Smith Associates (WSA), an internationally recognized consulting and engineering firm possessing special expertise in engineering, planning and economics.

5. WSA collected data through empirical studies of Warren County and its economy and studied data available from governmental sources and the Bowling Green – Warren County Chamber of Commerce. A Benefit-Cost & Economic Impact Analysis prepared by Wilbur Smith Associates ("WSA") dated March 16, 2000 concluded, among other things:

> The optimal development should incorporate an enhanced replacement airport (i.e. small) with <u>staged construction</u> of a 1,200-acre industrial park (i.e. large). [Emphasis added].

6. A document entitled "Kentucky Trimodal Transpark Environmental Evaluation" dated August 2001 prepared by WSA, Palmer Engineering, Inc.; Commonwealth Technology; Third Rock Consultants, LLC; Law Gibb Group; and Logsdon & Logsdon Architects states:

> Utilizing the environmental information developed, this environmental document analyzes the potential environmental impacts of the <u>business/commerce park element</u> of the KTT were evaluated to the greatest extent possible, given the current level of information about the nature of potential uses of the site. [Emphasis added].

and

> Although linked, in terms of long range goals and objectives, the business/commerce segment and the aviation segment of the KTT are not interdependent. <u>The business/commerce park development is the key element and primary focus of the project, and it possesses independent utility and function</u>. [Emphasis added].

7. The initial business plan for the Transpark was prepared by Baird, Kurtz & Dobson, a regional accounting firm with offices in Bowling Green, Kentucky. ITA Board Minutes of January 17, 2001 adopted the Business Plan, which provides for a phased development of the Transpark with the development of subsequent phases dependent on the success of previous phases. The minutes state:

> Spencer Coates of BKD presented the Business Plan Summary, which provided "Beginning in 2002, the business park will be <u>developed in phases</u> of 240-acre increments. <u>Development of additional phases will depend on the success of the first phase of the business park development</u>. *** At the end of the first 5-year period, these notes would be refinanced at that time and converted to long-term debt in FY 2011. <u>The amount is $25,000,000 during the first phase. The uses of the money would be to provide funds for the purchase of the initial land, and also for design and engineering for the business park</u>." [Emphasis added].

> Motion made, seconded and passed to approve the business plan as presented by BKD.

8. The ITA confirmed its commitment to a Phased development of the Transpark by adopting a resolution reflected in the Board Minutes of February 20, 2002 as follows:

3

Whereas the Inter-Modal Transportation Authority, Inc. (ITA) Board of Directors understands that the Kentucky Trimodal Transpark (KTT) is a long range economic development project designed to attract business, commerce and industrial facilities to south central Kentucky, then

BE IT RESOLVED that the ITA Board of Directors is committed to a policy of <u>conservative, phased development</u> of the KTT. This approach includes the following fundamental elements:

<u>The ITA's current land acquisition effort will focus exclusively on the land for the business/commerce park portion of the project</u>.

The ITA will develop the land in approximately 240-acre increments according to a comprehensive master plan.

<u>The ITA will delay subsequent phases of the Business/commerce Park and the airport until each previous phase is considered successful</u>.

Moreover, the following conditions must exist:

The FAA is satisfied that financial risk and environmental factors warrant purchase of land and construction of a replacement airport.

The ITA believes that economic and business conditions at the time still indicate that moving forward with the replacement airport and additional business/commerce park development would be advantageous to the south central Kentucky region. [Emphasis added].

9. In short, the development of the Transpark in phases has been the plan of development since a staged approach was recommended by WSA in the year 2000. No development of any part of the Transpark beyond Phase I has been undertaken or will be undertaken until Phase I is completed and a determination is made, after completion of Phase I, whether development beyond Phase I should be undertaken.

10. Phase I of the Transpark does not include the construction of an airport. Although initial plans for development of the Transpark included development of a new airport, as the project

is currently envisioned, any new airport will be developed by the Bowling Green – Warren County Airport Board (the "Airport Board"), an agency of the City and the County unrelated to the ITA. ITA Board Minutes of January 21, 2004 state:

> President Jim Vance discussed the termination of a written agreement between the Bowling Green/Warren County Regional Airport and Inter-Modal Transportation Authority, Inc. The BG/WC Regional Airport Board will move forward as the lead agency with respect to FAA for completion of the relocation of the Bowling Green Warren County Regional Airport.

