## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC., <u>et al.</u> | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, <u>et al.</u> | ) ) ) ) | |
| Defendants, | ) ) | No. 1:05-CV-01190-RMU Judge Ricardo M. Urbina |
| INTER-MODAL TRANSPORTATION AUTHORITY, INC; FISCAL COURT OF WARREN COUNTY, KENTUCKY; and BOARD OF COMMISSIONERS OF CITY OF BOWLING GREEN, KENTUCKY | ) ) ) ) ) ) | |
| Intervener Defendants. | ) ) | |

## <u>INTERVENER DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT</u>

### INTRODUCTION

The Inter-Modal Transportation Authority, Inc. ("ITA"), the fiscal Court of Warren County, Kentucky (the "County"), and the Board of Commissioners of the City of Bowling Green, Kentucky (the "City") (collectively, the "Intervener Defendants") seek dismissal of the Amended Complaint. The Intervener Defendants are the owners and developers of an industrial park known as the Kentucky Tri-Modal Transpark, or simply the Transpark, currently being developed in the City of Bowling Green, Kentucky. The ITA is an agent, instrumentality and constituted authority of the County and is the owner of the land where the Transpark is being developed; the City and the County have guaranteed a bond issue to finance the acquisition of the land and the construction of the infrastructure necessary to develop the land into a business

and industrial park.  In the making since 1998, the Transpark is a vital element of the regional economy and a key to its growth.

The Plaintiffs in this action contend that the U.S. Environmental Protection Agency ("EPA"), the U.S. Department of Housing and Urban Development ("HUD"), and the Tennessee Valley Authority ("TVA") (collectively, the "Federal Defendants") have violated various provisions of the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA") by failing to review the impact of site preparation and construction during the first phase of the Transpark.  To remedy these purported violations of federal law, the Plaintiffs seek declaratory and injunctive relief that would have the effect of delaying or halting further development activities associated with the Transpark.  Thus, while EPA, HUD, and TVA have been named as defendants, this action is, in reality, a collateral attack on the Transpark itself.  By seeking orders that would stop or delay the Transpark project, Plaintiffs seek relief that would directly and substantially impact the interests of the Intervener Defendants.

However, EPA, HUD, and TVA have not engaged in any "major federal actions significantly affecting the environment" under NEPA or any "federal undertakings" under the NHPA related to the Transpark. Therefore, the Amended Complaint should be dismissed for lack of jurisdiction, since there has been no "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704, 706 ("APA"), the jurisdictional statute upon which this case hinges.  Finally, the Amended Complaint also fails to state a claim upon which relief can be granted.  Therefore, the Amended Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

The City of Bowling Green is the fourth largest city in Kentucky and is located in Warren County, Kentucky, a political subdivision of the State.  Second Declaration of James N. Hizer ("2nd Hizer Decl."), ¶ 1.  In 1998, the Kentucky General Assembly granted to the County the

2

sum of $6,000,000 for the purpose of evaluating and developing an industrial park. Shortly
thereafter, the County formed the Inter-Modal Transportation Authority, Inc., a non-stock, non-
profit corporation, to act as the County's agent and instrumentality in acquiring and financing the
project. 2nd Hizer Decl., ¶ 3. The facility envisioned by the County is known as the Kentucky
Tri-Modal Transpark, or the Transpark. Id. The Transpark is an intermodal commerce-
distribution center and industrial park, and is being financed through bonds issued by the ITA
pursuant to authority granted to the ITA by the County. Second Declaration of Michael O.
Buchanon ("2nd Buchanon Decl."), ¶ 3. Pursuant to a lease agreement between ITA and the
County, the County is obligated to the ITA in the amounts necessary to repay the bonds; if the
ITA has insufficient income to repay the bonds, the County is obligated to make up the shortfall.
2nd Hizer Decl., ¶ 12; Second Declaration of Terrell Ross ("2nd T. Ross Decl."), ¶ 4. The
business plan developed by the County with its consultants provided for the development of the
Transpark in separate phases or stages. 2nd Hizer Decl., ¶¶ 5-9.

Phase I of the development includes the purchase and local development of
approximately 900 acres of land as a business or industrial park. To date the ITA has utilized a
portion of the bond issue to acquire the land and to commence the installation of the
infrastructure of Phase I of the project. 2nd Hizer Decl., ¶ 13. Bowling Green Metalforming,
LLC ("Metalforming"), has agreed to locate an industrial plant on the property acquired by ITA.
2nd Hizer Decl., ¶ 21. All of the land currently comprising Phase I of the Transpark is located
within the corporate limits of the City of Bowling Green. 2nd Hizer Decl., ¶ 13. The Transpark
also is in the process of attracting other industries to join the project. 2nd Hizer Decl., ¶ 26;
Second Declaration of Elaine Walker, ¶ 4; Second Declaration of Jerry Pearson, ¶ 3. The first
phase of the development does not include the construction of an airport, 2nd Hizer Decl., ¶ 10,

3

although the Bowling Green – Warren County Airport Board is considering replacement of the existing airport with a new regional airport which may or may not be located near the Transpark. Second Declaration of Robert Barnett ("2nd Barnett Decl."), ¶ 2.

The efforts to develop the Transpark are supported by neighboring counties and municipalities, who have pledged to bear approximately 35% of the financial burden of the project in the event it fails to become self-supporting as anticipated. 2nd Buchanon Decl., ¶ 4. Pursuant to an agreement between the City and the County, the remaining 65% of the financial burden of the project, in the event it fails to become self-supporting, will be borne equally by the City and the County. 2nd Buchanon Decl., n.1.

## STATUTORY BACKGROUND

### I.    THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA, 42 U.S.C. § 4321, *et seq.*, was enacted for the purpose of protecting the human environment by requiring federal agencies to carefully consider the environmental consequences of their actions. Under Section 4332(2)(C) of NEPA, federal agencies are required to conduct an environmental analysis and prepare an Environmental Impact Statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment." *See, e.g.*, Kleppe v. Sierra Club, 427 U.S. 390 (1976); Macht v. Skinner, 715 F. Supp. 1131 (D.D.C. 1989), *aff'd,* 889 F.2d 291 (D.C. Cir. 1990); Stewart Park & Preserve Coal. Inc. ("SPARC") v. Slater, 352 F.3d 545, 557 (2d Cir. 2003). Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-1508, provide guidance in the application of NEPA. *See* Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989).

The purpose and intent of NEPA is to focus the attention of the federal government and the public on a proposed federal action so that the consequences of the action can be studied

before the action is implemented.  42 U.S.C. § 4321; 40 C.F.R. § 1501.10; Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).  While NEPA mandates procedures to be used by federal agencies in considering the environmental impacts of their actions, it does not dictate the substantive results.  Robertson, 490 U.S. at 350; Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-28 (1980).  NEPA's mandate to federal agencies is "essentially procedural. . . . It is to insure a fully informed and well-considered decision, . . . "  Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

While Plaintiffs have based Count III of their Amended Complaint on alleged non-compliance with NEPA, they have failed to specifically identify "a major federal action significantly affecting the environment" taken by the Federal Defendants related to the Transpark.  Therefore, as will be demonstrated in detail below, Plaintiffs fail to establish that federal jurisdiction exists and fail to state a claim upon which relief can be granted under NEPA.

