**SECOND DECLARATION OF**
**MICHAEL O. BUCHANON**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC. et al. | ) ) ) | |
| Plaintiffs, | ) ) ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY et al. | ) ) ) ) | |
| Defendants, | ) ) | No. 1:05-CV-01190-RMU |
| | ) | Judge Ricardo M. Urbina |
| INTER-MODAL TRANSPORTATION AUTHORITY, INC; FISCAL COURT OF WARREN COUNTY, KENTUCKY; and BOARD OF COMMISSIONERS OF CITY OF BOWLING GREEN, KENTUCKY | ) ) ) ) ) ) | |
| Intervener Defendants | ) ) | |

**SECOND DECLARATION OF MICHAEL O. BUCHANON**

I, Michael O Buchanon, make the following declaration based on personal knowledge, information and belief:

1. I am the duly elected Judge-Executive of Warren County, Kentucky (the "County"), the Chief Executive Officer of the County. I was first elected by the people of Warren County in 1993, and I have served as Judge-Executive since that time. Warren County is a political subdivision of the Commonwealth of Kentucky.

2. The City of Bowling Green (the "City") is the county seat of Warren County, the largest incorporated city within the County, and with roughly 50,000 residents, contains slightly

over half of the population of the entire County. Bowling Green is the fourth largest city in the State of Kentucky and is the economic hub of South-Central Kentucky.

3. In 1998 the County received six million dollars from a legislative appropriation by the Kentucky General Assembly in its 1998 legislative session as a grant to be used in planning, designing and developing what is now the Kentucky Tri-Modal Transpark (the "Transpark"). The County formed the Inter-Modal Transportation Authority, Inc. (the "ITA") to act as its agent and instrumentality in planning, acquiring and developing the Transpark. Warren County later borrowed additional bridge funding to begin land acquisition, and later authorized the ITA to issue $25 million in bonds to finance additional land acquisition totaling approximately 900 acres and install infrastructure (roads, sewers, water lines, etc.) in the Transpark. No funds from any agency of the United States Government have been used by the ITA in the acquisition or development of these 900 acres, which comprise Phase I of the Transpark, and the ITA is not dependent on Federal funds to complete development of Phase I of the Transpark.. ITA, itself, has no present intention to apply for funding from any agency of the United States Government in connection with the future development of the Transpark.

4. The County has entered into agreements with neighboring counties and cities for financing and marketing purposes. These neighboring communities are smaller in population than the County, and many do not have the financial capacity to employ their own economic development staff. Twenty-five Board members were appointed to the ITA Board of Directors by the County, consisting of regional business people, educators, individuals from the economic development community and elected Judge/Executives and Mayors from all of the counties and cities who have agreed to support the Transpark. The importance of the Transpark to the entire South-Central Kentucky region is evidenced by the fact that these neighboring counties and

cities have, collectively, agreed to reimburse the County for approximately 35% of any funds required to repay the bonds issued by the ITA in the event the ITA is unable to generate sufficient income to repay the bonds.

5. At the outset of the Transpark project, professional consultants were hired to study the feasibility of the project and to conduct cost/benefit studies, environmental studies, and site selection studies. These studies considered several large areas, mostly within the County, but some areas crossing over into adjoining counties were also investigated. These large study areas were examined and analyzed thoroughly, from every aspect, before selecting the site that the Transpark now occupies.

6. If the plaintiffs are successful in obtaining the sweeping injunction they seek, the result will be devastating to the continued development of the Transpark and will result in economic harm to the City, to the County, to the nearly 100,000 residents of Warren County, and to the more than 130,000 residents of the cities and counties which have entered into agreements to support the Transpark, for the following reasons.

7. The $25,000,000 in bonds issued by the ITA is amortized over 30 years. The revenues to repay the bonds are to be derived from industrial land sales, payroll deductions from those employed in the Transpark as part of a development district, and incremental ad valorem taxes. Thus, the production of the revenues necessary to repay the bonds depends on the ITA being able to successfully market its land to businesses and industries that will locate business and industrial facilities in the Transpark.

8. Our community and the Transpark stand to lose credibility in the international marketplace altogether if the ITA is forced to delay development of the Transpark.

9. Any delay in the development of the Transpark will cause economic harm to our collective community, damage the financial strength of the County and the City, and might cause neighboring counties and cities, who have agreed to provide financial support for the Transpark in the event it is needed, to withdraw from the regional partnership relationship that many have worked so hard to build.

10. Through a lease agreement between the ITA and the County, the County has guaranteed the repayment of the $25 million in bonds issued by the ITA if there is a shortfall in revenue from anticipated sources.[1] Should the injunction the plaintiffs seek be granted, the County might be required to reallocate money from its general fund to repay the bonds. Such a reallocation of funds would force the County to curtail normal funding for social programs within the County that benefit many underprivileged or underserved individuals. Funding for agencies that benefit local citizens may have to be eliminated. Initiatives that have been put in place for storm water planning, recycling, solid waste removal, illegal dump cleanups, and parks and recreation facilities and programs could be seriously curtailed if the plaintiffs are successful in obtaining the injunction they request.

