# DECLARATION OF
# ALLEN HEIDEL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC. et al.<br><br>Plaintiffs,<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY et al.<br><br>Defendants,<br><br>INTER-MODAL TRANSPORTATION AUTHORITY, INC; FISCAL COURT OF WARREN COUNTY, KENTUCKY; and BOARD OF COMMISSIONERS OF CITY OF BOWLING GREEN, KENTUCKY<br><br>Intervener Defendants | No. 1:05-CV-01190-RMU<br><br>Judge Ricardo M. Urbina |

## DECLARATION OF ALLEN HEIDEL

I, Allen Heidel, make the following declaration based on personal knowledge, information and belief:

1. I am the Operations Manager for the Inter-Modal Transportation Authority, Inc. ("ITA") and have held that position since December 22, 2003. It is my responsibility to oversee the construction of the Kentucky Trimodal Transpark (the "Transpark"), which is the subject of the above-styled litigation.

2. All of the documents mentioned in this declaration are business records maintained by ITA in the ordinary course of its business.

3. The Oakland-Freeport Historic District, mentioned in numerical paragraph 34 of the Amended Complaint For Declaratory and Injunctive Relief filed July 29, 2005 in the above-

styled case (the "Amended Complaint") is located approximately 15,600 feet, or 2.9 miles, from Phase I of the Transpark as measured in a direct straight line between the nearest points according to a scale map produced for the ITA by DDS Engineering. The Loving/Sunnyside community mentioned in numerical paragraph 35 of the Amended Complaint is located approximately 7,800 feet, or 1.5 miles, from Phase I of the Transpark as measured in a direct straight line between the nearest points according to a scale aerial view map dated October of 2003 prepared by QK 4, an engineering consulting firm that has provided services to the ITA in the past.

4. Attached hereto as Composite Exhibit 1 are photographs of the house and two barns located at 206 Hayes Martin Road which are referenced in numerical paragraph 35 of the Amended Complaint. The photographs attached as Composite Exhibit 1 accurately depict the buildings appearing in them as of the time the photographs were taken. To the best of my information, knowledge and belief none of the buildings located at 206 Hayes Martin Road have any historical or architectural significance and at the time the buildings were demolished, and at the time the buildings were demolished the ITA had not been notified of any claim that the buildings had any historical or architectural significance. The two barns located on the property were not demolished by the ITA, but were demolished by Bowling Green Metalforming LLC's contractor. The buildings located at 206 Hayes Martin Road do not differ significantly from thousands of farm houses and barns that dot the landscape of South-Central Kentucky and that are routinely demolished for various reasons.

5. Attached hereto as Composite Exhibit 2 are photographs of the buildings located at 809 Glasgow Road which are referenced in numerical paragraph 35 of the Amended Complaint. The photographs attached as Composite Exhibit 2 accurately depict the buildings

appearing in them as of the time the photographs were taken. To the best of my information, knowledge and belief, these buildings have no historical or architectural significance and at the time the buildings were demolished, the ITA had not been notified of any claim that the buildings had any historical or architectural significance. The buildings located at 809 Glasgow Road do not differ significantly from thousands of farm houses, out buildings and barns that dot the landscape of South-Central Kentucky and that are routinely demolished for various reasons.

6. Attached hereto as Composite Exhibit 3 are photographs of the buildings located at 1075 Glasgow Road which are referenced in numerical paragraph 35 of the Amended Complaint. The photographs Attached hereto as Composite Exhibit 3 accurately depict the buildings appearing in them as of the time the photographs were taken. To the best of my information, knowledge and belief these buildings have no historical or architectural significance and at the time the buildings were demolished, the ITA had not been notified of any claim that the buildings had any historical or architectural significance. The buildings located at 1075 Glasgow Road do not differ significantly from thousands of farm houses, out buildings and barns that dot the landscape of South-Central Kentucky and that are routinely demolished for various reasons.

7. A document dated August, 2001 entitled "Kentucky Trimodal Transpark Environmental Evaluation" prepared by Wilbur Smith Associates; Palmer Engineering, Inc.; Commonwealth Technology; Third Rock Consultants, LLC; Law Gibb Group; and Logsdon & Logsdon Architects found the Transpark would not adversely affect Mammoth Cave National Park, stating at p. 43:

> Mammoth Cave National Park is a 52,830-acre national park, World Heritage Site and Biosphere Reserve. *** No land will be used from the Park. In addition, since the Park is outside of the Graham Springs Basin, into which the Yellow Study Area drains, no impacts from the KTT would be anticipated for endangered

3

<u>species, biotic communities, wetlands, and water quality within the Park</u>. No indirect impacts as a result of KTT construction and operation are anticipated at this time due to the physical distance (8 miles) and the anticipated uses of the KTT site (non-polluting). KTT destined highway and rail traffic will not have to pass through our utilize Park roads. Large trucks are prohibited within the Park boundaries. [Emphasis added].

