UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION          )
AND PROTECTION, INC.,                   )
WARREN COUNTY CITIZENS FOR              )
MANAGED GROWTH, GAYLA CISSELL,          )
JIM DUFFER and ROGER BRUCKER            )
                                        )
Plaintiffs                              )
                                        ) No.1:05-cv-01190-RMU
                                        )
v.                                      )
                                        )
U.S. ENVIRONMENTAL PROTECTION           )
AGENCY,                                 )
U.S. HOUSING AND URBAN DEVELOPMENT,     )
and                                     )
TENNESSEE VALLEY AUTHORITY              )
                                        )
Defendants                              )
                                        )
INTER-MODAL TRANSPORTATION              )
AUTHORITY, INC. et al.                  )
                                        )
Intervening Defendants                  )

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF RESPONSE TO
DEFENDANTS' AND INTERVENING DEFENDANTS'
MOTIONS TO DISMISS**

Plaintiffs, Karst Environmental Education and Protection, Inc. ("KarstEEP"), Warren County Citizens for Managed Growth, Gayla Cissell, Jim Duffer and Roger Brucker, file the following MEMORANDUM OF POINTS AND AUTHORITIES ("Memorandum") in support of their Response to the Motion to Dismiss filed by the Defendants United States Environmental Protection Agency ("EPA") and the United States Department of Housing and Urban Development ("HUD"), referred to hereafter as "EPA/HUD Motion" and by the Defendant Tennessee Valley Authority ("TVA"), referred to hereafter as "TVA Motion." EPA, HUD, and TVA are also referred to herein as "Defendant Federal Agencies." This Memorandum is

also filed in support of Plaintiffs' Response to the Motion to Dismiss filed by the Intervening Defendants, Inter-Modal Transportation Authority, Inc. ("ITA"), Fiscal Court of Warren County, Kentucky ("Warren County") and the Board of Commissioners of the City of Bowling Green, Kentucky ("Bowling Green"), referred to hereafter as "ITA Motion."

## INTRODUCTION

The Kentucky Trimodal Transpark ("Transpark") is under construction.[1] Construction has already impacted a 2,000-foot long cave containing the skeletal remains of two prehistoric Native Americers (dated as early as 3,000-1,000 B.C.) and petroglyphs, encountered when Intervener ITA's construction contractor's equipment punched into the cave on Dec. 27, 2004. This occurred three years after the Smithsonian Institution forewarned Intervener ITA of the likelihood of significant prehistoric sites within the Transpark and the need to assemble a well qualified research team to identify "often elusive karst and cave cultural deposits in the region," which professional advice Intervener ITA disregarded.[2]

Sinkholes, which are other potential archaeological sites, have been filled at the Transpark's Bowling Green Metalforming, LLC site. Bowling Green Metalforming is a manufacturer of frames for sports utility vehicles; this industry creates a water quality pollution risk

---

[1] See photos in Exhibit 1 to Plaintiffs' Brief in Support of Motion for Preliminary Injunction.("Plaintiffs' P.I. Brief")

[2] Plaintiffs' P.I. Brief, Exhibit 6. Declaration of Lena Sweeten, para. 3 ("Sweeten Declaration"), Exhibit 1 to this Memorandum.  The impacted cave was supposedly sealed on an unspecified date after a "ritual...consisting of saying a prayer and sprinkling tobacco" performed by Intervener ITA's Operations Manager at the recommendation of the Warren County Deputy Coroner whose "grandmother happens to be Native American" and Warren County (Intervener) Judge-Executive "whose great, great grandmother was a Native American..." Heidel Declaration, para. 18.-19.  Mr. Heidel does not claim Native American ancestry himself.  According to Sweeten, the legal adequacy of this "ritual" is questionable. Sweeten Declaration, para. 3.

because of the chemicals involved in the processes[3].    Farmhouses and barns were demolished for this construction. The Kentucky State Historic Preservation Officer ("KY SHPO") is not aware of any prior consultation that was initiated by TVA with his office under Section 106 of the National Historic Preservation Act ("NHPA") before the sinkhole filling and demolition.[4]   Aerial photos have shown impacts to water quality during construction.[5]    The rural landscape has been altered by the Transpark water tower.[6]   Prime farmland under the federal Farmland Policy Protection Act has been converted to Transpark roads, the TVA-funded Bowling Green Metalforming plant, and the Technical Training Center.

This is a live, on-the-ground project with a substantial history, not an abstract or inchoate disagreement.    The Transpark has been highly controversial nationally, statewide, and locally since it was proposed in 1998.[7]   One of the primary reasons for the national scientific attention to the project relates to the potential for the Transpark, located on a vast karst and sinkhole plain in north Warren County, to contaminate groundwater and harm endangered and threatened species at Mammoth Cave National Park (also a United Nations-designated World Heritage Site and International Biosphere Reserve)[8] and in the

---

[3] See Declaration of Dr. Michael T. May, Exhibit 3, Section 2.
[4] Declaration of David L. Morgan, Exhibit 2 to this Memorandum ("KY SHPO Declaration.")
[5] Declarations of Dr. Michael May and Dr. Ken Kuehn, Exhibits 3 and 4 to this Memorandum, respectively ("Second May Declaration" and "Kuehn Declaration").
[6] Exhibit 1, photos 1-3, Plaintiffs' P.I. Brief..
[7] Stakeholders include the Smithsonian Institution, the National Trust for Historic Preservation, Sierra Club, National Parks Conservation Association, a joint letter in 2001 to ITA from 18 national karst scientists (Exhibit 1 to Kuehn Declaration), the National Speleological Society, Cave Research Foundation, Natural Resources Defense Council, Speleo-Club de Paris, Kentucky Resources Council, Plaintiff KarstEEP, Preservation Kentucky, Kentucky Waterways Alliance, the rural village of Oakland, KY, and Plaintiff Warren County Citizens for Managed Growth.

[8] Declaration of Roger Brucker, para. 3 ("Brucker Declaration"), Exhibit 5 to this Memorandum.  The specific issue is whether there are underground flow

Green River.  Groundwater flows in Kentucky have been reported as high as 1,300 feet *per hour* (Kentucky Division of Water).  Regardless of whether Mammoth Cave is six miles as the crow flies (as Plaintiffs contend) or eight miles (as Intervener ITA contends),there is sharp scientific disagreement over the risk that a spill of chemicals from the Transpark could reach this priceless national and world resource in a matter of hours or days.  Even if the groundwater flow proves to be in the direction alleged by ITA's consultant, federally endangered species of freshwater mussels in the Green River are at risk. See Second May Declaration, Kuehn Declaration and Brucker Declaration, Exhibits 3, 4 and 5.

Defendant Federal Agencies, EPA, HUD, and TVA, have failed Plaintiffs, citizens, taxpayers, and other public interest stakeholders despite NEPA's and NHPA's clear mandates on designation of a lead agency and preparation of an Environmental Impact Statement (see Sec. II.D. *infra*).  In newly discovered information received in an Open Records Act request, Plaintiffs have found that Defendant HUD exempted its NEPA responsibilities for the Transpark's Technical Training Center after this suit was filed (see Sec. III.B. *infra*). Exhibit 19. TVA has already issued a NEPA Categorical Exclusion for its role (see Sec. III.B. *infra*).  EPA now denies that "....it has decided whether to award (the sewer and water monies)" and that "the NEPA and NHPA process cannot commence until an actual application is received...."  However,

_____

mechanisms, such as flow reversal and spillover, from the Graham Springs Karst Groundwater Basin that could contaminate the Mammoth Cave groundwater basin (and associated Green River surface water system).  There is no surface water drainage at the current 4,000- to 6,000-acre Transpark site.  All drainage from the site enters groundwater through sinkholes and other karst features.  The karst groundwater system—subsurface streams and rivers, some of which are navigable—then typically discharges to the Graham Springs surface water feature, which flows into the Barren River. The National Park Service's official position remains that "...the possibility for a spillover or flow reversal (does exist)" and that "...the existing data does not adequately answer the fundamental questions..." (Second May Declaration, para.3).

last year, the EPA Region 4 Administrator wrote the Federal Highway Administration ("FHWA") to acknowledge both the need to prepare an environmental review for the entire Transpark and that further Transpark development would be very limited without the infrastructure **"for which EPA is providing funding"** (see Sec. II.C. *infra*; Exhibit 17 to this Memorandum). Emphasis added. EPA has also denied a NEPA Categorical Exclusion for this funding and told the ITA's agent that an EIS for the entire project, including direct, indirect, and cumulative impacts was required, but has failed to take further action. Exhibit 17, Liles letter dated February 7, 2005.

