**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION )
AND PROTECTION, INC., )
WARREN COUNTY CITIZENS FOR )
MANAGED GROWTH, GAYLA CISSELL, )
JIM DUFFER and ROGER BRUCKER )
)
Plaintiffs )    No. 1:05-cv-01190-RMU
)
v. )
)
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, )
U.S. HOUSING AND URBAN )
DEVELOPMENT, )
and TENNESSEE VALLEY AUTHORITY )
)
Defendants. )

\* \* \* \* \* \* \* \* \* \*

### DECLARATION OF LENA SWEETEN

I, Lena Sweeten, make the following declaration based
on personal knowledge, information, and belief:

1. **Qualifications.** I have a Bachelors of Arts degree in
History from Western Kentucky University (Bowling Green),
*summa cum laude*, and a Masters of Arts degree in Public
History from Middle Tennessee State University. Over the
past 8 years, I have participated in at least 30 projects
involving historic preservation assessments; 5 nominations
for properties or districts to the National Register of
Historic Places ("National Register"); 10 projects
involving eligible determinations for the National
Register; and 11 projects involving the application for
federal tax credits for rehabilitation or adaptive re-use
of listed or eligible historic properties. I am currently
employed with a private development firm involved in
adaptive re-use of National Register eligible and listed
historic properties.

I am from the City of Smiths Grove, which is
approximately 2.4 miles from the border of the Kentucky

1

Trimodal Transpark.  Since 2001, I have provided volunteer
assistance to the City of Oakland for guidance for the
City's successful listing on the National Register of
Historic Places and for response to the Kentucky Trimodal
Transpark.

     I am providing this declaration as a volunteer and
without compensation.

2.   **National Register of Historic Places ("National
Register") Eligibility of Demolished Structures and Altered
Landscapes at the Bowling Green Metalforming Facility**.

     I have reviewed the declaration of Robin Ziegler,
Historic Preservation Planner for the Bowling-Green-Warren
County Historic Preservation Board.  The properties and
landscapes that Ms. Ziegler stated she personally reviewed
on June 23, 2005 and concluded were not National Register
eligible *were not any of the properties* that have already
been demolished or altered on the 123-ac. TVA-funded
Bowling Green Metalforming LLC site, including the 80-ac.
farm and house at 206 Hays Martin Rd.; the 1-ac. tracts
(each) with houses at 809 Glasgow Rd. and 1075 Glasgow Rd.;
a 27-ac. former dairy operations at an unspecified address
on Hays Martin Rd.; and a 60-ac. farm at Glasgow Rd.

     Ms. Ziegler's declaration includes other properties
owned by the Intervener ITA, though not complete, which are
under threat of demolition given the ITA's past actions.
One of those homes, an 1895 very modest and simple one-
story wood-frame saddlebag residence on 1.08 acres at 297
Fred Madison Rd., was determined *by ITA's consultant in
2001 as eligible for National Register listing under
Criterion C* (architecture) because its simple design is not
common in the area (Exhibit 1, Kentucky TriModal Transpark,
Cultural/Historical Resources Survey Report, Jan. 2001,
Logsdon & Logdson).  At the very least, the differing
opinions of Intervener ITA's consultant and Ms. Ziegler,
whose declaration was submitted by Intervener ITA, reveal
that there needs to be a formal process for evaluating
historic significance of the properties under threat of
imminent demolition.

     As detailed below, it is my professional opinion
that one or more of these demolished homes, farms, farm
fields, outbuildings (like barns, silos, dairy equipment)
could have been determined to be eligible under at least

2

Criterion A (association with agricultural in Warren County) and Criterion D (archaeology/prehistory).

These properties that were demolished and landscapes that were altered are addressed in the Declaration of Allen Heidel, Operations Manager of the Intermodal Transportation Authority ("ITA"), which I have reviewed.  The ITA procured the services of the demolition contractor.  I have also reviewed the Phase I Environmental Site Assessment conducted by EnSafe Inc. for the ITA for the Bowling Green Metalforming site (the "EnSafe Phase I," relevant excerpts in Exhibit 2).  Though this report was not conducted for the purpose of identification of National Register eligibility, it provides additional photo and descriptive documentation of the buildings, properties and landscapes that were demolished or irrevocably altered.

Mr. Heidel declares that "none of the *buildings*...have any historical or architectural significance and (sic) at the time they were demolished..."  Mr. Heidel presents no professional qualifications to declare as to the significance and eligibility of above-ground standing structures, properties, historic districts, landscapes, and archaeological resources for the National Register.  I am aware that he has an undergraduate degree in Business Administration.

I have applied the standards and criteria for determining eligibility of and listing properties in the National Register.  These properties include individual buildings, historic districts, such as rural districts (a collection of contributing buildings, landscapes), and archaeological features.  In addition to an age criterion (typically, the property must be older than 50 years), there are four criteria, ***any one of which may separately*** render a property, site, district, or structure as eligible.  Criterion A is associated with ***events*** that are significant in local, state, or national history, such as the farming in north Warren County.  Criterion B is associated with a ***person*** notable in local, state, or national history.  Criterion C is associated with buildings with notable or distinctive ***architectural*** style, features or workmanship.  Criterion D is associated with ***archaeology*** or prehistory.

The three demolished properties at the Bowling Green Metalforming site (1075 and 809 Glasgow Rd., 206 Hays

3

Martin Rd.; Heidel Composite Photos 1, 2, 3; EnSafe Phase I, Photos 31, 32, 36) all clearly were more than 50 years old, which would have placed them within the age requirement for assessment for National Register eligibility.   The EnSafe Phase I photos 31 and 32 of the home at 809 Glasgow Rd. additionally shows a potential cistern and pad suggesting the potential for significance under Criterion D (archaeology) that Mr. Heidel does not address. Additionally the EnSafe Phase I report (pg. 4) states that "an abandoned cemetery is reportedly located on parcel 062A-058," which is a 60-ac. farm field, now the site of the Bowling Green Metalforming plant.   Cemeteries are also assessed for significance under National Register Criterion D.   Mr. Heidel's declaration does not address a cemetery and it is not known whether one was located and, if so, its fate during construction of the Metalforming plant.

