EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

KARST ENVIRONMENTAL EDUCATION )
AND PROTECTION, INC., )
WARREN COUNTY CITIZENS FOR )
MANAGED GROWTH, GAYLA CISSELL, )
JIM DUFFER and ROGER BRUCKER )
)
Plaintiffs )    No. 1:05-cv-01190-RMU
)
v. )
)
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, )
U.S. HOUSING AND URBAN )
DEVELOPMENT, )
and TENNESSEE VALLEY AUTHORITY )
)
Defendants. )

* * * * * * * * * *

## SECOND DECLARATION OF DR. MICHAEL T. MAY

I, Dr. Michael T. May, make the following declaration
based on personal knowledge, information, and belief:

### 1. Qualifications.

a) I have three degrees in geology with the third being a
terminal degree of the Doctor of Philosophy and I am a
tenured, Associate Professor of Geology in the Department
of Geography and Geology at Western Kentucky University
(WKU), located in Bowling Green, Kentucky. Although as a
professor I am exempt from professional registration, I
became registered because of my consulting and public
practice of geology beyond my duties at WKU.

b) I am a registered professional geologist in the
Commonwealth of Kentucky (KY- 2343) via the National
Association of State Boards of Geology (ASBOG) exam and a
licensed professional geologist in the state of Indiana
(license no. 1654).

1

c) I am an active member in Karst Education & Environmental
Protection, Inc. (KarstEEP).

d) I have been involved with the Kentucky Society of
Professional Geologists (KSPG) since 1996, the year I
accepted a tenure-track academic position at WKU.
Presently, I am President-elect of the KSPG and will take
over as President of the organization in 2006.

e) I have studied the karst terrain of Kentucky since
coming to WKU in 1996, as an example, I published results
in the peer-reviewed journal *Environmental Geosciences* were
I chronicled karst groundwater pollution at a Kentucky
military installation that was one of the many sites
undergoing the Base Realignment and Closure process.  I
have also been active leading or co-leading field trips in
karst, including one scheduled for October 2005 for the
National Meeting of the American Institute of Professional
Geologists (AIPG) to the Mammoth Cave region.

f) In 2004, I was awarded the Ogden College of Science and
Engineering's Public Service Award at WKU.  The vast
majority of my public service entailed educating school
groups on karst (through KarstEEP) and other environmental
issues, attending and participating in planning and zoning
hearings on the transpark, as well as volunteering for
being on the City of Bowling Green's Storm Water Advisory
Committee. My testimony before the Warren County Planning
Commission on several occasions mostly from 2002 to 2003
was in regard to my concern over the concerted effort on
the part of the proponents of the Kentucky Trimodal
Transpark to address issues pertinent to the National
Environmental Policy Act, in particular, those of an
environmental nature dealing with geology and hydrogeology.
I was a key member of the storm water committee (2002-2003)
and presented a lecture on karst issues as a way of
educating the city's committee on what they would have to
deal with to be in compliance. The storm water committee
was established in response to EPA's Storm Water Final Rule
Phase II program and the listing of Bowling Green, KY in
the Federal Register as a community in need of being in
compliance with the Clean Water Act.

g) I am an expert in sedimentary geology including the
detailed study of limestones, their origin, associated
secondary mineralization, their dissolution or
karstification, and their diagenesis (chemical, volumetric

2

and mineralogical changes). Limestone underlies the whole
site in question.

h) Prior to my academic career I was employed by a company
who was a prime contractor for EPA Region VII in Kansas
City, Kansas. My main duties included evaluating and
scoring sites for potential National Priority List (NPL)
status, as well as conducting third-party oversight of
groundwater monitoring and remedial operations for various
environmental sites including military installations,
industrial sites and mining and smelting sites in several
states. One of the largest sites I was a project manger on
was the Galena, Kansas former mining and smelting site
(subsite or part of the Cherokee County Superfund site),
located on karst terrain in southeast Kansas.