Any new airport would be located outside the land comprising Phase I of the Transpark, since Phase I of the Transpark consists solely of a business and industrial park. The ITA has not acquired any land to use for the construction of an airport. An airport is not presently part of any future plans by the ITA. If a new airport is constructed near the Transpark, it will be constructed under the auspices of the Airport Board, not the ITA. Whether an environmental impact statement will be required is a matter that will be addressed by the Airport Board and the Federal Aviation Administration ("FAA") if and when the Airport Board determines that a new airport should be constructed.

11.   On April 5, 2001 the County and ITA filed a Petition with the appropriate Kentucky authority, the State Local Debt Officer, seeking approval of a financing plan to provide permanent and interim financing for Phase I of the Transpark through the issuance of industrial revenue bonds (the "bond issue"). The Petition made no mention of an airport or the potential development of later Phases of the Transpark.

12.   The SLDO approved the bond issue consisting of three elements: (1) Bond Anticipation Notes to be issued for interim financing of Phase I of the Transpark; (2) First Mortgage Revenue Bonds in the amount of $25 million in one or more series maturing in 30 years, representing permanent financing for Phase I of the Transpark; and (3) a Lease to be entered into between ITA

and Warren County obligating the County to make such payments to ITA as are necessary to pay the Bond Anticipation Notes and the Bonds. The State Local Debt Officer's approval of the bond issue was ultimately affirmed by the Kentucky state courts on appeal.

13. To date, the ITA has utilized a portion of the bond issue to acquire approximately 900 acres of land and to commence the installation of the infrastructure of Phase I of the project, such as roads, water lines, sewer lines, storm water treatment systems, etc. All of the land comprising Phase I of the Transpark is located in the corporate limits of the City of Bowling Green and is adjacent to I-65, the CSX Railroad, U.S. 68/80 and U.S. 31W.

14. On June 10, 2004 the contractor chosen to begin construction of the infrastructure of the Transpark was authorized to begin construction and construction began shortly thereafter on Phase I of the Transpark. Phase I of the Transpark was planned, designed, financed, and has been constructed, without any federal funding.

15. Numerical paragraph 1 of the Amended Complaint for Declaratory and Injunctive Relief (the "Amended Complaint") states "The Kentucky Trimodal Transpark ("Transpark"), as proposed, is a 4,000-6,000 integrated road, air and rail industrial park in north Warren County, Kentucky, approximately six miles south of Mammoth Cave National Park." While this statement would have been accurate if made in the year 2000 or 2001, it is not an accurate description of the current scope of the Transpark. The current scope of the Transpark does not include air transportation and is limited to the development of approximately 900 acres, not 4,000 to 6,000 acres.

16. Numerical paragraph 8 of the Amended Complaint states, "EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and

sewer infrastructure for the Transpark." This statement is incorrect. The $3.75 million referred to represents two separate grants, neither of which were actually made to the ITA and neither of which relate to the Transpark. The $3.75 million referenced in numerical paragraph 8 of the complaint consists of (1) a $2 million grant made to the Warren County Water District to extend larger water and sewer lines to north Warren County and (2) a $1.75 million dollar grant to the city of Bowling Green to assist in the "South Central Kentucky Water Infrastructure Project," which is being administered by the Warren County Water District.

17. While it is true that the $2 million grant was initially requested by the ITA, after the funds were appropriated, the ITA realized that the funds had been requested by mistake because (1) the water and sewer lines were to be constructed on property not owned by the ITA and (2) the water and sewer lines were to be constructed and owned by the Warren County Water District. After the funds were appropriated, but before they were received by the ITA, the ITA notified the office of Kentucky's senior Senator, Senator Mitch McConnell, that the funds had been mistakenly applied for. Senator McConnell's office contacted the grantor, the Environmental Protection Agency ("EPA"), which changed the grantee from the ITA to the Warren County Water District before the funds were dispersed. Thus, the ITA never received the funds and did not spend them.

18. Neither of these two grants will finance construction of water and sewer lines in the Transpark. The water and sewer lines located in the Transpark have been constructed using exclusively the proceeds of the bond issue referenced above. The ITA awarded Brock Excavating a contract in the spring of 2004 to do all the grade work for the internal roads of the Transpark connecting U.S. 68/80 and U.S. 31-W. Included in this contract was the installation of 20 inch water and sewer lines inside the Transpark, which constitutes all of the water and sewer lines to be located

inside Phase I of the Transpark. To date Brock Excavating has been paid approximately $6 million entirely out of revenue bonds issued by Warren County and/or funds received from the Commonwealth of Kentucky.