## II.    THE NATIONAL HISTORIC PRESERVATION ACT

Through the NHPA, 16 U.S.C. § 470, et seq., Congress directed federal agencies to consider the impact of federal undertakings on historic resources of national significance, 16 U.S.C. § 470f, and to assume responsibility for the preservation of historic resources that they own or control, 16 U.S.C. § 470h-2.  Section 106 of the NHPA establishes responsibilities of a federal agency over a proposed federal or federally assisted "undertaking":

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.  The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under title 11 of this Act a reasonable opportunity to comment with regard to such undertaking. 16 U.S.C. § 470f.

Because of the operational similarity between NEPA and NHPA, the courts have generally treated "major federal action" under NEPA as closely analogous to "federal undertakings" under NHPA. Sac & Fox Nation of Mo. v. Norton, 240 F.3d 1250 (10th Cir. 2001), *cert. denied*, 534 U.S. 1078 (2002). Like NEPA, the requirements set forth in Section 106 of the NHPA are essentially procedural in nature. National Mining Ass'n v. Fowler, 324 F.3d 752, 755 (D.C. Cir. 2003). The NHPA "neither . . . forbid[s] the destruction of historic sites, nor . . . command[s] their preservation." United States v. 162.20 Acres of Land, 639 F.2d 299, 302 (5th Cir. 1981), cert. denied, 454 U.S. 828 (1981). Section 106 of the NHPA requires agency decision-makers to consider specified information concerning the effects of a federal undertaking on National Register-eligible resources prior to the agency's issuance of a final decision.

Furthermore, as articulated by the D.C. Circuit in Sheridan Kalorama Historical Ass'n v. Christopher, 49 F.3d 750, 754-56 (D.C. Cir. 1995), the only activities triggering federal obligations under the NHPA are direct federal undertakings, federal funding of projects, or federal approval or licensing of projects. Since the Phase I Transpark activities are not subject to federal financing, ownership, licensing, or control, there is simply no federal "undertaking" that triggers NHPA review. Therefore, the Amended Complaint should be dismissed with prejudice for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

### III.    THE ADMINISTRATIVE PROCEDURE ACT

Section 704 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, only waives sovereign immunity, and provides for judicial review of discrete Federal agency decisions, in two categories of administrative action: (1) "[a]gency action made reviewable by statute" and (2) "final agency action for which there is no other adequate remedy in a court." Id.  Although the Amended Complaint is predicated on alleged violations of NEPA and NHPA, neither of those substantive statutes establishes a private cause of action.  Therefore, jurisdiction in this case hinges on the second clause of Section 704, and Plaintiffs must demonstrate EPA, HUD, or TVA took "final agency action for which there is no other adequate remedy in a court." Id.

Generalized attacks upon actions undertaken by the Federal Defendants EPA, HUD, and TVA do not demonstrate that there has been final agency action.  "Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, __, 124 S. Ct. 2373, 2380 (2004), (citations omitted).  The Norton Court noted that these must be "circumscribed, discrete agency actions" and may include "five categories of decisions made or outcomes implemented by an agency – 'agency rule, order, license, sanction [or] relief.'" Id. at 2378 (citing 5 U.S.C. § 551(13)).  In determining whether the agency action is final, the Court should consider "whether the agency's position is definitive and whether it has a direct and immediate . . . effect on the day-to-day business of the parties." Indep. Petroleum Assoc. of Am. v. Babbitt, 235 F.3d 588, 594 (D.C. Cir. 2000) (internal quotations and citation omitted).  "Agency action is final when it 'imposes an obligation, denies a right, or fixes some legal relationship.'" Action on Smoking & Health v. DOL, 28 F.3d 162, 165 (D.C. Cir. 1994), (quoting NRDC v. NRC, 680 F.2d 810, 815 (D.C. Cir. 1982)).

Since Plaintiffs have predicated their complaint on NEPA, NHPA, and the APA, they must identify a "final federal agency action" taken by the Federal Defendants relative to the Transpark that required consideration of impacts on the environment or historical sites. However, Plaintiffs have utterly failed to identify an application for a permit, license, or federal funding made by the ITA or the Transpark to the Federal Defendants that was acted upon in a "final federal agency action"; thus, the Amended Complaint should be dismissed with prejudice for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

## ARGUMENT

## I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO DEMONSTRATE THAT FEDERAL SUBJECT MATTER JURISDICTION EXISTS UNDER NEPA, NHPA, OR THE APA

Federal Rule of Civil Procedure § 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. Federal courts are courts of limited jurisdiction and may only decide cases after the party asserting jurisdiction demonstrates that the dispute falls within the court's constitutional and statutory jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). It is presumed that federal courts lack jurisdiction unless the contrary appears affirmatively from the record, DOE v. Ohio, 503 U.S. 607, 614 (1992); Renne v. Geary, 501 U.S. 312, 315 (1991). The party seeking federal court jurisdiction bears the burden of demonstrating that jurisdiction exists. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Commodity Futures Trading Comm'n v. Nahas, 738 F.2d 487 (D.C. Cir. 1984).

Neither NEPA nor the NHPA contains a grant of federal jurisdiction to private litigants, and the APA only allows federal judicial review of "final agency actions" pursuant to 5 U.S.C. §§ 704, 706. As recently articulated by the Supreme Court, the APA grants jurisdiction to

review "some particular 'agency action'' that causes . . . harm" such as the outcome from an "agency rule, order, license, sanction, [or] relief." <u>Norton</u>, 542 U.S. ___, 124 S. Ct. 2378-80 (citations omitted). Such discrete federal actions do not exist in this case. To invoke the Court's subject matter jurisdiction, the Plaintiffs must show that the federal defendants in this case took final agency action relative to the Transpark, 5 U.S.C. § 704, which they have utterly failed to do.

The Plaintiffs try to "federalize" the Transpark through a series of allegations regarding federal appropriations and funding. In contrast, Judge Michael O. Buchanon, Judge-Executive (Chief Executive Officer) of the County summarizes the absence of any federal funding or involvement in the development of the Transpark as follows:

> No funds from any agency of the United States Government have been used in the acquisition or development of these 900 acres, which comprise Phase I of the Transpark, and the ITA is not dependent on such funds to complete development of the Transpark. 2nd Buchanon Decl., ¶ 3.

The mere appropriation of funds is not a final agency action which confers jurisdiction under the APA. That Act expressly excludes Congressional actions from its coverage. 5 U.S.C. §§ 701(b)(1), 551(1). The existence of federal appropriations alone does not trigger NEPA's requirements, as this Court recently pointed out in <u>Citizens Alert Regarding the Env't v. EPA</u>, 259 F. Supp. 2d 9 (D.D.C. 2003), <i>aff'd</i>, 2004 WL 1336644 (D.C. Cir. 2004). In <u>Citizens Alert</u>, Plaintiff attempted to stop a township's sewer project because an EPA appropriation Act had earmarked money for the project. Plaintiff insisted a NEPA review was necessary. This Court held that, although the project might receive federal funds in the future, it would not enjoin the project because Congressional and EPA actions, prior to a possible award of a grant to the township, were not major federal actions under NEPA. <u>Citizens Alert</u>, 259 F. Supp. 2d at 20.