11. Construction of the infrastructure of the Transpark is nearly complete, with paved streets, storm water sewers, earthmoving, and excavation nearly finished. The remaining work, which includes the installation of state-of-the-art storm water filtration and treatment systems, as well as seeding and planting trees and vegetation, are among the more important elements of the infrastructure necessary for environmental protection and erosion control. Any delays in

---

[1] As stated above, neighboring cities and counties have collectively agreed to pay the County approximately 35% of any shortfalls. In addition, the City has agreed to reimburse the County for ½ of the remaining 65% of any such shortfalls, resulting in remaining liability on the part of the County in the amount of approximately 32 ½ % of any shortfalls

4

completing these elements of the infrastructure would damage the very environmental interests the plaintiffs allege they desire to protect.

12. The initial plans for the Transpark were ambitious, including the development of a new regional airport to serve, not only the Transpark, but the entire region, and including the development of additional land for business and industrial use. As the project has developed, its scope has diminished. For example, as is established by other declarations to be filed in this action, the Transpark project no longer includes an airport.

13. The 900 acres of land currently under development as Phase I of the Transpark has independent utility whether or not any additional development is undertaken. Full development of the 900 acres of land which currently comprises the Transpark will generate many economic benefits for the citizens of South-Central Kentucky whether or not any further development of the Transpark occurs. Phase I of the Transpark, which is the only portion currently under development, does not depend for its success on any other development of additional land. The complete development of the currently owned acreage will yield revenues sufficient to repay the bonds that have been sold to date. It is clear that the plaintiffs seek to jeopardize the entire project.

14. The Plaintiffs and others opposed to development of the Transpark have made numerous unsuccessful efforts in the past to stop or delay development of the Transpark. The State Local Debt Officer's initial approval of the $25 million bond issue to finance Phase I of the Transpark was appealed to the Kentucky Department of Local Government allegedly based on environmental concerns; the State Local Debt Officer's decision approving the bond issue was affirmed by the Kentucky Department of Local Government. The Kentucky Department of Local Government's decision affirming the State Local Debt Officer's approval of the bond issue

was appealed to the Franklin Circuit Court, a court of general jurisdiction, which again affirmed the approval of the bond issue. The Franklin Circuit Court's decision was appealed to the Kentucky Court of Appeals, Kentucky's intermediate appellate court, which again affirmed the approval of the bond issue. No further appeal was taken and the decision of the Kentucky Court of Appeals became final.

15. In addition to opposing the funding for Phase I of the Transpark, the plaintiffs and others have unsuccessfully opposed efforts to re-zone the land within the Transpark allegedly based on environmental and historical concerns. Four separate judicial appeals have been filed which seek to reverse the rezoning of 747 acres of the Transpark from Agriculture to Light or Heavy Industry. The following is a summary of the present status of each of these four rezoning appeals:

 a. The first rezoning appeal involving 153 acres was commenced by the City of Oakland, Kentucky and two of its residents, including Gayle Cissell, one of the plaintiffs in this case. Another of the plaintiffs in this case, Warren County Citizens for Managed Growth ("WCCMG"), filed a belated motion to intervene in the appeal. The Kentucky Court of Appeals rendered a unanimous decision, which affirmed the Warren Circuit Court's decision sustaining the rezoning and denying WCCMG's motion to intervene. The Court of Appeals has also entered an order on December 22, 2004 denying a petition for rehearing. This appeal is now pending upon a motion for discretionary review filed with the Kentucky Supreme Court on 21 January 2005.

 b. The second rezoning appeal involving 236 acres was commenced by WCCMG, Gayla Cissell and Jim Duffer, all plaintiffs in this case. The Warren Circuit Court

6

entered an order affirming the rezoning on July 7, 2004 and overruled a motion to vacate, alter or amend that order on October 1, 2004. On October 28, 2004, an appeal was taken to the Kentucky Court of Appeals where the matter is now in the briefing process.

c. The third rezoning appeal involving 330 acres was commenced by WCCMG, Gayla Cissell and Jim Duffer. The zone change was affirmed by the Warren Circuit Court by its final judgment entered on January 7, 2005. On February 7, 2005, an appeal was taken to the Kentucky Court of Appeals. The appeal is in the process of being briefed.

d. The fourth rezoning appeal involving 28 acres was commenced by WCCMG, Gayla Cissell and Jim Duffer. The Warren Circuit Court has entered a scheduling order which required the parties to file briefs setting forth their position. These briefs have now been filed and the case is under submission to the Warren Circuit Court, which may set an oral argument.

Each of these past court actions that the plaintiffs have pursued against the Transpark, although without merit, have resulted in extraordinary costs to the Transpark and to the County. They have cost a great deal of money and set our marketing efforts back considerably. In view of the fact that the Transpark is in the final stage of construction, and the ITA is in the final stages of closing arrangements with prospective occupants of the Transpark, the effect of an injunction on the Transpark could be devastating.

16. In numerical paragraph 32 of the Amended Complaint for Declaratory and Injunctive Relief filed July 29, 2005 the allegation is made that

> … funding for a substantial portion of the demolition and construction that has occurred has come from local government loans or bonds or other local

government obligations for which the local government entities intend to seek reimbursement from the Defendants or other federal agencies, after the work has been completed and after there has been an irreplaceable commitment of resources, but without the protections and processes required by NEPA and NHPA.

This statement is patently false and without any factual basis whatsoever. The only local government entity that has provided funds for the demolition and construction in the Transpark is the County. Speaking as the chief executive officer of the County, I can categorically state that the County has no intention of seeking reimbursement from any agency of the United States Government for the cost of constructing the Transpark.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22 day of August, 2005.

Michael O. Buchanon

8