8. Before any construction of Phase I of the Transpark began, Dr. Nicholas C. Crawford, a Professor of Geology at Western Kentucky University and Director of the Center for Cave and Karst Studies ("CCKS"), investigated the Transpark site at ITA's request to determine whether construction of the Transpark would have any adverse effect on the ground water of Mammoth Cave National Park. In a document entitled "Site Evaluation and Design Assistance for the Proposed Kentucky Trimodal Transpark" dated February 28, 2003 Dr. Crawford concludes:

> Based upon the extensive research performed by several of the world's most recognized karst scientists, this investigation concludes that groundwater does not flow from the Transpark site into Turnhole Spring and Mammoth Cave National Park. Furthermore, the risk of a rain event or flood event ever happening that could produce flow reversal from the Transpark site over the divide and into Mammoth Cave National Park is negligible. Although there may be other risks to Mammoth Cave National Park, such as air pollution or noise which will need to be addressed by those qualified in those areas, <u>this investigation indicates that there is not a significant risk of groundwater contamination to MCNP from the Transpark site</u>. [Emphasis added].

9. The first construction to take place in the Transpark by the ITA was the construction of the main access road. Construction of the main access road was commenced on June 14, 2004 according to the Engineer's Project Representative Daily Report of that date generated by the engineering firm overseeing construction of the infrastructure of the Transpark.

10. Additional studies conducted at the request of the ITA before the beginning of construction confirmed that no archaeological sites existed in the area of the main access road. A document entitled "A Phase I Archaeological Survey for the Industrial Park Access Road,

4

Warren County, Kentucky" dated April, 2004 prepared by the University of Kentucky Program for Archaeological Research, Department of Anthropology, states that its purpose was to "identify any archaeological resources within the project area and assess their **potential** eligibility for nomination to the National Register of Historic Places." [Emphasis in original]. The Project area was described as an access road 4,700 feet long and 100 feet wide, which now constitutes the main access road to the Transpark. The investigators concluded:

> During the Phase I survey, <u>no new archaeological sites were identified</u>, however one isolated find was identified during pedestrian reconnaissance. This location did not receive an archaeological site number after consultation with the OSA, and is considered not eligible for nomination to the NRHP under Criteria A-D. Thus, no further archaeological work is recommended for the project area." [Emphasis added].

11.     Before construction began, ITA received confirmation from the State Historic Preservation Officer, Mr. David Morgan, that no historic properties existed within the area of potential impact of the main access road. In a letter dated June 2, 2004 to Jim Vance, then President of the ITA, Mr. Morgan, based on a review of the study by the University of Kentucky Program for Archaeological Research described above in paragraph 10, agreed that "... there are No Historic Properties Present within the undertaking's area of potential impact" and states, "Therefore, we have no further comments and the Agency Official's responsibility to consult with the Kentucky State Historic Preservation Officer under the Section 106 review process is fulfilled."

12.     Before beginning construction on Phase I of the Transpark, ITA retained CCKS to evaluate the area of the main access road to ensure that there were no caves, voids or other karst features of concern were present in the area of roadwork construction. CCKS evaluated the area using a technology referred to as microgravity. CCKS's evaluation failed to disclose the presence of any caves in the area.

13. On December 27, 2004 the crew excavating an area in which to place one of the components of a state-of-the-art groundwater treatment system penetrated the roof of a cave.

14. The cave in question is near the intersection of U.S. 31-W and the main access road to the Transpark, Commonwealth Drive, and is approximately 100 feet from U.S. 31-W. Previous microgravity studies conducted by CCKS had not disclosed the existence of the cave. After the cave was discovered, I discussed the previous microgravity studies with a representative of CCKS and confirmed that the previous studies had not disclosed the existence of the cave.

15. As soon as I was made aware of the cave, all work was stopped in the area of the cave. On December 28, 2004 I contacted QORE, ITA's geological consulting firm, to investigate the cave. I requested that a geological team from CCKS map the cave. I also contacted Mr. Pat Trader, Acting Director of the University of Kentucky Program for Archaeological Research, and requested that an archaeological exploration of the cave be performed.

16. A team of archaeologists from the University of Kentucky Program for Archaeological Research investigated the cave. The archaeology team's initial investigation of the cave revealed no archaeological findings, as indicated in a letter to me dated January 7, 2005 from Mr. Trader. During the subsequent process of mapping the cave, however, CCKS personnel discovered what appeared to be human remains. I once again contacted the University of Kentucky Program for Archaeological Research, which conducted another examination of the cave. During this second examination of the cave human remains and petroglyphs were found according to a letter dated January 27, 2005 I received from Mr. Trader. The remains were identified as probably those of prehistoric Native Americans and Mr. Trader recommended that

archaeologists from the University of Kentucky be allowed to photographically document the human remains, petroglyphs and other artifacts found in the cave and that samples of charcoal concentrations found in association with the human remains be taken for radiocarbon dating. The archaeologists were allowed to perform these tasks. Mr. Trader's January 27, 2005 letter recommended that the human skeletal remains be left in place and avoided. After the artifacts in the cave were documented by archaeologists from the University of Kentucky, Dr. George Crothers of the Kentucky Office of State Archaeology, who is a faculty member and archaeologist at the University of Kentucky, recommended that the human remains and other artifacts found in the cave be left in place and protected from vandals or others who might enter the cave and disturb them.