Declarant Michael O. Buchanon, Judge-Executive of Intervener Warren County, KY, characterizes Plaintiffs as Transpark opponents (Buchanon Declaration, para. 14.); he is **not** correct. Plaintiffs **do** oppose the **siting** of the Kentucky Trimodal Transpark at this rural karst location near Mammoth Cave National Park and within or proximate to the rural historic communities of Oakland, Sunnyside, and Freeport. This proposal — whether it is described as a 6,000-acre project or a 2,000-acre project or a 900-acre Phase I of a larger project — does not warrant the "field of dreams" description suggested by several of the declarations submitted with the ITA Motion. Given its location, a "field of sinkholes" is more fitting.[9] No wonder it took seven years and federal and state financial support to get **one** tenant.

Plaintiffs do not oppose economic development that benefits Bowling Green-Warren County and the region; they support appropriately sited development. Plaintiffs support the use of public funds to assist with economic development, provided that such assistance comes

---

[9]Even Intervener ITA's own consultant has concluded, with respect to the Phase II airport component, that "...no runway could be threaded through the assemblage of buffer zones (necessitated by avoiding karst/sinkhole features that connect with underground drainage conduits). Exhibit 6 to this Memorandum.

*after* a comprehensive EIS that includes a re-siting analysis for the Kentucky Trimodal Transpark;[10] preliminary and permanent cessation of construction of the Phase I (industrial park) component of the Transpark at its current location, including the proposed I-65 interchange, the airport, and the rail component; and monitoring and mitigation of the Bowling Green Metalforming and Technical Training Center that has already been constructed within the Transpark.

**ARGUMENT**

**I. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

The EPA/HUD Motion, TVA Motion, and ITA Motion were filed pursuant to Federal Rule of Civil Procedure 12(b), citing to subsection 12(b)(1) challenging the subject matter jurisdiction of this Court over Plaintiffs' claims and/or subsection 12(b)(6) challenging the sufficiency of the Amended Complaint to state a claim upon which relief can be granted. In support of these motions, they argue that the action is not ripe, that the Plaintiffs lack standing, that the action is moot and that the Plaintiffs have failed to state a claim upon which relief can be granted.

To withstand a Rule 12(b)(1) motion, the Amended Complaint must allege sufficient facts to show jurisdiction. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936). While Defendant Federal Agencies and Intervening Defendants are correct that Plaintiffs bear the initial burden of pleading sufficient facts to invoke the Court's

---

[10] The "best" site for re-siting the Transpark may not even be in Warren County. Intervening Defendants have secured contractual support from a number of regional counties on the basis that the Transpark benefits a multi-county region (Intervener Memorandum of Points, p. 4, and Declaration of Michael O. Buchanon, Judge-Executive, Intervener Warren County, para.4). It is not difficult to envision a legitimate re-siting analysis that concludes that another location is more environmentally acceptable, perhaps even one outside of Warren County. Interveners Bowling Green and Warren County could establish a governing body in the latter event that provides representation of their interests proportional to population so that they may control the direction and allocation of costs/possible revenues accordingly.

jurisdiction, this burden is only to plead sufficient jurisdictional facts. McNutt, 298 U.S at 182. Plaintiffs are not, at this stage, required to allege sufficient facts to prove their case on the merits or to support the evidentiary basis of their pleadings. Haase v Sessions, 835 F.2d 902, 903 (D.C. Cir. 1987). Most of the cases cited by Intervening Defendants in particular (discussed in Secs. II. and III. *infra*) are cases decided on the merits, not on motions to dismiss. While the Court may consider matters outside the pleadings to determine whether it has jurisdiction in a Rule 12(b)(1) challenge, it "must accept as true all the factual allegations contained in the complaint." Public Utility District No. 1 v. Federal Energy Regulatory Comm'n, 315 F.Supp.2d 89, 91 (D.D.C. 2004); Bennett v. Ridge, 321 F.Supp.2d 49, 51 (D.D.C. 2004). Furthermore, disputed facts must be construed in the light most favorable to Plaintiffs. Haase, 835 F.2d at 904.

The Court must accept the factual allegations contained in Plaintiffs' Amended Complaint as true and construe all disputed facts in the Plaintiff's favor in its consideration of the Rule 12(b)(6) motions. Williams v. AMTRAK, 357 F.Supp.2d 1, 2 (D.D.C. 2003). The Court "may dismiss a complaint for lack of subject-matter jurisdiction only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' (emphasis added)." El-Hadad v. United States, 377 F.Supp.2d 42, 45 (D.D.C. 2005).

## II. THERE IS "FEDERAL AGENCY ACTION" UNDER THE ADMINISTRATIVE PROCEDURE ACT, CONFERRING SUBJECT MATTER JURISDICTIONUPON THIS COURT

### A.    Overview.

This Court has subject matter jurisdiction to decide Plaintiffs' claims that Defendant Federal Agencies and Intervening Defendants have violated NEPA and NHPA. This Court has acknowledged a merging of what

constitutes "federal agency action" for purposes of subject matter jurisdiction under the Administrative Procedure Act ("APA") with the NEPA concept of "major federal action," and the definition of a "federal undertaking" under the NHPA has been treated essentially as equivalent to that of a NEPA "major federal action." Coalition for Underground Expansion v. Mineta, 333 F.3d 193, (D.C. Cir. 2003). See also Sac & Fox Nation of Mo. v. Norton, 240 F.3d 1250 (10th Cir. 2001), *cert. denied*, 534 U.S. 1078 (2002).

Defendant Federal Agencies and Intervening Defendants fail to respond to Plaintiffs' claim that the Kentucky Trimodal Transpark was a federal agency action (a federalized project) ***from its inception*** (Sec. II.A.i) *infra*). See Amended Complaint, para. 36, alleging that, "But for the federal funding described above, no part of the Transpark activities which are the subject of this Complaint would have been undertaken". See the same allegation at Paragraph 43 regarding Count I, at Paragraph 48 regarding Count II, and Paragraph 50 regarding Count III.  Instead, they purposely and disingenuously miscast Plaintiffs' basis for APA Sections 704 and 706 subject matter jurisdictions as resting solely on Congressional earmarks. Memoranda of Points and Authorities, Intervening Defendants, pp. 9-10, and Defendant EPA and HUD, p. 14.  This is not the case.

The "federal agency action" that confers subject matter jurisdiction on this Court consists of all the following elements:[11]

i)          As discussed in Sec. II.B. *infra* and Plaintiffs' Amended Complaint, para. 13-31, from the inception of the Kentucky Trimodal Transpark in 1998 through the present, Intervening Defendants' written and oral words, actions, and documents have defined the

---

[11] Finality of this federal agency action is addressed in Sec. III. *infra*.

Kentucky Trimodal Transpark as a project that, **but for** federal involvement in planning, funding, consultation, and approvals, and Intervener ITA adherence to federal requirements (i.e., land acquisition in accordance with the federal Uniform Acquisition Act), would not be viable; and

ii)     As discussed in Sec. II.C. *infra*, federal agency involvement in the Transpark has been extensive and long-standing, including some **ten (10)** federal funding, resource, and permitting agencies dating back to at least 1999; and

iii)    As discussed in Sec. II.D. *infra*, the Kentucky Trimodal Transpark is a major federal action significantly affecting the quality of the environment.  Federal agencies have failed to both designate a lead agency for purposes of preparing an EIS, to actually prepare an EIS for this project, and to prevent Intervening Defendants from foreclosing consideration of less damaging alternatives under NEPA and NHPA.

**B.  Intervening Defendants Federalized the Project from Its Inception and Now Frantically and Impermissibly Attempt to De-Federalize the Transpark.**

It is clearly established that "major federal action" triggering NEPA analyses can exist when the primary actors in a project are not federal agencies.  Save Barton Creek Ass'n v. Federal Highway Administration, 950 F. 2d 1129, 1134 (5th[th] Cir., 1992).  Plaintiffs' Amended Complaint, para. 13.-26. details the actions taken since 1998 by Interveners ITA, Warren County and Bowling Green to **deliberately structure and implement** the planning, management, financing, marketing,

acquisition of land, construction of infrastructure, and award of incentives to reflect the dependency of the project on federal agency involvement.