Mr. Heidel states that the demolished homes "do not differ significantly from thousands of farm homes and barns that dot the landscape." Ubiquity of a resource type (dwelling, barn, bridge, skyscraper, etc.) does not automatically detract from the potential National Register eligibility of a resource. If this were true, then the National Register would be a list of properties that numbered in the hundreds, not in the tens of thousands. The various criteria for National Register eligibility (age, setting, integrity, historical association, etc.) must be applied in order to gain a more accurate judgment of eligibility. Further, the eligibility determination for the properties affected by the Transpark must take place in the context of Section 106 of the National Historic Preservation Act, including the involvement of Consulting Parties and the public (see paragraph 6 *infra*).

The context of the setting within which the property is located also must be considered. Mr. David Morgan, the Kentucky State Historic Preservation Officer, told this to Wilbur Smith Associates (ITA consultant) in 2000, specifically that an agricultural context may be an important historic theme under which some properties may need to be assessed and re-documented (see Exhibit 3).   To the best of my knowledge this was never done, even in the 2001 Logsdon report.   An early twentieth century farmhouse that is located at the intersection of a busy four-lane highway and is surrounded on all sides by fast food restaurants and gas stations does not have the same

4

likelihood of eligibility as would a similar farmhouse in a rural area surrounded by actively farmed land. I am familiar with the Bowling Green Metalforming site and the surrounding area and the context is predominantly rural, pastoral, and agricultural. As the EnSafe Phase I Report even notes (pg. 4), the Bowling Green Metalforming property:

"...has most recently supported cattle grazing and corn and soybean production. In addition to the previously-referenced residences, the subject property supports numerous agricultural-related structures including barns. An abandoned dairy operation and associated equipment was located on a portion of parcel 62A-59. Several water bodies (ponds) were also observed during the site reconnaissance. According to information provided by DDS Engineering...an abandoned cemetery is reportedly located on parcel 062A-058."

All this considered, it is my professional opinion that one or more of the demolished homes, farms, farm fields, outbuildings (like barns, silos, dairy equipment) could have been determined to be eligible under at least Criterion A (association with agricultural in Warren County) and Criterion D (archaeology/prehistory).

Additionally, there was never a National Historic Preservation Act Section 106 process conducted by the Tennessee Valley Authority for its federal undertaking in providing Bowling Green Metalforming funding that would have served as the framework within which eligibility determinations would have been formally made, with the input of the Kentucky State Historic Preservation Officer, Consulting Parties, and the public. The Bowling Green Metalforming site is also outside the area in which the ITA had an initial survey done, the Cultural/Historical Resources Survey Report, Jan. 9, 2001, Logsdon & Logsdon Architects.

Finally, I am aware that the National Trust for Historic Preservation submitted a position statement to the Kentucky Transportation Cabinet indicating that federal funding for the project should be denied based on "anticipatory demolition" by the ITA of these properties (Exhibit 4).

5

3. **Dec. 2004 Construction Intrusion into a Cave Containing Prehistoric Human Remains and Petroglyphs.**

Mr. Heidel's declaration describes the penetration into a 2,000-ft. long cave by an ITA construction contractor building a groundwater treatment system at the Transpark Technical Training Center on December 27, 2004. According to a Feb. 10, 2005 *Bowling Green Daily News Report*, the skeletal remains of a prehistoric Native American were found, intentionally placed and "common practice during the Late Archaic (3,000-1,000 B.C.) and during the Early Woodland (1,000-500 B.C.) periods in the region. Petroglyphs (prehistoric writings) were also found. With regard to the episode of the cave discovery (and its human remains), if nothing else the incident utterly proves that the limited Phase I archaeological survey for the main access road (see para. 4 *infra*) is hardly adequate to prove that no archaeological resources exist within the Kentucky Trimodal Transpark.

Indeed, in 2001, the Director of Archaebiology Program, of the Smithsonian Institution, National Museum of Natural History, Washington, D.C., wrote to Dan Cherry, President, ITA, regarding the significant potential for archaeological resources within the Transpark, *of the very age that were intruded upon* (Exhibit 5). Bruce D. Smith indicated that "The cave and karst sinkhole landscape of the region has yielded, over the years, a remarkably well-preserved record of ancient human societies, including some of the earliest evidence yet discovered of the independent domestication of local seed plants in the eastern woodlands of North America...It will be important to assemble a research team well qualified to search out, identify, and assess the significance of the often elusive karst and cave deposits...."

To my knowledge, such an investigation has never been conducted by ITA or any federal agency. Ms. Ziegler's personal review of additional properties that the ITA owns which are at risk of demolition does not constitute the type of evaluation that the Smithsonian Institution has recommended. At the very least, a Phase II investigation is warranted. This would involve a more extensive subsurface investigation than the shovel tests that typically are taken every 50 feet in a Phase I investigation. The entire site of the Kentucky Trimodal Transpark should be subjected to this investigation, not

**6**

just the access road area. Federal and state funds, licenses, and permits are being directed to the entire KTT, which should bring all of it under the umbrella of Section 106, NEPA, and Section 4(f), to name just a few of the federal regulations that apply.

Further, Mr. Heidel describes the prayer and tobacco "ritual" that was performed by he and the Warren County Deputy Coroner (at the recommendation of the Warren County Judge Executive, the lead elected official promoting the Transpark, a party to this action [see Buchanon Declaration]), when the cave was sealed with the remains and cave art. The fact that the Deputy County Coroner, "whose grandmother happens to be a Native American," and Mr. Buchanon, "whose great, great grandmother was a Native American," in no way qualifies them to perform sacred rituals as a tribal representative with either the right or the expertise to determine appropriate treatment of human remains.