i) I am an expert in subsurface correlation of sedimentary
rocks, core description and in general, an expert in
geologically characterizing sites. My expertise in
subsurface geologic characterization was gained via not
only through my two graduate school experiences (University
of Kansas and Indiana University – both areas underlain by
limestone and the latter in a karst area as well) but also
through intensive industry training through my employment
at Exxon U.S.A., Inc. in Midland, Texas from 1985 to the
end of 1988 and through employment with Shell Western
Exploration & Production, Inc. (Shell Oil) in Houston,
Texas from 1992-1993. Many of these courses and the day-to-
day work projects dealt with geophysical methods for
characterizing subsurface conditions such as thickness and
continuity factors in rock strata, as well as rock porosity
and permeability and fluid flow dynamics.

j) Since the late 1990s, I have co-taught a week-long short
course on environmental regulations for the University of
North Carolina once or twice a year for persons employed in
governmental, industrial, defense and private sectors
including the U.S. State Department, USEPA, Dow Chemical,
U.S. Navy, ship builders, power companies, transmission
companies, etc. This course focuses on CERCLA, RCRA, NEPA,
CWA, CAA and similar issues.

k) I have authored a number of technical reports for
clients as a private consultant and working for a company
hired as a prime contractor for the USEPA. I have recently
been retained for litigation support and as an expert
witness in cases involving sedimentary geology and

3

groundwater flow. In two of these cases, the first bedrock
encountered on the sites in question is limestone
exhibiting karst features.

I am providing this declaration as a volunteer without
compensation. I have read the Second Declaration of
Nicholas Crawford, PH.D., P.G., dated August 18, 2005, and
the declaration of Mr. Allen Heidel, ITA Operations
Manager, dated August 23, 2005.

## 2. Environmental Harm from Transpark Construction.

Dr. Crawford states that, "It is my opinion (sic)
there has been no measurable negative impact on Graham
Springs during the construction of Bowling Green
Metalforming, LLC at the Transpark." Dr. Crawford (para.
7.-8.) and that "To my knowledge there has not been a
significant amount of clay and silt that has washed into
sinkholes during construction at the Transpark site."

There is no evidence to my knowledge that there has
been established by Dr. Crawford (para. 8) or others under
his direction any pre-construction, or post-construction
monitoring of clay and silt suspended sedimentation rates
or quantities in either the karst swallets or sinkholes on
the TVA-funded Bowling Green Metalforming site, in caves
discovered on the subject site (some by accident and others
certainly not by geophysics), or downstream at the rise of
the Grahams Springs karst groundwater basin at the
confluence with the Barren River.

As I indicated in my initial Declaration, in my
professional opinion, there has already been a negative
impact on the Graham Springs karst groundwater basin which
drains under the industrial complex already constructed for
TVA-funded Bowling Green Metalforming. Most of this damage
would be in the form of mobilization of fine-grained
materials of clay and silt size into the subsurface karst
conduits. Mobilization of fines is known to have negative
impacts on fauna in both karst and surface waters. During
construction at the site, I witnessed that silt fences had
done little to protect the watershed, as numerous sinkholes
and solution-enlarged fractures were illegally plugged with
multiple loads of trucked in rip-rap limestone blocks and
then back filled with mostly clayey soil on the site. Many
fine-grained materials obviously went into the subsurface.

4

Surface modification of the karst drainage network has already resulted in changes to the subsurface flow network. This was particularly evident during construction of the Metalforming site where I have seen aerial photos of holes opening up due to regolith (soil arch) collapse into karst systems that obviously had undergone a changed flow capacity due to surface modification (see Exhibit 1).

I was informed by a KarstEEP member that observations made during flyovers of that area during construction proved that abundant suspended load is issuing from the rise/spring that certainly drains the subject site. I have seen a photo of the Graham Springs karst groundwater basin discharge point into the Barren River taken on May 17,2004 (included in Exhibit 1), during construction of the Bowling Green Metalforming facility that clearly shows damaging suspended load impacts not only to the karst system issuing out of the ground but to the surface water as well. Again, the impact or potential impact due to suspended-load sedimentation on water quality, endangered mussels, and similar biota in the downstream area has been ignored. To my knowledge there has been no quantification or even screening of suspended load sediments by Dr. Crawford or anyone on behalf of Intervener ITA. The "monitoring" that Dr. Crawford refers to is apparently just a visual check by a Bowling Green employee of the presence and physical condition of the silt fences.