19. Numerical paragraph 9 of the Amended Complaint refers to $1.75 million appropriated by the Department of Housing and Urban Development ("HUD") for a training center under construction at the Transpark. The statements contained in numerical paragraph 9 of the complaint are incorrect for the following reasons: The amount of the appropriation was $1.50 million, not $1.75 million. These funds were appropriated for the purchase of equipment only, not for construction of the training center or the purchase of items that will become fixtures in the training center. The funds were appropriated for the City of Bowling Green, not the ITA. The funds to begin construction of the training center initially came from local sources involving no federal funds; interim financing from local sources was necessary because the Commonwealth of Kentucky was in a budget crisis at the time and had not enacted a budget. The Commonwealth of Kentucky has since enacted a budget and is in the process of taking over construction of the training center. The training center is not being constructed by the ITA. When completed, the training center will be part of the Kentucky Community and Technical College System ("KCTCS"), a state-wide system of vocational and training centers unrelated to the ITA.

20. The $1.5 million grant from HUD referred to in numerical paragraph 9 of the Amended Complaint was originally requested by Jack Thomas, the former President of the Bowling Green Technical College, which is a member of the KCTCS and is unrelated to the ITA. The ITA, KCTCS, and the Bowling Green Technical College are all separate entities. The training center is a state project which is part of the KCTCS, although it will be available to assist in training employees

of companies located in the Transpark. Neither the training center nor KCTCS is affiliated with the ITA. Based on my information, knowledge and belief, none of the grant funds referenced in numerical paragraph 9 of the Amended Complaint have been spent or requested.

21. Numerical paragraph 10 of the Amended Complaint refers to money being allocated by the Tennessee Valley Authority ("TVA") to Bowling Green Metalforming, LLC ("BGMF"). BGMF is a for profit company which was the first company to purchase land and build a facility in the Transpark. BGMF announced in December, 2003 its intention to locate in Bowling Green, Kentucky and in early 2004 BGMF's purchase of land from the ITA was completed. After BGMF purchased its land from the ITA, all decisions regarding the use of the land BGMF purchased from the ITA have been made by BGMF, not the ITA. The TVA funds referred to in numerical paragraph 10 of the Amended Complaint were not requested by the ITA and have not been received by the ITA. ITA was not involved in any request for funds made by BGMF to TVA and had no knowledge of any such request. ITA has not received any funds from TVA and has not spent any funds provided by TVA.

22. Numerical paragraph 11 of the Amended Complaint misrepresents the current scope of the Transpark for the reasons set forth in numerical paragraph 15, above.

23. Numerical paragraphs 13 through 24 of the Amended Complaint are misleading because, while they accurately reflect past events that occurred and past statements that were made in the years 2000, 2001 and 2003, they do not reflect the current scope of the Transpark or the present intention of the ITA with respect to federal funding as reflected in this Declaration.

24. Numerical paragraph 30 of the Amended Complaint states $8.7 million has been appropriated by the Federal Highway Administration ("FHWA") for road infrastructure for the

Transpark. This statement is incorrect. The Amended Complaint mentions a $2 million grant and a $5.25 million grant, but the $2 million is included in the $5.25 million grant. The $5.25 million was appropriated in fiscal year 2004 for improvements to U.S. 31-W and U.S. 68/80. The recipient of the funds was the Kentucky Transportation Cabinet, not the ITA. None of these funds were appropriated for, received by, or spent by the ITA. Although the expansion of U.S. 68/80 has recently been completed by the Kentucky Transportation Cabinet, none of the $5.25 million grant was used for construction of the expansion of U.S. 68/80. The allegation that the FHWA funds are to be used to add an exit and connector road for I-65 is misleading.

25.     The FHWA appropriated $1.7 million, which was divided into two grants, a $500,000 grant to the Kentucky Transportation Cabinet for a feasibility study of a new exit off I-65 and a $1.2 million grant for the construction of internal roads in the Transpark. The ITA declined the $1.2 million appropriation and these funds were never requested or received. The internal roads in the Transpark are being constructed and funded entirely by the proceeds of the bond issue discussed above and funds appropriated by the Commonwealth of Kentucky.

26.     The Kentucky Transportation Cabinet is currently studying the possibility of constructing a connector road as mentioned in numerical paragraph 30 of the Amended Complaint, along with two other options. The Kentucky Transportation Cabinet has made no decision as to which of the three options will be chosen. Any construction of such a connector will be undertaken by the Kentucky Transportation Cabinet, not the ITA. The I-65 connector is not part of the Transpark plan, but is part of the City of Bowling Green 20 year road plan. The proponents of the I-65 connector hope it will eventually become part of I-66, a new interstate highway which will cross Kentucky from east to west. The I-65 connector mentioned in the complaint is not part of the

Transpark and the ITA has not been notified as to which of the three options noted above will be chosen.