While the <u>Citizens Alert</u> Court concluded that EPA's actions did not constitute a "major federal action" pursuant to NEPA, its analysis applies equally to final agency action within the meaning of the APA.  <u>See Coal. for Underground Expansion v. Mineta</u>, 333 F.3d 193, 197 n.7 (D.C. Cir. 2003) ("[T]his court has expressly concluded that the requisite final agency action . . . of the APA is the 'major Federal action[] significantly affecting the quality of the human environment' within the meaning of [NEPA.]") (citations omitted).

Similarly, Section 106 of the NHPA applies to the actions of federal agencies. 16 U.S.C. § 470f.  The NHPA Regulations incorporate by reference the APA definition of "agency" which excludes Congress.  36 C.F.R. § 800.16(b); 5 U.S.C. § 551(1)(A) (2005).  Therefore, in <u>Capital Hill Restoration Soc'y, Inc. v. Ensign</u>, 1996 U.S. Dist. LEXIS 19771, 19775 (1996), this Court held that the Architect of the Capital and Congress were exempt from the NHPA since neither are a "federal agency" within the definition of agency under NHPA (as defined in the APA). <u>Id.</u>

The circumstances in the case at bar are very similar to those previously addressed by this Court under NEPA and the NHPA.  Many local aspects of Phase I are underway or completed.  While Plaintiffs have pointed to several federal appropriations, and even money earmarked for Transpark projects, Intervener Defendants have either not applied for, or have not accepted the award of, such funds from the Federal Defendants.

Plaintiffs base their claim of federal jurisdiction on appropriations, and little more.  The Amended Complaint cites Congressional authorizations and appropriations to the U.S. Federal Highway Administration ("FHWA"), HUD, and EPA during the fiscal years 2003 through 2005, allegedly for various Transpark activities. Pls.' Am. Compl., ¶¶ 8, 9, 30.  The Amended Complaint concludes that "but for federal funding described above, no part of the Transpark activities which are the subject of this complaint would have been undertaken."  Pls.' Am.

Compl., ¶¶ 36, 43. 48, 50.    The Court may disregard such conclusory allegation that are unsupported by pleaded facts.  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations."); Simpson v. Socialist People's Libyan Arab Jamahiriya, 362 F. Supp. 2d 168, 181-82 (D.D.C. 2005).

A.    **The Appropriation of HUD Funds for a Training Center Does Not Establish Federal Jurisdiction over the Transpark.**

The Amended Complaint alleges that "HUD's spending authorization bill for fiscal year 2005 appropriated a total of $1.75 million for a training center that is already under construction at the Transpark."  Pls.' Am. Compl., ¶ 9.  These allegations are erroneous and confuse the difference between a Congressional appropriation and actual funding.

While an appropriation does not constitute final agency action under the APA, and therefore does not confer subject matter jurisdiction, Intervener Defendants also point out that the allegation is incomplete and misleading.  Congress has appropriated HUD funds for a training center, and the training center is to be located at the Transpark.  However, HUD's prospective financial support for the training center does not establish, or equate to, federal funding of the Transpark or even the training center at this stage.

The June 27, 2005 Declaration of Francis P. McNally filed in support of the original Motion to Dismiss filed by HUD and EPA indicates that $1.5 million in funds were appropriated, not for the ITA, but for the City of Bowling Green.  McNally Decl., ¶ 8.  More importantly, the HUD funds were appropriated for the purchase of equipment, not construction of the training center.  Id.  Construction of the training center is being undertaken by the Commonwealth of Kentucky, not the ITA; the training center will be part of the Kentucky Community and

11

Technical College System, a state-wide system of vocational and training centers operated by the Commonwealth and unrelated to the ITA. Id. ¶¶ 9-10. Since no funds have been awarded yet to any applicant, HUD has taken no final agency action under the APA. Id. ¶ 11.

**B.      The Congressional Appropriation to FHWA for the Kentucky Transportation Cabinet Does Not Establish Federal Jurisdiction or Involvement in the Transpark.**

In an effort to establish that the Transpark is federally funded or is a "federal undertaking," Plaintiffs also erroneously allege that "FHWA's spending authorization bills for fiscal years 2003 through 2005 appropriated a total of $8.7 million for road infrastructure for the Transpark complex." Pls.' Am. Compl., ¶ 30. The FHWA grants in question relate to three separate construction projects: (1) the improvement of U.S. 31-W and U.S. 68/80; (2) the construction of a new interchange off I-65; and (3) the construction of internal roads in the Transpark. 2nd Hizer Decl., ¶¶ 24-26.

The FHWA funds appropriated for the improvement of U.S. 31-W and U.S. 68/80 were not appropriated for ITA, but were appropriated for the Kentucky Transportation Cabinet. 2nd Hizer Decl., ¶¶ 24-26. None of the funds were received or spent by the ITA and no part of this particular project was located inside the Transpark. Id.

The construction of a new connector or exchange off I-65 is not a project that is directly related to the Transpark. Rather, it is part of the 20-year transportation plan for the City of Bowling Green, through which I-65 passes, and is hoped to be part of a new interstate highway, I-66, which will pass through Kentucky in an east-to-west direction. Id. The Kentucky Transportation Cabinet, not the ITA, received a $500,000 grant from the FHWA to study the project, and none of these funds were received or spent by the ITA. Id. The Kentucky Transportation Cabinet is currently in the process of studying the project, and is considering three different options and proposals, none of which has yet been adopted. Id.

12

The FHWA funds referenced in the Amended Complaint included a $1.7 million grant for the construction of internal roads within the Transpark. Although these funds were allocated by the FHWA, they were never received by or spent by the ITA. Id. The ITA declined the funds and has constructed all internal roads inside the Transpark with funds derived from the ITA's $25 million industrial revenue bond issue and funds received from the Kentucky Transportation Cabinet. Id. Thus, no federal funds have been used to construct roads inside the Transpark.

The withdrawal of an application for a federal highway project is allowed if the project has not become irrevocably federal in nature; the bare application, without more, does not render an entire highway project a major federal action within the meaning of the APA and NEPA. SW. Williamson Co, C'mty. Ass'n, Inc. v. Slater, 67 F. Supp. 2d 875 (M.D. Tenn. 1999), aff'd, 243 F.3d 270 (6th Cir. 2001); see also Ely v. Velde, 497 F.2d 252 (4th Cir. 1974) (state initially intended to build prison reception and medical center with federal block grant; state allowed to shift money to training and build center with state funds since the prison project was not irrevocably federal). Phase I of the Transpark is clearly not a federal project, but decidedly a local one.

## C.    The Congressional Appropriations to EPA for Water and Sewer Infrastructure Do Not Establish Federal Jurisdiction or Involvement in the Transpark.