17.  CCKS staked the location of the cave on the surface and DDS Engineering, an engineering firm that has provided services to ITA, surveyed the staked boundaries of the cave to determine whether the cave would lie beneath the new KCTCS training facility that is to be built near where the cave was discovered. DDS's study revealed that the cave does not lie underneath the footprint of the KCTCS facility.

18.  During my conversations with Dr. Crothers he recommended that the coroner be contacted since human remains were found. The Deputy Coroner, whose grandmother happens to be a Native American, was contacted. The Warren County Judge/Executive, Mike Buchanon, whose great, great grandmother was a Native American, was also involved in the discussions regarding what actions should be taken in order to afford due care and respect for the Native American remains found in the cave.

19.  The Deputy Coroner suggested that a ritual should be performed consisting of saying a prayer and sprinkling tobacco on the remains before sealing the cave. I performed this

ritual with respect to the remains near the entrance to the cave and one of the archaeologists from the University of Kentucky performed the ritual with respect to the remains that were found approximately 2,000 feet from the entrance.

20. When the matter became public knowledge, two Native Americans sent an e-mail to the ITA web site expressing concern for the treatment of the Native American remains and they were invited to visit the site. I related to them everything that had taken place with respect to the Native American remains found in the cave. The Native Americans visited the site and were particularly pleased that the rituals had been performed before closing the entrance; they were satisfied with what had taken place when they concluded their visit. I have received no further communication from any representative of the Native American community expressing any concern about the treatment of the Native American remains located in the cave.

21. Soon after the cave was discovered, QORE suggested that the cave should be examined by Third Rock Consultants, an environmental analysis and restoration firm that provided an endangered species survey in connection with an assessment performed for the ITA in 2001. Third Rock Consultants investigated the cave and found no endangered species. In a report dated January 12, 2005 Third Rock Consultants concludes:

> <u>None of the organisms observed or captured is either state or federally listed or a federal candidate species.</u> There are several cave species known from Warren County and the nearby Mammoth Cave system, however, that are state or federally listed or candidates for federal listing. There was no sign that bats of any species were or had used the cave in the immediate past. Since the cave is at the highest level in the Graham Springs system, it has no flowing water and thus would not contain the Kentucky cave shrimp (Palaemonias ganteri). [Emphasis added].

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23 day of August, 2005.

*Allen Heidel*
Allen Heidel



Front View of Residence (Building 1) looking East from Hays-Martin Road

Date taken: 9/27/01

Taken by: Leigh Ann Groves



Rear View of Residence looking Southeast

Date taken: 9/27/01

Taken by: Leigh Ann Groves



Additional Rear View of Residence looking East

Date taken: 9/27/01

Taken by: Leigh Ann Groves

Exhibit 1, Page 1



View of Land and Barn (Building 3) looking North

Date taken: 9/27/01

Taken by: Leigh Ann Groves



View of Barn (Building 2) looking North

Date taken: 9/27/01

Taken by: Leigh Ann Groves



View of Frontage along Hays-Martin Road looking South

Date taken: 9/27/01

Taken by: Leigh Ann Groves

**Exhibit 1, Page 2**



VIEW OF BUILDING NO. 1, SINGLE FAMILY RESIDENCE, LOOKING SOUTH.



VIEW OF GRAVEL DRIVEWAY AND RESIDENCE, LOOKING SOUTH



VIEW OF PROPERTY'S U.S. 68/KY. 80 FRONTAGE, LOOKING WEST.

Exhibit 2, Page 1



VIEW OF BUILDING NO. 3, GARAGE/WITH ATT. SHED, LOOKING SOUTH



VIEW OF REAR OF RESIDENCE AND BUILDING NO. 2, GARAGE/SHOP, LOOKING NORTHWEST



Front View of Residence looking Southwest
Date taken: 7/31/01
Taken by: Leigh Ann Groves



Front view of Residence looking Southeast
Date taken: 7/31/01
Taken by: Leigh Ann Groves



Rear view of Residence looking Northwest
Date taken: 7/31/01
Taken by: Leigh Ann Groves

Exhibit 3, Page 1



Rear view of Residence and Patio looking Northeast
Date taken: 7/31/01
Taken by: Leigh Ann Groves



Front view of Detached Garage looking West
Date taken: 7/31/01
Taken by: Leigh Ann Groves



Rear view of Garage looking Northeast
Date taken: 7/31/01
Taken by: Leigh Ann Groves

Exhibit 3, Page 2



View of Chicken House looking Southwest

Date taken: 7/31/01

Taken by: Leigh Ann Groves



View of Rear Yard looking Southwest

Date taken: 7/31/01

Taken by: Leigh Ann Groves



Street scene looking West along Glasgow Road

Date taken: 7/31/01

Taken by: Leigh Ann Groves

Exhibit 3, Page 3