Additionally, the NEPA-implementing regulations promulgated by the federal Council on Environmental Quality (CEQ) specifically state that "major federal action" includes actions with effects that **may be** major and actions which are **potentially** subject to federal control and responsibility. 40 CFR Sec.1508.18. See also Save Barton Creek, *supra*, at 1134. The *initial funding authorization* for the Transpark in 1998—$6 million from the Kentucky General Assembly recognized the potential for federal control and responsibility in describing the project:

> "This will provide seed money for development of a state-of-the-art regional intermodal industrial park...(that) will combine air, rail, and highway transport systems with an industrial park site...The site is located within three miles of I-65, ten miles of the Cumberland Parkway, and adjacent to existing rail...**It is expected that the project will access FAA funds eventually** (emphasis added)."[12]

As noted in the Memorandum filed by Defendants EPA and HUD, the purpose of NEPA is to focus the attention of the federal government and the public on a proposed action so that the consequences thereof can be studied before the action is implemented or completed. Memorandum, p. 8, EPA/HUD Motion.

In Maryland Conservation Council, Inc. v. Gilchrist, 808 F.2d 1039, 1042 (4th Cir. 1986), the Court held that a highway construction project undertaken by a non-federal entity constituted a major federal action for the purpose of NEPA. The Court stated that a non-federal project is considered a 'federal action' if it cannot 'begin or continue without prior approval of a federal agency.'" Id. at 1042. A

---

[12] Exhibit 7 to this Memorandum.

key factor in this analysis is whether the federal agency has the
ability to influence or control the non-federal activity. Id. The
Court's decision that the action was a "major federal action" rested on
the fact that the project would inevitably depend on approval from at
least one federal agency and would therefore involve at least one major
federal action. "Because it is inevitable that the construction of the
highway will involve a major federal action, it follows that compliance
with NEPA is required before any portion of the road is built." Id.

In Gilchrist, the Circuit Court began the analysis by deciding
whether it had before it a summary judgment entered by the District
Court or a dismissal under FRPC 12(b)(6) as Defendants seek here.
That Court concluded that where the District Court failed to advise
that it was proceeding under FRCP 56 and failed to give parties the
opportunity to present additional evidence, the matter came before the
Court pursuant to FRPC 12(b)(6), and all facts well plead would be
assumed to be proven. These included:

> There is, however, an allegation that additional federal
> funds may be sought, i.e., that "additional ... Federal
> Aid, will be pursued to the extent feasible."

> The complaint alleges that the County has violated NEPA by
> authorizing construction of segments of the highway before
> the Department of Transportation has issued its final EIS,
> since construction will require federal approvals under §
> 404 of the Federal Water Pollution Control Act, 33 U.S.C. §
> 1344 (the Water Act), under §6(f) of the Land and Water
> Conservation Fund Act, 16 U.S.C. § 460*l*-8(f)(3)(the
> Conservation Act), and under § 4(f) of the Department of
> Transportation Act, 49 U.S.C. § 303 (the Transportation
> Act), all of which allegedly render the construction a
> major federal action.

> The Circuit Court reversed the District Court as to the NEPA
claim.

> A non-federal project is considered a "federal
> action" if it cannot "begin or continue without prior
> approval of a federal agency." Biderman v. Morton, 497 F.2d
> 1141, 1147 (2 Cir. 1974); Foundation on Economic Trends v.
> Heckler, 756 F.2d 143, 155 (D.C.Cir. 1985). "Cases finding

'federal' action emphasize authority to exercise discretion over the outcome." W. Rodgers, Environmental Law § 7.6, at 763 (1977). The decision of the Secretary of the Interior to approve the project, and the decision of any other Secretary whose authority may extend to the project, would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS. The completed segments would "stand like gun barrels pointing into the heartland of the park ...".  It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent.

Macht v. Skinner, 916 F. 2d 13, 19 (D.C. Cir. 1990) cited by Intervening Defendants for the "allowable segmentation" argument (see *infra* in this subsection), concluded that Maryland Conservation Council was a sound decision: that a project proponent could not begin construction over part of a project if the effect of the construction would be to limit significantly the options of federal agencies who have discretion over substantial portions of the project.

As in Maryland Conservation Council, federal involvement at the Transpark was planned from the start, and has happened (see Sec. II.C. *infra*). NEPA is intended to assure that federal agencies will consider the potential environmental effects of a project or action during the development of a proposal or the formulation of the agency's position on a proposal submitted by a non-federal entity. Kleppe v. Sierra Club, 427 U.S. 390, 409 (1976). "Non-federal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli*." Maryland Conservation Council, 808 F.2d at 1042. This is exactly what the Intervening Defendants have attempted to do.

Intervening Defendants claim that the Transpark project has been properly segmented, citing Macht v. Skinner, 715 F.Supp. 1131, (D.D.C. 1989), *aff'd*, 889 F.2d 291 (D.C. Cir. 1990), for the proposition that non-federal actors may segment a project into state and federally

funded segments, even if explicit purpose is to avoid regulation of the locally funded segment under NEPA, *also citing* <u>Wetlands Action Network v. U.S. Army Corps of Eng'rs</u>, 222 F.3d 1105, 1118 (9th Cir. 2000), *cert. denied*, 534 U.S. 815 (2001), and <u>Scottsdale Mall v. Indiana</u>, 549 F.2d 484, 488 (7th Cir. 1977), *cert. denied*, 434 U.S. 1008 (1978).

Intervening Defendants' segmentation argument (Memorandum, pp. 24-29) fails, first, as a matter of their actions. The Intervening Defendants' recent attempts to "de-federalize" the Transpark through *post hoc* re-framing (the Transpark is less ambitious now--merely a 900-acre Phase I industrial park;[13] the airport component may have been dropped) and facile tactics (e.g., the project website, www.kytranspark.org, now omits the word "Trimodal") are nothing more than a ruse that has been constructed for the sole purpose of avoiding NEPA and NHPA compliance. To allow these tactics despite past, present and future federal involvement contravenes the purposes and policies of NEPA and NHPA review.

Intervening Defendants' assertion the project "may" end with the completion of Phase I is unpersuasive. For the past eight years, the Transpark project has consistently been characterized, described and treated as an integrated road, air and rail economic development project. Actions belie rhetoric, as the following examples show. Intervener ITA has already purchased land **outside** of what it calls the 900-acre Phase I industrial park and within the airport component (Phase II) of the Transpark. The properties outside of Phase I and in

---

[13] Phase I simply happened to be the relatively easiest phase within which to acquire property (other phases are likely to require the use of eminent domain because of farmer-landowner resistance) and engage in limited construction (less than approx. 200 acres of the 900-acre Phase I actually have been built upon). However, the limited segmentation for purposes of construction does support Plaintiffs' claim that the matter is not moot because it has not been fully constructed and that there is relief (e.g., re-siting study/EIS for the Kentucky Trimodal Transpark) that can be granted.

the airport component include those reviewed in the Declaration of Robin Ziegler submitted on behalf of Intervening Defendants (297 Fred Madison Rd., 9508 Louisville Rd., 2410 and 2428 Glasgow Rd.). Exhibit 1.

Bowling Green-Warren County Airport Manager Rob Barnett's Declaration states that on **January 1, 2004**, the contract between the ITA and the Airport Board by which ITA served as the Board's agent for location of a new airport at the Transpark was dissolved and that a new airport "might or might not" be a part of the Transpark. Some 10 months after this agency agreement was terminated, the minutes of an **October 19, 2004** meeting of the Board of Commissioners of Bowling Green reflect that "...Mr. (Jim) Hizer *(*ITA President and CEO/President of the Bowling Green Chamber of Commerce) **stated that an airport is part of a long-term development plan for the Transpark**, but that it was under the direction of (Rob Barnett) (emphasis added)."[14]

Intervening Defendants do concede, however, that this purposeful segmentation must still meet independent utility and other tests of proper segmentation. The segmentation of the Transpark does not meet these tests.