The regulations of the Advisory Council on Historic Preservation, 36 Code of Federal Regulations ("CFR") Sec. 800.2(c)(2)(ii) provide that there shall be consultation on historic properties of significance to Indian tribes and that the formal representative of all Indian tribes that may hold a site in significance be notified, *Id.* at 800.2(c)(2)(ii)(C). The ITA's informal communication with two Native Americans who happened to email them about the discovery (Heidel, para. 20.) does not comport with the federal processes for such discoveries.

4. **Archaeology Report, Kentucky State Historic Preservation Officer (SHPO).**

Mr. Heidel states that a Phase I archaeological survey was conducted for the main access road at the Transpark and infers that the Kentucky SHPO's acceptance of the report somehow would have reasonably led ITA to conclude that there was no potential for archaeological discoveries in adjacent land, i.e., the cave that was punched through in Dec. 2004. The only thing that can be said is that the report would have only shown the potential for archaeological resources within the exact alignment of the road. The report and conclusions are inapposite to the issue of the potential for archaeological resources that were actually discovered within the 2,000-ft. long cave and within the rest of the Transpark, including those

7

properties currently owned by ITA and under threat of demolition or irrevocable alteration. This survey was only for a 100-ft. wide x 4,700-ft. long strip of land, and was not conducted for the entire Transpark, or for any phase, including ITA's description of a 900-acre Phase I. Further, an archaeological survey would not assess eligibility of above-ground standing structures (e.g., houses, barns, rural historic districts) as the April 2004 report makes clear.

Mr. Heidel declares that the ITA "received confirmation from the State Historic Preservation Officer, Mr. David Morgan, that no historic properties existed within the area of potential impact of the main access road" and that the SHPO had "no further comments." What Mr. Heidel does not declare is that this exact same archaeological report had been submitted for the main access road two months earlier to the SHPO. Titled A Phase I Archaeological Survey for the Industrial Park Access Road, January 2004, University of Kentucky Dept. of Anthropology, Lead Agency, Federal Highway Administration, it was prepared before the ITA and the Kentucky Transportation Cabinet (KYTC) rejected the $1.2 million in federal funds that had been programmed for the road.

When *this* report (Jan. 2004) was submitted to the SHPO, he responded by letter dated March 22, 2004 (Exhibit 6) questioning the relationship of the access road to the entire Transpark and noted that the Area of Potential Effect (to historic properties and archaeological sites) "continues to be of concern in our review of the Transpark," and that there is "strong public interest in the proposed Transpark." Morgan offers to meet to resolve these questions.

In April 2004, via email from Wayne Roach at KYTC to the UK archaeologist, Mr. Roach indicates that "the Federal money has been pulled from this project." He notes that ITA will pay for the report and have it issued as quickly as possible and the KYTC has agreed to this arrangement. He advises the project manager to start the process of replacing all KYTC references with ITA references.

The revised April 2004 report is identical in all places except the reference to the "KYTC" and "FHWA" was replaced with "ITA." It was resubmitted as an ITA report to the SHPO for the narrow corridor for the main access road. It

is in this context that Mr. Morgan's letter of June 2,2004 regarding the absence of archaeological resources within the 100-ft wide x 4,700-ft long strip of land was issued.

5.    **Sunnyside/Loving Community and Proposed Sunnyside National Register District.**

In response to Plaintiffs' Amended Complaint that the demolition of potentially eligible historic properties during the Bowling Green Metalforming facility construction are proximate to Reconstruction Era African-American communities, Mr. Heidel declares that the Loving/Sunnyside community is approx. 1.5 miles from Phase I of the Transpark. Loving/Sunnyside is a larger community in which the proposed Sunnyside National Register district is situated. The boundaries of the eligible Sunnyside district, depicted in the *Kentucky TriModal Transpark Cultural/Historical Resources Survey* Report, Logsdon & Logsdon, Jan. 2001, includes the properties and land at 455, 394, 365, 356, 296, and 297 Sunnyside-Gotts Road. This proposed district is approx. 2,000 ft. to the east of the Bowling Green Metalforming tract and directly abuts Transpark Phase I Lot 16A on its east side. The reason that the ITA's consultant evaluated the District is that it was within the overall Transpark boundary. Certainly, one would expect indirect and even cumulative impacts from the 900-ac. Phase I Transpark operations on the Sunnyside District as well as the Loving/Sunnyside community.

In 2001, I applied for and secured a grant from the Kentucky African-American Heritage Commission for the purpose of completing a study of the historic unincorporated community of Sunnyside/Loving in rural Warren County; the grant was matched by the City of Oakland. The unincorporated Sunnyside community is one of only three historic African-American communities in Warren County that have been documented with archival investigations or architectural surveys. The community is an historically significant, tangible link from the post-Civil War period to the present, and is illustrative of the development and evolution of African-American life in Warren County during the twentieth century. A total of 55 buildings were documented and evaluated during the course of fieldwork for this project. **The study area includes areas within the airport alignment selected by the ITA. The Intervener ITA currently owns properties within the Loving/Sunnyside study area.**

In addition to supporting the ITA's consultant's recommendation on the Sunnyside district and boundaries, the final results of my study (2002) were threefold. First, the Loving Union CME just north of 1295 Loving Road was recommended as eligible for individual listing in the National Register for its historical significance under Criterion A, specifically as related to its association with post-Reconstruction era African-American history in Warren County; Criteria Considerations A and D (for religious properties and cemeteries) also were met. Second, the project recommended several avenues for additional investigations, all of which would be for the purpose of increasing understanding of the complexities associated with African-American communities, lifeways, and traditions. These recommended avenues included archaeological investigations of privy sites; analysis of land subdivisions and land ownership patterns from the late nineteenth through the twentieth centuries; a more comprehensive inventory of all the small antebellum and postbellum cemeteries in the area; and a broader survey of historic resources associated with African-American communities and individuals.

The investigation also suggested, however, that a much larger historic district exists in the Sunnyside/Loving communities along Loving, Sunnyside-Gotts and Glasgow (68/80) roads, **including properties now owned by the Intervener ITA**. The period of significance for this district would extend from 1870 to 1975, which encompasses the Reconstruction era through to the fruition of the Civil Rights movement and is a period of enormous historical significance to American history and African-American development. One of the most interesting findings of the study was that many of the residential properties built after 1960 were the product of Warren County's first African-American homebuilder, a concrete example of the success African Americans enjoyed as a result of the Civil Rights movement. The historical significance of this period in local and national history satisfies Criteria Consideration G for resources less than 50 years old.