Dr. Crawford (para. 7) also states "The water quality monitoring that the CCKS has performed at Graham Springs during construction does not indicate a measurable negative impact." However, he does not provide any evidence of hard monitoring data, even as an exhibit. This absence of submitted data calls into question the scope and quality of the data, if indeed collected, e.g., what water quality parameters were measured? Were they chemical, biological, or sedimentological in nature?   Also, he does not define "measurable."  For example, if filter-feeding endangered or threatened species in the Barren River adjacent to the Graham Springs karst groundwater basin rise (photo) have taken in excessive suspended sediment loads during construction of the Bowling Green Metalforming site, there would be a "negative impact," but not "measurable" if one is only measuring non-biological impacts rather than biological impacts.

I also believe the there will be future negative
impacts to the Graham Springs karst groundwater basin. For
example, where storm water retention ponds have been
constructed, numerous sinks have been plugged and these
will surely open up in the future and could potentially
decrease water quality and perhaps even flood dry cave
passages that harbor rich archaeological remains as well as
ecological resources including many threatened and
endangered species. To the best of my knowledge, there has
been little or no discussion on the part of the proponents
about the types of chemicals, fluids, solids, etc. that
holding basins or tanks at the Bowling Green Metalforming
site (a manufacturer of sports utility vehicle frames) or
other sites that may become part of the Transpark. In
particular, I am concerned about both sinking contaminants
- Dense Nonaqueous Phase Liquids (DNAPLs) as well as
floating contaminants - Light Nonaqueous Phase Liquids
(LNAPLs). There have not been any models that I am aware
of where proponents hydrologists have modeled the behavior
of these in the Graham Springs karst groundwater basin
should a release occur. I am not aware of any Bowling
Green-Warren County Planning and Zoning Commission hearings
on rezoning of the Transpark during which I testified and
heard Intervener ITA and its consultants testify where this
issue was addressed by the ITA. I presented a conceptual
model of some of these DNAPL concerns under oath and this
is part of the rezoning record, but the ITA did not want to
engage in any discussion on the matter.

This is all the more reason to look at a total
potential impact for chemicals of concern to be released
from various proposed industrial process sites. This would
go far beyond mere consideration of stormwater run off,
which in my opinion, is the only groundwater contamination
issue the Intervener ITA and its consultants, including Dr.
Crawford, have explicitly directed resources toward from
the inception of this proposed project. Minimally, there
should be a review of Material Safety Data Sheets (MSDSs)
for chemicals and materials proposed to be used at the
Bowling Green Metalforming site.

Before there is modification of additional hundreds of
acres in the Grahams Springs karst groundwater basin, the
watershed should be investigated adequately. Likewise,
there should be a complete analysis of the four pathways of
potential concern - air, groundwater, surface water (to
which karst waters discharge such as the Barren River), and

6

soil/rock. This has not been completed heretofore in detail relative to what should be conducted for a project of this proposed size of 4,000 plus acres.

Again, full documentation of the hydrogeologic conditions both on the subject site and downstream are needed, and this can only be afforded via an EIS. I also disagree with the categorical statement that soil erosion from agricultural practices on farmland in the area will necessarily be much worse than an industrial site. There are many farmers being taught about Best Management Practices (BMPs) and they are using them in the area, this includes practices such as no-till and installing and managing grass buffer strips around sinkholes and swallets. Without baseline studies of suspended load sediments traveling through the karst system, statement's such as Crawford's "...construction at the Transpark site would be almost insignificant and probably less than when the land was used for row crop agriculture." has little merit.