27.    At present, the ITA is in final discussions with three separate corporate entities that have expressed an interest in locating facilities in the Kentucky Transpark. These entities represent a combined investment of approximately $180 million. These entities estimate they will employ over 1,100 persons. In addition, BGMF, which has already established a manufacturing facility in the Kentucky Transpark, holds a real estate option on an adjoining 68 acre parcel for the purposes of future expansion.

28.    The board of directors for one of the interested corporate entities had already voted to locate a $7 million, 44,000 square foot facility in the Kentucky Transpark at the time that the motion for preliminary injunction was filed in this case. After learning of this legal action through the news media, this same board of directors asked their management to postpone applying for a building permit and to seek out alternative sites. When the request for a preliminary injunction was withdrawn, this entity renewed its effort to purchase property within the Transpark. This chain of events illustrates the deleterious effect any injunction would have on development of the Transpark. An injunction will likely cause prospective purchasers of land in the Transpark, to abandon their plans to locate business and industrial facilities in the Transpark, thereby resulting in irreparable damage to the finances, marketing efforts and current good reputation of the Transpark, the ITA, and the economy of the Bowling Green/Warren County area.

29.    Currently, there are over 6,500 unemployed people living in the Bowling Green area. An injunction will cause employers to locate outside of the Bowling Green area, thus denying these unemployed individuals the opportunity to seek employment at these firms.

30. The impact of losing an occupant of the Kentucky Transpark goes far beyond the loss of jobs, since the loss of jobs results in a loss of revenue to the City and the County from property taxes, along with the loss of occupational taxes to the City. In addition, an injunction would shift the burden of paying the ITA bonds to the taxpayers in the City and the County.

31. An injunction would also likely force the ITA to cease operations, since the ongoing operations of the ITA are to be funded through the land sales in the Kentucky Transpark.

32. In addition, an injunction would cause irreparable harm to the standing and reputation of the ITA, the Transpark, and the community of Bowling Green/Warren County in the eyes of corporate site location consultants and business entities from all over the world. It would not be soon forgotten by our target audience that the local community aggressively marketed the Transpark to the world, only to find that the Transpark is not available for occupancy as a result of an injunction.

33. The overall loss of economic impact from the wages that would have been earned by employees of Transpark occupants could also be substantial. Studies have shown that for every dollar of wages paid to an employee, $2 - $3 in total economic activity is generated. The impact on retail and service businesses from the loss of this economic activity would constitute economic damage.

34. Local human service agencies, such as the United Way, and local arts organizations, such as the Bowling Green Chamber Orchestra, would also suffer financial damage from an injunction since the employers who abandon efforts to locate in the Kentucky Transpark would not support these local agencies, which rely on local businesses and industries for a substantial portion of their funding. The human service agencies in the area would also likely suffer additional financial

harm as a result of being compelled to provide financial support to the unemployed, who otherwise might have become employed by firms locating in the Kentucky Transpark. This, in turn, would result in a reduced standard of living and quality of life for residents of the Bowling Green area, since organizations such as these are vital to making our community a better place in which to live.

35. An injunction of the scope requested could halt construction on the South Central Kentucky Technical Training Center in the Kentucky Transpark. This 31,000 square foot training center will serve residents from throughout the South-Central Kentucky area. Such an injunction would harm these residents by denying them the opportunity to gain advanced technical skills and by denying them the employment opportunities that might have been available to them had they attended the Technical Training Center.

36. In view of the allegations contained in the complaint filed in this case, the ITA obtained a review of all structures located in Phase I of the Transpark by Robin Zeigler, the Historic Preservation Planner for the Bowling Green – Warren County Historic Preservation Board. Ms. Zeigler has filed a declaration stating that none of the structures she examined are eligible for inclusion in the National Register of Historic Places.

37. Construction on the Kentucky Transpark's state-of-the-art storm water management and filtration system is not yet complete. If an injunction is granted before construction of this system is complete, it is likely that groundwater under the Kentucky Transpark, and in the vicinity of the Transpark, will be fouled by unfiltered storm water runoff, causing irreparable damage to the environment.

38. Construction on the Kentucky Transpark's street lighting system is not yet complete. If an injunction is granted, these systems will not be installed. Personal injury automobile accidents could result, causing harm to pedestrians and automobile occupants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25 day of August 2005.

James N. Hizer, President, Inter-Modal
Transportation Authority, Inc.