The Amended Complaint also erroneously states that "EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the Transpark." Pls.' Am. Compl., ¶ 8. Although appropriations alone do not constitute final agency action under the APA, or trigger subject matter jurisdiction, it is important to point out that the funds were not appropriated for the ITA, and were not received or spent by the ITA. 2nd Hizer Decl., ¶ 11. All infrastructure within the Transpark, including water and sewer lines, has been constructed exclusively with the proceeds of the ITA's $25

13

million industrial revenue bond issue. Id. The June 27, 2005 Declaration of Dorothy Rayfield ("Rayfield Decl.") filed in support of the EPA's and HUD's original Motion to Dismiss, confirms the statements set forth in the Hizer Declaration. The $3.75 million referred to in the Complaint consisted of two EPA grants: (1) a grant to the Warren County Water District, not the ITA, to extend larger water and sewer lines to northern Warren County, and (2) a grant to the City of Bowling Green to assist the South Central Kentucky Water Infrastructure Project. 2nd Hizer Decl., ¶¶ 16-18.

The $1.75 million grant was requested by the ITA by mistake. 2nd Hizer Decl., ¶ 17. Before the funds were dispersed, the ITA realized that the funds had been mistakenly applied for by the ITA because the water and sewer lines were to be constructed on land located outside the Transpark by the Warren County Water District and were to be owned by the Warren County Water District. Id. EPA has not released the funds to the Warren County Water District and the funds remain unexpended. Id.

An additional $2 million was appropriated to fund a possible grant from the EPA to the City of Bowling Green; the ITA is not a recipient of the funds. Rayfield Decl., ¶ 12. Moreover, the City of Bowling Green has not made application for the funds and the funds have not been awarded, received, or spent. Rayfield Decl., ¶ 12. As discussed previously, this Court recently pointed out in Citizens Alert that sewer projects may not be enjoined simply because Congress had earmarked money for the project. While plaintiffs in that case insisted a NEPA review was necessary, this Court held that, although the project might receive federal funds in the future, it would not enjoin the project because Congressional appropriations and EPA actions prior to the award of a grant were not major federal actions under NEPA. Citizens Alert, 259 F. Supp. 2d at 20.

14

Similarly, the vague funding allegations made throughout the Amended Complaint do not establish "major federal actions" under NEPA or federal undertakings within the meaning of NHPA. Review of the more specific and detailed allegations of the Complaint demonstrate that those allegations also fail to establish a basis for federal jurisdiction and, moreover, fail to state a claim upon which relief can be granted.

## II. THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED UNDER NEPA, NHPA, OR THE APA.

If a complaint fails to establish that a "final agency action" has taken place under the APA, the complaint may be dismissed as a failure to state a claim upon which relief can be granted. As discussed previously, the Amended Complaint fails to establish any "final agency action." Therefore, dismissal is proper in this case pursuant to both Rule 12(b)(6) and 12(b)(1). In Reliable Automatic Sprinkler Co, Inc. v. Consumer Product Safety Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003), *reh'g denied*, 2003 U.S. App LEXIS 11337 (2003), the Court of Appeals for D.C. Circuit held that "[i]f there was no final agency action [in the case before the court], there is no doubt that appellant would lack a cause of action under the APA. Therefore, . . . we may properly affirm the judgment [below dismissing the case] pursuant to Rule 12(b)(6)." In interpreting its own decision in Reliable Automatic Sprinkler, the Court later stated that it "determined that the District Court lacked jurisdiction to review the Consumer Product Safety Commission's ("CPSC") process absent final agency action." CropLife Am. v. EPA, 329 F.3d 876, 882 (D.C. Cir. 2003). Thus, Plaintiffs' Amended Complaint in this case may be dismissed either for failure to demonstrate that subject matter jurisdiction exists under Rule 12(b)(1), or for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

The Supreme Court also has consistently held that Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. Neitzke v. Williams, 490 U.S. 319, 326 (1989); Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41 (1957)). "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." Neitzke, 490 U.S. at 327 (*quoting* Hishon, 467 U.S. at 73).

Plaintiffs allege that both NEPA and the NHPA have been violated. However, there is simply no basis in fact or law for either claim.

**A.    Plaintiffs Fail To State a Claim under NHPA Because There Has Been No "Federal Undertaking" and No "Anticipatory Demolition" at the Transpark That is Actionable Under NHPA.**

Plaintiffs allege in their Amended Complaint that:  (1) procedural violations of Section 106 of the NHPA have occurred at the Transpark; and (2) that anticipatory demolition has taken place in violation of Section 110(k) of the NHPA, 16 U.S.C. §§ 470f; 470h-2(k).  However, Plaintiffs have failed to state a claim upon which relief can be granted since (1) no federal undertaking, as a matter of law, has taken place at the Transpark; (2) Phase I of the Transpark project has not impacted any historic properties; and (3) no anticipatory demolition, under applicable law, has taken place at the Transpark.  Moreover, to the extent Plaintiffs' suit is premised upon "contingent future events that may not occur as anticipated, or indeed may not occur at all" the NHPA claims are unripe for judicial review.  Texas v. United States, 523 U.S. 296, 300 (1998) (*quoting* Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)).

16

1.    **No Federal Undertaking Has Occurred at the Transpark.**

It is well-settled that the NHPA review process is not triggered unless a federal agency engages in a statutorily covered "undertaking." National Trust for Historic Preservation v. Blanck, 938 F. Supp. 908 (D.D.C. 1996), aff'd, 203 F.3d 53 (D.C. Cir. 1999). Section 106 of the NHPA requires that federal agencies "having direct or indirect jurisdiction over a proposed . . . federally assisted undertaking in any State . . . prior to the approval of the expenditure of any Federal funds . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. In general, the requirements of Section 106 of the NHPA are consultative and procedural in nature, National Mining Ass'n, 324 F.3d at 755, and are satisfied by following the review process set forth by the Advisory Council on Historic Preservation (the "Council") in the regulations implementing Section 106 of the NHPA at 36 C.F.R. § 800, et seq. (hereinafter "NHPA Regulations").

A federal "undertaking" is defined in Section 301 as:

[A] project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including—(A) those carried out by or on behalf of a Federal agency; (B) those carried out with Federal financial assistance; (C) those requiring a Federal permit license or approval; and (D) those subject to State or local regulation administered pursuant to delegation or approval by a Federal agency. 16 U.S.C. § 470w(7) (emphasis added).

The NHPA Regulations track the statutory definition just quoted. See 36 C.F.R. § 800.16 (y). The U.S. Court of Appeals for the D.C. Circuit has narrowed the reach of the Section 301 definition of federal undertakings by noting that the jurisdictional provision of Section 106 is limited to only direct federal activities, or federally-funded or approved undertakings. National Mining Ass'n, 324 F.3d at 755. Accord Lee v. Thornburgh, 877 F.2d 1053 (D.C. Cir. 1989). Plaintiffs' Amended Complaint alleges no facts that establish a federal undertaking at the

17

Transpark. Phase I of the Transpark project has been, and will continue to be, planned, designed, financed, and constructed without any federal funding or approval. As will also be demonstrated, a federal undertaking cannot be established by any of the specific actions relied upon by the Plaintiffs, and the procedural requirements of Section 106 of the NHPA simply have not been triggered. Therefore, Plaintiffs fail to state a claim upon which relief can be granted.