"A segmentation is improper when the segmented project 'has *no* independent justification, no life of its own, or is simply illogical when viewed in isolation.'" One Thousand Friends of Iowa v. Mineta, 364 F.3d 890, 894 (8th Cir. 2004) *quoting* Save Barton Creek Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1139 (5th Cir. 1992). "The proper question [with regard to independent utility] is whether one project will serve a significant purpose even if a second related project is not built." Hammond v. Norton, 370 F. Supp. 2d 226, 248 (D.D.C. 2005), *quoting* Coalition on Sensible Transportation v. Dole, 826 F.2d 60, 70-

---

[14] Exhibit 8 to this Memorandum.

71 (D.C.Cir. 1987). The hallmark of segmentation analysis has been identified by some courts as a determination of the independent utility of a phase in a segmented project and by other courts as the direct and substantial probability that the phase will influence or predetermine agency decision on the other segments of the project. Any claim of independent utility must be substantiated by the evidence, rather than by mere assertions of Intervening Defendants in their recent pleadings. See Hammond, 370 F. Supp. 2d at 253.

Phase I of the Kentucky Trimodal Transpark clearly has no independent utility and is completely illogical if viewed in the absence of the remaining phases of the overall development plan. See Coalition on Sensible Transportation v. Dole, supra, at 70-71. A **fifth** Bowling Green Interstate-65 interchange has no purpose other than to serve the Transpark. The Transpark is practically inaccessible without federally funded road improvements to widen US 31W and US 68 and construct a new interstate interchange. On Defendant EPA's part, the agency has conceded that but for the water and sewer funding it was providing, further development of the Transpark will be very limited. Exhibit 17, below.

The repayment of revenue bonds used to fund the purchase of property and construction of roads, water lines and other facilities already undertaken in Phase I is dependent on the sale of the existing airport[15], which is not included in this first phase of development. The sale of the existing airport cannot be accomplished without FAA approval and, in turn, FAA approval is required for a new airport. See Amended Complaint, Paragraphs 15, 19, 31.

---

[15] According to the ITA president's sworn testimony at a hearing on the issuance of the revenue bonds in June, 2001.

Therefore, unlike the factual circumstances of <u>Citizens Alert Regarding the Environment v. United States Environmental Protection Agency</u>, 259 F. Supp. 2d. 9, 15 (D.D.C. 2003), <u>Highway J Citizens Group v. Mineta</u>, 349 F. 3d 938, 963 (7th Cir. 2003), *cert. denied*, 541 U.S. 947 (2204), and <u>Macht v. Skinner</u>, 916 F. 2d 13, 18 (D.C. Cir. 1990), there is substantial evidence to support Plaintiffs' claims that the Transpark project, including Phase I, would end without federal involvement, including federal funding because it would not be viable[16].

Finally, even if the Transpark is phased as a matter of construction, it is clear that the phases of the Transpark are connected actions under NEPA and NHPA. "Separate actions are considered 'connected' if they (1) automatically trigger other actions which may require Environmental Impact Statements; (2) cannot or will not proceed unless other actions are taken previously or simultaneously, or (3) are interdependent parts of a larger action and depend on the larger action for their justification." <u>South Carolina v. O'Leary</u>, 64 F.3d 892, 899 (4th Cir. 1995) *quoting* 40 C.F.R. Sec. 1508.25(a). Phase I of the Transpark is dependent on the simultaneous construction activities of the FHWA and the EPA water and sewer funding.

C. **<u>The Federal Agencies' Long-Standing Involvement (in Some Cases Individually and Together in the Aggregate) in the Transpark Constitutes Federal Action.</u>**

Since at least 1999, there have been **ten (10) federal agencies** involved at various times and in various ways with the Kentucky Trimodal Transpark. The agencies and the nature of their involvement (funding, resource, permitting authority) are addressed as follows. The failure of Defendant Federal Agencies to comply with their statutory

---

[16] See Amended Complaint, para. 20.

and regulatory responsibilities regarding the Transpark, itself a federal agency action is addressed *infra* at Sec. III.D.

**Funding agencies.** With respect to involvement in the Transpark, funding agencies include FHWA, FAA, EPA, HUD and TVA. Intervening Defendants have asked them for money and have had studies or construction funded with their money, and/or has involved them in planning the Transpark. FAA, though not a party to this proceeding, has been involved in the Transpark since at least 1999 (Plaintiffs Amended Complaint, para. 31). The ITA and Bowling Green-Warren County Regional Airport Board submitted a Joint Request for Inclusion into the National Plan of Integrated Airport Systems to the FAA for a new airport at the Transpark dated May 4, 2000 and a Benefit-Cost and Economic Impact Analysis ("EIA"), dated March 2000. The EIA clearly shows the airport, industrial park, and new I-65 interstate interchange as functionally interdependent components of the Transpark and geographically proximate. The report also shows that the new airport costs would be offset by the sale of the existing FAA-funded airport. FAA would also have to approve the sale of the existing Bowling Green-Warren County airport, itself a "major federal action" because of the indirect and cumulative impacts from the high-intensity redevelopment plans proposed by Intervener ITA for what would become very valuable property given its location in Bowling Green.[17]

FHWA, though not a party to this proceeding, has been involved in the Transpark planning since at least its 2003 spending bill proceedings. FHWA was aware of the project at least back to 2001 (Plaintiffs' Amended Complaint, para. 30). The widening of US31W and US 68/KY 80 with funding from FHWA is an infrastructure improvement that **Intervener ITA** committed to construct when it sought to rezone

---

[17]Exhibit 9 to this Memorandum.

property in Phase I from Agriculture to Industry for Bowling Green Metalforming.[18] Additionally, despite Intervener ITA's false claim that "[t]he construction of a new (FHWA-funded) connector or exchange off I-65 is not a project that is directly related to the Transpark" (Memorandum, p. 12, Intervening Defendants), Kentucky Transportation Cabinet ("KYTC") described the project to Bowling Green Metalforming's parent company as being "fast tracked" to provide access to the plant and the "Transpark industrial facility," and was discussed as a Transpark element by ITA's President Jim Hizer in a request for Transpark appropriations for sewer and Technical Training Center funding.[19]   The surface transportation reauthorization bill signed in August 2005 contains $35 million for the new I-65 interchange.

Defendant TVA has been apprised of the Kentucky Trimodal Transpark at least back to 1999 when ITA's Board meeting minutes reflected a meeting with TVA's Vice President for Economic Development who expressed strong support for the project. Plaintiffs' Amended Complaint, para. 14.  As detailed in Plaintiffs' Amended Complaint and this Memorandum, TVA supplied funding for equipment at the Bowling Green Metalforming plant. Since 2003, TVA's Quarterly Operational Reports to Congress have included the project on several occasions:

> "The Kentucky Tri-Modal Transpark Authority broke ground for a 1,200-acre industrial park.  Total project cost is estimated to be $66 million over the next 10 to 15 years.  TVA has offered financial assistance and technical support."
>
> 2003 Operational Report to Congress, p. 10

TVA also featured the Transpark in one of "The Valley Connection," a newsletter from TVA Economic Development (www.tva.com/ed_news/index.htm).

---

[18]Exhibit 10 to this Memorandum.
[19]Exhibit 11 to this Memorandum.