**6. Required Section 106 Process under the National Historic Preservation Act.** The federal defendants must satisfy the requirements of Section 106 of the National Historic Preservation Act ("NHPA").

**10**

The Section 106 regulations, 36 C.F.R. Part 800, define "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." 36 C.F.R.§ 800.16(y). The proposed Kentucky Trimodal Transpark is an "undertaking."

Section 106 required and requires EPA, HUD and TVA to examine the adverse effects of the proposed "undertaking" on sites on or eligible for the National Register of Historic Places, and afford the federal Advisory Council on Historic Preservation a reasonable opportunity to comment with regard to the undertaking. 16 U.S.C. § 470f.

The regulations require the federal agencies to determine the area of potential effect (APE), *id.* § 800.4(a)(1); identify, through consultation, the National Register-listed or eligible historic properties within the APE, *id.* § 800.4(b); determine whether the undertaking will adversely affect any identified historic properties, *id.* § 800.5; and resolve those adverse effects through avoidance or mitigation as documented in a Memorandum of Agreement, *id.* § 800.6(b).

An "adverse effect" is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* §800.5(a)(1).

Broadly speaking, the federal agencies first must begin the Section 106 process by identifying the area of potential effect. In this process, they must involve Consulting Parties in its findings and determinations. 36 C.F.R. §800.2(a)4.

The Advisory Council rules implementing Section 106 require that Consulting Parties be identified and given an opportunity to participate in consultation with the private

**11**

applicant, other Consulting Parties, the State Historic
Preservation Officer, the Advisory Council, and the public
during each step of the Section 106 process, *id.* §800.3(f).
"Consulting Parties" include "individuals and organizations
with a demonstrated interest in the undertaking [who] may
participate [in the Section 106 process] due to the nature
of their legal or economic relation to the undertaking or
affected properties, or their concern with the
undertaking's effects on historic properties." *Id.* §800.2.

Second, the federal agencies must, "except where
appropriate to protect confidentiality concerns of affected
parties, provide the public with information about an
undertaking and its effects on historic properties and seek
public comment and input."  36 C.F.R. §800.2(d)(2).  State
Historic Preservation Officers, "other consulting parties,
and  organizations and individuals who may be concerned
with the possible effects of an agency action on historic
properties should be prepared to consult with agencies
early in the NEPA process, when the purpose of and need for
the proposed action as well as the widest possible range of
alternatives are under consideration."  36 C.F.R.
§800.8(a)(2).

Third, the federal agencies "should ensure that
preparation of . . . an Environmental Impact Statement . .
. includes appropriate scoping, identification of historic
properties, assessment of effects  upon them, and
consultation leading to resolution of any adverse effects."
36 C.F.R. §800.8(a)(3), keeping in mind that the federal
agencies must "ensure that a determination, finding, or
agreement under the procedures in this subpart is supported
by sufficient documentation to enable any reviewing parties
to understand its basis."  36 C.F.R. §800.11(a).

All of this information is necessary to provide
meaningful comment on the APE, identification of historic
properties within the APE, potential effects upon those
properties, and proposed measures to resolve (mitigate or
avoid) any adverse effects.  To the best of my knowledge,
there has not been a comprehensive Section 106 process to
identify National Register-listed and eligible historic and
archaeological sites and assess and address direct,
indirect and cumulative effects on those properties
relating to the siting, construction, and operation of the
Kentucky Trimodal Transpark.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___8th___ day of ___September___ 2005.

**LENA SWEETEN**

EXHIBIT 1

Excerpt, **Kentucky TriModal Transpark, Cultural/Historical Resources Survey Report**, Jan. 2001, Logsdon & Logdson)

# Kentucky
# TriModal Transpark
## Warren County, Kentucky

## Cultural/Historical
## Resources Survey Report

*Prepared for:*
The Kentucky Heritage Council
300 Washington Street
Frankfort, Kentucky 40601
*and*
Wilbur Smith Associates
465 East High Street
Suite 100
Lexington, Kentucky 40507

*Submitted by:*

Logsdon & Logsdon Architects
5600 Hardyville Road
P.O. Box 10
Hardyville, Kentucky 42746-0010
(270) 528-4698

January 9, 2001

**II.**     **Potential Individual National Register Properties**



**Figure 15, WSA-32**
297 Fred Madison Rd.
Residence

| WSA- # | Parcel # | Address/Historic Name | Neg. # | Est. Date |
|--------|----------|-----------------------|--------|-----------|
| **WSA-32** | 062A52-002 | 297 Fred Madison Rd. | 00/07/18-19 | 1895 |

**Tax Card and Deed Research:** PVA tax card states house was built in 1895. Deed 809/422 dated 9-1-2000 states 1.08 acres. Deed 763/143 dated 5-27-98 states 1.08 acres. Deed 614/88 dated 10-23-89 states 24 acres. Deed 539/640 dated 8-14-84 states 24.11 acres. Deed 502/705 dated 12-23-81 divided land into tracts # 1=9.75 ac., # 2=4 ac., # 3=8 ac., # 4= .25 ac., # 5 = 11 ac., # 6 = 4 ac. Deed 274/436 dated 12-16-54 states railroad ROW with 1.04 acres.

**Description:** Built in 1895, this one-story wood-frame saddlebag residence appears to have been modified with the removal of the central chimney when the new roof was applied. Although it has been covered with vinyl siding, the original 3/1 wood frame windows remain intact as does the shed porch entry. This simple design is not frequently seen in this area. One old and one new barn are located on this site.