### 3. Potential for Contamination of Mammoth Cave National Park by Spillover or Reverse Flow from the Barren River and Graham Springs Basin.

Dr. Crawford states that "...groundwater from (the Transpark site) flows to Graham Springs on the nearby Barren River and that no imaginable flood event could result in water from the site flowing over its headland drainage divide and into Mammoth Cave National Park...More research has been performed and more is known about the Graham Springs and Turnhole Spring (Mammoth Cave) groundwater basins and how they respond to storm events than any other large karst groundwater basin in the world."

I have read the official report of the Mammoth Cave National Park Hydrologist, in response to the Center for Cave and Karst Studies (TTA's consultant, led by Dr. Nick Crawford. The Park's Chief Hydrologist concludes that "**At this time, the existing data are too limited in scope and accuracy to conclude that a flow reversal or spillover does not exist...We believe that the possibility for a spillover or flow reversal (does exist)** (emphasis added)." The failure to secure more comprehensive data in an Environmental Impact Statement (EIS) is the crux of this action.

7

I have also read Mr. Allen Heidel's declaration (ITA Operations Manager) and his reference to early studies conducted on behalf of ITA such as those conducted by Wilbur Smith Engineers and the LawGibb Group.  These studies are troubling considering that it is apparent that the geologic and hydrogeologic conditions at the site were misunderstood from the beginning and that proposals were made to rectify a "potential karst problem" associated with Quinlan and Ray's (1981) groundwater flow map.  These consultants even made a "buffer of caves" zone for the proposed airport runway alternative plans following inferred, karst dye-trace trajectories not actual caves.

To the best of my knowledge, according to Dr. Crawford's second declaration his work at this site (para. 2) has "dealt with groundwater flow and methods for preventing groundwater contamination…." This is not geology, it is hydrology, and if it is hydrogeology, his emphasis in my opinion has been on hydro not geology.  In short, it is my opinion that he has not sufficiently characterized any of the subject area geologically by drilling, correlating subsurface well logs, porosity or permeability trends in the limestone, or other pre-existing data, nor has he acquired any new geologic data.  This lack of detailed geologic characterization I believe reflects the need for a full-blown EIS, especially considering the projected size of this industrial site.

In my professional opinion, there has not been adequate assessment of geologic characterization at the Kentucky Trimodal Transpark, including the "Phase I" industrial park, which includes the Bowling Green Metalforming facility, partially funded by the Tennessee Valley Authority, nor has there been sufficient collection of data and evaluation by qualified professionals to address the issue of whether there is hydrogeologic communication and under what events between the Graham Springs Karst Groundwater Basin and Turnhole Springs, the headwaters of Mammoth Cave National Park, such that the Park's karst and surface water system could be harmed by contaminants from the Transpark.

## 4.  Endangered Species Act.

Threatened and endangered species as mentioned in ITA Operations Manager Allen Heidel's declaration (para 7), which I have read, are emphasized as being only worthy of

protecting within the confines of Mammoth Cave National Park but the law is protective of these species anywhere that they are found. This suggests to me that proponents of the Transpark and their agents have not understood the Endangered Species Act or similar acts. If an EIS was conducted, there would be a proper assessment of threatened and endangered species in the subject area and environmental mitigation could occur but without an EIS, it is feared that many species will not be documented or protected.

Mr. Heidel's declaration (para. 31) states that the ITA contractor found no endangered species in the cave but there was no mentioning of any potential downstream threatened or endangered species throughout the Graham Springs Karst Basin into the Barren River. If an EIS was conducted, the downstream waters both in the subsurface and on the surface would be addressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ day of _____ 2005.