### 2.    No Historic Properties Have Been Impacted by Federal or ITA Actions at the Transpark.

The NHPA "neither . . . forbid[s] the destruction of historic sites, nor . . . command[s] their preservation." 162.20 Acres of Land, 639 F.2d at 302. Section 106 of the NHPA requires agency decision-makers to consider specified information concerning the effects of a federal undertaking on National Register-eligible resources prior to the agency's issuance of a final decision. In the Amended Complaint the Plaintiffs assert that historic properties have been impacted within the Transpark or the surrounding area by the local construction activities and/or operations. "Historic property" is defined under the NHPA Regulations as:

> [A]ny prehistoric or historic site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places . . . . This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe . . . and that meet the National Register criteria. 36 C.F.R. 800.16(l)(1).

The NHPA does not require an impact analysis until a Federal undertaking has been established, 36 C.F.R. § 800.3, and there have been no federally funded or approved removals of structures or buildings at the Transpark. Since there has been no federal undertaking, funding, or approval for the Transpark, no federal impact analysis was required. However, it is important for the Court to understand that the ITA and appropriate local and State officials have conducted surveys and impact analyses, and, as described below, have been sensitive to potential impacts on the environment, historic properties, and archeological sites throughout the Transpark

construction process. *See generally*, Second Declaration of Nicholas C. Crawford ("2nd Crawford Decl."); Second Declaration of Robin Ziegler ("2nd Ziegler Decl."); Declaration of Allen Heidel ("Heidel Decl."). Most importantly, none of the buildings removed during Phase I were claimed as eligible for listing on the National Register before they were removed. Heidel Decl., ¶¶ 4-6, 11. None were in fact found to be eligible for listing on the National Register by the State Historic Preservation Officer or other officials who examined them. Id.

### a.    Local Action Protected the Prehistoric Cave that Was Discovered.

In January 2005, during local excavations for the storm water management system at the Transpark project, a cave containing prehistoric human remains and ancient drawings was discovered. 2nd Crawford Decl., ¶ 10. Following its discovery, the ITA contacted institutions to document and preserve the cave and its contents. Id. Western Kentucky University's Center for Cave and Karst Studies extensively mapped the cave and a team from the University of Kentucky Program for Archaeological Studies documented prehistoric drawings and human remains. ITA fully cooperated with these institutions and the Office of State Archaeology. Per the recommendations of the University of Kentucky, the cave was sealed in place to protect the remains and the integrity of the ancient drawings. Heidel Decl., ¶¶ 13-21.

In the Amended Complaint, the Plaintiffs assert claims regarding potential impacts to the cave by the operations of the Transpark project and the sufficiency of ITA's stewardship of the cave. Those claims fail as a matter of law because there has been no federal undertaking relative to the cave. Nevertheless, the State and local actions taken were appropriate and no construction has or will take place that could adversely impact the cave. Heidel Decl., ¶¶ 13-21.

**b.     There has been no Federal Involvement in Properties Demolished during Site Preparation and None of the Properties were Historical**.

As a part of site preparation, ITA demolished several structures located within the boundaries of the Transpark project. Plaintiffs have asserted that Federal Defendants should have prevented these pre-construction activities from occurring even though no federal funding was involved. Pls.'Am. Compl., ¶ 46. In <u>Sheridan Kalorama</u>, 49 F.3d at 755-56, the Court held that federal refusal to veto the demolition of a chancery was not a federal undertaking because it did not involve federal funding or direct federal approval. Stated another way, an agency's failure to act, without more, is not an undertaking sufficient to trigger the NHPA process. *See also* <u>National Trust for Historic Preservation</u>, 938 F. Supp 908.

In <u>Edwards v. First Bank of Dundee</u>, 534 F.2d 1242 (7th Cir. 1976), a state bank, in preparation for putting real estate to another local purpose, proposed demolition of structures without the use of federal funds, or assisted in any respect by the federal government. The court held it had no subject matter jurisdiction of a claim against the bank under NEPA or the NHPA. The <u>Edwards</u> decision is strikingly similar to the Transpark where local site preparation proceeded without federal involvement. Under the principles of both the <u>Sheridan Kalorama</u> and the <u>Edwards</u> decisions, Plaintiffs have failed to establish jurisdiction in this case and also have failed to state a claim upon which relief can be granted.

It should be noted, however, that ITA, on its own initiative, has taken the necessary actions to assure that no historic buildings were impacted in the Phase I development. For example, before the Transpark infrastructure work began, ITA received confirmation from the State Historic Preservation Officer, Mr. Morgan David, that no historic properties existed within the area of potential impact of the main access road. Heidel Decl., ¶ 11. None of the buildings removed during site preparation were even claimed to be historic prior to demolition, nor could

20

they have been listed on the Registry. Heidel Decl., ¶¶ 4-6. The Bowling Green and Warren County Historic Preservation Board also surveyed the buildings within the boundaries of the Transpark project in June 2005 and found that none of the remaining structures were eligible for listing on the National Register. 2nd Ziegler Decl., ¶ 2

### c.    No Anticipatory Demolitions of Historic Properties Have Taken Place.

Demolitions completed without federal involvement are also moot issues under section 106 of NHPA. *See* Benavides v. Housing Auth. of San Antonio, 238 F.3d 667, 669-71 (5th Cir. 2001), *reh'g denied*, 2001 U.S. App. LEXIS 6282 (2001) where the court concluded that completed demolition and completed NHPA analysis mooted plaintiffs' case for injunctive relief.

Nevertheless, in the Amended Complaint, Plaintiffs allege that "anticipatory demolition" of allegedly historic buildings has taken place at the Transpark in violation of Section 110(k) of the NHPA. Pls' Am. Compl. at Count II. Section 110(k) requires federal agencies to withhold grants, licenses, approvals or other assistance to applicants who "intentionally significantly adversely" affect historic properties prior to seeking federal assistance in an effort to avoid the section 106 process. 16 U.S.C. § 470h-2(k)(2000).

In order to succeed in their Section 110(k) claim, the Plaintiffs would need to establish (1) that ITA is an "applicant for federal funds"; (2) that historic properties were in fact demolished during Phase 1; and (3) demonstrate that the ITA intentionally and significantly adversely affected historic properties by demolition within the boundaries of the Transpark. Since ITA is not an applicant for federal funds, section 110(k) on its face can not serve as a basis for a claim under NHPA. As demonstrated above, no federal undertaking has occurred at the Transpark project, since no federal approval or funding for construction or site preparation has been sought by ITA. Moreover, Plaintiffs' Amended Complaint does not identify specific

21

demolished properties that were actually listed on the Federal Registry. In fact, no claim had been filed with the ITA asserting that any of the properties identified by the Plaintiff were eligible for listing. Heidel Decl., ¶¶ 4-6. Moreover, the State Historic Preservation Officer and the Historic Preservation Planner for the Bowling Green – Warren County Historic Preservation Board did not identify any structures eligible for listing. Heidel Decl., ¶ 11; 2nd Ziegler Decl., ¶ 2. These determinations make a finding of "intentional" misconduct in this case impossible. Thus, even though there was no federal involvement in Phase 1 of Transpark, ITA has demonstrated a willingness to appropriately address impacts on potential historic properties. For all these reasons, the Plaintiffs' bare allegations that the ITA intentionally and significantly adversely impacted historic resources in order to secure federal financial assistance fails to state a claim upon which relief can be granted.