**Resource agencies**.  Resource agencies are federal agencies with statutory and regulatory responsibilities over a natural or cultural resource (e.g., historic properties, wetlands), including providing consultative and commenting functions on private and public projects. In 2000, Intervener ITA sent formal letters to federal resource agencies such as National Park Service (Mammoth Cave National Park), U.S. Fish and Wildlife Service (endangered and threatened species), EPA (air, water, toxics, wetlands), United States Department of Agriculture ("USDA") (prime farmland),[20] U.S. Army Corps of Engineers ("USACE") (wetlands) seeking formal comment on the Transpark siting decision and review of ITA's limited environmental review document.[21]

Mammoth Cave National Park and the U.S. Fish and Wildlife Service found significant flaws in the work that had been done, particularly the selection of the specific site and the unresolved question as to whether the Transpark could contaminate the unique and irreplaceable ground water and cave system of the Park and impact federally listed endangered and threatened species.[22]

Additionally, the federal Advisory Council on Historic Preservation ("ACHP") has been involved in the Transpark project since 2001 as a result of requests of elected officials from the City of Oakland, KY, for review of the Transpark under 36 CFR Sec. 800.9(a). In response to such requests, the ACHP sent a Nov. 13, 2001 letter to the FAA inquiring into the role the agency has played in the

---

[20] In 1998, when the Judge-Executive of Intervener Warren County (Declarant Michael O. Buchanon) incorporated Intervener ITA, he appointed the local USDA Natural Resource Conservation Service employee to the Board of the ITA.  That employee chaired the ITA Board environmental committee in an official USDA capacity and was integrally involved in the current site selection of the Transpark site (almost all of which is "prime farmland" under federal law) until a formal conflict of interest complaint was filed.  In Feb. 2001, the USDA KY State Conservationist directed the employee to resign from the Board of Intervener ITA.  (Exhibit 12 to this Memorandum)
[21]Exhibit 13 to this Memorandum.
[22]Exhibit 14 to this Memorandum.

development of the Transpark, its anticipated role, and the status of Section 106 compliance under the NHPA.[23] The ACHP sent both FAA and FHWA letters dated Jan. 21, 2004, stating that "it would appear...that this project is moving forward...and requesting an update on FAA's involvement and the status of compliance with Section 106 of the NHPA."[24]

To the best of Plaintiffs' knowledge, Defendant EPA was first formally contacted by a consultant to Intervener ITA by letter dated October 12, 2000 to provide comments on environmental issues of concern as the consultant prepared a Site Master Plan for the Kentucky Trimodal Transpark, consisting of a new airport, business part, interstate highway access, and rail access.[25]  EPA responded by letter dated October 24, 2000 providing comments on the need to address air quality, noise, environmental justice, cultural resources, and wetlands. Subsequently, EPA contacted ITA to inquire into the status of the Transpark, stating that it had discussed the project with the National Park Service, U.S. Fish and Wildlife Service, and the FAA.[26]  As recently as October 2004, the EPA Regional Administrator for Region 4 (which includes Kentucky) wrote to the head of the Kentucky Division of the FHWA indicating that:

> Further development of the Transpark will be very limited without the expansion of essential water and sewer infrastructure for which EPA is providing funding...We wholeheartedly agree that our agencies should coordinate efforts in performing the environmental review and evaluation **of all aspects of the planned Transpark**.... (emphasis added). [27]

---

[23]Exhibit 15 to this Memorandum.
[24]Exhibit 16 to this Memorandum.
[25]Exhibit 13 to this Memorandum.  The consultant also send formal request for comment letters to the USACE, Mammoth Cave National Park, U.S. Fish and Wildlife Service, and USDA.

[26]Exhibit 13 to this Memorandum.
[27]Exhibit 17 to this Memorandum.

**Permitting Agencies**. Permitting, or approval, agencies are those who have jurisdictional responsibility for issuing federal permits and approvals for private and public projects. Intervener ITA solicited input from approval agencies such as EPA and the USACE (wetlands) since at least 2000 (see Exhibit 13, referenced *supra*).

**Discussion.** "[F]ederal involvement in a non-federal project may be sufficient to federalize the project for purposes of NEPA." Macht v. Skinner, 916 F.2d 13, 18 (D.C. Cir. 1990); Citizens Alert Regarding the Environment v. United States Environmental Protection Agency [CARE II], 259 F.Supp. 2d 9, 15 (D.D.C. 2003). "No litmus test exists to determine what constitutes 'major federal action,' and 'federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA.'" Mineral Policy Center v. Norton, 292 F.Supp.2d 30, 53 (D.D.C. 2003), as follows:

> "Deciding whether federal and non-federal activity are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship." Wetlands Action Network v. United States Army Corps of Engineers, 222 F. 3d 1105 (9th Cir. 2000), *quoting* Friends of the Earth v. Coleman, 518 F.2d 323 (9th Cir. 1995). An action which is not federally funded can constitute a "major federal action" triggering NEPA. *See also* Southwest Williamson County Community Ass'n, Inc. v. Slater, 243 F.3d 270 (6th Cir. 2001). Furthermore, "a non-federally funded project may become a major federal action **by virtue of the aggregate of federal involvement from numerous federal agencies**, even if one agency's role in the project may not be sufficient to create major federal action in and of itself (emphasis added)." Id. at 279.

The Amended Complaint and this Memorandum contain specific factual allegations to support Plaintiffs' assertions that the Transpark project, from inception through the present, has been and is suffused with federal involvement sufficient to constitute federal action and require that Defendant Federal Agencies and Intervening Defendants comply with NEPA and NHPA. See Citizens Alert Regarding the

21

Environment v. United States Environmental Protection Agency, 259 F.Supp. 2d 9, 15 (D.D.C. 2003).

In Scottsdale Mall v. State of Indiana, 549 F.2d 484 (7th Cir. 1977), the court found that a primarily state-funded construction project triggered NEPA review where the state had sought federal approval and involvement at various stages during the project, including the receipt of funds for preliminary activities such as planning and siting. The court held that because of the state's **periodic** solicitation of federal involvement, the project had become so imbued with a federal character as to constitute a major federal action notwithstanding the state's later withdrawal of the project from federal funding consideration. Id. at 489. The court stated that the state's withdrawal was not the crucial factor, but rather the **history** of federal-state involvement.

> If [the state] had not long ago sought federal funding for the. . .project, had not programmed the project for federal assistance, sought and received federal approval of the location and design stages, received federal funding for preliminary engineering studies, and had not begun right-of-way acquisition, but rather had proceeded with these various phases of the project on its own, the result in this case might have been different.
> Id. at 489-90.

The cases relied upon by Intervening Defendants involve minimal federal agency involvement, individually or in the aggregate, unlike the compelling record and history of federal agency-Transpark proponent involvement. In Edwards v. First Bank of Dundee, 534 F.2d 1242 (7th Cir. 1976), an NHPA decision on the grant of a motion for preliminary injunction, the court rejected the very thin thread of plaintiffs' argument for federal action. Plaintiffs sought to prevent a private bank from demolishing an historic building and constructing a new branch location, near an existing location. They argued that the federal action that implicated the NHPA was the Federal Deposit

Insurance Corporation's ("FDIC") action on the bank's application to transfer its approved operations to a new location. The court found that there was a "total absence" of federal involvement and noted that plaintiffs had not joined FDIC or any other federal agency in the lawsuit. Unlike Edwards, the Transpark has had a web of federal involvement since at least 1999, involving ten agencies, including the three Federal Defendant Agencies.

In the Macht v. Skinner case, *supra*, the court found limited federal involvement because of "small" approvals. The 22.5-mile light rail extension involved one federal permit for a wetlands area less than four acres in size. Unlike Macht, the Kentucky Trimodal Transpark, a 4,000-6,000-acre project, is to be funded, in part, by the sale of an airport and is planned to construct a new airport; encompasses thousands of acres of federally designated prime farmland; includes known and potentially National Register eligible historic and archaeological resources; poses risks to Mammoth Cave National Park; was concluded to feature wetlands associated with the vast sinkholes across the site; would need air and water permits for airport and larger industrial sources, and involved an interstate interchange and improvements to U.S. highways. There is no "small" approval in the aggregate for the Transpark.

In the CARE II case, the court found that all that was left after CARE I was a sewer line for which the federal appropriations earmark was not even for the project (unlike the Transpark appropriations which are project-specific), but was appropriated for the Township. It should be noted that, after CARE I, in which the court determined that the multi-use project could not proceed without NEPA compliance, the prison component was built elsewhere and the business park was dropped by the project proponents. This is not the case with the Transpark.

**D. Defendant Federal Agencies' Non-Discretionary Failure to Act on a Major Project Significantly Affecting the Quality of the Environment Itself Constitutes Federal Action.**

Plaintiffs allege that Defendant Federal Agencies have failed to designate a lead agency for preparation of an EIS, have failed to prepare an EIS for the Transpark, and have failed to prevent the ITA from taking action that forecloses federal consideration of alternatives and from engaging in anticipatory demolition under NHPA of properties, structures and sites potentially eligible for listing on the National Register of Historic Places.