**Area to be nominated:** 1.08 acres maximum.

**Proposed Theme:** Criterion C-Architecture

KENTUCKY HISTORIC RESOURCES
**INDIVIDUAL SURVEY FORM**
(KHC-91-1)

**COUNTY**
**RESOURCE** WSA- 32
**RELATED GROUP #**
**INTENSIVE DOC.**
**EVALUATION** D/Eligible: individually
**DESTROYED**

For instructions, see the Kentucky Historic Resources Survey Manual

**1. NAME OF RESOURCE:** 0/Unknown/not applicable

**2. ADDRESS / LOCATION:**
297 Fred Madison Road       Bowling Green   KY 42101

**3. UTM REFERENCES:**
**Quad Name:** Bristow
**Date:** 1965 PI 1979        **Zone:** 16
**Easting:** 5/6/2/2/0/0
**Northing:** 4/0/9/8/5/4/0
**Accuracy:** A: Accurate

**4. OWNER / ADDRESS:**      Eddie & Joy      Hanks
P.O. Box 2590                     Bowling Green KY   42102

**5. FIELD RECORDER / AFFILIATION:**
Donna G. Logsdon, Logsdon & Logsdon Architects

**6. DATE RECORDED:** 12/28/00

**7. SPONSOR:** Wilbur Smith Associates

**8. INITIATION:** 5/Other

**9. OTHER DOCUMENTATION / RECOGNITION**
☑ Survey          ☐ HABS/HAER
☐ KY Land        ☐ Local Land
☐ NR               ☐ R and C
☐ NHL             **Other:**

**10. ORIGINAL PRIMARY FUNCTION:**
0/1/A/Residential/single dwelling

**11. CURRENT PRIMARY FUNCTION:**
0/1/A/Residential/single dwelling

**12. CONSTRUCTION DATE:** 5/1875-1899        **estimated**
1/8/9/5 TC                                              **documented**

**13. DATE OF MAJOR MODIFICATIONS: (specify)**

**14. CONSTRUCTION METHOD / MATERIAL:**
W/3/frame construction, type unknown        **original**
                                                              **subsequent**

**15. DIMENSIONS:**
**Height:** 1.5     **Width:** 3     **Depth:** 2

**16. PLAN:**
E/hall-parlor
                                          **first**
                                          **second**
                                          **third**

**17. STYLISTIC  INFLUENCE:**
6/5/Bungalow/Craftsman
                                          **first**
                                          **second**
                                          **third**

**18. STYLE DEVELOPMENT:**
R/Regional     **first**          **second**          **third**

**19. FOUNDATION:**
**TYPE**                          **MATERIAL**
2/continuous              B/brick               **original**
                                                         **replacement**

**20. PRIMARY WALL MATERIAL:**
Y/vinyl siding
                                              **original**
                                              **replacement**

**21. ROOF CONFIGURATION COVERING:**
**CONFIGURATION**     **COVERING**
A/gable, side               5/asphalt shingle     **original**
                                                                **replacement**

**22. CONDITION:** G/good-in good state of repair

**23. MODIFICATION:** 2/moderate alteration

**24. NEGATIVE FILE: #** 00/07/18-19; 00/16/26A-28A
Write resource # on back of all prints.

**KENTUCKY HERITAGE COUNCIL * FRANKFORT, KY   40601 * (502)564-7005**

EXHIBIT 2

Excerpt, Ensafe, Inc., <u>Phase I Environmental Site
Assessment</u>

*Bowling Green*
*Metaforming Site*

# PHASE I ENVIRONMENTAL SITE ASSESSMENT

**Kentucky Transpark Master Plan - Lots 14 & 15**
**Approximately 250 acres south of U.S. Highway 68/80 (Glasgow Road)**
**Bowling Green, Kentucky**

*Prepared for:*

Mr. Jim Vance, President
Kentucky Transpark
2325 Airway Court, Suite C
Bowling Green, KY 42103



*Prepared by:*

EnSafe Inc.
1721 McIntosh Street - Suite A
Bowling Green, Kentucky 42104
(270) 843-1622
www.ensafe.com



**July 24, 2003**



## 2.0    SITE AND VICINITY CHARACTERISTICS

### 2.1    Location and Setting

The subject property comprises ten contiguous parcels totaling approximately 250 acres identified by the Warren County Property Valuation (PVA) office as Map 62A Parcels 57, 58, 58-001, 58-002, 58-003, 59, 60, 60-001, 60-002, and 60A.  The parcels are bounded on the north by U.S. Highway 68/80 (Glasgow Road), south by the Louisville & Nashville (L&N) Railroad, west by Hays Martin Road (and Scotty's Industrial Park), and east by parcels 062A-56-001 and 062A-56.  The property currently supports both agricultural and residential properties.

The subject property is in an area characterized by residential, industrial, commercial and agricultural properties.  The residential properties currently lie along the western and northern boundaries of the subject property.

*Bowling green*
*Metatormin Site*

The following table summarizes the subject property parcels:

| Warren County PVA Parcel | Street Address | Approximate Acreage | Current Land Use / Owner | |
|---|---|---|---|---|
| 62A-57 | Glasgow Road | 76 | agricultural (soybeans) / SCKRDA | |
| 62A-58 | Glasgow Road | 60 (of 120) | agricultural (soybeans) / Helen Stahl | |
| 62A-58-001 | 949 Glasgow Road | 1 | rental house / SCKRDA | |
| 62A-58-002 | 983 Glasgow Road | 1 | rental house / SCKRDA | |
| 62A-58-003 | 1075 Glasgow Road | 1 | rental house / Helen Stahl | *demolished* |
| 62A-59 | Hays Martin Road | 27 (of 75) | former dairy farm / SCKRDA | *demol. shes* |
| 62A-60 | 206 Hays Martin Road | 80 | rental house and agricultural (corn & pasture) / SCKRDA | *demol. shed* |
| 62A-60-001 | 639 Glasgow Road | 1 | rental house / SCKRDA | |
| 62A-60-002 | 913 Glasgow Road | 1 | rental house / SCKRDA | |
| 62A-60A | 809 Glasgow Road | 2 | rental house / SCKRDA | *demol. shes* |

A copy of a portion of Warren County Tax Map 062A depicting the subject property is provided in Appendix A.  A copy of the most recent USGS 7.5 minute topographic map along with historic topographic maps are provided in Appendix B.  A copy of a 1993 aerial photograph is provided in Appendix C.  Select photographs of the subject property and surrounding area are included as Appendix E.