DR. MICHAEL T. MAY

9

EXHIBIT 1

AERIAL PHOTOS





5-17-04-Graham
Springs to Barren

www.stoptranspark.org



# NO TRANSPORK

**Kentucky Transpark Cosma Magna Project :**
**A Collapse of Environmental Common Sense**

In February and March, 2004, the ITA in concert with Bowling Green city officials tossed three years of claims about "environmentally friendly" development out the window. The result: lawbreaking, cave collapse, flooding, and potential contamination of groundwater. The following photos document how they have ignored the National Environmental Policy Act, their expert consultants' advice, and "binding elements" for karst conservation. The spotlight is on Bowling Green for irresponsible environmental and economic injustice. They term it "fast track" construction. KEEP calls it crime. Judge for yourself -- Roger Brucker



Aerial view looking west of KY Transpark Cosma/Magna project site covering 105 acres at the intersection of Hayes-Martin Rd. and U.S. 68-80. At the lower left are two dug out sinkholes or cave collapses marked with yellow flagging tape and showing evidence of rock filling. On the ground are three 20 foot lengths of metal drainage culvert of the kind used to line vertical injection wells to channel storm water into cave passages beneath the site. At the extreme right side of the photo half way between



top and bottom is the location of the initial large cave collapse, subsequent filling, and site contouring. Rainfall occurring during early March ponded in this area and was pumped into sinkholes and caves. Industrial buildings across Hayes-Martin Road (left to right) are in the industrial park owned by Jim Scott, lead contractor. A building permit was applied for on March 8, 2004, three weeks after construction commenced without open burning permit, sinkhole modification permit, or required water and air quality permits. City officials term this unpermitted construction "fast track". KEEP Photo (c) 2004 by Guy Briggs. (PHOTO ID #178.088 2/28/04)

Close up view of unpermitted modified sinkholes or cave collapse areas termed "muddy spots" by the contractor at the KY Transpark (Oceana/Magna site. Construction materials stockpiled for further sinkhole modifications include three lengths of 20 foot metal culvert and two rolls of membrane or geofabric to combat subgrade instability. Culverts are used in karst areas to conduct storm water runoff into sinkholes and into the caves beneath them. KEEP Photo (c) 2004 by Guy Briggs. (PHOTO ID #178.086)



Steel pile of limestone rocks removed from modified sinkholes or cave collapses at the KY Transpark Coastal/Magna site. Pile is approximately 250 ft. x 70 ft. x 6 ft. or about 4,000 cubic yards. Rounded and eroded surfaces on the rocks were produced by solution from vertically flowing water being swallowed by caves. KGEP Photo (c), 2004 by Guy Briggs. (PHOTO ID #178 096 cropped)



Aerial view looking southeast of KY Transpark Osoma/Magna project site on Hayes-Martin Road (lower right), Bowling Green, KY. Dark ground in left foreground is the site of an initial cave collapse that was subsequently filled and contoured. Ponded rainfall runoff has since been pumped from this area into other sinkholes. Immediately above and adjacent to the right are two modified sinkholes or cave collapses marked with yellow flagging tape. Six water filled sinkholes are seen in the southwest corner of the 105 acre site. Sedimentation can temporarily plug sinkholes, as those shown, but due to subgrade instability such ponds can be swallowed into caves without warning. Attempts to line sinkholes with membranes to convert them into storm water holding ponds sometimes fail due to subgrade instability or flexbed liner like. KEEP Photo (c) 2004 by Guy Sluggs. (PHOTO ID #179 06)



Aerial photo of KY Transpark Cosma/Magna site prior to construction activities. The site is located on a 105 acre tract on the east side of Bowling Green, KY. Black and white photo shows numerous sinkholes as round circles. The site straddles a line extending from Plum Spring on the Barren River, through Grant Palmore Cave, Madison Broad Landfill, Mill Cave, and Wolf Sink, Kentucky highway consultants have described this line as the main cave trunk passage draining the Graham Springs karst basin. If true, it means the unpermitted sinkhole modification debris and storm water pumping from the construction site will flow into the main underground river of the groundwater basin. USGS Photo.

**Make a contribution to KEEP for legal fees and education**

What You Can Do | Frequently Asked Questions | Letters To Lawmakers | News | Area Map | Links | Sinkholes
Contact Roger Brucker | Home

Designed & Hosted by
Unlimited Media