Indeed, the relief for even a proven violation of Section 110(k) is prospective only. An agency may refuse to issue a license, permit, or provide assistance after a finding of intentional misconduct has been made against an applicant. Even then, the agency may determine, after consultation with the Council, that assistance to the applicant is appropriate despite the violation. 16 U.S.C. § 470h-2. Since ITA is not even an applicant for federal funds, the Court can not grant the relief that the section provides.

### 3.  Historic Properties in the Surrounding Area Are Not Impacted.

Plaintiffs' suggestion that the Transpark may impact listed or eligible properties outside the Transpark fails as a matter of law because there has been no federal undertaking within the Transpark. Moreover, even if we assume that there is a federal undertaking, the claim also fails as a matter of law because such properties are not "adjacent" or "proximate" to the Transpark. For example, Plaintiffs refer to the Mammoth Cave National Park, which they erroneously

22

assert is six miles away[1] from the Transpark, and also allege that the Transpark will impact listed historic properties, or properties eligible for listing, in the Oakland-Freeport Historic District (Pls.' Am. Compl., ¶ 34), some 3 miles away, and in the unlisted Loving/Sunnyside community (Pls.' Am. Compl., ¶ 35), some 1.3 miles distant from the Transpark.  Heidel Decl., ¶¶ 3.  Those communities are not proximate or adjacent to the Transpark under relevant NHPA case law even if it is assumed for sake or argument that the Transpark is a federal undertaking.

NHPA review of federal activities taking place on non-listed properties is triggered only by demonstrating impacts upon "adjacent or proximate" properties that are listed.  For example, in the leading case of Aersten v. Landrieu, 488 F. Supp. 314 (D. Mass. 1980), aff'd, 637 F.2d 12 (1st Cir. 1980) the court reviewed impacts on the South End Historical District of Boston from demolition of seven buildings outside, but adjacent to, the Historical District.  Buildings considered "adjacent" were immediately across the street from the Historic District.  Aersten, 488 F.2d at 317, n.2.  The court nevertheless allowed the demolitions and the HUD funded urban renewal project to continue. See also Mont. Wilderness Ass'n v. Fry, 310 F. Supp. 2d 1127 (D. Mont. 2004) (Indian ceremony ring 54 feet from gas pipeline located on federal land requires NHPA review).

**B.    Plaintiffs Have Failed to State A Claim Under NEPA Because There Has Been No Major Federal Action Taken By the Federal Defendants.**

As previously established, there is no major federal action currently pending regarding the Transpark. Plaintiffs attempt to "federalize" the Transpark through a series erroneous allegations regarding appropriations and utilization of federal funds by entities separate from the

---

[1]    In fact, it is 8 miles away.  Heidel Decl., ¶ 7.

Transpark. Even if those allegations are taken as true, they do not establish jurisdiction.[2]
Intervener Defendants and the Federal Defendants have demonstrated that there has been no
federal funding or involvement in the development of Phase I of the Transpark, which includes
only the local purchase and development of approximately 900 acres of land as a business or
industrial park.

> **1.    The Intervener Defendants Conducted Phase I of the Transpark Development with Local Funds and Without Federal Financing or Involvement; Therefore NEPA's Provisions Are Simply Inapplicable.**

Developments that do not depend on larger federal projects for their justification are said
to have "independent utility." This independent utility factor has been identified by certain
courts, including the D.C. Circuit, as the most significant factor in determining whether an
*admittedly federal* project is properly segmented for NEPA purposes. *See, e.g.*, Coal. of Sensible
Transp. v. Dole, 826 F.2d 60, 69 (D.C. Cir. 1987); Save Barton Creek Ass'n, 950 F.2d at 1139.
Thus, contrary to Plaintiffs' assertions, merely because two *federal* projects may share some
points of contact, be interrelated as part of an overall plan, or even benefit one another does not
render them improperly segmented as separate projects.

In Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1118 (9th
Cir. 2000), *cert. denied*, 534 U.S. 815 (2001), the court upheld a federal determination to not
treat three phases of a large scale mixed use development project as a connected action. It held
that phase I, consisting of a 600-acre development with office space, dwelling units and retail
space, had independent utility even if the latter phases were not, or could not, be constructed.
This case is very similar to the instant challenge to the Transpark Phase I, which includes only
local developments that are independent of prospective phases of development in the area, such
as a possible new regional airport or federal interstate highway. The court in Wetlands Action

---

[2]    See ARGUMENT, Section I, supra, at pp. 8-12.

noted that many of the details of subsequent phases had not yet been completed or had not yet received authorizations to begin development, concluding that the three phases did not have to be considered together as cumulative actions. <u>Wetlands Action</u>, 222 F.3d at 1118-19. This phased approach was permitted under NEPA even though federal approval had already been sought for part of the project. A fortiori, a phased approach is clearly allowable when the federal government is not even involved.

NEPA does not infringe on the right of state and local authorities to select portions of projects to be financed solely with non-federal funds. <u>Scottsdale Mall v. Indiana</u>, 549 F.2d 484, 488 (7th Cir. 1977), *cert. denied*, 434 U.S. 1008 (1978). This Court has held that a state may segment a project into state and federally funded segments, even if the state's explicit purpose is to avoid regulation of the locally funded segment under NEPA. <u>Macht</u>, 715 F. Supp. at 1135. The local segment must have independent utility and meet the other tests for proper segmentation under NEPA.

In the <u>Macht</u> case, this Court held that the State of Maryland could intentionally segment a light rail transportation project into federally funded and non-federally funded segments, even though there was evidence that the State's intention was to insulate the state construction projects from federal environmental law. This Court noted that segmentation was only improper if projects are "pretextually" segmented **and** have no independent use. <u>Id.</u> <u>See also</u> <u>Highway J Citizens Group v. Mineta</u>, 349 F.3d 938, 963 (7th Cir. 2003), *cert. denied*, 541 U.S. 974 (2004). In short, the "segmentation analysis functions to weed out projects which are pretextually segmented, *and* for which there is no independent reason to exist." <u>Highway J</u>, 349 F.3d at 962 (*quoting* <u>Save Barton Creek Ass'n v. FHWA</u>, 950 F.2d 1129 (5th Cir. 1992)).