"Agency action" under the APA, 5 U.S.C. Sec. 551(13), is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, **or failure to act**" (emphasis added).[28] It is quite settled that the failure of an agency to act is itself a circumstance cognizable as a "major federal action" and reviewable under the APA. Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 124 S. Ct. 2373 (2004). The APA provides relief for such failure to act in Sec. 706(1), "The reviewing court shall...compel agency action unlawfully held or unreasonably delayed." Under Norton v. Southern Utah Wilderness Alliance, agency failure to act is remediable under the APA so long as that failure concerns a discrete mandatory, nondiscretionary duty. "Thus a claim under Sec. 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Id at 2378.

Intervener ITA cites to Norton v. Southern Utah Wilderness Alliance, but they quote selectively to suggest a misleading interpretation of that decision. That case involved one issue – when

_____

[28] The CEQ rules, 40 C.F.R. Sec. 1505.18, also define a major federal action as a failure to act.

is agency failure to act reviewable under the APA. The citizens groups alleged that the failure of the Bureau of Land Management to take action to address off road vehicles was subject to judicial review under the APA.

Justice Scalia responded:

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Where no other statute provides a private right of action, the "agency action" complained of must be "**final** agency action." § 704 (emphasis added). "Agency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or **failure to act**." (Emphasis added.) The APA provides relief for a failure to act in § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."

The final term in the definition, "failure to act," is in our view properly understood as a failure to take an **agency action** — that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13). Moreover, even without this equation of "act" with "agency action" the interpretive canon of *ejusdem generic* would attribute to the last item ("failure to act") the same characteristic of discreteness shared by all the preceding items. See, *e.g.,* <u>Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler</u>, 537 U.S. 371, 384-385 (2003). A "failure to act" is not the same thing as a "denial." The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request — for example, the failure to promulgate a rule or take some decision by a statutory deadline. The important point is that a "failure to act" is properly understood to be limited, as are the other items in § 551(13), to a **discrete** action.

As detailed herein, despite being integrally involved in, briefed, contacted for review, providing funding, responding to inquiries from citizens, elected officials, and the federal ACHP, and/or providing comments on environmental and related issues to Intervener ITA on the Transpark **since 1999**, Defendant Federal Agencies did not designate a lead agency for NEPA and NHPA compliance purposes,

even when Plaintiff Gayla Cissell was on record as so requesting (see *infra*); did not initiate an EIS and Section 106 process under the NHPA; and did not step in to prevent anticipatory demolition of potential National Register eligible properties and farms or adverse water quality impacts at the Bowling Green Metalforming site already constructed as the Transpark's key tenant.  Plaintiffs have experienced actual harm from Defendant Federal Agencies' failure to comply with mandatory, non-discretionary requirements of NEPA and NHPA. Intervening Defendants cite <u>Norton</u> as support for the notion that generalized attacks cannot form the basis of subject matter jurisdiction.  Plaintiffs agree.  Unlike <u>Norton</u>, which was a challenge to a **programmatic** responsibility of the Bureau of Land Management, the Transpark is a **project**, with discrete responsibilities on the part of Federal Agency Defendants, which have not been met.

> NEPA requires an integrated view of the environmental damage that may be caused by a situation, broadly considered, and its purpose is not to be frustrated by an approach that would defeat a comprehensive and integrated consideration by reason of the fact that particular officers and agencies have particular occasions for and limits on their exercise of jurisdiction. <u>Henry v. F.P.C.</u>, 513 F.2d 395, 406 (D.C. Cir. 1975).

This Court rejected the Federal Power Commission's argument that it did not have to consider the environmental effects of a coal gasification project when ruling on an associated and essential tap and valve facility though it did hold that the agency could rely on the EIS for the coal gasification plant that the already-designated lead agency, Bureau of Reclamation, was preparing in conjunction with the USACE (water structure approvals) and the U.S. Geological Survey (mining plan approval).

The CEQ rules on lead agency designation provide:

40 C.F.R. § 1501.5   Lead agencies.

(a) A lead agency **shall supervise** the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or **is involved in the same action;** <u>or</u>

(2) **Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.**

.   .   .

(c) If an action falls within the provisions of paragraph (a) of this section **the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay.** If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(emphasis added)

In response to an April 18, 2001 letter from Plaintiff Gayla Cissell asking for the designation of a lead agency (copied to the FAA Regional Administrator, Sec. of the U.S. Dept. of Transportation, and Defendant EPA), former Secretary of the Kentucky Transportation Cabinet James C. Codell, wrote, on November 6, 2001:

> **"As soon as federal funds are committed to the Transpark project, the Secretary of the U.S. Department of Transportation will determine whether the Federal Aviation**

> **Administration or the Federal Highway Administration will be the 'lead' federal agency...**[29]

This was never done.  Mr. Jose Sepulveda, FHWA Kentucky Division Administrator was copied on this reply, as was the FAA.

NEPA and NHPA preclude federal agency action in isolation from other agencies where that agency knows or should know of other federal involvement of the project.  It is exactly this type of "death by a thousand cuts" that these statutes and implementing rules seek to avoid through prior planning, consultation, and inter-agency cooperation for major federal actions that consist of projects significantly affecting the quality of the environment.  Plaintiffs request this Court to find subject matter jurisdiction over this federal action where, *inter alia*, the failure to act upon a non-discretionary duty has been unreasonably delayed and has harmed Plaintiffs' interests.

### III.  THERE IS "FINAL" FEDERAL AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT CONFERRING SUBJECT MATTER JURISDICTION UPON THIS COURT

#### A.    Overview.

The Court has subject matter jurisdiction to decide Plaintiffs' claims that Defendant Federal Agencies have violated NEPA and NHPA.  In Sec. II. *supra*, Plaintiffs addressed the issue of whether there is an "agency action" under the APA.  Defendants EPA and HUD do not dispute federal action but argue that there is no "final" agency action because they have not acted on any grant paperwork and that the matter is not yet ripe (ripeness is addressed in Sec. IV. *infra*).  (Defendant TVA argues, *inter alia*, that the matter is moot as to itself.  Plaintiffs' response to this point is addressed in Sec. V. *infra*.)

---

[29] Exhibit 18 to this Memorandum contains both Cissell's letter and Codell's reply.

As Plaintiffs demonstrate below in Sec. III.B.-C., the "finality" of federal agency action that confers subject matter jurisdiction on this Court consists of the following elements:

i) Defendants HUD and TVA have both issued Categorical Exclusions under NEPA for their responsibilities regarding the federalized Transpark; and

ii) The failure to designate a lead agency and prepare an EIS is "final" in the sense that this is a federalized project significant affecting the quality of the environment for which construction has begun and harm incurred.

**B. Defendant TVA and HUD Have Concluded Categorical Exclusions under NEPA.**

When TVA determined that the economic development award of $500,000 to the first tenant at the Transpark was entitled to a Categorical Exclusion from NEPA and NHPA requirements, that determination constituted "final agency action" under the APA for the purpose of conferring subject matter jurisdiction with this Court. TVA issued a NEPA Categorical Exclusion in July 2004 (for its funding of equipment at the 123-acre Bowling Green Metalforming plant constructed at the Transpark, see Exhibit 17, Plaintiffs' Brief in Support of Motion for Preliminary Injunction).

Incredibly, after Plaintiffs filed their first Complaint, Bowling Green submitted a proposed NEPA Categorical Exclusion, signed by Bowling Green Declarant Mayor Elaine Walker on June 21, 2005, for the $1.48 million dollars in equipment for the Transpark Technical Training Center, *one of the very actions at issue in this dispute*. Defendant HUD subsequently accepted the NEPA exemption in an undated document

indicating that "The City...*has satisfied the environmental grant condition.*"[30]    Action by HUD constituted "final agency action" under APA and confers subject matter jurisdiction upon this Court to review that decision.

Though not a party to this action, when FHWA awarded funding to widen US31W and US 68/80, that action also constituted "final agency action" under the APA (see description of the relationship of these projects to the Transpark *supra* at Sec.II.C.).