3

**ENSAFE**

## 2.2   Current Use of the Property

Approximately 189 acres of the subject property are currently owned by the South Central Kentucky Regional Development Authority with approximately 61 acres owned by Ms. Helen Stahl.

Regarding agriculture, the subject property has most recently supported cattle grazing and corn and soybean production. In addition to the previously-referenced residences, the subject property supports numerous agricultural-related structures including barns. An abandoned dairy farm operation and associated equipment was located on a portion of parcel 62A-59. Several water bodies (ponds) were also observed during the site reconnaissance. According to information provided by DDS Engineering (Bowling Green, KY), an abandoned cemetery is reportedly located on parcel 062A-058.

## 2.3    Geologic and Topographic Information

Topographical information was obtained from review of the 1965 U.S. Geological Survey (USGS) Bristow quadrangle topographic map (photo-inspected 1979), which includes the subject property and surrounding area. The subject property topography is rolling and approximately 553 feet above mean sea level. On-site reconnaissance observations indicated the general gradient of the subject property is west/northwest. A copy of the current topographic map is provided in Appendix B.

Surface Water:

EnSafe observed numerous ponds on the subject property.

Subsurface Characteristics:

Geologic information was obtained from review of the 1980 Warren County Soil Survey Map *(Warren County Kentucky Soil Survey)*, published by the U.S. Department of Agriculture - Soil Conservation and a 1963 USGS Geology of the Bowling Green South Quadrangle map. The EDR report listed the "Dominant Soil Composition in General Area of Target Property" as *Baxter – Cherty Silt Loam* with the following characteristics:

- Hydrologic group:    Class B - Moderate infiltration rates. Deep and moderately deep, moderately well and well-drained soils with moderately coarse textures.

4



### PHOTOGRAPHIC DOCUMENTATION



31. View of 809 Glasgow Road residence on parcel 062A-60A.

*809 Mlasgow Rd - 2 cc.*

*Demolished*



*Potential archaeolog*

32. View of potential cistern and concrete pad and lid at the 809 Glasgow Road residence on parcel 062A-60A.

**PHOTOGRAPHIC DOCUMENTATION**



Former dairy farm, Hays Martin Rd., 27 ac. No street address.

1.  View of abandoned silo base located on parcel 062A-59.



Demolished?

2.  View of southern boundary of parcel 062A-59 (note structures associated with abandoned dairy farm in background).

## PHOTOGRAPHIC DOCUMENTATION



3. View of two ponds on parcel 062A-59 (note Scotty's Industrial Park in the left background).

*Former dairy farm, 27 cc, Hays Martin Rd*



*Demolished.*

4. View of abandoned barn (right) and milking parlor (left) on parcel 062A-59.

**PHOTOGRAPHIC DOCUMENTATION**



*These Glasgow Rd.*

25. Eastern view of parcel 062A-58 (foreground) and parcel 062A-57 (distant background) along U.S. Highway 68/80 (Glasgow Road).



*60-ac Glasgow Rd. (demolished)*

26. Southwestern view of parcel 062A-58 (note barn in background).

**EXHIBIT 3**

**Letter from Wilbur Smith & Associates, ITA Consultant, to
Kentucky State Historic Preservation Officer**

# WILBUR
# SMITH
# ASSOCIATES
### ENGINEERS • PLANNERS

465 EAST HIGH STREET • SUITE 100 • LEXINGTON, KY 40507-1938 • (606) 254-5759 • FAX (606) 254-5764

March 2, 2000

Mr. David Morgan
State Historic Preservation Officer
Kentucky Heritage Council
500 Washington St
Frankfort, KY 40622

Re: Cultural Resources in or near the proposed Airpark

Dear Mr. Morgan:

Thank you for meeting with Dr. Fenton and I to discuss cultural resource concerns involving the proposed airpark in Warren County, Kentucky.

In our discussion, you noted that some Nation Register properties near the proposed undertaking may require NR evaluation under criteria other than the one for which they were recommended as eligible buildings. I would appreciate any information you or your staff can provide, such as copies of example studies, that address this concern, and which we could potentially use as a model for any base studies we or our sub-consultants may conduct under Section 106 legislation.

You mentioned that an agricultural context may be an important historic theme under which some buildings may require re-documentation. An example of such a contextual study would be most helpful in assisting us to prepare planning documents that enable our client to avoid adverse impacts to our historic heritage.

Sincerely,
Wilbur Smith Associates

Marc Williams
Senior Transportation Engineer

cc: file

ACCRA, GHANA • ALBANY, NY • ANAHEIM, CA • ATLANTA, GA • BALTIMORE, MD • BANGKOK, THAILAND • CARACAS, VENEZUELA • CHARLESTON, SC • CHICAGO, IL
CLEVELAND, OH • COLUMBIA, SC • COLUMBUS, OH • FALLS CHURCH, VA • HONOLULU, HI • HONG KONG • HOUSTON, TX • ISLIN, NJ • KUWAIT • KNOXVILLE, TN
LEXINGTON, KY • LONDON, ENGLAND • MILWAUKEE, WI • NEW HAVEN, CT • ORLANDO, FL • OVERLAND PARK, KS • PHILADELPHIA, PA • PITTSBURGH, PA • RALEIGH
RICHMOND, VA • SALT LAKE CITY, UTAH • SAN FRANCISCO, CA • SAN JOSE, CA • TALLAHASSEE, FL • TAMPA, FL • TORONTO, CANADA • WASHINGTON

**EMPLOYEE-OWNED COMPANY**

**EXHIBIT 4**

**National Trust for Historic Preservation letter on ITA
"Anticipatory Demolition"**



**NATIONAL TRUST**
*for* HISTORIC PRESERVATION

August 20, 2004

Dave Harmon
Division of Environmental Analysis
Kentucky Transportation Cabinet
200 Mero Street
Frankfort, KY 40622

Re:    I-65 to US 31W Connector, Warren County, KY
       KYTC Item No. 3-16

Dear Mr. Harmon:

Thank you for including the National Trust for Historic Preservation in the consulting parties meeting held June 17, 2004 in Bowling Green. Although weather delays prevented me from flying to attend the meeting in person, I especially appreciate the efforts of the Kentucky Transportation Cabinet to make it possible for me to participate by phone.