These <u>Macht</u> principles have even more force and effect in the case of the Transpark, since, in <u>Macht</u>, the federal government was already involved in the very same rail system as the State of Maryland. Here, the ITA has not sought, and has no intention of seeking, federal funds to complete the Transpark. Moreover, ITA is not responsible for highways and airports outside the Transpark, and cannot control other applicants for federal approval or funding for such activities.

Other courts have articulated that the hallmark of improper segmentation is the direct and substantial probability of influencing or predetermining the agency's decision on other projects/segments. <u>E.g.,</u> <u>South Carolina v. O'Leary</u>, 64 F.3d 892, 898-99 (4th Cir. 1995); <u>Md. Conservation Council v. Gilchrist</u>, 808 F.2d 1039, 1042 (4th Cir. 1986).

In the case of the Transpark, locally funded elements of Phase I of the Transpark development meet both the "independent utility" and "predetermination tests" as proper segmentations.  The locally funded Phase I infrastructure developments, including the roads, demolitions, and industrial park construction, will have positive impacts on the economy of Bowling Green and the region, regardless of whether or not a new or expanded airport is built, or other Phase II construction is ever undertaken.  Buchanon 2nd Decl., ¶ 13; Hizer 2nd Decl., ¶ 6 (quoting Kentucky Trimodal Transpark Environmental Evaluation of August 2001, which states that "The business/commerce park development is the key element and primary focus of the project, and it possesses independent utility and function.").  2nd Barnett Decl., ¶¶ 5, 7 ("If a new airport is constructed, it will have utility independent of any income generated by businesses located in the Transpark."); Second Declaration of Glen Ross ("2nd G. Ross Decl."), ¶ 7.

Approval of Phase I of the Project will not in any way "directly or substantially influence" federal agency decision-making on separate or related highway or airport projects in

26

the future.  As stated by the Federal Defendants in their original Motion to Dismiss and Memorandum of Points and Authorities, any prospective Phase II projects will undergo full NEPA and NHPA reviews when and if federal approvals or funding are sought.  Therefore, Phase I development of the Transpark does not foreclose full and open consideration of possible federal funding, permits or approvals needed for elements of Phase II, should Phase II include such elements. See South Carolina v. O'Leary, 64 F.3d at 898-99 (impermissible segmentation of *federal* project elements will be found "only if the component action has a 'direct and substantial probability of influencing [the agency's] decision' on the larger project"); City of West Chicago v. NRC, 701 F.2d 632, 650-52 (7th Cir. 1983).

2.    **Local Completion of Phase I Elements of the Transpark Is Consistent with NEPA.**

a.    **Local Funding of the Highway Within the Transpark Was Proper.**

Plaintiffs' Amended Complaint alleges that the FHWA illegally segmented transportation elements of the Transpark Project into local and federal portions to circumvent NEPA. Pls.' Am. Compl., ¶ 30. Even if federal agency action clearly exists, CEQ regulations, as applied by the federal courts, expressly allow segmentation. 40 C.F.R. Part 1508 ("CEQ regulations").  On the other hand, a federally-funded project is improperly segmented only if the segmented portion has no independent utility, no life of its own, or is simply illogical when viewed in isolation. SPARC, 352 F.3d at 559.  Wetlands Action, 222 F.3d at 1118.

In the context of transportation projects, even a federal project is properly segmented if it (1) connects logical termini; (2) has independent utility or independent significance; and (3) will not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.   SPARC, 352 F.3d at 559 (citing 23 C.F.R. 771.111[f], Federal Highway

Administration NEPA regulations); 40 C.F.R. § 1508.25(a); <u>see also</u> <u>Save Barton Creek Ass'n</u>, 950 F.2d at 1140 (articulating a four part segmentation test under NEPA: logical termini, substantial independent utility, does not foreclose consideration of alternatives, and does not irretrievably commit federal funds for closely related projects).

The FHWA funds referenced in the Amended Complaint consisted, in part, of a $1.75 million grant for the construction of internal roads within the Transpark. Although these funds were allocated by the FHWA, as noted previously, they were never received by or spent by the ITA. 2nd Hizer Decl., ¶¶ 24-26. The ITA declined the funds and has constructed all internal roads inside the Transpark with funds derived from the ITA's $25 million industrial revenue bond issue and funds received from the Kentucky Transportation Cabinet. <u>Id.</u> at 25. Thus, no federal funds have been used to construct roads inside the Transpark. <u>Id.</u> The withdrawal of an application for federal highway funds is allowed if the project has not become irrevocably federal in nature; the bare application, without more, does not render an entire highway project a major federal action within the meaning of NEPA. <u>SW. Williamson Co.</u>, 67 F. Supp. 2d at 875; <i>see also</i> <u>Ely v. Velde</u>, 497 F.2d 252 (state allowed to shift federal block grant funding since prison project was not irrevocably federal).

The FHWA funds appropriated for the improvement of U.S. 31-W and U.S. 68/80 and the construction of a new connector or exchange off I-65, have been addressed in detail, <i>supra</i> at pp. 12-13, and are not part the Transpark. These other elements of state and federal highway development near the Transpark may proceed separately under the FHWA regulations, even if they tangentially benefit the Transpark. <i>See</i> <u>Preserve Endangered Areas of Cobb's History, Inc.</u> <u>v. U.S. Army Corps of Engineers</u>, 87 F.3d 1242, 1247 (11th Cir. 1996).

b.    **The Sewer and Water Project Undertaken By the Warren County Water District was Legally Segmented from the Transpark Project.**

The Amended Complaint states that "EPA's spending authorization bills for fiscal years 2004 and 2005 appropriated a total of $3.75 million for water and sewer infrastructure for the TransPark." Pls.' Am. Compl., ¶ 8. The erroneous nature of this allegation has been addressed in detail previously, *supra*, at pp. 13-14. All of the EPA funds the Plaintiffs refer to are for past or prospective recipients other than the ITA. If funded and built by the grant recipient, those projects will have economic benefits and utility unrelated to the Transpark. Finally, local funding of the water and sewer infrastructure wholly within the Transpark was proper. See Citizens Alert, 259 F. Supp. 2d 9.

## III.    PLAINTIFFS CLAIMS REGARDING PROSPECTIVE FEDERAL FUNDING OR APPROVALS FOR THE TRANSPARK ARE PURELY SPECULATIVE AND NOT RIPE FOR FEDERAL JUDICIAL REVIEW

Plaintiffs' Amended Complaint is replete with references to federal funding and approval decisions that can only take place, if at all, in the future. The Amended Complaint states that ITA anticipates and expects receiving federal funds, Pls' Am. Compl., ¶ 20, 22. Plaintiffs refer to "opportunities" and "options" for FAA and other funding in the future, Pls' Am. Compl., ¶ 16-17; and allege that federal "funding sources will be explored" by ITA, Pls' Am. Compl., ¶ 19. Plaintiffs' claims that are predicated on future funding decisions are not ripe for judicial review because "the existence of the dispute itself hangs on future contingencies that may or may not occur." Texas v. United States, 523 U.S. 296, 300 (1998) (*quoting* Thomas, 473 U.S. at 580-81 (claim not ripe where it rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all").