**C.    Failure to Act When Federalized Project has Started Construction and Harms Have Been Incurred *is* "Final."**

As noted in the Intervening Defendants' Memorandum of Points, p. 7, "Agency action is final when it 'imposes an obligation, **denies a right**, or fixes some legal relationship (emphasis added)." (citing Action on Smoking & Health v. DOL, 28 F.3d 162, 165 (D.C. Cir. 1994). See discussion above concerning Norton, and judicial review of agency failure to act. The issue here is when does agency failure to act constitute "final" agency action that us subject to judicial review. With a project that was federalized from inception, the final agency action that will trigger judicial review occurs when resources are committed so as to foreclose consideration by the federal agencies of the alternatives that NEPA and NHPA would otherwise require be considered.  With the Kentucky Trimodal Transpark, that happened when the ITA broke ground to construct what it is now calling Phase I. Prior to such construction, the ITA and other supporters of the Transpark were gathering information, purporting to do environmental investigations, seeking federal and state financial support, even acquiring land and seeking zone changes from agriculture to industrial.

---

[30] Exhibit 19 to this Memorandum contains both the request for and grant of the HUD Categorical Exclusion.

However, none of these actions were irreversible.  None had the potential to foreclose the options that the Defendant Federal Agencies would or should consider as part of the NEPA` and NHPA process.

Injury to the Plaintiffs occurred when construction started before the NEPA and NHPA process was started.  From that point, resources were being committed that foreclosed other options.  From that point, the ITA was seeking to present the federal agencies with a *fait accompli*.  See Maryland Conservation Council v. Gilchrist, *supra*.

When further delay will only increase the injury to the Plaintiffs, by further committing resources that are irreversible, and when agency action or inaction is sufficiently discrete to constitute a denial of a right, two of the three prongs for a finding of ripeness have been met.  See discussion of ripeness, Section IV, *infra*.

See Southwest Williamson County v. Slater, 243 F.3d 270 (6th Cir. 2001), a case relied upon by Defendants.  That Court carefully considered both Gilchrist and Macht, *supra*.  The Sixth Circuit found, "Clearly animating the [Gilchrist] court's analysis was the fact that the state had already begun to build the portions of the highway that entered and exited the park without having obtained the requisite federal approvals to build the middle section."  That court cited to the CEQ regulations Plaintiff's rely upon, which "sought to avoid a situation where the non-federal actor presents the federal agency with a *fait accompli* which significantly limits the federal agency's ability to reject the project."  The Sixth Circuit found that the Macht court was presented with a much smaller federal involvement and virtually no area of federal discretion to influence the overall project.  That court applied the tests:  will the non-federal party's action restrict or limit the federal decision-makers choices; and does a federal agency

have control over the outcome.  Applied here, the start of construction by the ITA clearly triggers the first test.

**IV.    THIS CASE IS RIPE FOR REVIEW UNDER THE STANDARD SET FORTH IN OHIO FORESTRY ASSOCIATION AND PLAINTIFFS HAVE STANDING.**

The Defendants argue that the lack of agency action means that this litigation is not ripe, that it is premature adjudication.  The Defendants rely on the same claims to challenge the Plaintiffs standing, arguing that since the Federal agencies have not done anything, they have not caused injury to Plaintiffs; therefore the Court cannot remedy the injury to Plaintiffs.  The Defendants do not focus this challenge on a claim that Plaintiffs have not been injured – but narrow the focus to assert that the federal defendants have not caused the injury.

Plaintiffs will respond to these claims together.  As to proof of Plaintiffs' injuries, see declarations of May, Kuehn, Sweeten, Brucker and Morgan, Exhibits 1, 2, 3, 4, and 5.

Plaintiffs' claims are ripe for judicial review and Plaintiffs have standing, where the failure of these federal Defendants to act before construction commenced on this federalized-from-inception-to-present project has denied the Plaintiffs procedural protections afforded by NEPA and NHPA, and denied protection to natural and cultural resources that Plaintiffs use and enjoy.  The Defendants carefully ignore the APA language that affords judicial review of agency failure to act.  See discussion of Norton, *supra*.  In addition, Plaintiffs have identified three separate and discreet federal final agency actions, each of which denied these Plaintiffs the protections they are entitled to under NEPA and NHPA:

1.  TVA award of federal funds to support the Transpark and the grant to itself of a categorical exclusion from further environmental review.

2.  HUD approval of the City of Bowling Green grant application and approval of the City's claim of a categorical exclusion from further environmental review.

3.  FHWA award of funds to improve U.S. 31-W and U.S. 68/KY 80 to assist ITA comply with the binding elements it agreed to as part of rezoning for Bowling Green Metalforming, the ITA Headquarters, and the HUD supported Training Center.

As the U.S. Supreme Court has concluded, the ripeness requirement is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in 'abstract disagreements' over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149 (1967). In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." Id., at 149.

In Ohio Forestry Association v Sierra Club ("Ohio Forestry Association"), 523 U.S. 726 (1998), the U.S. Supreme Court established the following criteria for ripeness review:

a. Whether delayed review would cause hardship to Plaintiffs
b. Whether judicial intervention is timely because of agency action (or inaction)
c. Whether the Court would benefit from further factual development of the issues presented.

The U.S. Supreme Court found that denial of judicial review of forest plans would not cause hardship to the plaintiffs, where the

plans themselves did not authorize the cutting of any trees, and because the Sierra Club would have ample opportunity to challenge future timber sales when they occurred:

> Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut. Id at 733.

Unlike the facts in Ohio Forestry Association, in the instant case, trees are being cut down, houses are being demolished, roads are being built, prehistoric burial sites have been disturbed, water quality has been impacted during construction, wetlands are being eliminated, public funds are being spent, and laws that were written to require a "hard look" at these activities and at more prudent alternatives before these actions were taken - have been ignored. Exhibit 1, photos 1-3, Plaintiffs' Brief in Support of Motion for Preliminary Injunction; Sweeten, May, and Kuehn Declarations, Exhibits 1, 2, and 3.  Here, Plaintiffs have suffered the "effects of a sort that traditionally would have qualified as harm." Id.

The Ohio Forestry Association decision clearly distinguished the forest planning process from the NEPA process at issue in the instant case:

> Nor does the Plan, which through standards guides future use of forests, resemble an environmental impact statement prepared pursuant to NEPA. That is because in this respect NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result. Compare 16 U.S.C. §1604(e) (requiring that forest plans provide for multiple coordinated use of forests, including timber and wilderness) with 42 U.S.C. §4332 (requiring that agencies prepare environmental impact statements where major agency action would significantly affect the environment). **Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.**
> Id at 738. Emphasis added.

34

This case presents the opposite factual situation from Ohio Forestry. Plaintiffs are being harmed now, in that their right to the protection of a NEPA and NHPA investigation of the resources at risk from the Transpark as currently proposed has been and is being denied. Plaintiffs do not bring the broad programmatic challenge the Supreme Court faced in Ohio Forestry. Plaintiffs are seeking the legal protections Congress provided when federal moneys and permissions are part of a specific proposed project. Plaintiffs seek to require a full and honest investigation of alternatives to the Transpark as currently planned – before any additional investment of public money is made and before any federal permission is granted. The last sentence quoted above could not be clearer: The failures of HUD, TVA and EPA to comply with NEPA can never be riper than when such failures have occurred. The first two considerations of Ohio Forestry have been met here.

The third consideration set forth in Ohio Forestry also supports a finding that this matter is ripe for judicial review. Where an agency is just beginning the process of policy development and may make mid-course corrections this third consideration mitigates against judicial review while the agency is deliberating. However, when the agency has failed to act – as these three agencies have done – there will be no further factual development by the agency to justify delay.

A related but separate issue is the need for factual development of a claim before this Court. As noted above, the motions filed by the Defendants are all FRCP 12 motions. Plaintiffs have complained that the Transpark was federalized from inception to present and that "but for" the promise of federal money and permission that would be no Transpark at this location. Defendants have claimed that they are entitled to decline certain federal moneys and to "Phase" the project, for the purpose of postponing the NEPA and NHPA requirements, or

perhaps avoid them altogether for the first 900 acres of project development. Plaintiffs respond that this is an illegal segmentation and that ITA's Phase I has no independent utility without the fifth Bowling Green I-65 interchange and EPA support for water and sewer lines. These claims are all dependent on a complete review of the facts. For purposes of FRCP 12(b)(1) and 12(b)(6), the Court must assume that the allegations pleaded in Plaintiffs' Complaint are true.