The purpose of this letter is to reiterate in writing some of the concerns that were expressed during the consultation meeting, in response to your request for additional comments during this initial phase of the review process under Section 106 of the National Historic Preservation Act.

**The Proposed Area of Potential Effects (APE) is Insufficient to Encompass the Full Range of Effects From the Project.**

The proposed Area of Potential Effects was limited to areas where the transportation infrastructure directly funded by this project will be visible. Assuming that the proposed APE does accurately reflect the scope of the project's direct visual effects, however, it would not be sufficient to take into account other types of potential effects, such as noise, traffic, and especially cumulative effects. Further, the Section 106 regulations explicitly require that the APE must include "indirect" effects. 36 C.F.R. § 800.16(d).

We also disagree with the proposal to limit the APE for archaeological effects to the footprint of the federally funded transportation infrastructure. The Karst topography of this area is permeated with cultural resources, including a potential for prehistoric human remains. It is beyond "reasonably foreseeable" that indirect and cumulative effects will threaten to harm those resources – they already have. The ongoing and foreseeable future development of the Kentucky Trimodal Transpark must be included within the APE for archaeological effects.

*Protecting the Irreplaceable*



1785 MASSACHUSETTS AVENUE, NW • WASHINGTON, DC 20036
202.588.6000 • FAX: 202.588.6038 • TTY: 202.588.6200 • WWW.NATIONALTRUST.ORG

Dave Harmon
August 20, 2004
Page 2

## Cumulative Effects Must be Included Within the Scope of the Section 106 Duty to "Avoid, Minimize, or Mitigate" Harm.

We were troubled by an apparent assumption, reflected in several comments by project officials at the meeting, that cumulative effects are only relevant to the NEPA analysis, and therefore, do not "require" mitigation. That misperception needs to be corrected. In fact, cumulative effects are an integral element of the Section 106 review, since they are explicitly included within the criteria of adverse effect. 36 C.F.R. § 800.5(a)(1). While we recognize that NEPA does not actually "require" mitigation, Section 106 is different. Consultation and dialogue is the approach under Section 106, which is very different from the more detached "disclose-comment-response" approach under NEPA. The fundamental goal of the Section 106 consultation process is "to develop and evaluate alternatives or modifications to the undertaking that could *avoid, minimize, or mitigate adverse effects* on historic properties." *Id.* § 800.6(a) (emphasis added). Accomplishing this goal successfully calls for collaboration, creativity, consensus-building, and ultimately, a commitment to changing the project in some way. And the mandate of Section 106 applies to cumulative effects just as it does to other types of adverse effects.

## Additional Historic Properties Need to be Evaluated.

We have reviewed the comment letter submitted by Lena L. Sweeten on July 16, 2004, which includes a great deal of valuable information about additional historic properties that need to be evaluated for their National Register eligibility. These include a variety of resource types, such as cultural landscapes, African-American cultural resources, and historic transportation corridors (the L&N Railroad corridor, a state-designated scenic byway, US 31W, and US 68/80). We support these comments and encourage you to move forward expeditiously on the process of identifying and evaluating these historic properties.

## Federal Funding for This Project Should be Denied Based on Anticipatory Demolition.

As you know, there is tremendous concern among the consulting parties that construction work has already begun on the Kentucky Trimodal Transpark, which is the primary development that will be served by this transportation project. This construction work, being carried out by or on behalf of the Intermodal Transportation Authority (ITA), is already resulting in adverse effects to historic properties. The relationship between the Transpark and the road project is long-standing, integral, and closely coordinated, both in terms of the planning process and the projects' purpose and need.

In our view, the ITA's construction work violates Section 110(k) of the NHPA, 16 U.S.C. § 470h-2(k), which prohibits federal assistance to projects that involve "anticipatory demolition." Section 110(k) bans federal funding to applicants who either intentionally harm historic properties in order to avoid Section 106 review, or allow a third party to harm historic properties

Dave Harmon
August 20, 2004
Page 3

when the applicant has the "legal power to prevent" the demolition.  16 U.S.C. § 470h-2(k) and 36 C.F.R. § 800.9(c)(1).

In this case, the Kentucky Transportation Cabinet is the applicant for federal funds. Unless the Transportation Cabinet takes aggressive action to stop the ITA's construction of the Trimodal Transpark, which it has the power to do, the Transportation Cabinet and the ITA both run the risk that the FHWA will deny federal funding for the project.  Indeed, the National Trust takes the position that the FHWA *should* deny the funding, in order to assure compliance with Section 110(k).

In the meantime, the ITA proceeds at its peril – and the Transportation Cabinet will imperil its own federal funding for this project by allowing that work to proceed.

We appreciate the opportunity to comment, and we look forward to continuing our consultation as this project goes forward.

Sincerely,

*Elizabeth Merritt*

Elizabeth S. Merritt
Deputy General Counsel

cc: Jose Sepulveda, FHWA, Kentucky Division Administrator
Evan Wisniewski, FHWA, Kentucky Division
Bob Farley, FHWA, Kentucky Division
James C. Thomason, FHWA, Assistant Chief Counsel, Region 4, Atlanta
Heinz Mueller, EPA, Office of Environmental Accountability, Atlanta
LaVerne Reid, FAA, Memphis
Don Klima, ACHP
David Morgan, Kentucky SHPO
Craig Potts, Kentucky Heritage Council
Tom FitzGerald, Kentucky Resources Council
Leslie Barras, Sierra Club
Lena L. Sweeten
Mary Ruffin Hanbury, Southern Regional Office, NTHP

**EXHIBIT 5**

Smithsonian Institution's 2001 Letter to ITA

# Smithsonian Institution
## *National Museum of Natural History*

Department of Anthropology

Mr. Dan Cherry, President
Intermodal Transportation Authority
2325 Airway Ct.
P.O. Box 2001
Bowling Green, Kentucky 42101-6001

Dear Mr. Cherry:

As a past-President of the Society for American Archaeology, and someone who has done considerable research on the long history of human occupation of the eastern United States, I am writing to express my concern regarding the potential impact that the proposed Transpark development could have on significant cultural resources of the direct impact zone, as well as on adjacent areas.