In the case of <u>Coal. for Underground Expansion</u>, 333 F.3d 193, the court faced sweeping allegations similar to those being raised in the instant case. Plaintiffs opposed a third line segment of a Metro-rail transit in St. Louis that was constructed by using local government funds. Plaintiffs asserted that the Federal Transit Administration's ("FTA") past and current funding of other portions of the system, and its potential future funding of the third line segment by matching grants, made the third line segment a federal undertaking. The court disagreed that the action federalized the local portion of the project.

The Supreme Court in <u>Abbott Laboratories v. Gardner</u>, explained that the "basic rationale" of the ripeness doctrine as applied to review of administrative action: "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." 387 U.S. 136, 148-49 (1967); *see also* <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 732-33 (1998). The prospective grantees for FAA, FHWA, HUD and EPA funds have not completed the necessary application processes. Despite this fact, Plaintiffs seek to involve the Court in speculation and ask for judicial intervention prior to the issuance of final agency decisions. Furthermore, Plaintiffs' current suit contemplates both that the grant applications will be submitted for the appropriated funds and that the Federal Defendants will approve the applications without performing appropriate environmental review. It is just such speculation about the future that the ripeness doctrine is intended to nip in the bud.

The best example of Plaintiffs unripe claims is the Amended Complaints' allegation respecting a possible FAA funding of a new airport. Initial plans for the Transpark were more ambitious than the development currently under construction and currently envisioned. The

development of a new regional airport is no longer part of the Transpark. 2nd Barnett Decl., ¶¶ 2-3; 2nd Buchanon Decl., ¶ 13; 2nd Hizer Decl., ¶ 6. Responsibility for determining whether a new airport will be constructed, when it will be constructed, and where it will be constructed, is now in the hands of the Bowling Green – Warren County Airport Board, an agency of the City and the County separate from the ITA. Id. Most importantly, however, even the Plaintiffs recognize that any final FAA decision regarding such an airport will be made in the future. FAA was not even named as a defendant. Therefore, allegations about the airport can not serve as a basis for jurisdiction in this case and fail to state a claim upon which relief can be granted.

IV.    **COMPLETED CONSTRUCTION AND OTHER WORK DURING PHASE I OF THE TRANSPARK RENDER ANY ISSUES UNDER NEPA AND NHPA MOOT WITH RESPECT TO THOSE ACTIVITIES**

On August 12, 2004, the TVA awarded a $500,000 economic development grant to an occupant of the Transpark, Metalforming, a privately held company, for the purchase of equipment. Prior to awarding this grant, TVA conducted a preliminary NHPA review and determined that Metalforming fell under a categorical exclusion (as having no impact on historical resources). In September 2004, TVA disbursed all the funds it agreed to pay to Metalforming. ITA had no role in the construction of the Metalforming facility and did not request any of the funds that Metalforming received from TVA. 2nd Hizer Decl., ¶ 21.

The Amended Complaint makes further attempts to establish federal involvement in the Transpark through its assertion that the grant to Metalforming was impermissibly exempted from NHPA. Pls.' Am. Compl., ¶ 10. Under the NHPA Regulations, federal agencies are permitted to find categorical exclusions "if the undertaking is a type of activity that does not have the potential to cause effects on historic properties, assuming such historic properties were present, the agency . . . has no further obligations under Section 106." In this case, the grant was for equipment, and there were no historical properties present, or immediately adjacent to the

31

Metalforming construction site. The courts defer to agency decision-making under the NHPA Regulations unless the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Presidio Golf Club v. National Park Serv., 155 F.3d 1153 (9th Cir. 1998). Given the standard of review and TVA's adherence to the NHPA regulations, Plaintiffs fail to state a claim upon which relief can be granted under NHPA. The facts pled do not establish that TVA engaged in illegal activity or abused its discretion in issuing a categorical exclusion.

Moreover, the challenge is moot, since final disbursement of federal funds to Metalforming has been completed. No claim under NEPA or the NHPA can ordinarily be made when the proposed action has been completed. Such claims are moot. See, e.g., One Thousand Friends of Iowa, 364 F.3d 890, 893 (8th Cir. 2004); Bayou Liberty Assoc., Inc., 217 F.3d 393 (5th Cir. 2000) (completion of construction project mooted NEPA claim); Knaust v. City of Kingston, 157 F.3d 86, 88 (2d Cir. 1998), cert. denied, 526 U.S. 1131 (1999) ("[Defendant's] construction was finished in July 1997, the final disbursement of the federal funds was made in September of that year, and there are no pending applications for additional federal financing. Because this [NEPA] appeal thus seeks to enjoin the future occurrence of events that are already in the past, we lack appellate jurisdiction."); Neighborhood Transp. Network, Inc., 42 F.3d at 1172 (8th Cir. 1994) (holding that an order enjoining defendants from further construction on a project for alleged violation of NEPA would serve no purpose and afford plaintiffs no relief where construction was complete).

While there was no funding provided to the ITA in the first instance, an injunction against the actual recipient, Metalforming, is a moot issue since the funding action has been

completed and the equipment purchased. Whatever federal obligations TVA had under NEPA and the NHPA have been discharged regarding the award for the equipment.

Similarly, any local demolition work or highway construction that has been completed is no longer subject to challenge under NEPA or the NHPA. *See* <u>Benavides v. Housing Authority of San Antonio</u>, 238 F.3d at 669-71 where the Fifth Circuit concluded that completed demolition and completed NHPA analysis mooted plaintiffs case for injunctive relief.

## CONCLUSION

Plaintiffs' Amended Complaint fails to identify any final federal action (because there has been none) approving the award of federal funds to ITA or the Transpark, or issuing a federal permit or license required for activities within the Transpark. Notwithstanding Plaintiffs' further allegation that the Transpark project developers are engaging in activities that amount to anticipatory demolition of historic properties, the Amended Complaint fails to identify the requisite federal funding decision or approval to establish federal jurisdiction or to state a claim upon which relief can be granted. The single instance of a federal award of funds for equipment to an occupant of the Transpark does not constitute a major federal action significantly affecting the environment. But even if it did, that action has been completed and is now moot. Allegations about prospective federal funding and approval for elements of the Transpark from FAA, FHWA, or EPA are mere speculation and unripe for judicial review.

For all the reasons stated above, the Court should grant the Intervener Defendants' Motion to Dismiss the Amended Complaint with prejudice.

Respectfully submitted,


ATTORNEYS FOR INTERVENER
DEFENDANTS

Charles E. English
Whayne C. Priest, Jr.
ENGLISH, LUCAS, PRIEST & OWSLEY, LLP
1101 College Street; P.O. Box 770
Bowling Green, KY 42102-0770
Telephone: (270) 781-6500
Facsimile: (270) 782-7782
E-mail:  charles@elpolaw.com
E-mail:  whayne@elpolaw.com

and

LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Avenue, NW
Washington, DC  20009
Telephone:  (202) 986-8000
Facsimile:  (202) 986-8102


GEORGE ELLARD
D.C. Bar No. 386084
D. RANDALL BENN
ROBERT M. ANDERSEN