The Defendants claim that the Transpark Phase I would proceed regardless of EPA or HUD funding, citing the Hizer declaration. This claim is contrary to the October 2004 EPA letter, at Exhibit 17, and Plaintiffs anticipate that they will disprove that claim when this issue is submitted to the Court on Plaintiffs' motion for summary judgment. This contested factual dispute cannot be resolved on FRCP Motions to dismiss.

Plaintiffs' claims are able to be redressed by this Court today. This Court can set aside the categorical exclusion HUD has approved and order HUD, EPA and TVA to begin actual consultation with FHWA and FAA to designate a lead agency. This Court can order Defendants and Intervening Defendants to take no further action that would foreclose a full and open NEPA and NHPA process. This Court can order these agencies to make no further grants to support the Transpark until they have complied with these laws.

## V. THIS ACTION IS NOT MOOT AS TO TVA

While all the Defendants argue that the Plaintiffs' claims are not ripe for judicial review, Defendant TVA argues both that the claims are not ripe and that they are moot. At first blush, this would seem to extend pleading in the alternative to an unreasonable and unpersuasive extreme. TVA argues that the decision of that agency to

support the development of the Transpark with an award of $500,000 to the first Transpark tenant – and to discharge the agency obligations under NEPA and the NHPA by awarding itself a Categorical Exclusion – is beyond judicial review because that sum has already been awarded to Bowling Green Metalforming, making judicial review moot.  TVA then argues that any challenge to future awards by TVA to future tenants of the Transpark is not ripe because there are no other tenants and it has no other applications pending.  (Intervening Defendants do not adopt this position, and could not, because they claim to be in discussion with three businesses regarding locating facilities in the Transpark, Declaration of James Hizer, ITA President, para. 27.[31])

Simply stated, TVA has misapplied the two doctrines by applying each to the wrong action.  TVA's award of $500,000 to the first Transpark tenant and award to itself of a Categorical Exclusion from any further NEPA or NHPA compliance **is** final agency action that is ripe for judicial review.  The prospect that TVA (or other federal funding agencies) will make further grants to Transpark tenant Bowling Green Metalforming, which has an option on an adjoining 68-acre parcel for the purpose of future expansion (Hizer Declaration, para. 27), and/or to any future tenants of the Transpark, which TVA admits by implication when it argues ripeness, has nothing to do with ripeness.  It does, however, have everything to do with action that is "capable of repetition yet evading review" a well-established exception from the mootness doctrine.

In <u>Southern Pacific Terminal Co. v. ICC</u>, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), the Supreme Court stated that its

---

[31] ITA's claim that it "had no role in the construction of the Metalforming facility..." is misleading since it also acknowledges that it demolished the farms and homes on the site (Memorandum, p. 20).

jurisdiction "ought not to be, as [it] might be, defeated, by short term orders, capable of repetition, yet evading review...." This doctrine has been used frequently in the last 60 years and applies to court orders and injunctions similar to that involved in the instant case. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S. Ct. 2791, 49 L.Ed.2d 683 (1976); Carroll v. President and Commissioners, 393 U.S. 175, 89 S. Ct. 347, 21 L.Ed.2d 325 (1968).

Clearly, this is a case where the action involved is of a character "capable of repetition yet evading review." In Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), the Court held that:

> The case is not moot where interests of a public character are asserted by the Government under conditions that may be immediately repeated, merely because the particular order involved has expired. United States v. Trans-Missouri Freight Assn., 166 U.S. 290, 308. The rule that this court will only determine actual controversies, and will dismiss if events have transpired pending appeal which render it impossible to grant the appellant effectual relief, does not apply to an appeal involving an order of the Interstate Commerce Commission merely because that order has expired. Such orders are usually continuing and capable of repetition, and their consideration, and the determination of the right of the Government and the carriers to redress, should not be defeated on account of the shortness of their term.

There is a not only a very reasonable possibility that TVA, or other federal agencies, will repeat the decision to further support the development of the Transpark by awarding additional sums of federal money either to a Bowling Green Metalforming expansion and/or to future tenants of the Transpark and awarding itself future Categorical Exclusions, exempting itself from further NEPA and NHPA compliance. Williams v. Alioto, 549 F.2d 136, 142 (9th Cir. 1977).  In fact, Defendant HUD has already done so. Exhibit 19.

In addition, ongoing operations of the TVA-funded Bowling Green Metalforming pose environmental risks that could be addressed through monitoring and mitigation identified and evaluated as part of an EIS process.     Dr. Michael May, professor of geology and registered professional geologist in Kentucky, notes in his Second Declaration (Exhibit 3 to this Memorandum) that the ITA's discussion of stormwater management does not address the issue of the potential for Nonaqueous Phase Liquids (organic contaminants often associated with the use of solvents and fuels, some which "sink" in water and some of which "float") in the stormwater management system at Bowling Green Metalforming, a facility that makes frames for sports utility vehicles. This is a heavy industrial operation with potential for spills, leaks and releases, either inside or outside, to escape into the stormwater system and contaminate the Graham Springs karst groundwater basin.

This Court should redress the TVA NEPA and NHPA violations by setting aside the CE and by investigating the terms of the grant to Bowling Green Metalforming to determine if TVA has imposed or can impose any environmental mitigation measures on the recipient of TVA funds. This Court can further order TVA to fully comply with NEPA and NHPA with respect to all future applications for support from Transpark tenants.

**VI. IF THE COURT FINDS THAT THE OTHER FEDERTAL AGENCIES THAT HAVE PARTICIPATED IN AND/OR AWARDED FUNDING TO HELP DEVELOP THE TRANSPARK ARE NECESSARY PARTIES TO CONFER SUBJECT MATTER JURISDICTION, PLAINTIFFS WILL SEEK LEAVE TO AMEND THEIR COMPLAINT TO ADD ADDITIONAL FEDERAL AGENCIES**

Plaintiffs contend that the EPA/HUD Motion, TVA Motion, and ITA Motion are without merit, and ask the Court to find that it has subject matter jurisdiction to hear Plaintiffs' claims and to find that

Plaintiffs have stated a cause of action upon which this Court can grant relief.

Plaintiffs acknowledge that a portion of their argument that the Transpark was a federalized project from inception and that, but for federal involvement (funding, permitting, consultation), there would be no Transpark at this location is based upon transactions between the Intervening Defendants and numerous additional federal agencies, including, without limitation, FAA and FHWA. See also Exhibit 17 to this Memorandum (November 6, 2001 KYTC Sec. Codell letter, suggesting that one of these two agencies will be designated the 'lead' federal agency). In the event the Court considers these or other federal agencies necessary parties to afford the Court with subject matter jurisdiction or to afford the Court with a claim upon which the Court can grant relief, Plaintiffs urge the Court to afford the Plaintiffs the opportunity to add one or more federal agencies as additional Defendants.

Respectfully submitted,
W. Henry Graddy, IV
KBA Bar No. 26350
W. H. GRADDY & ASSOCIATES
103 Railroad Street
P.O. Box 4307
Midway, KY 40347
859-846-4905
hgraddy@aol.com

AND

David Bookbinder
D.C. Bar No. 455525
Sierra Club
408 C Street, NE
Washington D.C.  20002
202-548-4598
david.bookbinder@sierraclub.org

By:_____
       David Bookbinder

40

## CERTIFICATE OF SERVICE

       I hereby certify that on September _____, 2005, I electronically filed the foregoing document with the Clerk of the Court using the DM/EMF system which will send notification of such filing by operation of the Court's electronic filing system to the following:

Hon. Kenneth Wainstein
United States Attorney's Office
555 4th Street, NW
Washington DC 20530

Sara Culley
Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington DC 20044-0663


Maureen H. Dunn
General Counsel
Harriet A. Cooper
Assistant General Counsel
Frank Lancaster
Maria V. Gillen
Office of General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401

Randall Benn
Robert Anderson
Paul Freeman
George Ellard
LeBOEUF, LAMB, GREENE & MacRAE
1875 Connecticut Ave, NW
Washington DC 20009
Counsel for Interveners

Charles E. English
Whayne C. Priest, Jr.
ENGLISH, LUCAS, PRIEST & OWSLEY
1101 College Street
P.O. Box 770
Bowling Green, KY 42102-0770

                            _____
                            DAVID BOOKBINDER

D:\wp\ENV\KEEP, Inc\pleadings\ResponseMotDis\Memo final 9.27.05.doc