The cave and karst sinkhole landscape of the region has yielded, over the years, a remarkably well-preserved record of ancient human societies, including some of the earliest evidence yet discovered of the independent domestication of local seed plants in the eastern woodlands of North America. There are of course, a range of well established procedures for ensuring the adequate assessment of cultural resources in the area, and for identifying appropriate mitigation efforts. It will be important to assemble a research team well qualified to search out, identify, and assess the significance of the often elusive karst and cave cultural deposits, to helpfully minimize the extent to which Transpark will damage the rich and unique cultural heritage of the region.

Thank you for considering my expressed concerns.

Sincerely,

Bruce D. Smith
Director, Archaeobiology Program

SMITHSONIAN INSTITUTION
National Museum of Natural History
10th & Constitution Avenue NW
Washington DC 20560-0112

EXHIBIT 6

Excerpt, Jan. 2004 Archaeological Report for Internal Road
and Kentucky State Historic Preservation Officer Response



Commerce Cabinet

# KENTUCKY HERITAGE COUNCIL
The State Historic Preservation Office

**Ernie Fletcher**
Governor
**W. James Host**
Cabinet Secretary

David L. Morgan
Executive Director and
SHPO

March 22, 2004

Mr. David Waldner, P.E. Director
Division of Environmental Analysis
Kentucky Transportation Cabinet
125 Holmes Street
Frankfort, KY 40601

**Re:    A Phase I Archaeological Survey for the Industrial Park Access Road, Warren County, Kentucky**

Dear Mr. Waldner:

We have completed our review of the above referenced cultural resource assessment report authored by Casey Barrier and Dr. Tanya Peres, Program for Archaeological Research, University of Kentucky. No archaeological sites were found during the survey, and no further work is recommended by the authors. While we agree with this recommendation with respect to the area surveyed, we do have questions as to the purpose of the Industrial Park Access Road, its Area of Potential Effect (APE), and how it is related to both the proposed Kentucky TriModal Transpark and the planned new exit off Interstate 65 to accommodate the Transpark.

The issue of the APE continues to be of concern in our review of the Transpark project, and I suggest that the Federal Highway Administration initiate consultation with the SHPO and other consulting parties to determine and document the APE as provided in 36 CFR Part 800.4(a). We are aware of the strong public interest in the proposed Transpark, and the fact that dozens of consulting party requests have been submitted to FHWA. I am available to meet with you and representatives of the FHWA at your convenience, and look forward to resolving this question.

Sincerely,

David L. Morgan
Executive Director and
State Historic Preservation Office

300 Washington Street
Frankfort, Kentucky 40601
An equal opportunity employer M/F/D

**EDUCATION PAYS**

Telephone (502) 564-7005
FAX (502) 564-5820
Printed on recycled paper

# A PHASE I ARCHAEOLOGICAL SURVEY FOR THE INDUSTRIAL PARK ACCESS ROAD, WARREN COUNTY, KENTUCKY (ITEM NO. 3-16.00) (UK-PAR PROJECT NO. 04-01)

**Authors:**
Casey R. Barrier
Dr. Tanya M. Peres, *Project Director*

**Report Submitted to:**
Division of Environmental Analysis
Kentucky Transportation Cabinet
125 Holmes Street
Frankfort, Kentucky 40622
Phone: (502) 564-7250
Fax: (502) 564-5655
Contact: David M. Waldner, P.E., Director

**Report Submitted by:**
Program for Archaeological Research
Department of Anthropology
University of Kentucky
1020A Export Street
Lexington, Kentucky 40506-9854
Phone: (859) 257-1944
Fax: (859) 323-1968
www.uky.edu/as/anthropology/par

**Technical Report No. 515**

Dr. Tanya M. Peres, RPA
*Principal Investigator*

**Lead Agency:** Federal Highway Administration

January 14, 2004

# ABSTRACT/MANAGEMENT SUMMARY

At the request of the Kentucky Transportation Cabinet (KYTC), staff of the University of Kentucky's Program for Archaeological Research (UK-PAR) conducted a Phase I archaeological survey for the proposed Industrial Park Access Road Project in Warren County, Kentucky. The purpose of this Phase I survey was to identify any archaeological resources within the project area and assess their **potential** eligibility for nomination to the National Register of Historic Places (NRHP).

UK-PAR archaeologists performed pedestrian reconnaissance, systematic shovel testing at 20 m intervals, and auger testing within the project area to identify any cultural materials. A total of 168 shovel tests and three auger tests were excavated within the project right of way (ROW). The project runs north from KY 68-80 and connects with US 31-W. The project area consists of one access road, measuring 4,700 ft. long by 100 ft. wide. The project area lies within a karstic terrain filled with small sinkholes. Only one sinkhole, however, is located within the project ROW, and this area was tested with three auger tests. During the UK-PAR field investigations, one isolated find, a non-diagnostic prehistoric lithic flake, was identified. A total of seven shovel tests were excavated in the vicinity of the isolated find, however, no further cultural materials were recovered. Consultation with the Office of State Archaeology (OSA) resulted in the isolated find not receiving an archaeological site number.

During the Phase I survey, no new archaeological sites were identified, however one isolated find was identified during pedestrian reconnaissance. This location did not receive an archaeological site number after consultation with the OSA, and is considered not eligible for nomination to the NRHP under Criteria A-D. Thus, no further archaeological work is recommended for the project area.